## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

---

**M CORP DBA 11:59,**

    **Plaintiff,**

**v.**                                                  **VERIFIED COMPLAINT**

**INFINITIVE, INC., JOSEPH BRADLEY SHERIDAN, AND DOES 1-25, INCLUSIVE**

    **Defendants.**

---

Plaintiff M Corp dba 11:59 ("11:59"), by and through its undersigned counsel, Nukk-Freeman and Cerra, P.C., files this Verified Complaint against Defendants Infinitive, Inc. ("Infinitive"), Joseph Bradley Sheridan ("Sheridan") and Does 1-25, inclusive, alleging as follows:

### <u>INTRODUCTION</u>

11:59 and Infinitive are competitors in the data consulting industry. Sheridan was 11:59's VP of Data Analytics, who left to take on a similar role at Infinitive. This lawsuit arises out of Sheridan and Infinitive's purposeful and calculated efforts to destroy a portion of 11:59's business and divert the business to Infinitive. Sheridan poisoned 11:59's partners and customers, disparaging the company with lies to ensure they would discontinue their business with 11:59 and follow him to Infinitive - while he remained an 11:59 employee. In so doing, Sheridan eviscerated the boundaries of any acceptable conduct to prepare for his new employment. Sheridan owed a duty of loyalty to 11:59, as well as duties not to leverage 11:59's confidential information or solicit 11:59's customers while he was still receiving a paycheck from 11:59.

The 1,478 text messages recovered from Sheridan's 11:59 issued Macbook laptop as well as data recovered from his Google searches, emails, browser history, and cloud service activity paint a clear picture of Sheridan's breach of his duties to 11:59 and Infinitive's aiding and abetting of Sheridan's breaches.  During Sheridan's two week notice period at 11:59, he disparaged 11:59 to key account executives for 11:59 projects, falsely claiming that 11:59 was insolvent and he was leaving for Infinitive, which he lauded as a superior company to 11:59.  Sheridan maneuvered to maintain his access to 11:59's proprietary demo code through his personal Gmail account so he could leverage it to service 11:59's clients for Infinitive, avoiding any lead time that would have been required for Sheridan to even attempt to service 11:59's work for Infinitive.   He ensured his success by taking 11:59 confidential work product on his last day of employment and retaining it in his personal Google Drive.  Sheridan confirmed to a personal contact the success of his plan to divert 11:59's business to Infinitive, texting, "On a oppty call yesterday going through Salesforce. ***Pipeline is only 7MM and 90% of its mine that are leaving to follow me***."  Sheridan confirmed to an account executive his intent to "steal" 11:59's projects for himself and Infinitive.

Infinitive knew about Sheridan's disloyal and tortious actions and condoned them.  On August 26, 2024, well before Sheridan's separation from 11:59, he texted with Infinitive's CEO, Denis McFarlane and told him about the "prospects that want to move forward and are going to wait for [him] to join Infinitive."  McFarlane directed Sheridan to set up a meeting with Infinitive's General Manager, Jeff Theobald. Regarding their meeting, Sheridan told Theobald "[b]ring something to take notes with bc I'm trying to minimize emails right now."

Although only Sheridan and Infinitive know the full extent of their actions, the evidence uncovered thus far shows Sheridan and Infinitive's actions were malicious, the two conspiring to injure 11:59.  Ignoring Sheridan's contractual and common law obligations to 11:59, Infinitive took affirmative actions to assist Sheridan in securing and moving 11:59's business over to Infinitive.

Infinitive cannot be permitted to benefit from its knowing aiding and abetting of breaches of Sheridan's obligations to 11:59.

## THE PARTIES

1.      Plaintiff 11:59 is a California based consulting firm dedicated to helping businesses transform their operations by leveraging the power of the cloud, artificial intelligence ("AI"), and other innovative technologies.  11:59 develops custom solutions in less time and at a lower cost than traditional consulting engagements.

2.      11:59 is engaged in interstate commerce, with employees and clients in multiple U.S. states, delivering products across state lines on a regular basis.

3.      Defendant Infinitive is a Delaware corporation with headquarters located in Ashburn, Virginia.  Infinitive is a data and AI consulting firm.

4.      Defendant Sheridan is an individual who resides in Ashburn, Virginia.  Sheridan commenced his employment with 11:59 in March 2023.  Until his separation on September 6, 2024, Sheridan's title was Vice President, Data Analytics.  11:59 learned shortly after Sheridan's separation that he accepted employment at Infinitive, a direct competitor of 11:59.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's claims arising under the laws of the United States that they form part of the same case or controversy. The Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter is between citizens of different states and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in the Eastern District of Virginia, pursuant to 28 U.S.C. § 1391(b) because Defendants are residents of Virginia within the jurisdiction of the Alexandria Division.

7.     The Court has personal jurisdiction over Infinitive because Infinitive does business in Virginia and has sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because Infinitive committed acts complained of in this Verified Complaint, purposely causing injury to 11:59.

8.     This Court has personal jurisdiction over Sheridan because he is a resident of the Commonwealth of Virginia and further has specific personal jurisdiction over Sheridan because he committed acts complained of in this Verified Complaint, in whole or in part, in the Commonwealth of Virginia, and purposely caused injury to 11:59.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

**A.  11:59's Business**

9.     11:59 and Infinitive are direct competitors in the data/AI consulting industry, an industry which is comprised of a relatively limited number of providers.

10.     11:59 is a premier data/AI consulting provider, working with clients to get the most out of their data, optimize processes and outcomes, using an approach that tailors solutions to each customer's unique needs. 11:59 offers custom solutions in projects involving data management, cyber security, Lakehouse implementation and management, reporting, data catalogue management, AI genies, and DBRX Instruct solutions (such as creating a web front-end for a RAG chatbot).

11.     11:59 works with strategic partners, such as Databricks and Amazon Web Services ("AWS"), to deliver its custom data solutions to clients.

12.     The sales cycle for 11:59's customers is typically 3-6 months, depending on the complexity of the project, but can be as long as 12-18 months.  Due to the technical nature of the work it does, 11:59 has made a significant investment, both in terms of personnel and financial

investment, into bringing projects to contract.  This investment often comes in the form of providing demos and showing potential customers proofs of concept.

13.     Given the competitive nature of the data/AI consulting industry, 11:59 has invested a significant amount of time, money, and resources developing and nurturing its client base, developing demonstrations and proofs of concept to respond to the identified needs and preferences of its clients and potential clients.  The information amassed through 11:59's efforts has been compiled over years at significant expense. Through its investment and efforts, 11:59 has amassed substantial trade secrets and proprietary information, including but not limited to custom coding, its customers' needs and preferences, and pricing and contract terms.  Such information is not known to the industry or outside of 11:59 and provides 11:59 with a competitive advantage.

