# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| M CORP DBA 11:59, | **:** | |
| | **:** | |
| Plaintiff, | **:** | Civil Action No. |
| | **:** | |
| v. | **:** | |
| | **:** | |
| INFINITIVE, INC., JOSEPH BRADLEY SHERIDAN, AND DOES 1-25, INCLUSIVE. | **:** | |
| | **:** | |
| | **:** | |
| Defendants. | **:** | |
| | **:** | |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER

---

On the Brief:

> John Murdock, Esq.
> Brian S. Szmak, Esq.
> **POTTER & MURDOCK**
> 252 N. Washington Street
> Falls Church, VA 22046
> jmurdock@pottermurdock.com
> bszmak@pottermurdock.com

> Kegan S. Andeskie, Esq.
> (*Pro Hac Vice Admission Pending*)
> Stacy Landau, Esq.
> (*Pro Hac Vice Admission Pending*)
> **NUKK-FREEMAN & CERRA, P.C.**
> 26 Main Street, Suite 202
> Chatham, New Jersey 07928
> Tel: (973) 665-9100
> Fax: (73) 665-9101
> *Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................3

        A.  Sheridan's 11:59 Employment ...............................................................3

        B.  Sheridan Submits Notice of Resignation, and Immediately Takes
            Action to Misappropriate Confidential and Proprietary Materials and
            Solicit 11:59's Clients ...........................................................................5

        C.  Sheridan Continues To Interfere with 11:59's Business and Uses
            Misappropriated Confidential and Proprietary Information After He
            Resigns ...................................................................................................9

        D.  Infinitive's Involvement In Sheridan's Misappropriation, Tortious
            Interference, and Breach of Fiduciary Duties ......................................10

III.    11:59 IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF .............11

        A.  The Legal Standard for Interim Injunctive Relief ................................11

        B.  11:59 Has a Likelihood of Success on the Mertis of Its Claims ..........12

            1.  11:59 is Likely to Prevail on Count I, Breach of Fiduciary Duty
                of Loyalty .....................................................................................12

            2.  11:59 is Likely to Prevail on Count VII, Aiding and Abetting Breach
                of Fiduciary Duty .........................................................................14

            3.  11:59 is Likely to Prevail on Count VI, Tortious Interference with Contractual
                Relations or Business Expectancies ..............................................16

                i.      *Sheridan's Intentional Interference* .....................................16

                ii.     *Infinitive's Intentional Interference* .....................................17

4. 11:59 is Likely to Prevail on Counts II-IV, Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, the Virginia Uniform Trade Secrets Act, § 59.1–336 to § 59.1–343, and Common Law Misappropriation .............................................................................18

5. 11:59 is Likely to Prevail on Count VIII, Breach of Contract ...........................22

6. 11:59 is Likely To Prevail on Count V, Statutory Conspiracy in Violation of Va. Code Ann. § 18.2-499 ..............................................................24

C. 11:59 Has Suffered and Will Continue to Suffer Immediate and Irreparable Harm Without Injunctive Relief ....................................................................25

D. The Balance of the Equities Favors a Preliminary Injunction ..................................27

E. The Public Interest Favors a Preliminary Injunction .................................................27

IV. 11:59 IS ENTITLED TO THE IMMEDIATE RETURN OF ITS CONFIDENTIAL AND PROPRIETARY INFORMATION AND DOCUMENTS, AS WELL AS EXPEDITED DISCOVEY ..........................................28

V. CONCLUSION ..............................................................................................................29

# TABLE OF AUTHORITIES

## CASES

ABT, Inc. v. Juszczyk,
   No. 5:09-cv-119, 2010 WL 3156542 (W.D.N.C. Aug. 10, 2010) ........................................27

Best Med. Int'l, Inc. v. Wittmer,
   73 Va. Cir. 504 (2007) ........................................................................................................15

Bleich v. Florence Crittenton Servs. of Balt.,
   632 A.2d 463 (Md. Ct. Spec. App. 1993) ...........................................................................17

Bowe Bell & Howell Co. v. Harris,
   145 F. App'x 401 (4th Cir. 2005) ........................................................................................26

Brightview Grp., LP v. Teeters,
   441 F. Supp. 3d 115 (D. Md. 2020) ...............................................................................18, 27

ClearOne Advantage, LLC v. Kersen,
   No. JKB-23-03446, 2024 WL 69918 (D. Md. Jan. 5, 2024) ..........................................22, 27

CorRx, Inc. v. Pellecome, LLC,
   No. G061435, 2023 WL 6453498 (Cal. Ct. App. Oct. 4, 2023) ...........................................23

Feddeman & Co. v. Langan Assoc.,
   260 Va. 35 (2000) ...............................................................................................................13

Fid. Glob. Brokerage Grp., Inc. v. Gray,
   No. 1:10CV1255, 2010 WL 4646039 (E.D. Va. Nov. 9, 2010) ...........................................25

ForceX, Inc. v. Tech. Fusion, LLC,
   No. 4:11CV88, 2011 WL 2560110 (E.D. Va. June 27, 2011)..............................................28

George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.,
   719 F.2d, 1326 (7th Cir.1983) ............................................................................................17

Goode v. Am. Veterans, Inc.,
   874 F. Supp. 2d 430 (D. Md. 2012) .....................................................................................16

Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.,
    415 U.S. 423 (1974) ...........................................................................................................11

Halifax Corp. v. Wachovia Bank,
    268 Va. 641 (Va. 2004) ...................................................................................................15

Hilb Grp. of New England, LLC v. Lavorgna,
    No. 3:24-CV-462–HEH, 2024 WL 3234060 (E.D. Va. June 28, 2024) .........................22, 27

Hilb, Rogal & Hamilton Co. of Richmond v. DePew,
    247 Va. 240, 249 (1994) ...................................................................................................12

Home Funding Grp., LLC v. Myers,
    No. 1:06-cv-1400 JCC, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) ..................................27

Horne v. Holley,
    167 Va. 234 (1936) ...........................................................................................................12

Iovino v. Michael Stapleton Assocs., Ltd.,
    No. 5:21-CV-00064, 2022 WL 3684624 (W.D. Va. Aug. 25, 2022) ....................................23

Jaggars v. Sandy Spring Bank,
    No. 6:14-cv-00015, 2014 WL 2882003 (W.D. Va. June 25, 2014) ......................................24

JTH Tax, Inc. v. Williams,
    310 F. Supp. 3d 648 (E.D. Va. 2018) ...............................................................................19

Kabando v. United States,
    No. l:15CV1040i JCC.JFA, 2015 WL 5052665 (E.D. Va. Aug. 26, 2015) ...........................11

Maximus, Inc. v. Holdren,
    No. 24-CV-395, 2024 WL 1756342 (E.D. Va. Mar. 15, 2024) .......................................13, 26

Maximus, Inc. v. Lockheed Info. Management Sys. Co.,
    254 Va. 408 (Va. 1997) ...................................................................................................16

Merrill Lynch v. Bradley,
    756 F.2d 1048 (4th Cir.1985) ...........................................................................................25

Milton v. IIT Research Inst.,
    138 F.3d 519 (4th Cir. 1998) ...........................................................................................19

Moore v. Kempthorne,
    464 F. Supp.2d 519 (E.D. Va. 2006) ...................................................................11

MPAY Inc. v. Erie Custom Comput. Applications, Inc.,
    970 F.3d 1010 (8th Cir. 2020) ..........................................................................18

Nabisco Brands, Inc. v. Conusa Corp.,
    722 F. Supp. 1287 (M.D.N.C.), aff'd, 892 F.2d 74 (4th Cir. 1989) .......................................12

Navar, Inc. v. Fed. Bus. Council,
    291 Va. 338 (2016) ......................................................................................22

Pashby v. Delia,
    709 F.3d 307 (4th Cir. 2013) ............................................................................12

