IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| M CORP DBA 11:59, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 1:24-cv-1823 |
| | ) |
| INFINITIVE, INC., *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Micah E. Ticatch, Va. Bar No. 83351
Isler Dare, P.C.
1945 Old Gallows Road. Suite 650
Vienna, Virginia 22182
Phone: (703) 748-2690
Facsimile: (703) 748-2695
mticatch@islerdare.com
*Counsel for Infinitive, Inc.*

Micah B. Schwartz, Va Bar No. 77299
Yiorgos L. Koliopoulos, Va Bar No. 93608
WILLIAMS MULLEN
323 2nd Street SE, Suite 900
Charlottesville, Virginia 22902
Telephone: (434) 951-5737
Facsimile: (434) 817-0977
mschwartz@williamsmullen.com
gkoliopoulos@williamsmullen.com
*Counsel for Joseph Bradley Sheridan*

# **TABLE OF CONTENTS**

RELEVANT FACTS .................................................................................................................... 1

ARGUMENT .................................................................................................................................. 9

I.   11:59 IS NOT ENTITLED TO INJUNCTIVE RELIEF ......................................................... 9

    A.   The Copying Claims do not justify injunctive relief because there is no threat of irreparable harm. ................................................................................................................ 9

    B.   11:59 is not entitled to injunctive relief based on the Use Claims because it is unlikely to succeed on those claims or establish irreparable harm. .............................. 11

    C.   11:59 is not entitled to injunctive relief based on the Pre-Termination Communications Claims. ............................................................................................... 12

II.  11:59 IS NOT ENTITLED TO INJUNCTIVE RELIEF AGAINST INFINITIVE. ............. 13

III. 11:59 HAS NOT ADEQUATELY JUSTIFIED THE RELIEF SOUGHT. .......................... 14

CONCLUSION ............................................................................................................................ 15

Defendants Infinitive, Inc. ("Infinitive") and Joseph Bradley Sheridan ("Mr. Sheridan") jointly, through their respective counsel, submit this Opposition to Plaintiff's Motion Pursuant to Fed. R. Civ. 65 for Order to Show Cause and Temporary Restraining Order (Dkt. 6). For the reasons explained below, that Motion should be denied.

## RELEVANT FACTS

*Infinitive and 11:59.*

Infinitive is a consultancy that assists clients in effectively utilizing their digital data. Among the services Infinitive provides are: cloud migration, advanced analytics, IT governance, and data monetization. As part of its business, Infinitive consults for clients who are either looking to migrate to a cloud platform or seeking assistance with data that already resides on a cloud platform. (Second McFarlane Decl. ¶ 3.) One such data platform that Infinitive works with is Databricks. (*Id.* ¶ 4.) Infinitive has had an active Databricks practice since August 2021. The Databricks work that Infinitive performs comes both from clients who reach out directly to Infinitive for support as well as from Databricks' employees who may recommend their clients to work with Infinitive. (*Id.*)

Plaintiff 11:59 also provides data consultancy. Among its services, 11:59 also provides consulting related to the Databricks platform.

*Mr. Sheridan.*

From February 2020 until March 2023, Mr. Sheridan was employed by Infinitive. (Sheridan Decl. ¶¶ 3-4.) In March 2023, Mr. Sheridan resigned his employment from Infinitive and accepted employment with Plaintiff 11:59. At 11:59, his primary job duty was to lead the delivery of the company's Databricks consultancy services to clients. (*Id.* ¶ 6.)

Although Mr. Sheridan was primarily hired for his delivery of services, he was also involved in receiving leads for prospective work. Potential projects typically came to Mr. Sheridan in one of two ways— (i) he was contacted by a prospective-client who was interested in working with Mr. Sheridan; or (ii) a Databricks Account Executive contacted Mr. Sheridan because Databricks was working directly with a client of theirs, and believed Mr. Sheridan and his team could be helpful in servicing that prospective client. (*Id.* ¶ 7.)

On August 13, 2024, Mr. Sheridan met with his former colleague and friend, Denis McFarlane, CEO of Infinitive, to catch up socially. During the conversation, Mr. Sheridan expressed his dissatisfaction with the working conditions at 11:59 and that he was preparing to look for a new job. (*Id.* ¶ 13.)

