IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| M CORP DBA 11:59, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-1823 (RDA/IDD) |
| | ) | |
| INFINITIVE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff M Corp d/b/a 11:59's ("Plaintiff") Motion for Temporary Restraining Order ("Motion"). Dkt. 6. Considering the Motion and accompanying exhibits and declarations together with Plaintiff's Memorandum in Support, Dkt. 7, the Memorandum in Opposition of Defendants Infinitive, Inc. ("Infinitive") and Joseph Bradley Sheridan ("Sheridan") (collectively, "Defendants"), Dkt. 24, and the arguments and testimony heard during the October 30, 2025 hearing, this Court GRANTS Plaintiff's Motion for the reasons that follow.

## I. BACKGROUND

### A. Factual Background

Plaintiff 11:59 is a California-based consulting firm that leverages "the power of the cloud, artificial intelligence ('AI'), and other innovative technologies" to help businesses transform their operations. *Id.* ¶ 1. Defendant Infinitive is a direct competitor of Plaintiff headquartered in Virginia. *Id.* ¶¶ 2, 9. Defendant Sheridan is an individual who has held employment with both consulting firms. *Id.* ¶ 4.

After working for Defendant Infinitive from February 2020 to March 2023, Defendant Sheridan accepted the position of Vice President ("VP") of Data Analytics with Plaintiff by executing an Offer of Employment ("Offer Letter") on March 10, 2023. *Id.* ¶¶ 14-15; Dkt. 1-1, Ex. A (Offer Letter). The Offer Letter contained clauses prohibiting Sheridan from engaging in conflicting employment and from soliciting employees of Plaintiff. Dkt.1 ¶¶ 17-19.

On March 17, 2023, Sheridan also executed an NDA regarding his use and treatment of 11:59's confidential and trade secret information. *Id.* ¶¶ 20-25; Dkt. 1-2, Ex. B ("NDA"). The NDA requires Sheridan to keep Plaintiff's Confidential Information "in the strictest confidence," prohibiting disclosure of "such information to anyone outside M Corp without M Corp's prior written consent" and prohibiting use of the information for Sheridan's "own purposes or the benefit of anyone other than M Corp." Dkt. 1-2, Ex. B at 2; Dkt. 1 ¶ 22. The NDA also contains a "Return of Materials" provision that obligates the return of "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information," as well as "equipment, files, software, programs and other personal property" belonging to Plaintiff. Dkt. 1 ¶ 23; Dkt. 1-2, Ex. B at 3.

As VP of Data Analytics, Sheridan was responsible for the growth of Plaintiff's data consulting practice, which involved "managing and maintaining client relationships, leading and overseeing complex data projects, overseeing a team who develops 11:59's custom data solutions, and included business development responsibilities." Dkt. 1 ¶ 16. To facilitate this role, Sheridan was provided with access to Plaintiff's confidential and proprietary information, "including 11:59's pipeline, forecasts, status of negotiations, clients, prospective clients, contract and pricing terms, and other critical aspects of 11:59's business." *Id.* ¶¶ 29-30.

During his employment with Plaintiff, Sheridan focused on data consulting practice projects with Databricks – one of Plaintiff's strategic partners and customers. *Id.* ¶¶ 31-32. The pipeline of work on the Databricks partner projects totaled over $7 million. *Id.* Plaintiff alleges that many of the Databricks pipeline projects "were at or near contract execution" by early August 2024. *Id.* ¶ 33. For instance, Plaintiff had received verbal commitment from a client regarding "Project A" and, as a result, there was an estimated engagement start date of August 19, 2024 on that project. *Id.*

On August 19, 2024, Infinitive offered Sheridan a new position at Infinitive. *Id.* ¶ 55. On August 22, 2024, Sheridan accepted the position with Infinitive and gave two weeks' notice of his resignation to Plaintiff, which would be effective September 6, 2024. *Id.* ¶¶ 34, 55.

Plaintiff alleges that, during the two-week period before his September 6, 2024 departure (and while he was still employed by Plaintiff), Sheridan began "brazenly and deliberately targeting 11:59's partners, vendors, customers, and prospective customers, taking improper and illegal actions to move 11:59's business to his new employer, Infinitive." *Id.* ¶ 35. Plaintiff discovered this misconduct after Sheridan's departure when the Project A client paused the project because it had "lost faith in 11:59." *Id.* ¶¶ 37-38. An internal investigation revealed that Sheridan had made derogatory and false statements about Plaintiff while he was still employed by Plaintiff and that these statements caused the Project A client to lose faith in Plaintiff. *Id.* ¶ 38. Sheridan's 11:59 email account revealed that Sheridan had informed a Databricks Account Executive ("AE") that he was returning to Infinitive and that Databricks should not do business with Plaintiff. *Id.*; Dkt. 1-5, Ex. E (email correspondence). Plaintiff also discovered an August 28, 2024 email in which Sheridan told a contact for Project B that he had resigned and would be returning to Infinitive. Dkt. 1 ¶ 40; Dkt. 1-7, Ex. G (email correspondence).

