
# EXHIBIT J



1945 Old Gallows Road, Suite 650
Tysons Corner / Vienna, Virginia 22182
703.748.2690 / 703.748.2695 (fax)

1111 East Main Street, Suite 1605
Richmond, Virginia 23219
804.489.5500 / 804.234.8234 (fax)

9841 Broken Land Parkway, Suite 214
Columbia, Maryland 21046
443.537.9810

300 East Main Street
Charlottesville, Virginia 22902
804.489.5500

www.islerdare.com

Sender's email: mticatch@islerdare.com

Steven W. Ray
Admitted VA DC MD CA

Edward Lee Isler
Admitted VA DC

Michelle B. Radcliffe
Admitted VA DC MD

Andrea I. O'Brien
Admitted VA DC MD

Steven D. Brown
Admitted VA CT FL NC

J Eric Paltell
Admitted VA DC MD

Lori H. Turner
Admitted VA DC MD

Vi D. Nguyen
Admitted VA DC

Jeanne E. Floyd
Admitted VA

Crystal L. Tyler
Admitted VA

Micah E. Ticatch
Admitted VA DC MD CA

Alison D. Kewer
Admitted VA GA

Amy E. Smith
Admitted VA DC GA FL

Grace H. Ristuccia
Admitted VA DC IL

Lindsey Strachan Komisin
Admitted VA

Clifford B. Geiger
Admitted MD

J. Garrett Wozniak
Admitted MD

Ashley F. Hedge
Admitted VA DC MD

Matthew M. Craig
Admitted VA PA

Jessica E. Kuester
Admitted DC MD PA IN

Katherine L. Yourth
Admitted NY

Ramana R. Briggs
Admitted VA DC

R. Mark Dare (Ret.)
Wayne A. Schrader (Ret.)
W. Michael Holm (Ret.)

September 24, 2024

**<u>Via Email</u>**
Stacy Landau, Esq.
Nukk-Freeman & Cerra, PC
26 Main Street, Ste 202
Chatham, NJ 07928
slandau@nfclegal.com

Stacy,

      As we have previously discussed, this firm is counsel to Infinitive, Inc. ("Infinitive"). This letter constitutes the company's response to your September 12 letter to Infinitive on behalf of the California entity M Corp ("11:59"). Although I do not represent Mr. Sheridan, he has reviewed this letter, agrees that it is accurate, and authorizes it to stand as his response to your prior correspondence with him.

      In the course of looking into the allegations in your letter, we have reviewed your correspondence with Infinitive and Mr. Sheridan. As you know, you and I also briefly spoke on September 17 regarding your client's concerns.

      Unfortunately, your correspondence both to Infinitive and to Mr. Sheridan consists almost entirely of assertions of wrongdoing without corresponding details as to the specific improper conduct for which you believe Mr. Sheridan has engaged. Moreover, at least in our initial phone discussion, you were hesitant to provide any further details. For reasons you can surely understand, the failure to provide more specifics somewhat limits Infinitive's ability to investigate your concerns. To the extent you would like Infinitive to look into this further, I would strongly encourage you to provide the documents or other information that is at the heart of your concerns.

Stacy Landau, Esq.
September 24, 2024
Page 2



**A.    Background.**

Mr. Sheridan was employed as Vice President with 11:59 from March 2023 until his resignation became effective on September 6, 2024. In his role, his responsibility was working on 11:59's "capability, capacity, and delivery" of its Databricks consulting. Importantly, Mr. Sheridan was *not* primarily responsible for generating sales or developing business— he was responsible for the actual product and services being provided to the customer.

During his employment with 11:59, the environment the corporate environment did not meet Mr. Sheridan's expectations. For example, on multiple occasions Mr. Sheridan watched 11:59's then-CEO berate other employees, reducing them to tears. The company also struggled with persistent turnover of employees, perceived solvency concerns based upon his conversations with 11:59 executives, and failed to provide adequate sales personnel that could grow the Databricks operation.

Prior to his employment with 11:59, Mr. Sheridan had been employed with Infinitive. On August 13, 2024, Mr. Sheridan met with his former colleague and friend, Denis McFarlane, CEO of Infinitive, to catch up on a social level. In the course of the conversation, Mr. Sheridan expressed to Mr. McFarlane his dissatisfaction with the working conditions at 11:59 and that he was preparing to look for a new job. Based on his past performance with the company, Mr. McFarlane believed Mr. Sheridan would bring value to the company and, consequently, on August 19 Infinitive made Mr. Sheridan an offer of employment. Mr. Sheridan accepted that offer on August 22, 2024.

The same day he accepted the offer of employment with Infinitive, Mr. Sheridan submitted his resignation letter to 11:59. That resignation letter specifically stated that Mr. Sheridan's last day of employment with 11:59 would be Friday September 6, 2024. Consistent with that notice, 11:59 ended Mr. Sheridan's access to the company's network on September 6.[1]

On September 9, 2024, Mr. Sheridan began working for Infinitive and he was provided a company email account (brad.sheridan@infinitive.com) on the same date.

**B.    Vague Allegations of Improper Communications.**

In your letter to Infinitive, you assert that "Mr. Sheridan has violated [his] obligations [to 11:59] by soliciting 11:59's clients and disparaging 11:59 to those client and partners prior to his separation of employment from the Company." However, the letter provides no details as to what Mr. Sheridan has specifically done, who he allegedly contacted, when such contact allegedly occurred, what he specifically communicated, or an explanation for why you think such communication constituted improper "solicitation" or "disparagement."