**B. Sheridan's Employment Background**

14.     In or about 2020, Sheridan worked for Infinitive in roles as Director of Data Engineering, Deputy Technology Practice Lead, and Market Technology Lead.  In these roles, he was responsible for the healthcare and education/non-profit market segments.

15.     In March of 2023, Sheridan left Infinitive and joined 11:59.  On or about March 9, 2023, 11:59 offered Sheridan a position as Vice President of Data Analytics.  Sheridan accepted the role by executing the Offer of Employment ("Offer Letter") on March 10, 2023.  Sheridan's start date was scheduled for March 27, 2023.  He earned a significant base salary and was eligible for a discretionary bonus if he achieved certain goals and milestones.  A true and correct copy of the "Offer Letter" is attached hereto as **Exhibit A.**

16.     As VP of Data Analytics, Sheridan was responsible for driving the growth and success of 11:59's data consulting practice.  His position involved managing and maintaining client relationships, leading and overseeing complex data projects, overseeing a team who develops

11:59's custom data solutions, and included business development responsibilities.  Sheridan reported to 11:59's Chief Technology Officer.

17.    Sheridan's Offer Letter contained a prohibition on Sheridan engaging in conflicting employment and a Non-Solicitation of Employees.

18.    Specifically, the "Conflicting Employment" provision of the Offer Letter provides:

> Executive is not automatically prohibited from having a second job or outside business interests. However, while Executive is employed by M Corp, he is expected to devote his professional energies to M Corp and shall not engage without disclosure to and written approval from M Corp. Executive is prohibited from engaging in any other employment, occupation, consulting or other business activity that creates a conflict of interest with M Corp. M Corp assumes no responsibility for secondary employment or an outside business interest and shall not provide workers' compensation coverage or any other benefit for injuries occurring from it.

19.    The Offer Letter's "Non-Solicitation of Employees" provision states:

> While Executive is employed by M Corp, and for a period of twelve (12) months immediately following the termination of his employment with M Corp for any reason, whether with or without cause, he shall not solicit, induce, recruit or encourage any of M Corp's employees to terminate their relationship with M Corp.

20.    In addition to the Offer Letter, Sheridan was under other obligations to 11:59 under his Confidentiality and Non-Disclosure Agreement ("NDA") regarding his use and treatment of 11:59's confidential and trade secret information.  Sheridan executed the NDA on March 17, 2023. A true and correct copy of the Confidentiality and Non-Disclosure Agreement ("NDA") is attached hereto as **Exhibit B.**

21.    "Confidential Information" in the NDA is defined to include:

> information or material that is commercially valuable to M Corp and not generally known or readily ascertainable in the industry. This includes, but is not limited to:
>
> (a) technical information concerning M Corp's products and services, including product knowhow, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda

and correspondence;

(b) information concerning M Corp's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, strategic plans for the capture of new business, technical and business approaches for improving target and existing client systems, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c) information concerning M Corp's employees and consultants, including salaries, strengths, weaknesses and skills;

(d) information submitted by M Corp's customers, suppliers, employees, consultants or coventure partners with M Corp for study, evaluation or use; and

(e) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect M Corp's business.

22.    The NDA requires Sheridan to keep 11:59's Confidential Information "in the strictest confidence."  It prohibits the disclosure of 11:59's Confidential Information to anyone outside of 11:59 without the company's prior written consent.  The NDA also prohibits the use of 11:59's Confidential Information for Sheridan's own purposes or for the benefit of anyone other than 11:59.

23.    Under the "Return of Materials" provision, Sheridan's NDA requires that he promptly deliver to 11:59 "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information."  The NDA further obligates Sheridan to return all of 11:59's equipment, files, software, programs and other personal property" belonging to the company.

24.    Sheridan's NDA obligations survived after his employment with 11:59 ended and remain as long as the Confidential Information remains confidential (*i.e.*, unknown to the public.)

25.    Under the NDA, if Sheridan misappropriated any of 11:59's Confidential Information, he acknowledged this would cause the company irreparable harm such that he agreed 11:59 may apply to a court of competent jurisdiction for an injunction against further misappropriation and for

any other relief the company and court deems necessary. This is in addition to any other remedies available.

26.    For any disputes arising out of the NDA, the prevailing party has the right to collect its attorneys' fees, costs, and other necessary expenditures from the other party.

27.    Under 11:59's Employee Handbook, which Sheridan reviewed and acknowledged, Sheridan was subject to additional obligations to the company, including:

a) **Ethics Code**: 11:59's managers and team members are expected to adhere to high standards of business and personal integrity as a representation of 11:59's business practices, at all times consistent with their duty of loyalty to the Corporation.

b) **Outside Employment:** Outside employment that creates a conflict of interest or that affects the quality or value of your work performance or availability at 11:59 is prohibited.

c) **Computer Security and Copying of Software:** Software programs purchased and provided by 11:59 are to be used only for creating, researching, and processing materials for Corporation use. By using Corporation hardware, software, and networking systems you assume personal responsibility for their use and agree to comply with this policy and other applicable Corporation policies, as well as city, state, and federal laws and regulations.

d) **Use of Company Technology**: Corporation IT resources and communications systems are to be used for business purposes only unless otherwise permitted under applicable law.

All content maintained in Corporation IT resources and communications systems are the property of the Corporation. Therefore, team members should have no expectation of privacy in any message, file, data, document, facsimile, telephone conversation, social media post, conversation, or any other kind or form of information or communication transmitted to, received, or printed from, or stored or recorded on Corporation electronic information and communications systems. The Corporation reserves the right to monitor, intercept, and/or review all data transmitted, received, or downloaded over Corporation IT resources and communications systems in accordance with applicable law. Any individual who is given access to the system is hereby given notice that the Corporation will exercise this right periodically, without prior notice and without prior consent. The interests of the Corporation in

monitoring and intercepting data include, but are not limited to: protection of Corporation trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.); managing the use of the computer system; and/or assisting team members in the management of electronic data during periods of absence.

e) **Confidentiality and Nondisclosure of Trade Secrets:** As a condition of employment, 11:59 team members are required to protect the confidentiality of Corporation trade secrets, proprietary information, and confidential commercially sensitive information (i.e., financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Corporation. Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released without prior authorization from management. If you have information that leads you to suspect that team members are sharing such information in violation of this policy and/or competitors are obtaining such information, you are required to inform your Manager and/or People Operations or Human Resources.

f) **Return of Property**: Return all Corporation[1] property at the time of separation, including computer equipment.

True and correct copies of 11:59's Employee Handbooks and Defendant Sheridan's acknowledgement of and training related to same are attached hereto as **Exhibit C**.

28.     11:59's Employee Handbook further prohibits employees from being under the influence of illegal drugs or substances during work hours or while on company business.