Patteson v. Horsley,
    70 Va. 263 (1877) .......................................................................................14

Pegasystems Inc. v. Appian Corp.,
    81 Va. App. 433 (2024) ..................................................................................19

Perk v. Vector Resources Group, Ltd.,
    253 Va. 310 (Va. 1997)...................................................................................16

Preferred Sys. Sols., Inc. v. GP Consulting, LLC,
    284 Va. 382 (2012) ......................................................................................19

Reg Seneca, LLC v. Harden,
    938 F. Supp. 2d 852 (S.D. Iowa) ........................................................................25

Robert Half Int'l Inc. v. Billingham,
    315 F. Supp. 3d at 433 ..............................................................................25, 26

Safe Haven Wildlife Removal & Prop. Mgmt. Experts, LLC v. Meridian Wildlife Servs. LLC,
    No. 7:21-CV-00577, 2024 WL 531268 (W.D. Va. Feb. 9, 2024) .........................................14

Saks Fifth Ave., Inc. v. James, Ltd.,
    272 Va. 177 (2006) ......................................................................................22

Salomon & Ludwin, LLC v. Winters,
    No. 3:24-CV-389-HEH, 2024 WL 3511629 (E.D. Va. July 23, 2024) ..................................27

Storey v. Patient First Corp.,
    207 F. Supp. 2d 431 (E.D. Va. 2002) .............................................................................16, 17

Tysons Toyota, Inc. v. Globe Life Ins. Co.,
    No. 93–1359, 1994 WL 717598 (4th Cir. Dec. 29, 1994) ....................................................14

Update, Inc., v. Samilow,
    311 F. Supp. 3d 784 (E.D. Va. 2018) .................................................................................25

Variable Annuity Life Ins. Co. v. Coreth,
    535 F. Supp. 3d 488 (E.D. Va. 2021) ...........................................................................12, 25

Video Grp., LLC v. Green,
    No. 1:14CV169 JCC/TCB, 2014 WL 793535 (E.D. Va. Feb. 26, 2014) .............................13

Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,
    144 F.Supp.2d 558 (W.D. Va. 2001) ..................................................................................24

Winter v. Natural Res. Def Council, Inc.,
    129 U.S. 365 (2008) ...........................................................................................................12

Wuchenich v. Shenandoah Memorial Hospital,
    215 F.3d 1324, 2000 WL 665633 (4th Cir.2000) ...............................................................16

**Statutes and Rules**

Fed. R. Civ. P. 65.................................................................................................................11

18 U.S.C. § 1836.................................................................................................................18

18 U.S.C. § 1839(3) ............................................................................................................18

18 U.S.C. § 1839(5) ............................................................................................................19

18 U.S.C. § 1839(6) ............................................................................................................19

Va. Code Ann. § 18.2..........................................................................................................24

Va. Code § 59.1 .............................................................................................................18, 19

## I.     __INTRODUCTION__

Plaintiff M Corp d/b/a 11:59 ("11:59" or the "Plaintiff") and Defendant Infinitive, Inc. ("Infinitive") are competitors in the data consulting industry.  Defendant Joseph Bradley Sheridan ("Sheridan") (collectively with Infinitive, "Defendants") was 11:59's VP of Data Analytics, who, on or about September 6, 2024 left to take on a similar role at Infinitive.  Sheridan provided notice of his resignation on August 22, 2024.  11:59 reasonably expected Sheridan to spend the final two weeks of his employment transitioning his accounts to the stewardship of other 11:59 employees. Instead, he spent that time poisoning 11:59's vendors and clients, disparaging the company with lies to ensure they would discontinue their business with 11:59 and follow him to Infinitive - all while he remained an 11:59 employee.  Sheridan also took calculated measures to ensure that he would be in the best possible position to take 11:59's business, misappropriating 11:59's confidential and proprietary business information with the goal of using that work product to service 11:59's current and prospective clients at Infinitive.

More specifically, Sheridan ensured that he would have continued access to 11:59's confidential and proprietary information after his employment ended, taking steps to provide his personal email address with access to client code environments and loading that material onto, at a minimum, his personal Google Drive account.  Doing so allowed Sheridan to utilize 11:59's confidential and proprietary code to provide demos for the clients he solicited immediately upon leaving 11:59 (a feat that would otherwise have been impossible), effectively using 11:59's own trade secrets against it and for the benefit of a competitor, Infinitive.  11:59 has already lost two clients as a result of this, and if not enjoined from use of the misappropriated data, Defendants will continue to use it to take customers and disrupt 11:59's goodwill and reputation in the industry, as Sheridan has already infected a $7,000,000 pipeline of projects.

All the while, Sheridan took steps to cover his electronic footprint and hide his malfeasance from 11:59. In so doing, Sheridan eviscerated the boundaries of any acceptable conduct in preparing for his new employment. Sheridan owed a duty of loyalty to 11:59, which, among other things, included the obvious obligation *not* to leverage 11:59's confidential information or solicit its clients **while he was still receiving a paycheck from 11:59**.

Sheridan did not accomplish this brazen feat of corporate espionage and sabotage alone. He directly conspired with, at a minimum, Infinitive's CEO and its Managing Director, as demonstrated by text messages between them recovered by 11:59. Infinitive did not just turn a blind eye. It actively supported and encouraged Sheridan, hoping to gain the economic benefit of Sheridan's misconduct, by taking over the 11:59 projects from clients Sheridan poisoned with his disparagement and misappropriation.

The net result of Sheridan and Infinitive's efforts is irreparable harm. 11:59 has already lost two accounts and the financial and reputational hemorrhage will undoubtedly continue if this Court does not take immediate action to enjoin Sheridan and Infinitive from further improper and unlawful action. As such, 11:59 respectfully submits this Memorandum of Points and Authorities in Support of its Application for a Temporary Restraining Order ("TRO") and Order to Show Cause ("OSC") seeking a Preliminary Injunction: (1) requiring Infinitive and Sheridan to immediately return all of 11:59's confidential documents and information in their possession, custody, and control, (2) enjoining Sheridan from soliciting 11:59's current employees or otherwise violating his post-employment contractual obligations, (3) requiring Infinitive and Sheridan to cease working with 11:59's current and prospective clients Sheridan serviced at 11:59, (4) enjoining Defendants from disparaging 11:59, (5) granting expedited discovery, including but not limited to forensic discovery of Defendants' computer systems and electronic devices, and (6)

compelling Sheridan and Infinitive to provide 11:59 with statements made under oath that all of 11:59's documents and property have been returned.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Sheridan's 11:59 Employment

11:59 and Infinitive are direct competitors in the data/AI consulting industry, an industry which is comprised of a relatively limited number of providers. The sales cycle for 11:59's clients is typically 3-6 months, but can be as long as 12-18 months depending on the complexity of the project. Due to the technical nature of the work it does, 11:59 has made a significant investment, both in terms of personnel and financial investment, into bringing projects to contract. This investment often comes in the form of providing demos and showing clients proofs of concept. See Verified Complaint, Docket Entry ("Dkt.") 1, at ¶¶ 9-13.

On or about March 27, 2023, Sheridan commenced his employment with 11:59 as Vice President of Data Analytics.[1] His position involved managing and maintaining client relationships, leading and overseeing complex data projects, overseeing a team who develops 11:59's custom data solutions, and included business development responsibilities. Sheridan reported to 11:59's Chief Technology Officer. Id., ¶¶ 14-16.

At the commencement of Sheridan's employment, he executed a Non-Disclosure Agreement ("NDA"). The NDA requires Sheridan to keep 11:59's Confidential Information (as defined therein) "in the strictest confidence." It prohibits the disclosure of 11:59's Confidential Information to anyone outside of 11:59 without the company's prior written consent. The NDA also prohibits the use of 11:59's Confidential Information for Sheridan's own purposes or for the

---

[1] Of note, Sheridan had a preexisting relationship with Infinitive, and worked there prior to joining 11:59.

benefit of anyone other than 11:59. Per the NDA, at the conclusion of his employment, Sheridan was also required to promptly deliver to 11:59 "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information." The NDA further obligates Sheridan to return all of 11:59's equipment, files, software, programs and other personal property" belonging to the company. Id., ¶¶ 20-23.