On August 21, 2024, Mr. Sheridan received and accepted an offer of employment with Infinitive, with a start date effective September 16, 2024. (*Id.* ¶ 14.) The offer letter Mr. Sheridan signed specifically stated:

> This Company does not hire people for the purpose of acquiring their former employer's trade secrets, confidential information, or proprietary information. By signing and returning a copy of this letter, you acknowledge that you have or will return all property, including documents, memoranda, software, or other record containing information belonging to your current or former employer before starting your employment with Infinitive. You further agree that you will not bring such materials to our premises or otherwise use any such material in performing work for the Company.

(*Id.* Ex. A.)

On August 22, 2024, Mr. Sheridan notified 11:59 in writing that he was resigning from his employment with the company effective September 6, 2024. (*Id.* ¶ 16.)

Mr. Sheridan began his employment with Infinitive on September 9, 2024, where he remains presently employed. (*Id.* ¶ 20.)

2

*Mr. Sheridan's Covenants with 11:59.*

As part of his employment with 11:59, Mr. Sheridan executed a Confidentiality and Non-Disclosure Agreement. (Dkt. 1-2.) The agreement is governed by California law. (*Id.* ¶ 6(h).) It defines "Confidential Information" as "information or material that is commercially valuable to M Corp and not generally known or readily ascertainable in the industry." (*Id.* ¶ 1.) While the agreement provides a general duty to keep "Confidential Information" in strict confidence, it provides notable exceptions to that duty, stating:

> Employee shall have no obligation to treat as confidential any information which:
>
> (a) was in Employee's possession or known to employee, without an obligation to keep it confidential, before such information was disclosed to Employee by M Corp;
>
> (b) is or becomes public knowledge through a source other than Employee and through no fault of Employee; or
>
> (c) is or becomes lawfully available to Employee from a source other than M Corp.

(*Id.* ¶ 2.)

Mr. Sheridan's 11:59 offer letter contained a post-employment nonsolicitation-of-employees covenant. (Dkt. 1-1.) That covenant is almost certainly unenforceable. *See, e.g., World Fin. Grp. Ins. Agency v. Olson*, 2024 WL 3498490, at *6 (N.D. Cal. 2024). Mr. Sheridan did not agree to any other post-employment restrictive covenants. Consequently, once his employment with 11:59 was terminated, he was permitted to compete against 11:59 and solicit its clients and prospective clients.

*Mr. Sheridan's Google Drive Account.*

For years, Mr. Sheridan has utilized a Google Drive account for both personal and professional reasons. (Sheridan Decl. ¶ 8.) He has maintained personal documents, such as tax

3

and medical records on that account, as well as saved work documents that he believed he might need access to away from his work computer. (*Id.* ¶¶ 8-9.) The work documents were saved routinely throughout his employment at 11:59. (*Id.*)

Prior to his employment at 11:59, while he was working for Infinitive the first time, Mr. Sheridan created a Google Document on this Google Drive that contained a list of professional contacts and email addresses (the "Google Contact List"). When Mr. Sheridan changed his employment to 11:59, he continued to use, access, and update this document. The Google Contact List was a document maintained entirely by Mr. Sheridan and was never stored on the 11:59 computer network. Mr. Sheridan was never directed by anyone at 11:59 to maintain this document. All of the information on the Google Contact List is lawfully available from a source other than 11:59. Mr. Sheridan has not shared the Google Contact List with any individual or entity other than his counsel in the course of this litigation. (*Id.* ¶ 22.)

Following the submission of his resignation to 11:59, Mr. Sheridan created another Google Document on his Google Drive account that listed items he wanted to remember to do once he began his job at Infinitive (the "Google To Do List"). The Google To Do List was a document maintained entirely by Mr. Sheridan and was never stored on the 11:59 computer network. Mr. Sheridan was never directed by anyone at 11:59 to maintain this document. All of the information on the Google To Do List is lawfully available from a source other than 11:59. (*Id.* ¶ 23.)