3

On September 12, 2024, Plaintiff served cease and desist letters upon Sheridan and Infinitive to put them on notice of Sheridan's breach of his agreements and to request preservation and return of Plaintiff's data and property.  Dkt. 1 ¶ 42; Dkt. 1-8, Ex. H ("Cease and Desist Letters").  Upon Sheridan's return of his 11:59-issued laptop on September 13, 2024, Plaintiff arranged for a third-party vendor to conduct a forensic examination of the laptop. Dkt. 1 ¶¶ 43-44.

Based on a review of 1,478 recovered text messages, Google searches, web history, cloud service access, and related artifacts revealed through the forensic examination of the laptop, Plaintiff discovered that "Sheridan spent weeks (at minimum) carrying out his plan to steal 11:59's confidential data and information and client projects." *Id.* ¶ 46; *see generally* Dkt. 1-11 ("Hillary Dec.").  For instance, on August 18, 2024, four days before giving notice of his resignation to Plaintiff, Sheridan texted a former 11:59 colleague that "I'm working hard to get out . . . I'm taking my Databricks AEs and several prospects with me." Dkt. 1 ¶ 46(a).  On August 21, 2024, Sheridan texted a Databricks contact, stating "Going back to Infinitive, company I left for 11.59.  Thomas out CEO let go last week.  Ran company into ground.  I'm worried about them Being (sic) insolvent, so it's time for me to leave." *Id.* ¶ 46(c).  After the contact asked if "we should pivot away from 11:59 for [Project A]," Sheridan responded that another client of his "already pulled the plug and is coming over." *Id.*  On August 22, 2024, Sheridan texted a personal contact that "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive." *Id.* ¶ 46(e).  On that same day, he texted a Databricks AE, stating "resignation done.  Last day is 9/6.  We need to come up with a plan for [Project C]." *Id.* ¶ 46(f).  On August 23, 2024, Sheridan told a former 11:59 colleague that he had diverted Projects A, B, and C successfully. *Id.* ¶ 46(g).  On August 27, 2024, Sheridan reached out to another prospective

4

client of Plaintiff, Company D, stating "I'm joining Infinitive, the company I left to come to 11:59. They have a stronger Databricks practice and a very helpful pipeline . . . I'd still like the oppty to partner with you/[Company D]." *Id.* ¶ 46(i). On August 28, 2024, Sheridan told two of his contacts that "90% of [11:59's $7 million pipeline is] mine that are leaving to follow me." *Id.* ¶ 46(j). And on September 5, 2024, while discussing Project C with a Databricks AE, Sheridan stated "I too want to steal it." *Id.* ¶ 47.

In addition to Sheridan's efforts to persuade Plaintiff's clients and prospective clients to follow him to Infinitive, Plaintiff also alleges that Infinitive aided and abetted Sheridan in doing so. *Id.* ¶ 52. For instance, on August 26, 2024, Sheridan messaged the CEO of Infinitive, Denis McFarland regarding "some prospects that want to move forward and are going to wait for me to join Infinitive." *Id.* McFarland directed Sheridan to meet with Infinitive's Managing Director, Jeff Theobald. *Id.* ¶ 53. Prior to that meeting, Sheridan instructed Theobald to "[b]ring something to take notes with bc I'm trying to minimize emails right now." *Id.*; Dkt. 1-11 ¶ 13. On August 27, 2024, Sheridan gave Theobald an email address for a Databricks contact, stating "AE for Databricks in [Project C] He will be reaching out to you." *Id.* Moreover, on September 5, 2024, prior to Sheridan's last day with Plaintiff, Sheridan reached out to an Infinitive employee to request access to his Infinitive email address sooner because "several account execs in Databricks that are pulling opportunities from 1159 tomorrow after my last day and I thought it'd be nice to not have to use my gmail." Dkt. 1 ¶ 47; Dkt. 1-11 ¶ 13.

In addition to Sheridan soliciting Plaintiff's clients to abandon Plaintiff while still working for Plaintiff, Plaintiff also asserts that Sheridan made efforts to maintain access to Plaintiff's confidential proprietary information even after his employment ended. Sheridan admitted to retaining files containing his work product from his employment with Plaintiff on a Google Drive

account. *Id.* ¶ 57; Dkt. 24-1 ¶ 24. Plaintiff's forensic analysis of the Google Drive account revealed that the account was accessed for the first time in 17 months on September 6, 2024 – Sheridan's last day of employment with Plaintiff. *Id.* ¶ 58. It also showed that, after he began working at Infinitive on September 9, 2024, Sheridan visited the Google Drive again on September 9, 10, 11, and 13, 2024, "access[ing] folders that appear to be related to Projects A and C, as well as folders entitled 'Infinitive' and '11:59.'" Dkt. 1 ¶ 58. Specifically, on September 9, 2024, "there is access to Google Drive folders related to . . . Project A, Project C, and Company D," and on September 11, 2024, there is access to folders including Project C , a general folder named "Projects," and a folder named "Infinitive." *Id.* Plaintiff also alleges that Sheridan reached out to a client contact for Project C to request access to the "11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address." *Id.* ¶ 46(b). Emails reveal that Sheridan then conducted a demo for Project C on September 20, 2024, after starting with Infinitive on September 9, 2024. *Id.* ¶ 48. Plaintiff alleges that Sheridon conducted the demo using Plaintiff's coding because "Sheridan could not have developed a demo in such a short amount of time as he did not have the skills necessary to do so." *Id.*