Mr. Sheridan has denied these amorphous allegations. In our phone call, I asked you for specific details to help us understand what exactly was being alleged. For the most part, with the

---

[1] In your first letter to Mr. Sheridan, you stated that his last day of employment with 11:59 was September 9, 2024. As best we can discern, that assertion was inaccurate.

Stacy Landau, Esq.
September 24, 2024
Page 3



exception that is described below, you refused to provide those details. Given the lack of specifics, it is nearly impossible for Infinitive to evaluate or investigate your concerns. As it stands now, we accept Mr. Sheridan's denial of any wrongdoing. If you have documentation that you believe shows improper conduct by Mr. Sheridan, I would strongly encourage you to provide that to us so we can look into it.

C.   **Databricks/** Project A .

In our call together, the one specific issue you mentioned dealt with a Partner entity that allegedly failed to sign a contract with 11:59 on Mr. Sheridan's final day of work. You expressed the belief that the failure of that contract to materialize was related to Mr. Sheridan's departure. In the call, you refused to identify the name of the Partner entity or the end-customer involved in that prospective deal.

Mr. Sheridan believes you were referencing a contract with Databricks that 11:59 was hoping to execute related to services for the Project A .

In the market that Infinitive and 11:59 operate in, Partners often feel as though they are hiring a specific person dedicated to delivery, more than the company that delivery person works for. This is similar to how a corporate client of a law firm may feel they are hiring a specific law partner rather than the firm as a whole when signing an engagement agreement. As the chief person responsible for delivery of the Databricks consulting work, Mr. Sheridan's sense was that the Databricks representatives he interacted with felt like they were hiring Mr. Sheridan when contracting with 11:59.

At some point following his two-week's notice, Mr. Sheridan did alert his contacts at Databricks that he would not be employed with 11:59 after September 6, 2024. The purpose of this communication was simply to make sure Databricks was aware that the primary delivery person they were expecting to work on the project would no longer be available to provide that service. That is an entirely appropriate thing to do. In fact, to do anything else and allow Databricks or the ▬▬▬▬▬▬▬ to enter into a deal thinking that Mr. Sheridan would be delivering it, when 11:59 knew otherwise, would have been unethical and subjected Mr. Sheridan and 11:59 to potential claims for fraudulent inducement. Given this background, we would be extremely surprised if 11:59 had not already independently disclosed this information to Databricks.

Moreover, it is Infinitive's understanding that the ▬▬▬▬▬▬▬ put this project on hold for reasons that are entirely independent of Mr. Sheridan's decision to resign his employment from 11:59.

D.   **Vague Allegations of Diversion.**

Your letter to Mr. Sheridan asserts that you "have already uncovered evidence you were attempting to divert business to Infinitive as early as August 1, 2024." Your letter does not provide any additional details as to what you are referring. Your letter to Infinitive does not mention this issue at all.

Stacy Landau, Esq.
September 24, 2024
Page 4



Mr. Sheridan denies that he engaged in any type of "diversion" to Infinitive during his employment with 11:59. Moreover, as stated above, Mr. Sheridan did not even meet with Infinitive to discuss the potential for employment with the company until August 13, 2024 — making your accusation implausible.

**E.     Company Information.**

After discussing the matter with Mr. Sheridan, it appears that following his resignation, he has retained copies of a number of files that contain his work product from his time at 11:59 on his Google Drive . For obvious reasons, no one from Infinitive has catalogued or analyzed these files, but we believe it is likely that at least some of the files contain information that 11:59 would consider confidential.

Mr. Sheridan has not opened, used, shared, or disclosed any of these files with anyone at Infinitive. Infinitive has searched its network and Mr. Sheridan's email and confirmed that none of these files have been shared through its network or placed on its servers.

Mr. Sheridan stands willing and ready to delete and destroy each of these files, but due to his preservation duty, cannot do so without your authorization. Please confirm that Mr. Sheridan can delete these files, and we will have him do so immediately and certify the same.

In the meantime, Mr. Sheridan has been instructed by Infinitive that he is not permitted to access or share any of those files and that violation of this instruction will lead to a termination of his employment with Infinitive.

**F.     Authorization to Practice Law.**

While I do not believe it is necessary to be a Virginia attorney in order to send a litigation threat letter to a Virginia resident, I am a bit concerned that you do not appear to be licensed in *any* of the jurisdictions that are connected to this matter. My understanding is that: (i) 11:59 is a California corporation with its headquarters in California; (ii) Infinitive is a Delaware corporation with its headquarters in Virginia; (iii) Mr. Sheridan is a Virginia resident whose employment with both companies has been in Virginia; and (iv) you are licensed to practice only in New York and New Jersey. If I have any of these facts wrong, please let me know.

While acknowledging you have likely looked into this issue prior to sending your letters, given that I have an independent duty to avoid the aiding or abetting of the unauthorized practice of law, I would ask that you please share with me the facts or authority that allows you to handle this matter, so we can continue to work together without any unnecessary concerns.

Stacy Landau, Esq.
September 24, 2024
Page 5



      After you have had time to review this letter with your client, please give me a call so we can discuss the path forward.

      Very truly yours,

      Micah E. Ticatch