29.     Sheridan held a senior role at 11:59, overseeing a team of professionals responsible for writing the code and developing the framework for its custom data solutions. Sheridan was client-facing, responsible for managing a pipeline of over $7 million in business.

---

[1] Corporation refers to 11:59.

30.    In connection with his role, Sheridan was provided with access to 11:59's confidential and proprietary information, including 11:59's pipeline, forecasts, status of negotiations, clients, prospective clients, contract and pricing terms, and other critical aspects of 11:59's business.  This information is extremely valuable and allows 11:59 to serve its clients, providing 11:59 with a competitive advantage.  This valuable information can be used by competitors to entice clients away from 11:59.

31.    Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with one of its strategic partners, Databricks.  Over the course of Sheridan's employment, 11:59's pipeline of work on Databricks partner projects grew to over $7 million.  Many of the projects in 11:59's pipeline were at or near contract execution after working with 11:59 for months or more than a year in some cases.  During the course of the sales cycle, 11:59 invested upwards of $500,000, creating and providing demonstrations and proving the concepts developed would succeed in providing the clients with the desired results.

32.    Unique to these projects, Databricks also makes a financial investment into the projects, giving Databricks both a customer and a partner aspect in relation to 11:59.

33.    By early August 2024, many of the Databricks pipeline projects Sheridan was working on were at or near contract execution.  For example, as to one project Plaintiff will refer to as "Project A,[2]" 11:59 had already received a verbal commitment from the client and a Statement of Work was in near final form with an estimated engagement start date of August 19, 2024.

**C. Sheridan's Resignation From 11:59**

34.    On August 22, 2024, Sheridan provided two weeks' notice of his resignation effective September 6, 2024.  Sheridan thanked 11:59 for the professional and personal development opportunities 11:59 provided to him over the course of his employment.  He

---

[2] 11:59's clients, projects, partners, and the like have been anonymized to protect 11:59's confidential information against further misuse.

commended 11:59 for its culture and talented team members.  During his two week notice period, 11:59 believed Sheridan was transitioning his work to his team members, ensuring 11:59's customers and prospects would continue to be seamlessly serviced by 11:59.  A true and correct copy of Sheridan's August 22, 2024 resignation is attached hereto as **Exhibit D**.

35.     Unbeknownst to 11:59, Sheridan had not been working to ensure 11:59's clients would continue to be served by 11:59.  Instead, he was brazenly and deliberately targeting 11:59's partners, vendors, customers, and prospective customers, taking improper and illegal actions to move 11:59's business to his new employer, Infinitive.

36.     11:59 only learned after Sheridan's separation that he had accepted a job offer to return to Infinitive the same day he gave notice to 11:59.

37.     Shortly after Sheridan's last day of employment at 11:59, 11:59 learned that several of the projects that were being managed by Sheridan and his team were suddenly and inexplicably in jeopardy.  Databrick's engagement with Project A was scheduled to start on or about August 19, 2024.  After Sheridan's departure, Project A put the project on "hold" stating it had lost faith in 11:59.

**D. 11:59's Investigation into Sheridan's Pre-Separation Misconduct**

38.     11:59 immediately began an internal investigation and quickly learned that the client's lost faith was due to Sheridan's derogatory and false statements about 11:59 while he was still an employee of 11:59.  Upon review of Sheridan's 11:59 email account, 11:59 first discovered that on August 29, 2024, Sheridan emailed a Databricks Account Executive, informing them that he was returning to Infinitive, which he called, "a more advanced Databricks partner and part of the invite-only DPP program."  Sheridan told this partner that "a lot of negative stuff" was happening at 11:59 and he needed "to get out."  Sheridan cautioned the partner, "Where there's smoke, there's fire," telling 11:59's partner in no uncertain terms not to do business with 11:59.  A true and correct copy of the August 29, 2024 email correspondence is attached hereto as **Exhibit E**.

39.     11:59's internal investigation revealed more.  Sheridan received an email regarding "Project B"[3] on his 11:59 email on August 1, 2024, that was copied to what appeared to be Sheridan's **Infinitive** email address, brad.sheridan@infinitive.com. This email address appeared to be active while Sheridan was still employed with Infinitive.  A true and correct copy of the August 1, 2024 email correspondence is attached hereto as **Exhibit F**.[4]

40.     Sheridan had been emailing with a contact at Project B in July 2024 regarding programming issues.  On July 25, 2024, the Project B contact asked Sheridan to look at an issue they had been discussing.  Sheridan did not provide the requested response until over a month later, on August 28, 2024.  Apologizing for the long delay in responding, Sheridan told Project B that he had resigned the previous week and was busying "turning over everything."  He told Project B the "[g]ood news is that I'm going back to Infinitive." A true and correct copy of the July 25, 2024 email correspondence is attached hereto as **Exhibit G**.

41.     During his two-week notice period in August 2024, 11:59's initial investigation further revealed that Sheridan also contacted numerous 11:59 employees on the company's Team platform to inform them he had resigned and was moving to Infinitive.  In contravention of his Non-Solicitation obligations to 11:59, Sheridan disparaged the company to these employees, telling them that 11:59 was insolvent and directing them to contact him offline to discuss further.  As a Vice President and a senior member of the company, Sheridan was perceived as a reliable source of information.  Those employees Sheridan targeted would have no way of knowing that his statements were false.   Sheridan's obligation not to interfere with 11:59's relationships with its employees, directly or indirectly remains in effect until, at the earliest, September 6, 2025.

42.     Although the investigation into Sheridan and Infinitive's conduct was ongoing and

---

[3] See Footnote 2.  Project B is another 11:59 Databricks partner project that Sheridan worked on while employed by 11:59.
[4] Some Exhibits attached hereto have been redacted to remove 11:59 client names and other confidential and trade secret information.

Sheridan had not yet returned his company issued laptop *despite requests for same*, 11:59 had already uncovered evidence of Sheridan's breach of his duty of loyalty and tortious interference and Infinitive's constructive or actual knowledge of same, such that it served upon Sheridan and Infinitive cease and desist letters (the "Cease and Desist Letters") on September 12, 2024.  The Cease and Desist Letters placed Sheridan and Infinitive on notice of Sheridan's breach of his applicable agreements and company policies, requested the preservation and return of 11:59's data and property, among other demands appropriate to the evidence and facts.  True and correct copies of the September 12, 2024 "Cease and Desist Letters" to Defendants are attached hereto as **Exhibit H**.

### E.  11:59's Forensic Review of Sheridan's Company MacBook

43.     In tandem with the Cease and Desist Letters, 11:59 followed up with Sheridan regarding his failure to return of his company-issued laptop, an Apple MacBook Pro.  On the afternoon of September 13, 2024, after 11:59's repeated follow up, Sheridan initiated the return shipment of his 11:59-issued laptop.