Sheridan held a senior role at 11:59, overseeing a team of professionals responsible for writing the code and developing the frameworks for its custom data solutions. Sheridan was client-facing, responsible for managing a pipeline of over $7 million in business. In connection with his role, Sheridan was provided with access to 11:59's confidential and proprietary information, including 11:59's pipeline, forecasts, status of negotiations, clients, prospective clients, contract and pricing terms, and other critical aspects of 11:59's business. This information is extremely valuable and allows 11:59 to serve its clients, providing 11:59 with a competitive advantage. This valuable information can be used by competitors to entice clients away from 11:59. Id., ¶ 30.

Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with one of its strategic partners, Databricks. Over the course of Sheridan's employment, 11:59's pipeline of work on Databricks partner projects grew to over $7 million. Many of the client projects in 11:59's pipeline were at or near contract execution after the clients worked with 11:59 for months or more than a year in some cases. During the course of the sales cycle, 11:59 invested upwards of $500,000, providing demonstrations and proving the concepts developed would succeed in providing the clients with the desired results. Id., ¶ 31.

**B.** **Sheridan Submits Notice of Resignation, and Immediately Takes Action to Misappropriate Confidential and Proprietary Materials and Solicit 11:59's Clients**

In providing custom data solutions, 11:59 works with strategic partners, such as Databricks and Amazon Web Services ("AWS"). Id., ¶ 11. Unique to these projects, Databricks often makes a financial investment into the projects giving Databricks both a client and a partner aspect in relation to 11:59. By early August 2024, many of the pipeline projects were at or near contract execution. For example, one project, referred to as "Project A"[2] in the Verified Complaint, 11:59 had already received a verbal commitment from the client and a Statement of Work was in near final form with an engagement start date of August 19, 2024. Id., ¶¶ 32-33.

On August 22, 2024, Sheridan put in his two weeks' notice, resigning from his employment at 11:59 effective September 6, 2024. That same day, he accepted a job offer from Infinitive. Over his two week notice period, 11:59 believed Sheridan was working on transitioning his work to his team members, to ensure 11:59's clients and prospects would continue to be seamlessly serviced by 11:59. However, unbeknownst to 11:59, Sheridan had not been working to ensure 11:59's clients would continue to be served by 11:59. Instead, he was brazenly and deliberately targeting 11:59's partners, vendors, clients, and prospective clients, taking inappropriate and illegal actions to move 11:59's business to Infinitive. Shortly after Sheridan's last day of employment at 11:59, 11:59 learned that several of the projects that were being managed by Sheridan and his team were suddenly in jeopardy. Project A's engagement was scheduled to start on or about August 19, 2024. After Sheridan's departure, the client working with 11:59 on Project A placed the project on hold, stating they had lost faith in 11:59. 11:59 immediately began an internal investigation and quickly learned that its client's lost faith was directly because of Sheridan, but not because Sheridan had left the company. Id., ¶¶ 34-37.

---

[2] To protect the confidentiality of its clients, 11:59 uses fictional designations for its projects and clients in this brief, and in the Verified Complaint.

See also Declaration of Steven Hillary ("Hillary Dec.").

That investigation revealed highly concerning activity, including but not limited to the following:

- Sheridan received an email on a project for another client, referred to in the Verified Complaint as "Project B" on his 11:59 email on August 1, 2024, prior to giving notice of termination of his employment, that was copied to what appeared to be Sheridan's *Infinitive* email address, brad.sheridan@infinitive.com. Id., ¶ 39.

- On Sunday, August 18, 2024, (four days before Sheridan would give notice to 11:59) Sheridan's cellular phone number texted a contact identified as one of Sheridan's former 11:59 colleagues, confirming Sheridan would ensure 11:59 lost its Partner A related work telling him, "I'm working hard to get out . . . I'm taking my [Partner A] AEs and several prospects with me." Id., ¶ 46 (a); Hillary Dec., ¶ 13.

- On August 20, 2024, Sheridan contacted a client contact at Project C, requesting access to the 11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address. Id., ¶ 46 (b); Hillary Dec., ¶ 17.

- On August 21, 2024, Sheridan's cellular phone number texted a contact at Databricks telling her, "Going back to Infinitive, company I left for 11:59. Thomas out CEO let go last week. Ran company into ground. I'm worried about them Being insolvent, so it's time for me to leave." The contact responded, "Should we pivot away from 11:59 for [Project A]??" Sheridan advised the contact that one of his clients "already pulled the plug and is coming over." The two conspired to ensure the Project A contract with 11:59 was not signed. Id., ¶ 46 (c); Hillary Dec., ¶ 13.

- On August 21, 2024, Mr. Sheridan texted another contact at Databricks, "I'm resigning

tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." The two went on to discuss whether Sheridan could change his 11:59 email associated with the project access site to a personal email and concern over whether Sheridan would be able to access the 11:59 work after he moved to Infinitive. <u>Id.</u>, ¶ 46 (d); Hillary Dec., ¶ 13.

- On August 22, 2024, Mr. Sheridan confirmed to a personal contact that his efforts to divert 11:59 clients to Infinitive were successful, writing, "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive." <u>Id.</u>, ¶ 46; Hillary Dec., ¶ 13.

- On August 22, 2024, Sheridan confirmed he had submitted his resignation to 11:59 to one Databricks Account Executive ("AE"), telling him, "resignation done. Last day is 9/6. We need to come up with a plan for [Project C]." <u>Id.</u>, ¶ 46 (f).

- On August 23, 2024, Sheridan bragged to a former colleague that he had been successful in diverting Projects A, B and C to Infintive. <u>Id.</u>, ¶ 46 (g); Hillary Dec., ¶ 13.

- On August 23, 2024, Sheridan communicated with an Infinitive employee, apparently providing him with critical information impacting Infinitive's Q4 business planning. On information and belief, Sheridan disclosed 11:59 information to this Infinitive employee. <u>Id.</u>, ¶ 46 (h)

- Over the next several days, Sheridan conferred with Infinitive's CEO and General Manager regarding bringing 11:59 business over to Infinitive, which is described in more detail in Section II(D) below. <u>Id.</u>, ¶ 46 (i); Hillary Dec., ¶ 13.

- On August 27, 2024, Sheridan texted yet another 11:59 prospective client, telling him:

  "Afternoon Jonathan. It's Brad Sheridan with 11:59. I wanted to let you know that I've resigned from 11:59 and my last day is Friday 9/6. I'm

joining Infinitive, the company I left to come to 11:59. They have a stronger Databricks practice and a very healthy pipeline. I of course will reach out to you during my first week so that you have my new email address bc I'd still like the oppty to partner with you/[Company D]. If you'd like more information on my decision to leave, please feel free to call me."

Moments before Sheridan sent this text message, he emailed the same client with a facially innocuous announcement of his resignation, clearly attempting to cover up his solicitation. Id., ¶ 46 (i); Hillary Dec., ¶ 17(c).

- On August 28, 2024, Sheridan messaged with two contacts making clear that he saw 90% of 11:59's $7 million pipeline as his, stating, "On a oppty call yesterday going through Salesforce. Pipeline is only 7MM and 90% of its mine that are leaving to follow me." Id., ¶ 46 (j); Hillary Dec., ¶ 13.