In his final weeks of employment at 11:59, Mr. Sheridan copied a number of files from 11:59 to his Google Drive account. (*Id.* ¶ 15.) Mr. Sheridan now recognizes that this conduct was improper. (*Id.*) Mr. Sheridan was not acting on the direction of Infinitive when he copied 11:59's

4

documents to his Google Drive account, and Infinitive was not even aware that he had made those copies until it received 11:59's Cease-and-Desist letters. (*Id.* ¶ 25-26.)

Since his employment ended at 11:59, Mr. Sheridan has accessed his personal documents on his Google Drive account, as well as the Google To Do List and the Google Contact List. (Sheridan Decl. ¶ 24.) Importantly, Mr. Sheridan has <u>not</u> accessed, used, or copied any of the 11:59 documents saved on his Google Drive since his employment with 11:59 ended. (*Id.*)

Mr. Sheridan has repeatedly indicated to 11:59 that he would like to delete all the 11:59 documents from his Google Drive. (*Id.* ¶ 27.) However, 11:59 has repeatedly declined to provide such authorization. (*Id.* ¶ 28.)

### *Mr. Sheridan's Communications Following His Notice of Resignation.*

After giving notice of his resignation, Mr. Sheridan reached out to several contacts at both Databricks and to prospective-clients of 11:59 to inform them of his departure from 11:59 and transition to Infinitive. The primary reason for this outreach was Mr. Sheridan's concern that many Databricks representatives and prospective clients perceived themselves as hiring him rather than the company he was working for. Consequently, he believed it would be improper to resign without alerting them. (*Id.* ¶ 30.)

11:59 has alleged that Mr. Sheridan's communications led to the loss of three projects, referred to as "Project A," "Project B," and "Project C."[1]

Project A represented a potential opportunity to perform work for a state government agency. Databricks Account Executive Cheryl Miles suggested this project to Mr. Sheridan while

---

[1] Defendants object to use of pseudonyms to refer to these projects. The opportunities are not confidential information, in their own right, as the information for each is available from sources other than 11:59. Although Defendants use 11:59's nomenclature in this Opposition, they request that Court permit future filings to correctly identify the opportunities at issue.

he was working for 11:59. After learning about Mr. Sheridan's departure, Ms. Miles expressed her intention to move the work away from 11:59. (*Id.* ¶ 32.)

Project B involves a potential project for a nonprofit membership association. The prospective client for Project B is a long-time client of Infinitive, with whom Mr. Sheridan had worked while still employed at Infinitive. (2d McFarlane Decl. ¶ 6; Sheridan Decl. ¶ 33.) While at 11:59, Mr. Sheridan was contacted directly by an individual at the client whom he met during his time at Infinitive. (*Id.*) However, independently of Mr. Sheridan, the same Project B client had already approached Infinitive to discuss the same project. (*Id.*) It appears that the client was soliciting bids for Project B from both 11:59 and Infinitive. (*Id.*)

Project C was a potential opportunity to work for another state government agency involving a demonstration of the Databricks platform's capabilities to leadership within the state government agency. Databricks Account Executive Will McKinney suggested this project to Mr. Sheridan while he was working for 11:59. Prior to his last day with 11:59, Mr. Sheridan's 11:59 team experienced difficulty accessing the agency's Databricks environment. After discussing with Mr. McKinney and the state agency's representative, Mr. Sheridan discussed using his personal email address to see if that would help resolve the access issues. Mr. Sheridan does not have a record of having received any credentials and, if he did, he never logged into the state agency's Databricks environment. (*Id.* ¶ 35.)

### *Mr. Sheridan Was Not Working with Infinitive on August 1, 2024.*

11:59 incorrectly alleges that Mr. Sheridan was coordinating with Infinitive as of August 1, 2024, based on an email sent to brad.sheridan@infinitive.com on that date. The assertion is inaccurate. (*Id.* ¶ 34.)

As noted, Mr. Sheridan did not discuss the possibility of rejoining Infinitive until August 13, 2024. He did not have access to his Infinitive email address until he became employed again on September 9, 2024. (Second McFarlane Decl. ¶ 8.)