Plaintiff asserts that absent Defendants' efforts to solicit its customers and partners, it is likely that Plaintiff would have finalized its contracts with those clients and continued those relationships. Instead, Plaintiff suffered harm due to Defendants' actions causing the loss of Projects A and C. *Id.* ¶ 76. Plaintiff also suffered harm from Sheridan's retention and use of its confidential information for the benefit of himself and Plaintiff's direct competitor, Infinitive. *Id.* ¶ 77.

## B.  Procedural Background

On October 15, 2024, Plaintiff filed a Verified Complaint, alleging ten causes of action against Defendants in this Court for the alleged misconduct.  Dkt. 1.  Plaintiff also filed the instant Motion for TRO, Dkt. 6, along with a Memorandum in Support, Dkt. 7.  On October 28, 2024, Defendants filed a Memorandum in Opposition, Dkt. 24, and Plaintiff filed additional declarations to support its Motion, Dkt. Nos. 25-27.  A hearing regarding Plaintiff's Motion for TRO was held before this Court on October 30, 2024.  Dkt. 30.  The Court heard argument from the parties, as well as the testimony of Defendant Sheridan.  *Id.*

Ultimately, with its request for TRO, Plaintiff seeks:

> "a Preliminary Injunction: (1) requiring Infinitive and Sheridan to immediately return all of 11:59's confidential documents and information in their possession, custody, and control, (2) enjoining Sheridan from soliciting 11:59's current employees or otherwise violating his post-employment contractual obligations, (3) requiring Infinitive and Sheridan to cease working with 11:59's current and prospective clients Sheridan serviced at 11:59, (4) enjoining Defendants from disparaging 11:59, (5) granting expedited discovery, including but not limited to forensic discovery of Defendants' computer systems and electronic devices, and (6) compelling Sheridan and Infinitive to provide 11:59 with statements made under oath that all of 11:59's documents and property have been returned."

Dkt. 7 at 2.

## II. STANDARD OF REVIEW

A motion for a TRO is subject to the requirements of Federal Rule of Civil Procedure 65(b).  "While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held."  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).  A grant of temporary injunctive relief requires the movant to establish the same four factors that govern preliminary injunctions: (1) that the plaintiff will likely succeed on the merits; (2) that the plaintiff will likely suffer irreparable harm if the TRO is denied; (3) that the

balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### III. ANALYSIS

A review of the factors set forth in *Winter* establishes that Plaintiff has satisfied its burden to obtain a TRO. The Court addresses the elements for entry of a TRO, the amount of the required security bond, and expedited discovery below.

#### A. Temporary Restraining Order

Having reviewed the papers and exhibits filed in support of Plaintiff's Motion, the Court hereby makes the following findings.

#### 1. Likelihood of Plaintiff's Success on the Merits

Where multiple causes of action are alleged, "finding a likelihood of success on only one claim is sufficient to 'justify injunctive relief.'" *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021). Here, Plaintiff brings ten causes of action[1] and is likely to succeed on the merits of at least one of its claims. The Court will address three of those claims below.

#### a. Breach of Fiduciary Duty Claim

Plaintiff is likely to succeed on its breach of fiduciary duty claims against Sheridan. To prevail on a breach of fiduciary duty, a plaintiff must establish "(1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) subsequent damages attributable to the breach." *DCG & T*

---

[1] Plaintiff asserts the following causes of action: (1) Breach of Duty of Loyalty; (2) Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (3) Virginia Uniform Trade Secrets Act, , § 59.1-336 to § 59.1-343; (4) Common Law Misappropriation of Trade Secrets; (5) Conspiracy in Violation of Virginia Code § 18.2-499; (6) Tortious Interference with Business Expectancies and/or Contract Relations; (7) Aiding and Abetting Breach of Fiduciary Duty; (8) Breach of Contract; and, (9) Violation of the Federal Computer Fraud and Abuse Act; (10) Violation of the Virginia Computer Crimes Act. Dkt. 1 ¶¶ 79-185.

*ex rel. Battaglia/Ira v. Knight*, 68 F. Supp. 3d 579, 586 (E.D. Va. 2014).  In Virginia, employees owe a fiduciary duty of loyalty to their employers.  *See Horne v. Holley*, 167 Va. 234, 241 (1936) (holding that "the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer.  He is duty bound not to act adversely to the interest of his employer"); *see also Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 247 Va. 240, 249 (1994) ("An employee's duty to his employer not to compete arises out of his relationship to his employer.").  As part of this duty, an employee must not have "misappropriated trade secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment."  *Feddeman & Co. v. Langan Assoc.*, 260 Va. 35, 42 (2000). Moreover, after the employment relationship has ended, an employee "continue[s] to owe his former employer a fiduciary duty under *limited* circumstances, such as when the former employee engages in business transactions founded on information gathered during his employment."  *Safe Haven Wildlife Removal & Prop. Mgmt. Experts, LLC v. Meridian Wildlife Servs. LLC*, No. 7:21-CV-00577, 2024 WL 531268, at *3 (W.D. Va. Feb. 9, 2024) (citing *Today Homes, Inc. v. Williams*, 272 Va. 462 (2006)).