44.     Shortly thereafter, 11:59 engaged a third-party vendor to undertake forensic imaging and review of Sheridan's 11:59-issued laptop.

45.     The forensic review revealed substantial evidence that in the weeks leading to Sheridan's separation from 11:59, instead of working to ensure that 11:59's customers experienced a seamless transition with 11:59 following his departure, he engaged in actions designed to ensure that 11:59's customers would not continue working with 11:59 and would instead move their projects to Infinitive.  The forensic review confirmed that Infinitive was aware of Sheridan's misconduct and to have sanctioned it.[5]

---

[5] See Declaration of Steve Hillary, Lead Digital Forensic Examiner at Maragell, LLC and the appendices attached thereto, filed herewith, which are incorporated by reference as if fully set forth herein.

46.     On Sheridan's company-issued MacBook, the forensic examination recovered 1,478 text messages.  Based on those text messages and a review of his Google searches, web history, cloud service access, and related forensic artifacts on the MacBook, 11:59 learned that Sheridan spent weeks (at minimum) carrying out his plan to steal 11:59's confidential data and information and client projects, as follows:

a.     On Sunday, August 18, 2024, (four days before Sheridan would give notice to 11:59) Sheridan's cellular phone number texted a contact identified as one of Sheridan's former 11:59 colleagues, confirming Sheridan would ensure 11:59 lost its Databricks related work, telling him, "I'm working hard to get out . . . I'm taking my Databricks AEs and several prospects with me."

b.     On August 20, 2024, Sheridan contacted a client contact at "Project C,"[6] requesting access to the 11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address.

c.     On August 21, 2024, Sheridan's cellular phone number texted a contact at Databricks telling her, "Going back to Infinitive, company I left for 11:59. Thomas out CEO let go last week. Ran company into ground. I'm worried about them Being insolvent, so it's time for me to leave." The contact responded, "Should we pivot away from 11:59 for [Project A]??" Sheridan advised the contact that one of his clients "already pulled the plug and is coming over." The two conspired to ensure the Project A contract with 11:59 was not signed.

d.     On August 21, 2024, Mr. Sheridan texted another contact at Databricks, "I'm resigning tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." The two went

---

[6] See Footnote 2.  Project C is another 11:59 Databricks partner project that Sheridan worked on while employed by 11:59.

14

on to discuss whether Sheridan could change his 11:59 email associated with the project access site to a personal email and concern over whether Sheridan would be able to access 11:59's work product (*i.e.*, demo coding) after he moved to Infinitive.

e.    On August 22, 2024, Mr. Sheridan confirmed to a personal contact that his efforts to divert 11:59 customers to Infinitive were successful, writing, "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive."

f.    On August 22, 2024, Sheridan confirmed he had submitted his resignation to 11:59 to a Databricks Account Executive ("AE"), telling him, "resignation done. Last day is 9/6.  We need to come up with a plan for [Project C]."

g.    On August 23, 2024, Sheridan bragged to a former 11:59 colleague that he had been successful in diverting Projects A, B and C.

h.    On August 23, 2024, Sheridan communicated with an Infinitive employee, apparently providing him with critical information impacting Infinitive's Q4 business planning.  On information and belief, Sheridan disclosed 11:59 information to this Infinitive employee.

i.    As stated above, throughout August 2024, Sheridan conferred with Infinitive's CEO and General Manager regarding transitioning 11:59 projects over to Infinitive. On August 27, 2024, Sheridan texted yet another 11:59 prospective client, telling him:

> Afternoon ["Company D"[7] Vice President]. It's Brad Sheridan with 11:59.  I wanted to let you know that I've resigned from 11:59 and my last day is Friday 9/6. I'm joining Infinitive, the company I left to come to 11:59.  They have a stronger Databricks practice and a very healthy pipeline. I of course will reach out to you during my first week so that you have my new email address bc I'd still like the oppty to partner with you/[Company D].  If you'd like more information on my decision to leave, please feel free to call me.

---

[7] See Footnote 2.  Company D is a partner with whom Sheridan worked on project opportunities while employed by 11:59.

Moments before Sheridan sent this text message, he emailed the same client with a facially innocuous announcement of his resignation, clearly indicating he was attempting to cover up his solicitation.

j.    Sheridan's tortious conduct continued on August 28, 2024, when Sheridan messaged with two contacts making clear that he believed 90% of 11:59's $7 million pipeline belonged to him, stating, "On a oppty call yesterday going through Salesforce. Pipeline is only 7MM and 90% of its mine that are leaving to follow me."

k.    On August 29, 2024, Sheridan brazenly disparaged 11:59 to a Databricks contact on his 11:59 email, telling him he was leaving 11:59 for Infinitive, "a more advanced Databricks partner and part of the invite-only DPP program." Sheridan told the contact, "a lot of negative stuff going on at 11:59 and I need to get out. Where there's smoke, there's fire."

47.    Sheridan knew the importance of ensuring he had access to 11:59's demo coding to move the business to Infinitive. After ensuring he had access to the Project C demo workspace through his personal Gmail account, he told his Databricks AE that he could schedule a demo for Project C at the end of the week of September 16th, after he started at Infinitive. However, Sheridan was concerned about any delay in delivering the demo to the Project C client. So, on September 5, 2024, Sheridan reached out to an Infinitive employee to request that he be given access to his Infinitive email address sooner as he had "several account execs in Databricks that are pulling opportunities from 1159 tomorrow after my last day and I thought it'd be nice to not have to use my gmail."

48.    On September 5, 2024, Sheridan went on to discuss with his Databricks AE how to convince Project C to move to Infinitive. Here, Sheridan made his goal crystal clear, telling him, "I too want to **steal** it." And steal it he did, as on information and belief, Sheridan conducted the

demo for Project C on September 20, 2024, as demonstrated by a September 9, 2024 Gmail calendar invite, and did so using 11:59's coding. Sheridan could not have developed a demo in such a short amount of time as he did not have the skills necessary to do so.

49.     On September 20, 2024, a misdirected email seemingly intended for Sheridan at Infinitive was sent to Sheridan's 11:59 email by a Databricks AE providing apparent confirmation that Sheridan was providing a demo for Project C on behalf of Infinitive.

50.     Sheridan also communicated with another 11:59 partner on Thursday, September 5, 2024, suggesting that the partner reply to 11:59, "["Company E"[8]] still isn't quite ready" . . . [t]hen next week we have Bill tell Drew that he's taking this oppty to follow me." Later that day, Sheridan told the same contact, "I'm going to reply to your email now and you can ignore it. I will then reply with my true response from my Gmail account." This is just one of many examples where Sheridan attempted to take his conversations to his personal accounts and hide his malfeasance from 11:59.