- On August 29, 2024, Sheridan disparaged 11:59 to a Databricks contact on his 11:59 email, telling him he was leaving 11:59 for Infinitive, "a more advanced Databricks partner and part of the invite-only DPP program." Sheridan told the contact, "a lot of negative stuff going on at 11:59 and I need to get out. Where there's smoke, there's fire." Id., ¶ 46 (k); Hillary Dec., ¶ 17(d).

- On September 5, 2024, Sheridan also communicated with another 11:59 partner, designated as Company E, stating that his last day would be September 6, 2024, and referring the contact to another 11:59 employee. However, Sheridan then surreptitiously texted the contact, suggesting that the partner reply to 11:59, "[Company E] still isn't quite ready" . . . [t]hen next week we have Bill tell [the 11:59 employee] that he's taking this oppty to follow me." Later that day, Sheridan told the same contact, "I'm going to reply to your email now and you can ignore it. I will then reply with my true response from my Gmail account." Id., ¶ 50; Hillary Dec., ¶ 17(e).

- On September 5, 2024, Sheridan reached out to an Infinitive employee to request that he be given access to his Infinitive email address sooner as he had "several account execs in Databricks that are pulling opportunities from 1159 tomorrow after my last day and I thought it'd be nice to not have to use my gmail." Id., ¶ 47; Hillary Dec., ¶ 13.

**C. <u>Sheridan Continues To Interfere with 11:59's Business and Uses Misappropriated Confidential and Proprietary Information After He Resigns</u>**

As noted above, Sheridan's final day of employment with 11:59 was September 6, 2024. However, his efforts to misappropriate information and interfere with 11:59's clients did not end there. After obtaining access to Project C's 11:59 demo environment through his Gmail (as discussed above), Sheridan told his Databricks AE that he could schedule a demo for Project C at the end of the week of September 16th, after he started at Infinitive. The only possible way for Sheridan to conduct a demo for Project C so soon after transitioning to Infinitive would be if he used 11:59's confidential and proprietary information (i.e. the demo code) to accomplish this. Sheridan went on to discuss with his Databricks AE how to convince Project C to move to Infinitive, telling him, in no uncertain terms "I too want to steal it." Sheridan ultimately conducted the demo for Project C on September 20, 2024, as demonstrated by a September 10, 2024 Gmail calendar invite mistakenly sent to Sheridan's 11:59 email account. Id., ¶¶ 48-49; Hillary Dec., ¶ 13.

Sheridan also took steps to cover his electronic footprint. In fact, by way of example only, just before shipping his 11:59 laptop back to 11:59, on September 9, 2024, he searched, "how to reset macbok" [sic]. Id., ¶ 51; Hillary Dec., ¶ 18. Through Infinitive's counsel, Sheridan acknowledged that he has "a number of files that contain his work product from his time at 11:59 on his Google Drive," which 11:59's forensic analysis showed was accessed for the first time in

*17 months* on September 6, 2024, the last day of his employment with 11:59. He visited the Google Drive account again on September 9, 10, 11, and 13th, when he accessed folders that appear to be related to Projects A and C, as well as folders entitled "Infinitive" and "11:59." Id., ¶ 58; Hillary Dec., ¶ 15. Forensic review of the MacBook also revealed artifacts suggesting that Sheridan also attempted to access a Dropbox account and/or change the password for same on September 10, 2024. Id., ¶ 59; Hillary Dec., ¶ 16.

**D. Infinitive's Involvement In Sheridan's Misappropriation, Tortious Interference, and Breach of Fiduciary Duties**

11:59's forensic evaluation confirmed that not only was Infinitive aware of Sheridan's malfeasance, they actively aided, encouraged, and all-but directed his actions. More specifically:

- On August 26, 2024, Mr. Sheridan messaged Infinitive's CEO, Denis McFarland, telling him:

    > Morning Denis. I have some prospects that want to move forward and are going to wait for me to join Infinitive. I'd like to chat with someone, perhaps Jeff, but wanted to know if you'd rather me wait until the 16th or can I reach out now to setup another coffee with him?

    Id., ¶ 52; Hillary Dec., ¶ 13.

- McFarlane responded directing Sheridan to set up the meeting. The "Jeff" referred to in the above text message is Jeff Theobald, Infinitive's Managing Director. Regarding their meeting, Sheridan told Theobald, "[b]ring something to take notes with bc I'm trying to minimize emails right now." Id., ¶ 53; Hillary Dec., ¶ 13.

- On August 27th, Sheridan provided Theobald with one of his Databricks contact emails stating, "AE for [Partner A] in [Project C] He will be reaching out to you." Sheridan had begun to lay the groundwork to move Project C to Infinitive back on August 20, 2024,

when he requested that a Project C contact provide him with access to Project C's systems with his personal Gmail.  Id., ¶ 53; Hillary Dec., ¶ 13.

Further, and as detailed above, it appears that Sheridan may have been provided an Infinitive email address well before he started in September 2024, which Sheridan used to collect information for Infinitive in advance of his departure.  On information and belief, Infinitive continues to service 11:59's prospective clients, as multiple clients advised 11:59 of the same.

## III.    11:59 IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF

### A.    The Legal Standard for Interim Injunctive Relief

The primary purpose of a preliminary injunction is to preserve the status quo until a court can make a final determination on the merits of the action.  Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty., 415 U.S. 423, 439 (1974). Federal Rule of Civil Procedure ("Fed. R. Civ. P") 65 authorizes a federal court to issue injunctive relief, including temporary restraining orders and preliminary injunctions. The standard for granting a TRO and a preliminary injunction is the same. Kabando v. United States, No. l:15CV1040i JCC.JFA, 2015 WL 5052665, at *2 (E.D. Va. Aug. 26, 2015) (citing Moore v. Kempthorne, 464 F. Supp.2d 519, 525 (E.D. Va. 2006)).

In order to obtain a TRO, Plaintiff must show: (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in Plaintiffs favor; and (4) an injunction is in the public's interest.  Winter v. Natural Res. Def Council, Inc., 129 U.S. 365, 374, 375-376 (2008). The standard for granting preliminary injunctions articulated in Winter is applied in the Fourth Circuit.  Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013). "Finding a likelihood of success on only one claim is sufficient to justify injunctive relief."  Variable Annuity Life Ins. Co. v. Coreth, 535 F. Supp. 3d 488, 494

n.3 (E.D. Va. 2021) (internal quotations and citation omitted); <u>see</u> <u>also</u> <u>Nabisco Brands, Inc. v.</u>

<u>Conusa Corp.</u>, 722 F. Supp. 1287, 1292 (M.D.N.C.), aff'd, 892 F.2d 74 (4th Cir. 1989)

Here, these factors weigh heavily in favor of the issuance of the interim injunctive relief sought by 11:59. The relief sought is narrowly and reasonably targeted to ensure Defendants return to 11:59 all the confidential documents and information Defendants took from 11:59 upon Sheridan's orchestrated and abrupt departure to work for 11:59's competitor. The relief sought will also stop Sheridan from continuing to damage 11:59 and prevent both Defendants from reaping the financial benefits of their intentional malfeasance.

**B. <u>11:59 Has a Likelihood of Success on the Merits of Its Claims</u>**

      **1. 11:59 is Likely to Prevail on Count I, Breach of Fiduciary Duty of Loyalty**

Virginia courts have long recognized that under the common law, an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment. <u>See</u>, <u>e.g.</u>, <u>Horne v. Holley</u>, 167 Va. 234, 241 (1936). Subsumed within this general duty of loyalty is the more specific duty that the employee not compete with his employer during his employment. <u>Hilb, Rogal & Hamilton Co. of Richmond v. DePew</u>, 247 Va. 240, 249 (1994). While not every action taken by an employee in preparation for his departure is a violation of this duty, it is well established that an employee must not have "misappropriated trade secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment." <u>Feddeman & Co. v. Langan Assoc.</u>, 260 Va. 35, 42 (2000).