The email in question is excerpted below:

```
From:         Project B
To:           Brad Sheridan
Subject:      FW: AI Strategy
Date:         Thursday, August 1, 2024 4:27:47 PM
Attachments:  2025 - EDS AI Strategy v10.docx
              2025 - EDS AI Ethics n Compliance v5.docx


Enterprise Data Services
M:         2366
     @ Project B

From: Project B
Sent: Thursday, August 1, 2024 4:25 PM
To: David Lindstrom <david.lindstrom@1159.ai>; Tim Collinson <tim.collinson@1159.ai>; Justin Coker <justin.coker@1159.ai>
Cc: Brad Sheridan <Brad.Sheridan@infinitive.com>
Subject: AI Strategy
```

(Dkt. 1-6.)

As can be readily discerned, the original email was sent on August 1 at 4:25 p.m. Approximately two minutes later at 4:27 p.m., the email is forwarded to Mr. Sheridan's 11:59 email address. This is consistent with the sender getting an error message that the email address was not valid, realizing his mistake, and re-sending to Mr. Sheridan's correct email address.

Additionally, the recipients of the original email included *three other* 11:59 employees. This would not make sense if the email were intended as part of a surreptitious plot to provide business to Infinitive. In sum, Plaintiff's suggestion that this email demonstrates Mr. Sheridan was working for Infinitive in early August is completely without merit.

7

### *11:59 Fails to Fully Convey the Parties' Discussions.*

As noted in 11:59's Memorandum, on September 12, it sent letters to both Defendants. (*See* Dkt. 6-3, 6-4.)  On September 24, Counsel for Infinitive responded.  (Dkt. 6-5.)  As part of that response, Infinitive alerted 11:59 to the fact that the company had learned that Mr. Sheridan had copied documents to his Google Drive — but that he had not used, shared, or disclosed any of that to Infinitive.  (*Id.* at p.4.)  Infinitive also conveyed that Mr. Sheridan wished to delete the information and sought authorization from 11:59 so he could do so without violating any preservation duty.  (*Id.*)

On October 2, Infinitive provided a declaration to 11:59 stating that Mr. Sheridan had not accessed, used, or shared any of 11:59's confidential information.  (McFarlane Decl. ¶ 5.)  Further, Infinitive stated that it had searched its network and Mr. Sheridan's email and confirmed that 11:59's information was not present.  (*Id.* ¶ 6.)  Again, Infinitive conveyed that Mr. Sheridan wished to delete the information from his Google Drive to avoid 11:59's concerns with his possession of those documents.  (*See id.* ¶ 8.)

On October 3, 2024, Mr. Sheridan retained counsel, who notified 11:59 of that retention that same day.  (Koliopoulous Decl. ¶ 2.)  On October 8, 2024, Mr. Sheridan's counsel discussed the matter with 11:59's counsel.  (*Id.* ¶ 3.)  On October 11, Mr. Sheridan's counsel provided 11:59 with copies of the Google To Do List and Google Contact List, along with a draft declaration from Sheridan.  (*Id.* ¶ 4.)  The purpose of providing a draft declaration was so the parties could discuss any additional statements that 11:59 needed in the declaration to ease their concerns.  Among other things, the draft declaration again stated that Mr. Sheridan wished to receive authorization to delete 11:59's files from his Google Drive account.  (*Id.*)

8

On October 14, 2024, Mr. Sheridan's counsel provided an electronic copy of each of the 11:59 documents on Mr. Sheridan's Google Drive. (*Id.* ¶ 5.) Without further discussing concerning the return of the 11:59 documents with Sheridan or Infinitive's counsel, 11:59 filed the instant suit.

## ARGUMENT

**I.     11:59 IS NOT ENTITLED TO INJUNCTIVE RELIEF.**

In order to succeed on its request for preliminary injunctive relief, 11:59 must clearly demonstrate all four of the following elements: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm without injunctive relief, (3) that the balance of equities favor Plaintiff, and (4) that an injunction is in the public interest. *See, e.g., Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (emphasis added).