Plaintiff alleges that Sheridan breached the duty of loyalty that he owed to Plaintiff to "act in the company's best interest and to not compete against 11:59 during his employment."  Dkt. 1 ¶ 80.  Sheridan allegedly breached this duty by disparaging Plaintiff to its customers and employees while he was employed by Plaintiff, *id.* ¶¶ 41, 46(c), 46(k); actively persuading Plaintiff's customers to follow him to Infinitive, while he was employed by Plaintiff, *id.* ¶¶ 46(a)-(k), 47-50; abandoning his efforts to secure contracts for in progress projects, while he was employed by Plaintiff, *id.* ¶ 45; maintaining access to and using Plaintiff's demo code to solicit Plaintiff's customers, after his employment with Plaintiff ended, *id.* ¶¶ 46(b), 46(d), 47-49, 53;

9

maintaining access to Plaintiff's confidential information after his employment ended by copying files to his Google Drive, after his employment with Plaintiff ended, *id.* ¶¶ 57-58, 60; and failing to maintain the secrecy of Plaintiff's confidential, proprietary and trade secret information to benefit himself and Infinitive, after his employment with Plaintiff ended, *id.* ¶ 81.  In doing so, Sheridan caused harm to Plaintiff in the form of lost customer and partner relationships. *Id.* ¶¶ 75-77.  Courts have previously found liability for an employee's breach of fiduciary duty in cases with similar facts.  *See Audio-Video Grp., LLC v. Green*, No. 1:14CV169 JCC/TCB, 2014 WL 793535, at *3 (E.D. Va. Feb. 26, 2014) (finding likelihood of success where the plaintiff submitted evidence from former employee's laptop showing that former employee was competing with plaintiff while still employed by plaintiff); *see also Maximus, Inc. v. Holdren*, No. 24-CV-395, 2024 WL 1756342, at *1 (E.D. Va. Mar. 15, 2024).  Therefore, as Sheridan concedes,[2] Plaintiff is likely to succeed on its breach of fiduciary duty claim against Sheridan.

### b. Aiding and Abetting Breach of Fiduciary Duty

Plaintiff is also likely to succeed on the merits of its claim that Infinitive aided and abetted Sheridan in the breach of his fiduciary duty to Plaintiff. *Id.* ¶¶ 150-53; *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, No. 93-1359, 1994 WL 717598, at *4 (4th Cir. Dec. 29, 1994) ("Under Virginia law, one who aids and abets a third party's breach of fiduciary duty may be held liable for providing such assistance.").  A plaintiff asserting this cause of action must establish the defendant's "(1) actual knowledge of the underlying fiduciary duty and (2) actual knowledge of the breach of that fiduciary duty by the primary tortfeasor." *Best Medical Intern., Inc. v. Wittmer*,

---

[2] Defendants state that "11:59 has asserted claims for breach of contract, trade secret violation, and breach of duty of loyalty based on Mr. Sheridan's copying and post-employment retention of 11:59's documents. For the purposes of this Motion, Mr. Sheridan concedes that 11:59 is likely to be able to succeed on one or more of these claims for his acts in copying that data." Dkt. 24 at 9-10.

73 Va. Cir. 504, at *2 (2007) (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 660 (2004)).

Moreover, in addition to knowledge of the breach, a "plaintiff must assert that the defendant

somehow recruited, enticed, or participated in the fiduciary's breach of its duty." *Halifax Corp.*,

268 Va. at 661.

Here, Plaintiff alleges that, during Sheridan's campaign to solicit Plaintiff's clients and

partners to move business to Infinitive while he was still employed by Plaintiff, Infinitive was

aware that Sheridan was still employed by Plaintiff and thus aware that Sheridan owed Plaintiff a

fiduciary duty of loyalty. Dkt. 1 ¶¶ 151-52; Dkt. 7 at 12. Moreover, Infinitive encouraged and

participated in Sheridan's breach of that duty. On August 26, 2024, while Sheridan was still

employed by Plaintiff, Sheridan messaged the CEO of Infinitive, stating:

> I have some prospects that want to move forward and are going to wait for me to join
> Infinitive. I'd like to chat with someone, perhaps Jeff, but wanted to know if you'd rather
> me wait until the 16th or can I reach out now to setup another coffee with him?

Dkt. 1 ¶ 52. The CEO directed Sheridan to meet with Infinitive's Managing Director, Theobald.