51.     The forensic analysis further revealed that on September 9, 2024, before Sheridan had shipped back his 11:59-issued MacBook, there was a Google search conducted, "how to reset macbook [sic]" suggesting Sheridan planned to erase the evidence of his and Infinitive's wrongdoing.

**F. Infinitive's Involvement in Sheridan's Illegal Actions**

52.     The forensic evaluation did more than reveal Sheridan's wrongdoing. It also uncovered Infinitive's participation in aiding and abetting Sheridan's breach of his duty of loyalty to 11:59, tortious interference with 11:59's business relationships and coordination between the two regarding the same. On August 26, 2024, Mr. Sheridan messaged Infinitive's CEO, Denis McFarland, telling him:

---

[8] See Footnote 2. Company E is a company with whom Sheridan worked on project opportunities while he was employed by 11:59.

Morning Denis. I have some prospects that want to move forward and are going to wait for me to join Infinitive. I'd like to chat with someone, perhaps Jeff, but wanted to know if you'd rather me wait until the 16th or can I reach out now to setup another coffee with him?

53.     McFarlane responded directing Sheridan to set up the meeting.  The "Jeff" referred to in the above text message is Jeff Theobald, Infinitive's Managing Director.  Regarding their meeting, Sheridan told Theobald, "[b]ring something to take notes with bc I'm trying to minimize emails right now." On August 27, 2024, Sheridan provided Theobald with one of his Databricks' contact emails stating, "AE for Databricks in [Project C] He will be reaching out to you."  Sheridan had begun to lay the groundwork to move Project C to Infinitive back on August 20, 2024, when he requested a Project C contact provide him with access to Project C's systems via his personal Gmail.

54.     On September 24, 2024, as 11:59 continued its investigation, Infinitive's counsel responded to the Cease and Desist Letters (the "Cease and Desist Letters Response").  Although Infinitive's counsel did not represent Sheridan, they represented that Sheridan had reviewed the contents of their letter and that he agreed it was accurate.

55.     The Cease and Desist Letters Response confirmed *Sheridan's* timeline of events:

a.      On August 13, 2024, Sheridan met with McFarlane to discuss possible employment.

b.      On August 19, 2024, Infinitive offered Sheridan a position.

c.      On August 22, 2024, Sheridan accepted Infinitive's employment offer.

d.      Infinitive falsely claimed Sheridan was provided with an Infinitive email address, brad.sheridan@infinitive.com on September 9, 2024, his first day of employment with Infinitive despite the fact that this email address was copied to an email received on 11:59's systems on August 1, 2024.

56.    Sheridan denied having solicited or disparaged 11:59 to its clients or partners or having diverted business from 11:59 to Infinitive.  With respect to Project A, Sheridan admitted only that he alerted his Databricks contacts that he would no longer be employed by 11:59 after September 6, 2024.  Sheridan claimed it was "an entirely appropriate thing to do" so that Databricks or Project A would not enter into a deal thinking Sheridan would be delivering it.  He claimed that not doing so "would have been unethical."

57.    Sheridan further admitted to improperly retaining "a number of files that contain his work product from his time at 11:59 on his Google Drive."  Sheridan claimed (through counsel that does not represent him and not under penalty of perjury as had been requested) that he did not use or disclose the files with anyone at Infinitive. Contrary to the evidence revealed in 11:59's investigation as detailed above, Sheridan and Infinitive lied to Infinitive's counsel and Plaintiff about their actions.

58.    Contrary to Defendants' representations, on Sheridan's 11:59 laptop, there are artifacts showing Google Drive activity for the first time in 17 months on Sheridan's last day at 11:59, Friday, September 6, 2024.  Then, the following week after Sheridan started at Infinitive, there is evidence of Google Drive activity related to multiple 11:59 projects Sheridan had worked on while he was an 11:59 employee:

   a.    On Monday, September 9th, Sheridan's first day at Infinitive, there is access to Google Drive folders related to 11:59 project work, including Project A, Project C and Company D.

   b.    On Wednesday, September 11th, there is access to Google Drive folders related to 11:59 project work including Project C at 3:17 p.m. and to a general folder named "Projects."  At 3:18 p.m. the same day, there is access to a Google Drive folder named "Infinitive."

59.     There is also evidence supporting that Sheridan had a Dropbox account. An email was sent to the email address sheridan06@gmail.com, which was accessed on September 10, 2024 and shows an attempt to change a Dropbox password.

**G.  <u>Plaintiff's Further Attempts to Address Defendants' Misconduct</u>**

60.     On September 24, 2024, through Infinitive's counsel, Defendants responded to 11:59's September 12, 2024 Cease and Desist Letters ("Cease and Desist Response").  Therein, it was confirmed that Sheridan "retained copies of a number of files that contain his work product from his time at 11:59 on his Google Drive" and "it is likely that at least some of the files contain information that 11:59 would consider confidential."  Sheridan requested to "delete and destroy" these files, which would have eliminated any evidence of access to and use of same.  A true and correct copy of the September 24, 2024 "Cease and Desist Response" is attached hereto as **Exhibit I**.

61.     Although it asserted that "no one from Infinitive has catalogued or analyzed these files," Infinitive vaguely advised it "searched its network" and Sheridan's email and confirmed that none of the files on Sheridan's Google Drive had "been shared through its network or placed on its servers."  It is unclear how Infinitive could have searched its network for files it had not catalogued or analyzed.

62.     As the Cease and Desist Response did not contain the assurances Plaintiff requested from Defendants as to their access and use of 11:59's information and improper solicitation and servicing of 11:59's clients using that information, on September 30, 2024, 11:59 sent a follow up letter to Defendants ("Cease and Desist Follow Up").  The purpose of the Cease and Desist Follow up was to apprise Defendants of the results of the forensic examination of Sheridan's 11:59 computer and Sheridan's lack of candor and to further explain the assurances 11:59 needed.  A true and correct copy of the September 30, 2024 "Cease and Desist Follow Up" correspondence is attached hereto as **Exhibit J**.

63.    Counsel for the parties attempted to confer in the days following the Cease and Desist Follow Up but were unable to agree upon a course of action that would provide 11:59 with appropriate assurances that Defendants would not use or benefit from the use of 11:59's confidential, proprietary and trade secret information.

**H.  Plaintiff's Confidential and Trade Secret Information**

64.    11:59 invests time, resources, and money in creating, developing, and protecting its confidential information and trade secrets.

65.    Access to 11:59's systems, including e-mail and shared drives, is password protected and requires two factor authentication.  Employees have differing levels of access based on their position and job responsibilities.

66.    11:59 employee access to 11:59's systems is withdrawn immediately upon termination.

67.    11:59's employees are subject to policies not to disclose the company's confidential information or trade secrets and are generally required to sign agreements containing confidentiality restrictions and other restrictive covenants.

68.    11:59's employees are required to return all company devices, documents, and information upon request and/or termination.