The matter of <u>Video Grp., LLC v. Green</u> is informative on this subject. No. 1:14CV169 JCC/TCB, 2014 WL 793535, at *3 (E.D. Va. Feb. 26, 2014). In that case, the court found that plaintiff showed that it was likely to succeed on the merits of its breach of duty of loyalty claim, where plaintiff provided evidence that during plaintiff's employment, defendant performed work,

directly or through competitors, for plaintiff's actual or potential clients. Id. Similarly, in Maximus, Inc. v. Holdren, the court found that plaintiff was likely to succeed on the merits of a breach of duty of loyalty claim, where the employee engaged in the following: "(1) accessing the [employer's] system using her personal laptop, (2) deleting data and files from the [employer's] Salesforce system, (3) forwarding emails from her work account to her personal email accounts that included [employer's] proprietary and trade secret information, (4) removing the data she deleted from [employer's] Salesforce Recycling Bin, making some of it unrecoverable, and (5) failing to return her company assigned laptop immediately upon termination. No. 24-CV-395, 2024 WL 1756342, at *1 (E.D. Va. Mar. 15, 2024)

Sheridan's conduct here is very similar. As detailed at length in 11:59's Verified Complaint and above, while still employed with 11:59, Sheridan (on behalf of and in furtherance of his conspiracy with Infinitive) commenced a campaign to sabotage 11:59's relationship with current clients and convince them to leave 11:59. In short, Sheridan brazenly badmouthed 11:59 and then utilized 11:59's confidential and proprietary information to solicit 11:59's clientele to leave in favor of Sheridan's prospective new employer, Infinitive. Sheridan made multiple negative and damaging statements concerning 11:59 to Databricks and/or 11:59's present or prospective clients directly (as well as 11:59's existing employees), with full knowledge that those statements would cause economic harm to 11:59 and for Sheridan's personal benefit. He misappropriated documents and information while still employed with 11:59, and took steps to make sure that he would be able to access that information from his personal and/or Infinitive email accounts after leaving. His actual use and access of that material is evidenced by the fact that he was able to perform demos for clients immediately upon arriving at Infinitive, which would otherwise have been impossible. As such, 11:59 can clearly demonstrate a likelihood of

success on the merits of its claim of breach of duty of loyalty as to Sheridan.

Sheridan's breach of his duty of loyalty is not limited to those actions he took while still employed with 11:59. Under Virginia law, an employee continues to owe his former employer a fiduciary duty under limited circumstances, even after the employment relationship has ended, "such as when the former employee engages in business transactions founded on information gathered during his employment." Safe Haven Wildlife Removal & Prop. Mgmt. Experts, LLC v. Meridian Wildlife Servs. LLC, No. 7:21-CV-00577, 2024 WL 531268, at *3 (W.D. Va. Feb. 9, 2024). That is exactly the case here - Sheridan used the work product, information, good will, and business relationships he cultivated while employed at 11:59 to engage in business transactions with 11:59's current and prospective clients for his own and Infinitive's benefit. That was a clear violation of his fiduciary duties to 11:59.

For these reasons, 11:59 has established that it is likely to succeed on its claim that Sheridan violated his fiduciary duty of loyalty to 11:59.

### 2. 11:59 is Likely to Prevail on Count VII, Aiding and Abetting Breach of Fiduciary Duty

"Under Virginia law, one who aids and abets a third party's breach of fiduciary duty may be held liable for providing such assistance." Tysons Toyota, Inc. v. Globe Life Ins. Co., No. 93–1359, 1994 WL 717598 at *4 (4th Cir. Dec. 29, 1994) (citing Patteson v. Horsley, 70 Va. 263, 270–71, 273, 276 (1877)). To assert such a claim, a plaintiff must plead: (1) actual knowledge of the underlying fiduciary duty; and (2) actual knowledge of the breach of that fiduciary duty by the primary tortfeasor. Best Med. Int'l, Inc. v. Wittmer, 73 Va. Cir. 504 (2007) (citing Halifax Corp. v. Wachovia Bank, 268 Va. 641, 660 (Va. 2004)). In order to support a claim of aiding and abetting, the Halifax Court implicitly recognized this requirement when it determined that the "plaintiff must assert that the defendant somehow recruited, enticed, or participated in the

fiduciary's breach of its duty." <u>Halifax Corp.</u>, 268 Va.at 66.

As set forth above, Sheridan clearly violated his fiduciary duty of loyalty prior to the termination of his employment with 11:59 by actively soliciting 11:59's clients and partners to move business away from 11:59 in favor of his new prospective employer, Infinitive while still employed by 11:59.  Infinitive, by contrast, was aware that Sheridan was still employed by 11:59, and thus aware that he owed a fiduciary duty of loyalty to 11:59.

More specifically, on August 26, 2024 (again, while still employed at 11:59), Mr. Sheridan messaged Infinitive's CEO, Denis McFarlane, telling him:

> Morning Denis. I have some prospects that want to move forward and are going to wait for me to join Infinitive. I'd like to chat with someone, perhaps Jeff, but wanted to know if you'd rather me wait until the 16th or can I reach out now to setup another coffee with him?

<u>See</u> Verified Complaint, ¶ 52.  McFarlane responded directing Sheridan to set up the meeting with Jeff.  The "Jeff" referred to in the above text message is Jeff Theobald, Infinitive's Managing Director.  Regarding their meeting, Sheridan told Theobald, "[b]ring something to take notes with bc I'm trying to minimize emails right now."  <u>Id.</u>, ¶ 53. These messages uncontrovertibly establish that Sheridan and Infinitive were conspiring to eliminate an electronic "paper trail" of Sheridan's diversion of Infinitive clients and corporate opportunities as they prepared for Sheridan's transition to Infinitive (along with 11:59's clientele and misappropriated confidential and proprietary information).

The following day, on August 27, 2024, Sheridan provided Theobald with one of his Databricks' contact emails stating, "AE for Databricks in [Project C] He will be reaching out to you." <u>Id.</u> Sheridan and Infinitive started laying the groundwork to move Project C to Infinitive the week prior (on August 20, 2024), when Sheridan requested that his Project C contact provide his personal email address with access to Project C's systems.

As such, 11:59 is likely to succeed on its claim that Infinitive aided and abetted in the violation of Sheridan's fiduciary duty of loyalty.

### 3. 11:59 is Likely to Prevail on Count VI, Tortious Interference with Contractual Relations or Business Expectancies

In order to establish tortious interference, Plaintiff must prove: (1) the existence of a contract or contract expectancy; (2) the defendant's knowledge thereof; (3) intentional interference with the contract or expectancy; (4) use of improper means or methods to interfere; and (5) loss suffered by the plaintiff resulting from disruption of the contract or contract expectancy. Maximus, Inc. v. Lockheed Info. Management Sys. Co., 254 Va. 408, 493 (Va. 1997); see also Perk v. Vector Resources Group, Ltd., 253 Va. 310, 485 (Va. 1997).

#### i. *Sheridan's Intentional Interference*

As a general matter, a party cannot tortiously interfere with his own contract, nor can a party's agent while acting within the scope of the agency relationship. See e.g., Wuchenich v. Shenandoah Memorial Hospital, 215 F.3d 1324, 2000 WL 665633, at **17 (4th Cir.2000); Storey v. Patient First Corp., 207 F. Supp. 2d 431, 448 (E.D. Va. 2002); Goode v. Am. Veterans, Inc., 874 F. Supp. 2d 430, 447 n.12 (D. Md. 2012). However, an individual acts outside that scope of employment where he "act[s] out 'of personal motive and without intent to further the interests of [his] corporate principal.'" Bleich v. Florence Crittenton Servs. of Balt., 632 A.2d 463, 475 (Md. Ct. Spec. App. 1993) (quoting George A. Fuller Co. v. Chi. Coll. of Osteopathic Med., 719 F.2d, 1326, 1333 (7th Cir.1983)); Storey v. Patient First Corp., 207 F. Supp. 2d 431, 449 (E.D. Va. 2002) (permitting a tortious interference claim to proceed against two individual defendants where the plaintiff alleged that they acted out of a personal motive).