11:59 asserts claims of liability against Mr. Sheridan for three broad reasons: (i) for copying and retaining the 11:59 documents on his Google Drive (the "Copying Claims"); (ii) for the alleged use of the 11:59 documents or other confidential information (the "Use Claims"); and (iii) for his communications in the final two weeks of employment to Databricks representatives and prospective clients (the "Pre-Termination Communications Claims"). For reasons explained below, 11:59 cannot meet the exacting preliminary injunction standard as to any of these sets of claims.

**A.     The Copying Claims do not justify injunctive relief because there is no threat of irreparable harm.**

Among its claims, 11:59 has asserted claims for breach of contract, trade secret violation, and breach of duty of loyalty based on Mr. Sheridan's copying and post-employment retention of

9

11:59's documents. For the purposes of this Motion, Mr. Sheridan concedes that 11:59 is likely to be able to succeed on one or more of these claims for his acts in copying that data. However, injunctive relief is still not warranted because, regarding the Copying Claims, 11:59 will not suffer irreparable harm in the absence of an injunction.

To establish irreparable harm, a plaintiff must make a <u>clear</u> showing that it will suffer harm that cannot be remedied by monetary damages, and that such harm is "neither remote nor speculative, but <u>actual</u> and <u>imminent</u>." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (emphasis added); *also Hair Club for Men, LLC v. Ehson*, 2016 WL 3636851, at *7 (E.D. Va. 2016).

Irreparable harm does not exist merely because a former employee possesses certain confidential information of its former employer, as long as they have provided assurances that they do not intend to use the information. *See, e.g., Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 580 (S.D.N.Y. 2009); *Graham Capital Mgmt., L.P. v. Bongiovanni*, 2019 WL 632287, at *5 (D. Conn. 2019).

It is especially clear that there is no irreparable harm when the employee actively seeks to return or delete the information in his possession, and the employer refuses that request. *See id.* That is precisely the situation here. Since receiving 11:59's initial cease-and-desist letter, Mr. Sheridan has clearly stated that he does not intend to use or access the documents he copied and, he has repeatedly requested permission to delete those documents. In response, 11:59 has not only denied the request for deletion, but has repeatedly instructed Mr. Sheridan that he is required to preserve that information on his Google Drive.

Quite simply, 11:59 cannot both require Mr. Sheridan to retain the documents on his Google Drive and simultaneously claim that his mere possession of those documents constitutes an actual and imminent threat of irreparable harm.

### B. 11:59 is not entitled to injunctive relief based on the Use Claims because it is unlikely to succeed on those claims or establish irreparable harm.

Although 11:59 makes numerous assertions in its papers regarding Mr. Sheridan's alleged use of its confidential information, it cannot show that such claims are clearly likely to succeed.

While it is true that Mr. Sheridan copied and retained 11:59 documents on his Google Drive account, he has not accessed, used, or shared those documents since his employment ended. The only two documents arguably related to his 11:59 employment that he has accessed since his resignation are: 1) the Google To Do List; and 2) the Google Contact List. As noted above, neither of these documents were 11:59 documents; neither was ever stored on the 11:59 computer network; no one at 11:59 ever directed Mr. Sheridan to create or maintain these documents; and all of the information in both documents are lawfully available from sources other than 11:59. Consequently, neither of these documents constitutes confidential information.[2] As such, 11:59 cannot demonstrate that it is likely to succeed on its Use Claims.

Furthermore, *even if* 11:59 could demonstrate success on these claims, it cannot establish the risk of irreparable harm for the same reason noted above— Mr. Sheridan only has any confidential information in his possession because 11:59 will not allow him to delete it.

---

[2] As best as can be discerned, 11:59's only other allegation of Mr. Sheridan allegedly using their confidential information is an unsupported assertion that he participated in a demonstration for Project C on September 20, 2024, which 11:59 claims could only be done if he used their "demo code." (*See* Dkt. 1-7 at 9.) However, Mr. Sheridan's declaration under oath is that he did not use any 11:59 code when he attended that demonstration. (Sheridan Decl. ¶ 36.) Obviously, an unsupported allegation is insufficient to overcome Mr. Sheridan's testimony on a motion for injunctive relief.

11:59 could eliminate any chance of harm by simply allowing Mr. Sheridan to delete the confidential information in his possession, which he would prefer to do.