*Id.* ¶ 53. Prior to that meeting, Sheridan instructed Theobald to "[b]ring something to take notes

with bc I'm trying to minimize emails right now." *Id.*; Dkt. 1-11 ¶ 13. On August 27, 2024,

Sheridan gave Theobald an email address for a Databricks contact, stating "AE for Databricks in

[Project C] He will be reaching out to you." Dkt. 1 ¶ 53. Sheridan had previously contacted

Project C on August 20, 2024 to request access to its systems using his personal Gmail. *Id.*; Dkt.

1-11 ¶ 13. Moreover, on September 5, 2024, prior to Sheridan's last day with Plaintiff, Sheridan

reached out to an Infinitive employee to request access to his Infinitive email address sooner

because "several account execs in Databricks that are pulling opportunities from 1159 tomorrow

after my last day and I thought it'd be nice to not have to use my gmail." Dkt. 1 ¶ 47; Dkt. 1-11 ¶

13. These communication convey to Infinitive that Sheridan was engaging in subterfuge to hide

his breaches of fiduciary duty from Plaintiff. As alleged, Infinitive took steps to assist Sheridan in continuing this subterfuge (such as by providing an Infinitive email address) against Plaintiff to Infinitive's benefit.

Thus, upon review of the record, Plaintiff is likely to succeed with its aiding and abetting claim against Infinitive. *See AvalonBay Communities, Inc. v. Willden*, No. 1:08-CV-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) (finding third party liable for aiding and abetting in employee's breach of fiduciary duty of loyalty owed to the plaintiff where third party participated in the breach), *aff'd,* 392 F. App'x 209 (4th Cir. 2010).

c. Tortious Interference with Business Expectancies and/or Contract Relations

Plaintiff is also likely to succeed on its tortious interference with business expectancies and/or contract relations claim. Plaintiff asserts this claim against both Defendants. Dkt. 1 ¶¶ 143-149. In Virginia, to prevail on a claim for tortious interference with a business expectancy, a plaintiff must establish "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Benton v. Phillips Edison & Co., Ltd.*, No. 3:17-cv-630, 2017 WL 6273361, at *6 (quoting *Commercial Bus. Sys. v. Halifax Corp.*, 253 Va. 292, 300 (1997)).

Here, Plaintiff alleges that Sheridan and Infinitive "are both aware of 11:59's expected business relationships and contracts with its customers," Dkt. 1 ¶ 145, and have "intentionally sought to destroy 11:59's relationships with its customers," *id.* ¶ 146. After Sheridan's departure, Plaintiff discovered that various projects being managed by Sheridan were suddenly in jeopardy due to his campaign to convince these projects to follow him. *Id.* ¶ 37; Dkt. 7 at 16-17. Although

the Verified Complaint refers to several projects and companies that Sheridan attempted to solicit, Project A and Project C are of note here.

Plaintiff alleges that it received verbal commitment for Project A, a Databricks project that had an estimated engagement start date of August 19, 2024. Dkt. 1 ¶ 33. Sheridan had knowledge of this engagement because he managed the project. *Id.* ¶ 37. While still employed by Plaintiff, Sheridan disparaged Plaintiff through text messages with his Databricks contacts. *See, e.g., id.* ¶ 46(c) (informing Databricks contact that "I'm worried about [Plaintiff] Being insolvent, so it's time for me to leave" and, after contact asked "Should we pivot away from 11:59 for [Project A][,]" advising her that one of his clients "already pulled the plug and is coming over [to infinitive]"); *Id.* ¶ 46(k) (notifying Databricks AE that "a lot of negative stuff is going on at 11:59 and I need to get out"). Soon after Sheridan's departure on September 6, 2024, Project A informed Plaintiff that it had lost faith in the company and would be putting the project on hold. *Id.* ¶ 37. Absent Sheridan's disparaging comments, it is likely that Plaintiff would have continued in its relationship with Project A. Instead, Plaintiff suffered harm due to Sheridan's actions causing the loss of Project A. *Id.* ¶ 76.

Project C is another Databricks partner project that Sheridan worked on during his employment with Plaintiff. *Id.* ¶ 46(b) n.6. Plaintiff alleges that, on August 20, 2024, Sheridan reached out to a client contact for Project C and requested access to the "11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address." *Id.* ¶ 46(b). The next day, he texted a Databricks contact stating that he was putting in his notice of resignation "tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." *Id.* ¶ 46(d). With that same contact, Sheridan also discussed changing the email address associated with the project site to his personal