69.    11:59 employee policies and agreements impose confidentiality and safeguarding obligations, in addition to those imposed by contract and by the law.

70.    11:59, upon discovering evidence of misconduct serves a cease and desist letter placing the employee on notice of a breach of applicable agreements and company policies, requesting the preservation and return of Plaintiff's data and property, among other demands appropriate to the facts and circumstances.

71.    11:59 enters into non-disclosure agreements ("NDA") with its potential customers, such as in relation to Project B, which govern the treatment of proprietary information while the

parties discuss, evaluate and consult to determine whether a possible future transaction will occur. This NDA requires the party receiving proprietary information not to disclose such proprietary information, including but not limited to information about the disclosing party's software and technology, analyses, compilations, and the disclosing party's trade secret information without the disclosing party's written permission.

72.     11:59 derives a significant benefit from its confidential information and trade secrets and will suffer a significant detriment from their misappropriation.

73.     11:59 owns and/or lawfully possesses confidential information and trade secrets.

74.     Defendants do not own, lawfully possess, or have any right or authorization to use any of 11:59's confidential information or trade secrets.

### I.   Harm Caused by Sheridan and Infinitive

75.     As a direct result of the misconduct of the Defendants, absent injunctive relief, 11:59 could potentially lose millions of dollars in projects.   Much of Defendants' tortious conduct uncovered and described herein involves their use of 11:59's demo codes, materials and strategy, disparagement of 11:59, and interference with 11:59's relationships with Databricks and Databricks related projects including but not limited to Projects A-C and the other customer and partner relationships described herein such that the financial impact of Defendants' misconduct on 11:59 is incalculable, but potentially exceeds millions of dollars.

76.     As a direct result of Defendants' actions, 11:59 has already received confirmation that Projects A and C will not proceed with 11:59 and that instead, they have moved these projects to Sheridan and Infinitive.

77.     As a direct result of the misconduct of the Defendants described above and herein, Plaintiff has suffered irreparable harm, including but not limited to:

        a.      Loss of future business opportunities;

        b.      Loss of customers and other goodwill;

c.      Loss of market share; and

d.      Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties.

78.      Absent injunctive relief and an immediate cessation of misconduct by Defendants, and as a direct result of likely and inevitable future misconduct by the Defendants, Plaintiff will suffer irreparable harm, including but not limited to:

a.      Loss of future business opportunities;

b.      Loss of customers, customers' trust and other goodwill;

c.      Loss of market share;

d.      Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties; and

e.      Present economic loss, which is difficult to ascertain at this time, and future economic loss, which is presently incalculable.

**CAUSES OF ACTION**

**COUNT I**
**BREACH OF DUTY OF LOYALTY**
**(AGAINST DEFENDANT SHERIDAN)**

79.      Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs, as if fully set forth herein.

80.      As a result of his employment, Sheridan owed a common law duty of loyalty to 11:59 to act in the company's best interest and to not compete against 11:59 during his employment.

23

81.     Sheridan breached his duty by, among other things, purposefully and deliberately disparaging 11:59 to its customers, employees, and vendors, deliberating abandoning his efforts to secure 11:59's contracts for in progress projects in the 11:59 pipeline, soliciting and obtaining access to 11:59's demo code via his personal Gmail, and his failure to maintain the secrecy of 11:59's confidential, proprietary and trade secret information in order to benefit himself and/or his new employer, Defendant Infinitive.

82.     As a result of Sheridan's breach of his common law duty of loyalty, 11:59 has suffered damages.

## COUNT II

### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (AGAINST ALL DEFENDANTS)

83.     11:59 realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

84.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

85.     The DTSA defines "Trade Secret" as "information that derives economic value from not being generally known to or readily ascertainable through proper means by another person, and that is subject to reasonable efforts to maintain its secrecy. *Id*. § 1839(3).

86.     11:59 possesses highly confidential trade secrets, protected under the DTSA including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

87.     11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets out of its business.

24

88.      11:59 uses these trade secrets in both interstate and foreign commerce; 11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

89.      11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

90.      The DTSA defines "Misappropriation" to include the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or disclosure or use of a trade secret of another without express or implied consent in specified circumstances.

91.      Sheridan had access to and regularly used 11:59's highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

92.      Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

93.      11:59, upon discovering evidence of misappropriation Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and company policies, requesting the preservation and return of Plaintiff's data and property, among other demands.

94.      By unlawfully taking, accessing, and/or using Plaintiff's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the DTSA.

95.    Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the DTSA.

96.    11:59's investigation into Defendants' conduct, which is ongoing, has identified substantial evidence of misappropriation by Defendants.  This conduct includes, but is not limited to, Sheridan's use of improper means, without authorization and/or by exceeding authorization, to breach his duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

97.    As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets.  By engaging in the conduct described herein, Sheridan violated those policies.

98.    The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

99.    Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

100.    Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

101.    Defendants' conduct was wanton, willful, and malicious.

102.    11:59 has had to incur cost and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

103.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages.

## COUNT III

### VIRGINIA UNIFORM TRADE SECRETS ACT, § 59.1–336 to § 59.1–343
### (AGAINST ALL DEFENDANTS)

104.    11:59 realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

105.    The Virginia Unified Trade Secrets Act ("VUTSA") is analogous to the DTSA and similarly prohibits the misappropriation of trade secrets.

106.    The VUTSA defines a trade secret as:

[I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

107.    "Misappropriation" under the VUTSA means:

1. Acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

   a. Used improper means to acquire knowledge of the trade secret; or

   b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

   (1) Derived from or through a person who had utilized improper means to acquire it;

   (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

   (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

   (4) Acquired by accident or mistake.

108.     11:59 possesses highly confidential trade secrets, protected under the VUTSA including, but not limited to, demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

109.     11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of its business.

110.     11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

111.     11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

112.     Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

113.     Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

114.     11:59, upon discovering indicia of misappropriation by Sheridan, served upon Defendants a Cease and Desist Letter placing them on notice of Sheridan's breach of applicable agreements and company policies, requesting the preservation and return of 11:59's data and property, and requesting the cessation of tortious interference and contact with the customers Sheridan improperly solicited during his 11:59 employment, among other demands.

115.    By unlawfully taking, accessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the VUTSA.

116.    Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the VUTSA.

117.    11:59's investigation into Defendants' conduct, which is ongoing, has identified multiple instances of this misappropriation by Defendants.  This conduct includes, but is not limited to, Defendants' use of improper means, without authorization and/or by exceeding authorization, to breach their duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

118.    As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets.  By engaging in the conduct described herein, Sheridan violated those policies.