As detailed above, well prior to the separation of his employment, Sheridan launched an aggressive campaign to interfere with 11:59's existing and prospective contractual relationships

and poach its clientele. He did so knowingly, and using improper means, including but not limited to spreading falsehoods about the Company. He did this while still employed by 11:59, and in violation of his fiduciary duties. Mr. Sheridan clearly acted outside of the scope his employment, for personal gain, and for the benefit of his new employer, Infinitive. As detailed at length above, his actions directly caused significant financial and reputational harm to 11:59, and will continue to do so absent injunctive relief. As such, 11:59 has established a clear likelihood of success with respect to its claim of tortious interference as to Sheridan.

### ii. Infinitive's Intentional Interference

With respect to Infinitive, 11:59 has also recovered communications between Sheridan and Infinitive executives - *including its CEO* - clearly demonstrating that Infinitive was not only aware of Sheridan's efforts to improperly interfere with 11:59's prospective and existing contractual relations, Infinitive actively supported Sheridan's efforts. Sheridan was effectively acting as an agent of Infinitive in his efforts, all of which were directly designed to financially benefit Sheridan and Infinitive, and harm 11:59.

As detailed above and in the Verified Complaint, Infinitive was further aware of Sheridan's actions in soliciting 11:59's current and prospective clients prior to his resignation. Sheridan communicated directly with Infinitive's CEO concerning his poaching 11:59's clientele *while employed with 11:59*, openly discussing the diversion of business while covering their electronic footprint by taking paper notes at meetings to discuss the logistics of the diversion. These communications alone go well beyond the bounds of pre-employment meetings with a prospective employee. Infinitive was aware, encouraging, and actively involved in Sheridan's systematic raid on 11:59's business prior to his departure from 11:59, and participated in Sheridan's intentional interference with 11:59's current and prospective clients.

**4. 11:59 is Likely to Prevail on Counts II-IV, Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, the Virginia Uniform Trade Secrets Act, § 59.1–336 to § 59.1–343, and Common Law Misappropriation**

11:59 is also entitled to injunctive relief due to Sheridan and Infinitive's established theft of documents containing its trade secrets on a Google drive, and through other means. As such, Plaintiff can establish violation of the DTSA and Virginia Uniform Trade Secrets Act.

"To demonstrate misappropriation of trade secrets [under the DTSA], [a plaintiff] must show ... the existence of a protectable trade secret and misappropriation of that trade secret." MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1016 (8th Cir. 2020). "'[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information,' regardless of whether it is tangible or intangible, or how the information is stored, memorialized, or maintained, can qualify for protection as a 'trade secret' under the federal Defend Trade Secrets Act." Brightview Grp., LP v. Teeters, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (quoting 18 U.S.C. § 1839(3)). Such information becomes a trade secret when "(1) the owner of the trade secret takes 'reasonable measures to keep such information secret,' and (2) the information 'derives independent economic value ... from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure [or] use of the information.' " Id. (quoting 18 U.S.C. § 1839(3)(A)–(B)).

The DTSA provides that misappropriation occurs "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, id. § 1839(5)(B)(i)." Teeters, 441 F. Supp. 3d at 132. "The DTSA further provides that the 'improper means' of acquiring a trade secret 'includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means.'" Id. (quoting 18 U.S.C. § 1839(6)(A)).

The Virginia Uniform Trade Secrets Act ("VUTSA") is analogous to the DTSA. To state a trade secret claim under the VUTSA, a plaintiff must allege sufficient facts to establish (1) the existence of a trade secret, and (2) its misappropriation by the defendant." Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 284 Va. 382, 405 (2012); Pegasystems Inc. v. Appian Corp., 81 Va. App. 433, 464 (2024) Similar to the DTSA, the VUTSA defines a trade secret as:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code § 59.1-336.

Similarly, to show common law misappropriation, the plaintiff must show: (1) the existence of a trade secret, and (2) its misappropriation by a defendant. See, e.g., Milton v. IIT Research Inst., 138 F.3d 519, 521 (4th Cir. 1998); JTH Tax, Inc. v. Williams, 310 F. Supp. 3d 648, 655 (E.D. Va. 2018).

Here, Sheridan was an executive level employee with access to a litany of 11:59 work product, including but not limited to the code environments for 11:59's demo projects, all of which was highly confidential and proprietary client business information, which 11:59 takes reasonable measures to protect and keep secret, as detailed in the Verified Complaint at ¶¶ 61-71. The information derives independent economic value, especially in regards to the services that 11:59 provides to its clients. Sheridan and Infinitive (a direct competitor of 11:59) can and already have used that information to gain unfair competitive advantage over 11:59, as evidenced by Sheridan and Infinitives' demonstrable conspiracy to improperly solicit and poach 11:59's clients *while Sheridan was still employed with 11:59*.

For example, on Sheridan's 11:59 laptop, there are artifacts showing Google drive activity for the first time in 17 months on Sheridan's last day of employment at 11:59, Friday, September 6, 2024. On Monday, September 9, 2024, Sheridan's first day of employment at Infinitive, there is access to Google Drive folders related to 11:59 work such as Project A. In response to 11:59's cease and desist letters, Sheridan acknowledged that there were "a number of files that contain his work product from his time at 11:59 on his Google Drive." 11:59 is in possession of forensic evidence suggesting that Sheridan also possesses confidential and proprietary materials on a Dropbox account, and in printed hard copy. See Verified Complaint at ¶¶ 57-59.

Sheridan's intention to misappropriate trade secrets as defined by the DTSA is further evidenced by his text message communications with Databricks, described above, in which they discussed whether Sheridan could change his 11:59 email associated with the project access site to a personal email and concern over whether Sheridan would be able to access 11:59's confidential and proprietary work product after he moved to Infinitive. Indeed, as early as August 20, 2024, Sheridan was making arrangements to obtain access to Project C's materials through his personal email address. The specific information to which Sheridan sought to maintain access was highly confidential and proprietary demo code, which would allow Sheridan to immediately perform demos for Project C upon transitioning to Infinitive, a feat he would never otherwise be able to accomplish.

More specifically, despite being employed with 11:59 since March 2023, Sheridan did not actually close any sales prior to joining Infinitive, but he did have several projects that were in the process of closing. This is in part due to the fact that the sales cycle on such deals can last as long as 12-18 months. However, following the inadvertent receipt of a calendar invite, 11:59 became aware that, immediately upon joining Infinitive, Sheridan performed demos for Project C, which

would have been completely impossible but for the benefit of the confidential and proprietary demo code Sheridan had already completed for those prospective clients while working for 11:59 and accessed after he left. In short, after 11:59 put months of work into obtaining a contract, Sheridan essentially hijacked 11:59's demo code for his own benefit and the benefit of Infinity. And he did this while still employed by 11:59.

Infinitive has acknowledged that Sheridan remains in possession of a Google Drive containing confidential and proprietary information belonging to 11:59. While Infinitive has represented that these documents were transferred onto its "computer networks," it failed to provide any information as to how Infinitive made that determination, including what systems were searched, how they were searched, and whether there are any other locations where 11:59 information may be stored. 11:59, on the other hand, has uncovered clear evidence that Sheridan accessed this material *after* he started working at Infinitive, including folders related to Projects A and C, and folder labeled "Projects," "11:59," and "Infinitive." See Verified Complaint at ¶ 58. 11:59 has also uncovered evidence suggesting that Sheridan may have stored 11:59 confidential and proprietary information in other locations, including but not limited to a Dropbox account and via printed hardcopies. Given the complicity of Infinitive's own CEO in Sheridan's diversion of 11:59 business while Sheridan was still employed by 11:59, it is highly likely that Sheridan and/or Infinitive is using and will continue to use 11:59's confidential and proprietary information to service the improperly diverted business. Hilb Grp. of New England, LLC v. Lavorgna, No. 3:24-CV-462–HEH, 2024 WL 3234060, at *6 (E.D. Va. June 28, 2024) ("[C]ourts frequently grant injunctions when there is a substantial risk that the defendant[ ] will continue to divulge or misappropriate trade secrets in the absence of court action.") (quoting ClearOne Advantage, LLC v. Kersen, No. JKB-23-03446, 2024 WL 69918, at *7 (D. Md. Jan. 5, 2024).