### C. 11:59 is not entitled to injunctive relief based on the Pre-Termination Communications Claims.

The final group of claims asserted against Mr. Sheridan is based on his communications with Databricks' employees and prospective clients that occurred after his notice of resignation, but before his final day of employment with 11:59. Plaintiff argues that at least some of these communications breached the duty of loyalty because they amounted to Mr. Sheridan engaging in competition with 11:59, while he was still an employee.

However, even assuming 11:59 can be successful on these claims, it cannot show a threat of any imminent irreparable harm in connection with these claims. That is because any duty of loyalty to refrain from competition that Mr. Sheridan owed to 11:59 ceased on his last day of employment, September 6, 2024.[3] Any future solicitations of prospective clients or Databricks' account executives are not capable of violating the lapsed duty to refrain from competition. That is especially true in this matter, where the employer chose not to require any type of contractual covenant to restrict such post-employment competition.

Furthermore, although 11:59 alleges that Mr. Sheridan's communications led to the loss of three Databricks projects, this type of harm can be fully compensated with monetary damages. *See, e.g., Hair Club for Men, LLC v. Ehson,* 2016 WL 3636851, at *7 (E.D. Va. 2016); *NVR, Inc. v. Nelson*, 2017 WL 631684, at *8 (E.D. Va. 2017). Thus, *even if* 11:59 could demonstrate some

---

[3] 11:59 notes that courts have found a continuing duty of loyalty not to use confidential information taken during employment. (*See* Dkt. 7 at 14 (citing *Safe Haven Wildlife Removal v. Meridian Wildlife Servs.*, 2024 WL 531268, at *3 (W.D. Va. 2024).) However as explained above, Mr. Sheridan has not used any confidential information post-resignation.

sort of continuing duty to refrain from speaking with former prospects, injunctive relief would still not be warranted because a judgment at law would adequately compensate 11:59.

## II.        11:59 IS NOT ENTITLED TO INJUNCTIVE RELIEF AGAINST INFINITIVE.

For the purposes of this Motion, 11:59 asserts two broad types of claims against Infinitive: (i) claims based on the fact that Mr. Sheridan has 11:59 documents on his Google Drive; and (ii) claims asserting that Infinitive aided, abetted, and/or conspired with Mr. Sheridan in his pre-termination communications with prospective clients and Databricks' employees. Neither set of claims provide justification for injunctive relief against Infinitive.

First, as noted above, Mr. Sheridan has not accessed, used, or shared any of the confidential information on his Google Drive since beginning his employment at Infinitive. Moreover, Infinitive has conducted a search of its systems and confirmed that no 11:59 documents reside on its network. Furthermore, Mr. Sheridan has confirmed that no one at Infinitive was aware of his plans to take 11:59 documents; no one encouraged him to take those documents; and he was specifically instructed otherwise in his offer letter. Consequently, the claims against Infinitive related to Mr. Sheridan's copying and retention of 11:59's documents are unlikely to be successful. Additionally, as stated above, there is no irreparable harm associated with Mr. Sheridan's possession of these documents, given that he has assured 11:59 that he has no plans to access, use or share the documents, and they only remain in his possession because 11:59 will not authorize him to delete them.

Regarding the conspiracy/aiding claims, 11:59 has not demonstrated a likelihood of success on these claims either. Again, Mr. Sheridan has disclaimed that anyone at Infinitive was aware of his plans to solicit 11:59 prospective clients or Databricks employees prior to the end of his employment and no one encouraged him to do so. The only evidence put forward by 11:59 to

13

invoke liability against Infinitive is messages that suggest Mr. Sheridan met with his soon-to-be supervisor to discuss his potential targets for business once he started with Infinitive. But "in the absence of a contract restriction regarding this duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer after resigning his post." *Williams v. Dominion Tech. Partners, L.L.C.*, 265 Va. 280, 289 (2003). Making a list of potential opportunities to compete once his employment with 11:59 ended is precisely the type of preparation to compete that is permissible under Virginia law. Given that Mr. Sheridan denies having discussed making early solicitations (or taking documents) with Infinitive, there is no basis for finding that Infinitive conspired or aided Mr. Sheridan in his conduct.