email and expressed concern about whether he would be able to access the demo coding – Plaintiff's work product – after he began at Infinitive. *Id.* On August 22, 2024, he texted a Databricks AE that his "resignation done. Last day is 9/6. We need to come up with a plan for [Project C]." *Id.* ¶ 46(f). On August 26, 2024, Sheridan messaged the CEO of Infinitive, Denis McFarland stating, "I have some prospects that want to move forward and are going to wait for me to join Infinitive. I'd like to chat with someone, perhaps Jeff. . ." *Id.* ¶ 52. McFarland directed Sheridan to meet with Infinitive's Managing Director, Jeff Theobald. Dkt. 1 ¶ 53. On August 27, 2024, Sheridan gave Theobald an email address for the "AE for Databricks in [Project C] He will be reaching out to you." Dkt. 1 ¶ 53. On September 5, 2024, Sheridan had a discussion with the Databricks AE on how to convince Project C to move to Infinitive, stating "I too want to steal it." *Id.* ¶ 48. Additionally, emails reveal that Sheridan conducted a demo for Project C on September 20, 2024, after starting with Infinitive on September 9, 2024. *Id.* Plaintiff alleges that Sheridon conducted the demo using Plaintiff's coding because "Sheridan could not have developed a demo in such a short amount of time as he did not have the skills necessary to do so." *Id.* As with Project A, absent Sheridan's efforts to persuade Project C to follow him, it is likely that Plaintiff would have continued its relationship with Project C. Instead, Plaintiff suffered harm due to Sheridan's actions causing the loss of Project C. *Id.* ¶ 76.

Accordingly, Plaintiff is likely to succeed on its tortious interference with business expectancies and/or contract relations claim because Defendants used improper means to interfere with Plaintiff's business relationships and Plaintiff has incurred the loss of current and prospective clients because of that interference.

### 2. Likelihood of Irreparable Harm to Plaintiff

In addition to success on the merits, Plaintiff is also likely to suffer irreparable harm in the absence of a TRO. A party generally suffers irreparable harm where monetary damages are difficult to ascertain or are inadequate. *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488 (E.D. Va. 2021). "[T]he Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of costumers and the potential loss of goodwill . . . support a finding of irreparable harm." *Variable Annuity Life Ins. Co. v. Corinth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (quoting *Update, Inc., v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018)). Similarly, courts in this District have held that "the likelihood of irreparable harm in customer solicitation cases . . . is obvious" because "'[c]ustomers cannot be 'unsolicited.'" *Fid. Glob. Brokerage Grp., Inc. v. Gray*, No. 1:10-cv-1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (quoting *Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985)). Moreover, a former employee's use or disclosure of confidential business information can also constitute irreparable harm. *See Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) ("Once Plaintiff's 'information is disclosed to [ ] competitors in the market,' Plaintiff to some extent will lose a competitive advantage over competitors, and 'that loss would be hard to quantify through money damages.'"); *see also E.I. De Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691 (E.D. Va. 2012) ("The damage remedy . . . is insufficient to protect the plaintiff's interest against . . . the competitive use of its own trade secrets against it in the competitive marketplace.").

Plaintiff will likely suffer irreparable harm if the TRO is denied because of the threat of permanent loss of customers and goodwill. Plaintiff alleges that Defendants' conduct has already caused the loss of various projects. Dkt. 1 *id.* ¶ 76 ("11:59 has already received confirmation that Projects A and C will not proceed with 11:59 and that instead, they have moved these projects to Sheridan and Infinitive."). Indeed, prior to his last day with Plaintiff, Sheridan himself claimed to

have successfully persuaded Plaintiff's prospective clients to follow him to Infinitive. *See, e.g.,* Dkt. 1 ¶ 46(e) (confirming to personal contact that "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive."); *see also* Dkt. 1-11 at 6 (informing former 11:59 colleague that "Cheryl isn't going to sign the [Project A] sow. She waiting for me to start at INF. Then Will . . . told me he's going to have [Project C] wait too . . . Then [Project B] told me yesterday that . . . he's not going to sign the proposal with 11:59."). Because Plaintiff has already lost clients, the harm Plaintiff faces here is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

Plaintiff also faces irreparable harm from Sheridan's retention of Plaintiff's confidential proprietary information. Sheridan admitted to retaining files containing his work product from his employment with Plaintiff on a Google Drive account. *Id.* ¶ 57; Dkt. 24-1 ¶ 24. Plaintiff's forensic analysis of the Google Drive account revealed that the account was accessed for the first time in 17 months on September 6, 2024 – Sheridan's last day of employment with Plaintiff. Dkt. 1 ¶ 58. Despite Defendants' claims that Sheridan has not accessed Plaintiff's confidential files since beginning with Infinitive on September 9, 2024, Dkt. 24 at 13, the forensic analysis showed that Sheridan visited the Google Drive on September 9, 10, 11, and 13, 2024, "access[ing] folders that appear to be related to Projects A and C, as well as folders entitled 'Infinitive' and '11:59.'" Dkt. 1 ¶ 58. Specifically, on September 9, 2024, "there is access to Google Drive folders related to . . . Project A, Project C, and Company D," and on September 11, 2024, there is access to folders including Project C, a general folder named "Projects," and a folder named "Infinitive." *Id.* Plaintiff has also provided evidence that Sheridan used confidential information without Plaintiff's authorization on September 20, 2024 during a demo for Project C. *Id.* ¶¶ 46(b), 48. "Courts

16

frequently grant injunction when there is a substantial risk that the defendants will continue to divulge or misappropriate trade secrets in the absence of court action." *ClearOne Advantage, LLC v. Kerson*, 2024 WL 69918, at \*7 (D. Md. Jan. 5, 2024) (citation omitted).

Accordingly, this factor counsels in favor of granting the requested relief.