119.    The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

120.    Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

121.    Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

122.    Defendants' conduct was wanton, willful, and malicious.

123.    11:59 has had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

124.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT IV
## COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
## (AGAINST ALL DEFENDANTS)

125.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

126.    11:59 possesses highly confidential, proprietary information and trade secrets, including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

127.    11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets. These trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

128.    11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

129.    Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

130.    Based on information available to date, Defendants accessed Plaintiff's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

131.    11:59, upon discovering indicia of misappropriation by Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and company

policies, and requesting the preservation and return of 11:59's data and property, among other demands.

132.     By unlawfully taking, accessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained 11:59's trade secrets, thus misappropriating such information in violation of Virginia common law.

133.     These actions, taken together, at a minimum, demonstrate that Defendants used the proprietary, confidential and trade secrets as a result of discovery by improper means.

134.     The acts and threatened acts of misappropriation or misuse have directly and proximately caused and continue to cause substantial damage to 11:59.

135.     Defendants have been unjustly enriched by the information wrongfully obtained from 11:59.

136.     Disclosure or use of 11:59's proprietary, confidential and trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

137.     Defendants' conduct was wanton, willful, and malicious.

138.     11:59 had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

139.     As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

## <u>COUNT V</u>

### <u>CONSPIRACY IN VIOLATION OF VA CODE ANN. § 18.2-499 (AGAINST ALL DEFENDANTS)</u>

140.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

141.    Defendants have mutually undertaken and acted in concert to purposefully, willfully, and maliciously injure 11:59 as set forth herein, without legal justification for their actions.

142.    As a result of Defendants' actions Plaintiff has incurred substantial damages including without limitation to its reputation.

<u>COUNT VI</u>

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES AND/OR CONTRACT RELATIONS**
**(AGAINST ALL DEFENDANTS)**

143.    11:59 realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

144.    11:59 had a reasonable expectation of business and contract relationships with its customers.

145.    Sheridan by virtue of his 11:59 employment and by the actions described herein and, on information and belief, Infinitive are both aware of 11:59's expected business relationships and contracts with its customers.

146.    Defendants have intentionally sought to destroy 11:59's relationships with its customers without any legitimate purpose for doing so.

147.    Defendants used improper means, including but not limited to taking, retaining, and leveraging 11:59's confidential, proprietary, and trade secret information for the purpose of interfering with 11:59's business relationships.

148.    These actions are not mere competition; they are unlawful acts meant solely to harm 11:59 and to benefit Defendants.

149.    As a result of Defendants' actions, 11:59 has incurred substantial damages that are irreparable and cannot be fully or adequately measured or compensated by monetary relief.

## COUNT VII

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST DEFENDANT INFINITIVE)

150.     11:59 realleges and incorporates by reference the allegations contained in Paragraphs 1 through 146, as if fully set forth herein.

151.     Defendant Infinitive was aware that Sheridan owed and owes 11:59 a fiduciary duty, including but not limited to duties of care, loyalty, candor, and disclosure.

152.     Upon information and belief, Defendant Infinitive requested, directed, incited, encouraged, compelled, and otherwise solicited Sheridan to breach his fiduciary duty to 11:59 by engaging in the acts and omissions described above.

153.     Defendant Infinitive's conduct was intentional, willful, malicious, wanton, and intended to damage 11:59's business.

## COUNT VIII

### BREACH OF CONTRACT
### (AGAINST DEFENDANT SHERIDAN)

154.     Plaintiff and realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

155.     The NDA is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

156.     Sheridan's Offer Letter is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

157.     The NDA and Offer Letter (the "Agreements") contain valid and enforceable confidentiality, non-solicitation, return of company property and other provisions which prohibit Sheridan from interfering with 11:59's relationships with its employees, directly or indirectly, from

disclosing or using 11:59's confidential information for improper purposes and require the prompt return of 11:59's equipment and information upon Sheridan's separation from the company.

158.    Sheridan failed to protect, retained, disclosed and utilized 11:59's confidential and trade secret information for his own and Infinitive's benefit, interfered with 11:59's relationships with its employees, and failed to promptly return 11:59's equipment and confidential, proprietary and trade secret information.

159.    Infinitive knowingly, purposefully and/or negligently aided and abetted the breach of the Agreements by, among other things, leveraging and/or allowing Sheridan to leverage 11:59's confidential and trade secret information for Sheridan and Infinitive's benefit.

160.    Sheridan has retained, obtained, used, and disclosed (and has not returned) 11:59's trade secrets and confidential information in violation of these provisions.

161.    11:59 has a legitimate business interests justifying the non-solicitation and confidentiality provisions contained in the Agreements, which include, but are not limited to, the protection of 11:59's business goodwill, reputation, competitive advantage, and trade secrets and other valuable confidential business information.

162.    The provisions are reasonably necessary to protect 11:59's legitimate business interests since 11:59's confidential and trade secret information is not available to the public or generally known in the industry.

163.    The provisions are not harmful to the general public and are not unreasonably burdensome to the Defendants.

164.    Unless enjoined by this Court, Sheridan will continue breaching the Agreements.

165.    As a direct and proximate result of Sheridan's breaches, as described herein, 11:59 has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at

the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## COUNT IX

## VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT ("CFAA") 18 U.S.C.S. § 1030, ET SEQ. (AGAINST DEFENDANT SHERIDAN)

166. Plaintiff and realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

167. Defendant Sheridan's actions as described above constitute violations of one or more provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.

168. The CFAA makes it unlawful for a person to intentionally obtain information from a "protected computer system," "without authorization" or by "exceeding authorized access." 18 U.S.C. § 1030 (a)(2)(C).

169. The CFAA provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). 18 U.S.C. § 1030(g).

170. Conduct violates the CFAA if it, among other things, causes "damage or loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value[,]" or damage "affecting 10 or more protected computers during any 1-year period." 18 U.S.C § 1030(c)(4)(A)(i)(I) & (VI).

171. "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030 (e)(8).

172.    11:59's computers are "protected computers" that are used in or affect interstate and foreign commerce and/or communication within the meaning of 18 U.S.C. § 1030(e)(2)(B).

173.    Defendant Sheridan had no authority to access 11:59's computer server system, computer networks, computer programs or software to make unauthorized copies of, or use, 11:59's Confidential, proprietary and trade secret information for purposes of using it in a competitive business, such as Infinitive, which as described in detail herein, he did.

174.    Defendant Sheridan willfully and maliciously used 11:59's computer server system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive.

175.    Such actions violated 11:59's policies regarding the access, use, and disclosure of company Confidential, proprietary and trade secret information and were without authorization and/or exceeded Plaintiff's authorization to access 11:59's protected computers and Information Systems within the meaning of 18 U.S.C. §1030(a)(2)(C).

176.    Defendant Sheridan's actions and 11:59's resulting damage and loss all occurred within a one (1) year period.

177.    As a result of Defendant Sheridan's conduct, 11:59 has sustained damage and/or loss of not less than $5,000.00, within the meaning of the CFAA, and will continue to suffer substantial losses in excess of $5,000, including but not limited to losses sustained in responding to and investigating Defendant Sheridan's misconduct.