21

11:59 is likely to prevail on its claims for violation of the DTSA and VUTSA.

### 5. 11:59 is Likely to Prevail on Count VIII, Breach of Contract

"[T]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Navar, Inc. v. Fed. Bus. Council, 291 Va. 338, 344 (2016). "A plaintiff ... must prove two primary factors relating to damages. First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 189 (2006)

As set forth in the Verified Complaint, in consideration for his employment with 11:59, Sheridan executed a Confidentiality and Non-Disclosure Agreement ("NDA") at the commencement of his employment, on March 17, 2023.[3] The NDA requires Sheridan to keep 11:59's Confidential Information (as defined therein) "in the strictest confidence." It prohibits the disclosure of 11:59's Confidential Information to anyone outside of 11:59 without the company's prior written consent. The NDA also prohibits the use of 11:59's Confidential Information for Sheridan's own purposes or for the benefit of anyone other than 11:59. Per the NDA, at the

_____

[3] The NDA contains a choice of law provision providing for the application of California law. However, regardless of whether California or Virginia law is applied to the NDA, the same ultimate result, namely that Sheridan breached the agreement, will follow. CorRx, Inc. v. Pellecome, LLC, No. G061435, 2023 WL 6453498, at *4 (Cal. Ct. App. Oct. 4, 2023) (applying the following elements to a breach of contract claim arising from breach of an NDA: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach."). See also Iovino v. Michael Stapleton Assocs., Ltd., No. 5:21-CV-00064, 2022 WL 3684624, at *3 (W.D. Va. Aug. 25, 2022) (finding plausible allegations that plaintiff breached her NDA obligations, applying New York law). To the extent the Court is inclined to apply California law to any other cause of action stated herein or in the Verified Complaint, once again, the same result will follow.

conclusion of his employment, Sheridan was also required to promptly deliver to 11:59 "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information." The NDA further obligates Sheridan to return all of 11:59's equipment, files, software, programs and other personal property" belonging to the company.

As set forth above, Sheridan: (1) did not keep 11:59's Confidential Information in the "strictest confidence;" (2) disclosed Confidential Information to 11:59's direct competitor, Infinitive; and (3) improperly misappropriated and retained Confidential Information after the conclusion of his employment. Sheridan violated the NDA with the malicious intent to use that information to gain an unfair competitive advantage over 11:59 in his capacity as an employee of Infinitive.

In addition, Sheridan's offer letter from 11:59, which Sheridan executed in consideration for his continued employment with 11:59, contained a twelve (12) month prohibition on the solicitation of 11:59's employees following the termination of his employment. See Verified Complaint, ¶¶ 15-19. As set forth in the Verified Complaint, Sheridan disparaged 11:59 to its own employees prior to his separation, in violation of his obligations to 11:59. Id., ¶ 41.

As such, 11:59 is likely to succeed on its claim that Sheridan violated the terms of his NDA and contractual obligations to 11:59.

### 6. 11:59 is Likely To Prevail on Count V, Statutory Conspiracy in Violation of Va. Code Ann. § 18.2-499

Va. Code Ann. § 18.2-499 provides, in relevant part, that "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of […] willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever […] shall be jointly and severally guilty of a Class 1 misdemeanor. Such

punishment shall be in addition to any civil relief recoverable under § 18.2-500," which provides for treble damages, costs, and attorney's fees.

"The elements of a statutory conspiracy claim under § 18.2-499(i) are: (1) concerted action (2) legal malice; and (3) causally-related injury." <u>Virginia Vermiculite, Ltd. v. W.R. Grace & Co.</u>, 144 F.Supp.2d 558, 601 (W.D. Va. 2001) (internal citations omitted). "A plaintiff must prove that a defendant acted intentionally, purposefully, and without legal justification. The standard is legal malice rather than actual malice." <u>Jaggars v. Sandy Spring Bank,</u> No. 6:14-cv-00015, 2014 WL 2882003 at *3 (W.D. Va. June 25, 2014) (internal citations omitted).

Applied here, 11:59 can clearly demonstrate that it is likely to succeed on its claim that Sheridan and Infinitive maliciously conspired against 11:59's business interests in a concerted action designed to damage 11:59's name in the eyes of its current and prospective clients and partners.

### C.     <u>11:59 Has Suffered and Will Continue to Suffer Immediate and Irreparable Harm Without Injunctive Relief</u>

"[T]he Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill ... support a finding of irreparable harm." <u>Variable Annuity Life Ins. Co. v. Coreth</u>, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (quoting <u>Update, Inc., v. Samilow</u>, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018)). The Eastern District of Virginia has further held "the likelihood of irreparable harm in customer solicitation cases […] is obvious[,]" because "'[c]ustomers cannot be 'unsolicited[.]'" <u>Fid. Glob. Brokerage Grp., Inc. v. Gray</u>, No. 1:10CV1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (<u>quoting Merrill Lynch v. Bradley</u>, 756 F.2d 1048, 1054 (4th Cir.1985)). Furthermore, the "'loss of clients' goodwill and future business [is] difficult, if not impossible, to measure fully.'" <u>Id.</u>; <u>accord Bradley</u>, 756 F.2d

at 1055 (4th Cir. 1985) (upholding preliminary injunction when plaintiff "faced irreparable, noncompensable harm in the loss of its customers").

Moreover, a former employee's use and disclosure of confidential business information constitutes irreparable harm. Robert Half Int'l Inc. v. Billingham, 315 F. Supp. 3d at 433-34. Armed with that information, as well as the training, knowledge, and access that 11:59 provided Sheridan, Sheridan not only hit the ground running with Infinitive, he (and Infinitive) were able to hit the ground running *while Sheridan was still employed at 11:59*. As discussed above and in the Verified Complaint, email correspondence confirms that Infinitive set up a company email account for Sheridan no later than August 1, 2024 (three weeks before his resignation). Sheridan and Infinitive were also able to "'to essentially skip much of the expensive time-intensive investment that [11:59] made in [Sheridan]'" and in cultivating the relationships with its current and prospective clients. Id. at 434 (quoting Reg Seneca, LLC v. Harden, 938 F. Supp. 2d 852, 860 (S.D. Iowa)).

Moreover, as set forth above, thanks to Sheridan's misappropriation of 11:59's work product, Sheridan and Infinitive were in a position to perform demos for Project C immediately upon the commencement of Sheridan's employment at Infinitive, which never would have been the case otherwise. Sheridan and Infinitive effectively "imported" "the relationships and customer knowledge that [he] developed at [11:59]," which allows both Defendants "to capitalize on [their] presence immediately, without having to invest resources of its own to develop [them] into productive asset[s]" which is a "competitive disadvantage suffered by [11:59 that] cannot be quantified or ascertained." Robert Half, 315 F. Supp. 3d at 434. See also Maximus, Inc., 2024 WL 1756342, at *3 (finding "irreparable harm from the deletion and potential disclosure of [employer's] confidential and proprietary information."); Bowe Bell & Howell Co. v. Harris, 145

F. App'x 401, 404 (4th Cir. 2005) (finding irreparable harm where, in part, former employees copied plaintiff's source code for use in competing company.)