Furthermore, even if, 11:59 could demonstrate a likelihood of success on the aiding/conspiracy claims, it still cannot establish irreparable harm for the same reasons noted above — any loss of projects is fully compensable with a monetary award after trial.

### III.     11:59 HAS NOT ADEQUATELY JUSTIFIED THE RELIEF SOUGHT.

Even if 11:59 could demonstrate a right to injunctive relief, any such relief should be denied because 11:59 has not even attempted to justify its proposed order in its briefing. The briefing only requests expedited discovery and "that Defendants *immediately* return any and all 11:59 trade secrets and/or confidential and proprietary information in their possession." This request is highly misleading to the extent it insinuates that Mr. Sheridan has not already done so.

The digital documents in question are on Mr. Sheridan's Google Drive account, which resides in the cloud. The only way to "return" such digital information is to produce a copy of the documents in his possession to the employer and then delete the files residing on his Google Drive. Mr. Sheridan has *already produced* the documents in question to 11:59, and the only reason he has

not finished the job by deleting the contents from his account is because 11:59 will not permit him to do so.

Outside the briefing, 11:59 submits a Proposed Order (Dkt. 6-1) that requests, among other things, that both Defendants be enjoined from "servicing, soliciting, enticing, or inducing any 11:59 client serviced by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59." Plaintiff provides no explanation for why its Motion would justify this relief. Why, for example, would all the employees at Infinitive be prohibited from servicing *any* client that Sheridan had serviced at any time in his employment with 11:59 (including those he did not even contact at the end of his employment)?

Again, no agreement exists between 11:59 and Sheridan containing a non-competition or customer non-solicitation restrictive covenant. Moreover, the proposed order is filled with terms like "clients" and "confidential information," over which the parties are sure to disagree regarding their meanings. Plaintiff does not provide any proposed definitions or specifics either in the Proposed Order or its briefing.

Lastly, the Proposed Order includes numerous items that are more appropriately contained in Rule 33 and Rule 34 discovery requests. (*See* Dkt. 6-1 at 5-6, ¶¶ F-J.) Plaintiff provides no explanation for why such matters need to be handled in a Rule 65 order rather than in the ordinary course of discovery.

## **CONCLUSION**

For the reasons stated above, 11:59's Motion should be denied.

|     /s/ Micah E. Ticatch     |     /s/ Yiorgos L. Koliopoulos     |
|---|---|
| Micah E. Ticatch, Va. Bar No. 83351 | Micah B. Schwartz, Va Bar No. 77299 |
| ISLER DARE, P.C. | Yiorgos L. Koliopoulos, Va Bar No. 93608 |
| 1945 Old Gallows Road. Suite 650 | WILLIAMS MULLEN |

Vienna, Virginia 22182  
Phone: (703) 748-2690  
Facsimile: (703) 748-2695  
mticatch@islerdare.com  
*Counsel for Infinitive, Inc.*

323 2nd Street SE, Suite 900  
Charlottesville, Virginia 22902  
Telephone: (434) 951-5737  
Facsimile: (434) 817-0977  
mschwartz@williamsmullen.com  
gkoliopoulos@williamsmullen.com  
*Counsel for Joseph Bradley Sheridan*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of October 2024, I will file the foregoing which will provide copies to the following counsel of record:

        John M. Murdock, Esq. (VSB#26647)
        (703) 992-6950
        jmurdock@pottermurdock.com
        POTTER & MURDOCK, P.C.
        252 N. Washington Street
        Falls Church, VA 22046

        Stacy Landau, Esq.
        Kegan S. Andeskie, Esq.
        26 Main Street, Suite 202
        Chatham, New Jersey 07928
        Tel: (973) 665-9100
        Fax: (973) 665-9101
        slandau@nfclegal.com
        kandeskie@nfclegal.com


           /s/ Micah E. Ticatch
        Micah E. Ticatch, Va. Bar No. 83351
        ISLER DARE, P.C.
        1945 Old Gallows Road. Suite 650
        Vienna, Virginia 22182
        Phone: (703) 748-2690
        Facsimile: (703) 748-2695
        mticatch@islerdare.com

        *Counsel for Defendant Infinitive, Inc.*