### 3. The Balance of Equities

The balance of equities also tips in favor of injunctive relief. As established, Plaintiff has demonstrated a likelihood of success on at least one claim, has suffered harm due to the loss of clients, and continues to face irreparable harm if the conduct continues. In contrast, Defendants would suffer minimal harm if they were restrained from soliciting Plaintiff's clients.

Plaintiff, however, requests a TRO enjoining Defendants from "[d]irectly or indirectly *servicing*, soliciting, enticing, or inducing any 11:59 client serviced by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59." Dkt. 6-1 at 3 (emphasis added). This proposed restriction is too broad, as an injunction prohibiting Defendant Infinitive from "servicing" Plaintiff's clients would interfere with the clients' freedom to contract with whomever they choose. *See United States v. Colgate Co.*, 250 U.S. 300, 307 (1919) (recognizing that "a business has a right to deal, or refuse to deal, with whomever it likes"). A more narrowly tailored injunction would better balance the interests of both parties, allowing Defendant Infinitive to continue servicing its existing clients and acquiring new ones, but prohibiting it and Sheridan from *actively* soliciting any client of Plaintiff's that Sheridan serviced during his employment with Plaintiff. *See Salomon & Ludwin, LLC v. Winters*, No. 3:24-CV-389-HEH, 2024 WL 3511629, at \*6 (E.D. Va. July 23, 2024) ("[A]n injunction here would not prohibit Defendants from working with Plaintiff's former clients, nor would it prohibit clients from leaving

Plaintiff's firm of their own volition.  It would only prevent Defendants from soliciting clients, leaving the clients free to choose who they would like to hire.").

Narrowing the relief to temporarily prohibit Defendants from soliciting Plaintiff's clients and to prohibit only Sheridan from servicing clients that he serviced during his employment with Plaintiff allows Infinitive to service existing clients while preventing further harm to Plaintiff, thus balancing the equities by protecting Plaintiff's interests without unduly restricting Defendants' business activities. *See id.* ("The only limitation is that they would be unable *to proactively* solicit Plaintiff's clients.").

### 4. Public Interest

Finally, a TRO in this case serves the public interest.  The public interest favors the protection of confidential business information." *Salomon & Ludwin, LLC v. Winters*, No. 3:24-CV-389-HEH, 2024 WL 3511629, at *6 (E.D. Va. July 23, 2024); *see also Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020) ("[T]he public interest favors the protection of trade secrets, and the prevention of unfair business practices.").

Thus, upon review of the record before it, this Court finds that an analysis of the TRO elements demonstrates that injunctive relief is appropriate at this juncture.

### B. Security Bond

Courts "may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  A district court has discretion to set the bond amount where it deems proper, but "it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co.*, 174 F.3d at 421.

18

In trade secret misappropriation cases, courts often set bond between $100,000 and $200,000. *See Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 & n.14 (M.D.N.C. 2009) (awarding $100,000 bond after enjoining former employee from working for a competitor and from disclosing plaintiff-former employer's confidential information); *Teksystems, Inc. v. Spotswood*, 2005 WL 8174397, at *7 (D. Md. June 29, 2005) (awarding $125,000 bond after enjoining former employee from using previous employer's trade secrets for another competitor); *Rockford Mfg., Ltd. v. Bennet*, 296 F. Supp. 2d 681, 691 (D.S.C. 2003) (awarding $200,000 bond in case involving former employee's violation of a non-disclosure and non-compete agreement).

Under appropriate circumstances, however, courts have also issued nominal bonds in trade secret misappropriation cases. *See Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 556-57 (3d Cir. 2003) (affirming award of nominal bond of $10,000 in trade secret misappropriation case because the enjoined party "produced no evidence of any irreparable harm to it from the injunction"); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 145 (D. Md. 2020) (setting bond of $10,000 in trade secret misappropriation case because the defendants did not show evidence of likelihood of harm and were free to continue their business without using confidential information of the plaintiff).

Here, Defendants have shown no evidence of likelihood of harm stemming from entry of a TRO and would be free to continue their business without using Plaintiff's confidential information. "The fact that they may lose some opportunity because of an injunction's issuance, due to their own previous misconduct, is not a relevant harm." *Brightview Grp.*, 441 F. Supp. 3d at 145. Nevertheless, out of an abundance of caution, the Court will require Plaintiff to post a $50,000 bond. This amount is more than ample to account for any harm that could accrue to Defendants due to the TRO.