178.    Defendant Sheridan's theft of 11:59's trade secrets and other proprietary and Confidential information and documents has caused 11:59 to devote substantial resources and efforts to investigate Defendant Sheridan's misconduct in order to assess the full extent of Defendant Sheridan's misappropriation, to respond to Defendant Sheridan's misconduct, and to

ensure that 11:59 is protected from further harm to its business. These amounts continue to accumulate.

## **COUNT X**

**VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT, VA CODE ANN. § 18.2-152.1, ET SEQ.**
**(AGAINST DEFENDANT SHERIDAN)**

179.    Plaintiff and realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

180.    The Virginia Computer Crimes Act prohibits, among other things, any person "without authority" to use a computer or computer network to "make... an unauthorized copy... of computer data." Virginia Code § 18.2-152.4.

181.    Virginia Code § 18.2-152.2 provides that a person is "without authority" when he or she knows or reasonably should know that he or she has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission that was actually granted to him or her.

182.    Defendant Sheridan had no authority to access 11:59's computer server system, computer networks, computer programs or software to make unauthorized copies of, or use, 11:59's Confidential, proprietary and trade secret information for purposes of using it in a competitive business, such as Infinitive, which he did.

183.    Defendant Sheridan willfully and maliciously used 11:59's computer server system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive, in violation of Va. Code §§ 18.2-152.3 and 18.2-152.4.

184.    11:59 was damaged by, among other damages, loss of revenue and goodwill as a result of these actions by the Defendant Sheridan. As a direct and proximate cause of the Sheridan's

unauthorized actions, 11:59 has sustained damages, which, in part, are undeterminable, and, in part, in an amount to be determined by evidence at trial, but not less than $7 million.

185.     Under Va. Code § 18.2-152.12(A), 11:59 is entitled to recover damages and costs, which includes the costs of retaining computer forensics experts to discover exactly what Confidential information was accessed, what Confidential information was printed, and to determine whether such information was subsequently stored in the Defendants' storage locations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court an Order enjoining and restraining Defendants, and any person acting in concert with Defendants, from:

(a)     Directly or indirectly servicing, soliciting, enticing, or inducing any 11:59 client serviced by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59 or assisting any other person or entity to do so;

(b)     Using any confidential, proprietary, or trade secret information of 11:59;

(c)     Continuing to use 11:59's confidential information, and Defendants shall specifically identify, preserve, and appropriately sequester and refrain from further accessing any information belonging to 11:59 in Defendants' possession, including but not limited to, hard copies and computer-saved versions of these documents, whether the information is on external hard drives, disks, CD-ROMs, networked data services, internet accessed outside storage, or any other portable media device;

(d)     With respect to Defendant Sheridan, directly or indirectly soliciting, recruiting, inducing, or hiring any employee of 11:59 to work for a third party other than 11:59 or engage in any activity that would cause any employee to violate any agreement with 11:59;

(e)     With respect to Defendant Sheridan, disclosing any 11:59 confidential, proprietary, and trade secret information or documents to any third party, including but not limited to Infinitive;

(f)      Granting such other relief as the court deems equitable and just.

And further requiring that:

(g)      Defendants shall immediately produce copies of any and all of 11:59's documents within their possession to 11:59;

(h)      Sheridan shall identify any and all storage locations where he retained, copied, accessed or modified 11:59's confidential, proprietary or trade secret information following his separation from 11:59;

(i)      Sheridan shall identify any and all third parties, including but not limited to Infinitive, to whom he provided information or documents belonging to 11:59;

(j)      Sheridan shall provide a certification that verifies, under the pains and penalties of perjury, that he has identified, preserved, and sequestered all of 11:59 documents and information in his possession;

(k)      An appropriate and duly authorized representative of Infinitive shall provide a certification that verifies, under the pains and penalties of perjury, that Infinitive has returned all 11:59 documents and information in its possession and it has not retained copies, electronic or otherwise.

(l)      Ordering disgorgement and requiring Defendants to repay to 11:59 the value of Sheridan's salary, benefits and other compensation paid during the period of faithless service and/or disloyalty to 11:59;

(m)      Ordering disgorgement and requiring Infinitive to repay to 11:59 the value of the ill-gotten gains it received as a result of its violations of the law;

(n)      Ordering disgorgement and requiring the Defendants to pay to 11:59 the value of all benefits obtained as a result of their tortious conduct;

(o)    Awarding 11:59 compensatory, special, consequential, exemplary, treble, and punitive damages in an amount to be determined but no less than the amount of 11:59's actual loss and the amount of Defendants unjust enrichment;

(p)    Awarding 11:59 its attorneys' fees, costs, and other expenses incurred in this Action and in otherwise enforcing its rights and addressing misconduct by the Defendants;

(q)    Awarding 11:59 reimbursement of the expenses it incurred in forensically examining the Sheridan's 11:59 issued device and other data storage devices related to the Defendants' breaches of their duties, contracts, and other violations of the law; and

(r)    Granting such other relief as the court deems equitable and just.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issue so triable as set forth herein.

[*Signature on next page*]

Respectfully submitted,

POTTER & MURDOCK
*Attorneys for Plaintiff M Corp dba 11:59*

By:_____

_____/s/John M. Murdock_____
John M. Murdock, Esq. (VSB#26647)
(703) 992-6950
jmurdock@pottermurdock.com
POTTER & MURDOCK, P.C.
252 N. Washington Street
Falls Church, VA  22046

Brian S. Szmak (VSB#92555)
(202) 798-6053
bszmak@pottermurdock.com
POTTER & MURDOCK, P.C.
252 N. Washington Street
Falls Church, VA  22046
NUKK-FREEMAN & CERRA, P.C.
*Attorneys for Plaintiff M Corp dba 11:59*

By:_____
        Stacy Landau, Esq.
        (*To be admitted Pro Hac Vice*)
        Kegan S. Andeskie, Esq.
        (*To be admitted Pro Hac Vice*)
        26 Main Street, Suite 202
        Chatham, New Jersey  07928
        Tel:  (973) 665-9100
        Fax: (973) 665-9101
        slandau@nfclegal.com
        kandeskie@nfclegal.com

Dated:  October 15, 2024

## VERIFICATION

I, Tim Collinson, am the Chief Technology Officer at 11:59. I have read the Verified Complaint seeking Temporary Restraints and a Preliminary Injunction, and I am familiar with its contents. Based on my own personal knowledge and the information provided to me by others, I state that the allegations of 11:59 in the Verified Complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing statements are true and correct. I understand that if any of the foregoing statements are willfully false, I am subject to punishment.

By: /s/ _____

Executed on: October 15, 2024