11:59 has also shown that it has lost at least two current or prospective clients. More importantly though, Defendants' actions have "poisoned the well" with respect to a $7M pipeline of projects, and unless enjoined from further disparaging 11:59 and using its confidential and proprietary information, 11:59 fully expects the losses to continue.

11:59 has already shown a loss of goodwill and business reputation in the industry directly resulting from the negative statements made by Sheridan to its partners and clients. The future financial value of the loss is incalculable as many of the projects Defendants "stole" were (relatively speaking) smaller initial projects to prove the value of the 11:59 solutions or create a functional proof of concept that could be built upon for future projects. 11:59 has also provided evidence that Sheridan (with Infinitive's backing) used confidential information, trade secret information, and client information without authorization. Moreover, Defendants' use of 11:59's confidential and proprietary information was not curtailed by multiple cease-and-desist letters.

This all constitutes irreparable harm. Hilb Grp. of New England, LLC v. Lavorgna, No. 3:24-CV-462–HEH, 2024 WL 3234060, at *6 (E.D. Va. June 28, 2024) (finding irreparable harm under similar circumstances); Salomon & Ludwin, LLC v. Winters, No. 3:24-CV-389-HEH, 2024 WL 3511629, at *5 (E.D. Va. July 23, 2024) (irreparable harm establish with loss of 100 clients and 400 accounts, loss of goodwill and business reputation, and "evidence of Defendants' unauthorized use of its confidential client information.")

The Court should issue the requested injunctive relief accordingly.

### D.  **The Balance of the Equities Favors a Preliminary Injunction**

For their part, despite being given every opportunity to cooperate, Defendants elected to

meet 11:59's good faith remediation efforts with delay, obfuscation, occlusion, and a flat-out refusal to provide any meaningful assurances that it is not in possession of the misappropriated information.

### E. **The Public Interest Favors a Preliminary Injunction**

"The public interest favors the protection of confidential business information." <u>Salomon & Ludwin, LLC v. Winters</u>, No. 3:24-CV-389-HEH, 2024 WL 3511629, at *6 (E.D. Va. July 23, 2024) (<u>citing</u> <u>ABT, Inc. v. Juszczyk</u>, No. 5:09-cv-119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010); <u>Home Funding Grp., LLC v. Myers</u>, No. 1:06-cv-1400 JCC, 2006 WL 6847953, at *3 (E.D. Va. Dec. 14, 2006)). <u>See also</u> <u>Brightview Grp., LP v. Teeters</u>, 441 F. Supp. 3d 115, 142 (D. Md. 2020). ("[T]he public interest favors the protection of trade secrets, and the prevention of unfair business practices.")

While Defendants will surely argue that there are countervailing public interests in fostering robust competition, these interests are outweighed when, as here, the Defendants are not engaging free and fair competition, but rather are profiting from misappropriated confidential business information in violation of trade secrets laws, fiduciary duties, and common law. <u>ClearOne Advantage, LLC v. Kersen</u>, 710 F. Supp. 3d 425, 438 (D. Md. 2024). Sheridan, went far beyond merely misappropriating 11:59's work product. He actively engaged in a systematic campaign to destroy the good will 11:59 spent countless time and money building with its clients, with the sole intent of benefiting himself and his new employer, Infinitive. Accordingly, the public interest weighs in favor of issuing a TRO.

### IV. **11:59 IS ENTITLED TO THE IMMEDIATE RETURN OF ITS CONFIDENTIAL AND PROPRIETARY INFORMATION AND DOCUMENTS, AS WELL AS EXPEDITED DISCOVEY**

As part of the injunctive relief sought, 11:59 requests that Defendants *immediately* return

any and all 11:59 trade secrets and/or confidential and proprietary information in their possession and provide a written certification attesting to this return. This requirement is not unusual. It is customary and routine for employers to require exiting employees return company property, along with any other confidential and proprietary business information belonging to their employer upon separation of employment. Indeed, this was required by Sheridan's NDA.

In addition to the return of the misappropriated documents and information, 11:59 is entitled to an immediate forensic investigation of Sheridan's personal and work devices, the personal and work devices belonging to McFarlane and Theobald, and Infinitive's "computer systems." Without forensic examination of these devices and networks, it is impossible to confirm the scope of the Defendants' misuse of 11:59's confidential and proprietary information, or to guarantee that all of it is returned. The court has broad discretion to grant expedited discovery, and it is ***routinely*** ordered in conjunction with injunctive relief. <u>ForceX, Inc. v. Tech. Fusion, LLC</u>, No. 4:11CV88, 2011 WL 2560110, at *5 (E.D. Va. June 27, 2011) ("Motions for expedited discovery are routinely considered either during a court's consideration of motions for a preliminary injunction or temporary restraining order, or directly before such motions in order to prepare for a preliminary injunction argument.")

As outlined in the Complaint, the evidence establishes that Defendants have already engaged in misconduct. However, 11:59 is constrained by the evidence immediately available to it – ***which is necessarily limited to information on 11:59's own computer network and devices***. 11:59 does not have access to Sheridan's Infinitive or personal devices or email accounts, and 11:59 has already obtained evidence that Defendants used these systems and devices to misappropriate confidential and proprietary information, divert clients away from 11:59 while he was still employed there, and badmouth 11:59 to clients, partners, and other employees. 11:59 has

also provided evidence that Sheridan communicated with McFarlane and Theobald concerning ***all of the above***, who encouraged and supported his malfeasance. Accordingly, 11:59 is entitled to expedited discovery, including but not limited to forensic inspection of Sheridan's, McFarlane's, and Theobald's Infinitive and personal devices and email accounts, as well as the "computer systems" Infinitive claims it searched, in order to ensure Defendants have returned all 11:59 confidential information in their possession, custody and control, and to identify whether 11:59 must use other means to claw back that information from third parties. Without expedited discovery, 11:59 will not be able to determine the extent of misappropriation and take steps required to prevent continued harm to 11:59.

## V.  CONCLUSION

For the reasons stated above, in 11:59's Verified Complaint, Application for a Temporary Restraining Order and Order to Show Cause, and the supporting Declarations, the Court should grant Plaintiff's application.

POTTER & MURDOCK
*Attorneys for Plaintiff M Corp dba 11:59*


By:

　　/s/John M. Murdock
John M. Murdock, Esq. (VSB#26647)
(703) 992-6950
jmurdock@pottermurdock.com
POTTER & MURDOCK, P.C.
252 N. Washington Street
Falls Church, VA  22046

Brian S. Szmak (VSB#92555)
(202) 798-6053
bszmak@pottermurdock.com
POTTER & MURDOCK, P.C.
252 N. Washington Street

Falls Church, VA  22046
*Counsel for Plaintiff Freddie Mac*

NUKK-FREEMAN & CERRA, P.C.
*Attorneys for Plaintiff M Corp dba 11:59*

By:_____
    Stacy Landau, Esq.
    (*To be admitted Pro Hac Vice*)
    Kegan S. Andeskie, Esq.
    (*To be admitted Pro Hac Vice*)
    26 Main Street, Suite 202
    Chatham, New Jersey  07928
    Tel:  (973) 665-9100
    Fax: (973) 665-9101
    slandau@nfclegal.com
    kandeskie@nfclegal.com

Dated:  October 15, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of October 2024, I filed the foregoing with the Court through the ECF system and further served the foregoing by email to and USPS First Class Mail to:

Micah E. Ticatch, Esq.
Isler Dare PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
mticatch@islerdare.com
*Attorneys for Defendant Infinitive*

Micah B. Schwartz, Esq.
Yiorgos L. Koliopoulos, Esq.
Williams Mullen
323 2nd Street SE
Suite 900
Charlottesville, VA 22902
mschwartz@williamsmullen.com
gkoliopoulos@williamsmullen.com
*Attorneys for Defendant Joseph Bradley Sheridan*

_/s/_____
John M. Murdock