C. Expedited Discovery

District courts enjoy "broad discretion" to supervise discovery, *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014), and may allow discovery to begin before a Rule 26(f) conference occurs. *See* Fed. R. Civ. P. 26(d)(1). In the instant case, because Plaintiff has demonstrated that it faces irreparable harm if Defendants' conduct continues, the interests of justice permit limited and expedited discovery to allow the parties to prepare for a preliminary injunction hearing. *ForceX, Inc. v. Tech. Fusion, LLC*, No. 4:11CV88, 2011 WL 2560110, at *5 (E.D. Va. June 27, 2011) ("Motions for expedited discovery are routinely considered either during a court's consideration of motions for a preliminary injunction or temporary restraining order, or directly before such motions in order to prepare for a preliminary injunction argument."). The Court therefore orders that limited discovery as outlined below may begin upon entry of this order.[3]

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiff's Motion for Temporary Restraining Order (Dkt. 6) is GRANTED; and it is

FURTHER ORDERED that Defendants are temporarily enjoined and restrained from the following:

    A. Soliciting or inducing any 11:59 client serviced within the last two (2) calendar years by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59 or assisting any other person or entity to do so;

---

[3] To give the parties an opportunity to conduct the expedited discovery and prepare for a Preliminary Injunction hearing, the hearing will be set for December 12, 2024. The TRO will remain in place during this period.

B. With respect to Defendant Sheridan, servicing any 11:59 client serviced within the last two (2) calendar years by Sheridan during his employment with 11:59 or assisting any other person or entity to do so;

C. Using any confidential, proprietary, or trade secret information of 11:59;

D. Continuing to use 11:59's confidential information, and Defendants shall specifically identify, preserve, and appropriately sequester and refrain from further accessing any and all documents and information belonging to 11:59 in Defendants' possession, including but not limited to, hard copies and computer-saved versions of these documents, whether the information is on external hard drives, disks, CD-ROMs, networked data services, internet accessed outside storage, or any other portable media device;

E. With respect to Defendant Sheridan, directly or indirectly soliciting, recruiting, inducing, or hiring any employee of 11:59 to work for a third party other than 11:59 or engage in any activity that would cause any employee to violate any agreement with 11:59;

F. With respect to Defendant Sheridan, disclosing any 11:59 confidential, proprietary, and trade secret information or documents to any third party, including but not limited to Infinitive;

And further requiring that:

G. Defendants shall immediately produce copies of any and all of 11:59's documents or data within their possession to 11:59;

H. Defendants shall produce communications between Defendant Sheridan and representatives of Infinitive between August 19, 2024, and September 6, 2024;

21

I. Sheridan shall identify any and all storage locations where he retained, copied, accessed or modified 11:59's confidential, proprietary or trade secret information following his separation from 11:59;

J. Sheridan shall identify any and all third parties, including but not limited to Infinitive, to whom he provided information or documents belonging to 11:59;

K. Sheridan shall provide a certification that verifies, under penalty of perjury, that he has identified, preserved, and appropriately sequestered and refrained from further accessing any all 11:59 documents and information in his possession and he has not retained copies, electronic or otherwise;

L. An appropriate and duly authorized representative of Infinitive shall provide a certification that verifies, under the pains and penalties of perjury, that Infinitive has specifically identified, preserved, and appropriately sequestered and refrained from further accessing any all 11:59 documents and information in its possession; and it is

FURTHER ORDERED that pursuant to Fed. R. Civ. P. 26(d)(1), the parties may engage in expedited discovery as set forth below concerning the factual allegations contained within and the subject matter of the Verified Complaint:

A. Within five (5) business days of this Order, the parties shall be entitled to serve Requests for Admission and Requests for the Production of Documents.

B. Within fourteen (14) days of this Order, the parties shall agree upon a forensic protocol, including but not limited to: (1) a declaration from Sheridan identifying all devices, accounts, and storage locations in which he has retained or stored 11:59 confidential, proprietary, or trade secret information, or which he has disclosed 11:59 confidential, proprietary, or trade secret information; (2) the forensic imaging of all such devices,

22

accounts, and storage locations within Sheridan or Infinitive's possession or control; (3) the neutral forensic search of such locations using search terms agreed upon by the parties, to identify 11:59 information; and (4) directing the neutral forensic generation of forensic reports regarding such imaged devices and accounts (All Files Report, USB report on laptop/computer device(s), USB report on external drive(s), Deleted Files/Folders report, Recycle bin report, Shellbag report, LNK file report, and anti-remediation analysis), and providing the results to 11:59 counsel;

C. Each party may in the interim conduct up to three (3) depositions; and it is

FURTHER ORDERED that the Parties shall preserve all documents, electronically stored information and other information relevant to factual allegations and claims contained within the Verified Complaint; and it is

FURTHER ORDERED, pursuant to Federal Rule of Civil Procedure 65(b), that Defendants shall appear before this Court in Courtroom 1000 of the Albert V. Bryan Courthouse on December 12, 2024 at 10:00 a.m. to show cause, if any, why this Court should not enter a Preliminary Injunction, pending final ruling on the Complaint against Defendants, enjoining Defendants from the conduct temporarily restrained by the preceding provisions of this order; and it is

FURTHER ORDERED that Plaintiff shall post bond in the amount of $50,000 to be paid into the Court registry pursuant to Federal Rule of Civil Procedure 65(c); and it is

FURTHER ORDERED that this Temporary Restraining Order shall remain in effect for forty-five (45) days from the date and time of the entry of this Order.

It is SO ORDERED.

Alexandria, Virginia
November _6_, 2024

/s/

Rossie D. Alston, Jr.
United States District Judge

23