**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

-----------------------------------------------------X

M CORP DBA 11:59,

                      Plaintiff,

       -v-

INFINITIVE, INC., JOSEPH BRADLEY
SHERIDAN, DATABRICKS INC.,
WILLIAM MCKINNERY, CHERYL
MILES, AND DOES 1-25, INCLUSIVE,

                    Defendants.

Civ. No.:  1:24-cv-01823-RDA-IDD

-----------------------------------------------------X

**DEFENDANT JOSEPH BRADLEY SHERIDAN'S ANSWER TO M CORP**
**DBA 11:59's FIRST AMENDED COMPLAINT**

Defendant Joseph Bradley Sheridan ("Sheridan" or "Defendant"), by and through
undersigned counsel, hereby responds to Plaintiff M Corp dba 11:59's ("Plaintiff" or "11:59")
First Amended Complaint.

**THE PARTIES**

1.     Plaintiff 11:59 is a California based consulting firm dedicated to helping
businesses transform their operations by leveraging the power of the cloud, artificial intelligence
("AI"), and other innovative technologies. 11:59 develops custom solutions in less time and at a
lower cost than traditional consulting engagements.

**ANSWER:**  Sheridan admits that "Plaintiff 11:59 is a California based consulting firm
dedicated to helping businesses transform their operations by leveraging the power of the cloud,
artificial intelligence ("AI"), and other innovative technologies."  Sheridan lacks sufficient

information and belief to admit or deny whether "11:59 develops custom solutions in less time and at a lower cost than traditional consulting engagements."

2.       11:59 is engaged in interstate commerce, with employees and clients in multiple U.S. states, delivering products across state lines on a regular basis.

**ANSWER:** The allegations contained in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Sheridan admits the allegations in Paragraph 2.

3.       Defendant Infinitive is a Delaware corporation with headquarters located in Ashburn, Virginia. Infinitive is a data and AI consulting firm.

**ANSWER:** Upon information and belief, Sheridan admits the allegations in Paragraph 3.

4.       Defendant Sheridan is an individual who resides in Ashburn, Virginia. Sheridan commenced his employment with 11:59 in March 2023.  Until his separation on September 6, 2024, Sheridan's title was Vice President, Data Analytics.  11:59 learned shortly after Sheridan's separation that he accepted employment at Infinitive, a direct competitor of 11:59.

**ANSWER:** Sheridan denies that he resides in Ashburn, Virginia. Sheridan admits he commenced his employment with 11:59 in March 2023. Sheridan lacks sufficient information and belief to admit or deny whether "11:59 learned shortly after Sheridan's separation that he accepted employment at Infinitive, a direct competitor of 11:59," because Defendant cannot ascertain what and when 11:59 learned the purported information.

5.       Defendant Databricks is a data and AI company headquartered in San Francisco, California, which provides a platform for data analysis, engineering and generative AI.

**ANSWER:** Upon information and belief, Sheridan admits the allegations in Paragraph 5.

6.     Defendant McKinney is an individual who resides, on information and belief, in Raleigh, North Carolina. McKinney was at all relevant times an Account Executive at Databricks, responsible for public sector projects in the eastern half of the United States.

**ANSWER:**  Upon information and belief, Sheridan admits McKinney resides in Raleigh, North Carolina and at all relevant times was an Account Executive at Databricks.  Sheridan denies that McKinney was responsible for public sector projects in the eastern half of the United States.

7.     Defendant Miles is an individual who resides, on information and belief, in Fair Oaks, California.  Miles was at all relevant times an Account Executive at Databricks, responsible for public sector projects in the western half of the United States.

**ANSWER:**  Upon information and belief, Sheridan denies Miles resides in Fair Oaks, California.  Sheridan admits Miles at all relevant times was an Account Executive at Databricks.  Sheridan denies that Miles was responsible for public sector projects in the western half of the United States at all relevant times.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's claims arising under the laws of the United States that they form part of the same case or controversy.  The Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter is between citizens of different states and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan admits this Court has jurisdiction over Plaintiff's claims as pled. Sheridan denies all other allegations.

9.       Venue is proper in the Eastern District of Virginia, pursuant to 28 U.S.C. § 1391(b) because Defendants Sheridan and Infinitive are residents of Virginia within the jurisdiction of the Alexandria Division and a substantial part of the events or omissions giving rise to the claims occurred in this jurisdiction.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan admits this Court has jurisdiction over Plaintiff's claims as pled. Sheridan denies all other allegations.

10.       The Court has personal jurisdiction over Infinitive and Databricks because they do business in Virginia and have sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because Infinitive and Databricks committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan admits this Court has jurisdiction over Plaintiff's claims as pled. Sheridan denies all other allegations.

11.       This Court has personal jurisdiction over Sheridan because he is a resident of the Commonwealth of Virginia and further has specific personal jurisdiction over Sheridan because he committed acts complained of in this Verified Complaint, in whole or in part, in the Commonwealth of Virginia, and purposely caused injury to 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan admits this Court has jurisdiction over Plaintiff's claims as pled. Sheridan denies all other allegations.

12.     This Court has personal jurisdiction over Miles because she has sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because Miles committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia, purposefully availing herself of the laws of Virginia.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan denies all other allegations.

13.     This Court has personal jurisdiction over McKinney because he has sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because McKinney committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia, purposefully availing himself of the laws of Virginia.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan denies all other allegations.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

**A.     11:59's Business**

14.     11:59 and Infinitive are direct competitors in the data/AI consulting industry, an industry which is comprised of a relatively limited number of providers.

**ANSWER:** Sheridan admits 11:59 and Infinitive are direct competitors in the data/AI consulting industry. Sheridan lacks sufficient information and belief to admit or deny whether the "industry…is comprised of a relatively limited number of providers," and therefore denies this allegation.

15.     11:59 is a premier data/AI consulting provider, working with clients to get the most out of their data, optimize processes and outcomes, using an approach that tailors solutions to each customer's unique needs. 11:59 offers custom solutions in projects involving data management, cyber security, Lakehouse implementation and management, reporting, data catalogue management, AI genies, and DBRX Instruct solutions (such as creating a web front-end for a RAG chatbot).

**ANSWER:** Sheridan admits 11:59 is a "data/AI consulting provider, working with clients to get the most out of their data, optimize processes and outcomes, using an approach that tailors solutions to each customer's unique needs."  Sheridan admits "11:59 offers custom solutions in projects involving data management, cyber security, Lakehouse implementation and management, reporting, data catalogue management, and DBRX Instruct solutions (such as creating a web front-end for a RAG chatbot)."  Sheridan denies the remaining allegations in Paragraph 15.

16.     11:59 works with strategic partners, such as Databricks and Amazon Web Services ("AWS"), to deliver its custom data solutions to clients.

**ANSWER:** Sheridan admits the allegations in Paragraph 16.

17.     The sales cycle for 11:59's customers is typically 3-6 months, depending on the complexity of the project, but can be as long as 12-18 months.  Due to the technical nature of the work it does, 11:59 has made a significant investment, both in terms of personnel and financial investment, into bringing projects to contract. This investment often comes in the form of providing demos and showing potential customers proofs of concept and sponsoring and attending events.

**ANSWER:** Sheridan admits the allegations in Paragraph 17.

18.     Given the competitive nature of the data/AI consulting industry, 11:59 has invested a significant amount of time, money, and resources developing and nurturing its client base, developing demonstrations and proofs of concept to respond to the identified needs and preferences of its clients and potential clients. The information amassed through 11:59's efforts has been compiled over years at significant expense. Through its investment and efforts, 11:59 has amassed substantial trade secrets and proprietary information, including but not limited to custom coding, its customers' needs and preferences, and pricing and contract terms. Such information is not known to the industry or outside of 11:59 and provides 11:59 with a competitive advantage.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan lacks sufficient information and belief to admit or deny the factual allegations in this Paragraph and therefore denies them.

**B.      Sheridan's Employment Background**

19.     In or about 2020, Sheridan worked for Infinitive in roles as Director of Data Engineering, Deputy Technology Practice Lead, and Market Technology Lead. In these roles, he was responsible for the healthcare and education/non-profit market segments.

**ANSWER:** Sheridan admits Paragraph 19.

20.     In March of 2023, Sheridan left Infinitive and joined 11:59. On or about March 9, 2023, 11:59 offered Sheridan a position as Vice President of Data Analytics. Sheridan accepted the role by executing the Offer of Employment ("Offer Letter") on March 10, 2023. Sheridan's start date was scheduled for March 27, 2023. He earned a significant base salary and was eligible for a discretionary bonus if he achieved certain goals and milestones. A true and correct copy of the "Offer Letter" is attached hereto as **Exhibit A.**

**ANSWER:** Sheridan admits "In March of 2023, Sheridan left Infinitive and joined 11:59. On or about March 9, 2023, 11:59 offered Sheridan a position as Vice President of Data Analytics. Sheridan accepted the role by executing the Offer of Employment ("Offer Letter") on March 10, 2023. Sheridan's start date was scheduled for March 27, 2023." Sheridan admits he earned a base salary and was eligible for a discretionary bonus if he achieved certain goals and milestones. Sheridan denies the remaining allegations. The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

21.     As VP of Data Analytics, Sheridan was responsible for driving the growth and success of 11:59's data consulting practice. His position involved managing and maintaining client relationships, leading and overseeing complex data projects, overseeing a team who develops 11:59's custom data solutions, and included business development responsibilities. Sheridan reported to 11:59's Chief Technology Officer.

**ANSWER:** Sheridan admits the allegations in Paragraph 21.

22.     Sheridan's Offer Letter contained a prohibition on Sheridan engaging in conflicting employment and a Non-Solicitation of Employees.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent the reference to "prohibition" refers to the enforceability of said documents, this allegation is a legal conclusion to which no response is required.

23.     Specifically, the "Conflicting Employment" provision of the Offer Letter provides:

> Executive is not automatically prohibited from having a second job or outside business interests. However, while Executive is employed by M Corp, he is expected to devote his professional energies to M Corp and shall not engage without disclosure to

8

and written approval from M Corp. Executive is prohibited from engaging in any other employment, occupation, consulting or other business activity that creates a conflict of interest with M Corp.   M Corp assumes no responsibility for secondary employment or an outside business interest and shall not provide workers' compensation coverage or any other benefit for injuries occurring from it.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

24.   The Offer Letter's "Non-Solicitation of Employees" provision states:

While Executive is employed by M Corp, and for a period of twelve (12) months immediately following the termination of his employment with M Corp for any reason, whether with or without cause, he shall not solicit, induce, recruit or encourage any of M Corp's employees to terminate their relationship with M Corp.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

25.   In addition to the Offer Letter, Sheridan was under other obligations to 11:59 under his Confidentiality and Non-Disclosure Agreement ("NDA") regarding his use and treatment of 11:59's confidential and trade secret information.   Sheridan executed the NDA on March 17, 2023.   A true and correct copy of the Confidentiality and Non-Disclosure Agreement ("NDA") is attached hereto as **Exhibit B.**

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

9

26.     "Confidential Information" in the NDA is defined to include:

information or material that is commercially valuable to M Corp
and not generally known or readily ascertainable in the industry.
This includes, but is not limited to:

(a)  technical information concerning M Corp's products and
services, including product knowhow, formulas, designs,
devices, diagrams, software code, test results, processes,
inventions, research projects and product development,
technical memoranda and correspondence;

(b)  information concerning M Corp's business, including cost
information, profits, sales information, accounting and
unpublished financial information, business plans, strategic
plans for the capture of new business, technical and business
approaches for improving target and existing client systems,
markets and marketing methods, customer lists and customer
information, purchasing techniques, supplier lists and supplier
information and advertising strategies;

(c)  information concerning M Corp's employees and
consultants, including salaries, strengths, weaknesses and skills;

(d)  information submitted by M Corp's customers, suppliers,
employees, consultants or coventure partners with M Corp for
study, evaluation or use; and

(e)  any other information not generally known to the public
which, if misused or disclosed, could reasonably be expected to
adversely affect M Corp's business.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a
document, and to the extent the allegations are inconsistent with the document, the allegations are
denied.

27.     The NDA requires Sheridan to keep 11:59's Confidential Information "in the
strictest confidence."  It prohibits the disclosure of 11:59's Confidential Information to anyone
outside of 11:59 without the company's prior written consent.  The NDA also prohibits the use of

11:59's Confidential Information for Sheridan's own purposes or for the benefit of anyone other than 11:59.

**ANSWER:**  The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required

28.    Under the "Return of Materials" provision, Sheridan's NDA requires that he promptly deliver to 11:59 "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information." The NDA further obligates Sheridan to return all of 11:59's equipment, files, software, programs and other personal property" belonging to the company.

**ANSWER:**  The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

29.    Sheridan's NDA obligations survived after his employment with 11:59 ended and remain as long as the Confidential Information remains confidential (*i.e.*, unknown to the public.)

**ANSWER:**  The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

30.    Under the NDA, if Sheridan misappropriated any of 11:59's Confidential Information, he acknowledged this would cause the company irreparable harm such that he agreed

11:59 may apply to a court of competent jurisdiction for an injunction against further misappropriation and for any other relief the company and court deems necessary. This is in addition to any other remedies available.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

31. For any disputes arising out of the NDA, the prevailing party has the right to collect its attorneys' fees, costs, and other necessary expenditures from the other party.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

32. Under 11:59's Employee Handbook, which Sheridan reviewed and acknowledged, Sheridan was subject to additional obligations to the company, including:

a) **Ethics Code**: 11:59's managers and team members are expected to adhere to high standards of business and personal integrity as a representation of 11:59's business practices, at all times consistent with their duty of loyalty to the Corporation.

b) **Outside Employment:** Outside employment that creates a conflict of interest or that affects the quality or value of your work performance or availability at 11:59 is prohibited.

c) **Computer Security and Copying of Software:** Software programs purchased and provided by 11:59 are to be used only for creating, researching, and processing materials for Corporation use. By using Corporation hardware, software, and networking systems you assume personal responsibility

for their use and agree to comply with this policy and other applicable Corporation policies, as well as city, state, and federal laws and regulations.

d) **Use of Company Technology**: Corporation IT resources and communications systems are to be used for business purposes only unless otherwise permitted under applicable law.

All content maintained in Corporation IT resources and communications systems are the property of the Corporation. Therefore, team members should have no expectation of privacy in any message, file, data, document, facsimile, telephone conversation, social media post, conversation, or any other kind or form of information or communication transmitted to, received, or printed from, or stored or recorded on Corporation electronic information and communications systems. The Corporation reserves the right to monitor, intercept, and/or review all data transmitted, received, or downloaded over Corporation IT resources and communications systems in accordance with applicable law. Any individual who is given access to the system is hereby given notice that the Corporation will exercise this right periodically, without prior notice and without prior consent. The interests of the Corporation in monitoring and intercepting data include, but are not limited to: protection of Corporation trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.); managing the use of the computer system; and/or assisting team members in the management of electronic data during periods of absence.

e) **Confidentiality and Nondisclosure of Trade Secrets:** As a condition of employment, 11:59 team members are required to protect the confidentiality of Corporation trade secrets, proprietary information, and confidential commercially sensitive information (i.e., financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Corporation. Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released without prior authorization from management. If you have information that leads you to suspect that team members are sharing such

information in violation of this policy and/or competitors are obtaining such information, you are required to inform your Manager and/or People Operations or Human Resources.

f) **Return of Property**: Return all Corporation[1] property at the time of separation, including computer equipment.

True and correct copies of excerpts of 11:59's Employee Handbooks and Defendant Sheridan's acknowledgement of and training related to same are attached hereto as **Exhibit C**.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

33.     11:59's Employee Handbook further prohibits employees from being under the influence of illegal drugs or substances during work hours or while on company business.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

34.     Sheridan held a senior role at 11:59, overseeing a team of professionals responsible for writing the code and developing the framework for its custom data solutions. Sheridan was client-facing, responsible for managing a pipeline of over $7 million in business.

**ANSWER:** Sheridan admits he "held a senior role at 11:59, overseeing a team of professionals responsible for writing the code and developing custom data solutions." Sheridan denies the remaining allegations in Paragraph 34.

---

[1] Corporation refers to 11:59.

35.     In connection with his role, Sheridan was provided with access to 11:59's confidential and proprietary information, including 11:59's pipeline, forecasts, status of negotiations, clients, prospective clients, contract and pricing terms, and other critical aspects of 11:59's business.  This information is extremely valuable and allows 11:59 to serve its clients, providing 11:59 with a competitive advantage.  This valuable information can be used by competitors to entice clients away from 11:59.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required.

### C.     11:59 and Sheridan's Relations with Databricks

36.     Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with one of its strategic partners, Databricks.  11:59 and Databricks worked together to provide data, analytics and AI solutions and services to their clients. In furtherance of their partnership, 11:59 entered into a Partner Program Agreement ("Partner Agreement") with Databricks on or about August 15, 2022.  A true and correct copy of the Databricks Partner Agreement is attached hereto as **Exhibit D**.

**ANSWER:**  Sheridan admits "Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with one of its strategic partners, Databricks.  11:59 and Databricks worked together to provide data, analytics and AI solutions and services to their clients."  Sheridan lacks sufficient information and belief to admit or deny whether 11:59 entered into a Partner Program Agreement with Databricks on or about August 15, 2022 because Sheridan did not work for 11:59 at that time and therefore denies the allegation.  The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the

referenced document is enforceable, this allegation is a legal conclusion to which no response is required

37.     Pursuant to the Terms and Conditions of the Partner Agreement, Databricks was required to maintain the confidentiality of 11:59's Confidential Information to any third party except under limited enumerated circumstances.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required

38.     The Terms and Conditions of the Partner Agreement define Confidential Information to include:

> a party's non-public information, know-how, or trade secrets that (a) the disclosing party designates as being confidential (either at the time of disclosure or in writing within 30 days of disclosure), or (b) given the nature of the disclosure or circumstances surrounding the disclosure, the receiving party should treat as confidential, and (c) which is disclosed by a party to the receiving party, or to any of the other's Affiliates, employees, contractors, agents and advisors.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

39.     The Terms and Conditions of the Partner Agreement further provide that Databricks is permitted to distribute 11:59's Partner Materials "solely in connection with promoting [] [11:59's] solutions, and furthering the parties' collaboration . . ." Partner Materials are defined to mean "published content, logos and other branding materials, sales tools, and other

resources concerning your Company or solutions that you may provide Databricks, but excluding your Confidential Information."

**ANSWER:**  The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. To the extent this Paragraph alleges the referenced document is enforceable, this allegation is a legal conclusion to which no response is required.

40.    11:59 worked with various Databricks personnel to promote their services to prospective customers.  Relative to public entity work, 11:59 primarily worked with two Databricks Account Executives – Defendant William McKinney, who oversaw projects in the eastern half of the United States, and Defendant Cheryl Miles, who oversaw projects in the western half of the country.

**ANSWER:** Sheridan admits "11:59 worked with various Databricks personnel to promote their services to prospective customers.  Relative to public entity work, 11:59 primarily worked with two Databricks Account Executives": Defendant William McKinney and Defendant Cheryl Miles.  Sheridan denies the remaining allegations in Paragraph 40.

41.    Over the course of Sheridan's employment, 11:59's pipeline of work on Databricks partner projects grew to over $7 million. Many of the opportunities in 11:59's pipeline were single source opportunities, meaning because of their size, there is no public request for proposal and 11:59 was the only vendor being considered.  Many of the projects in 11:59's pipeline were also at or near contract execution after 11:59 had worked on them for months or more than a year in some cases.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny "11:59's pipeline of work on Databricks partner projects grew to over $7 million" and therefore denies the allegation.  Sheridan denies the remaining allegations in Paragraph 41.

42.     During the course of the sales cycle, 11:59 invested upwards of $500,000, creating and providing demonstrations, proving the concepts developed would succeed in providing the clients with the desired results and sponsoring and attending industry events.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in Paragraph 42 and therefore denies them.

43.     Unique to these projects, Databricks also makes a financial investment into the projects, giving Databricks influence over whether prospective clients ultimately select 11:59.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in Paragraph 43 and therefore denies them.

44.     By early August 2024, many of the Databricks pipeline projects Sheridan was working on were at or near contract execution.  For example, as to one project Plaintiff will refer to as "Project A,[2]" 11:59 had already received a verbal commitment from the client and a Statement of Work was in near final form with an estimated engagement start date of August 19, 2024.

**ANSWER:** Sheridan denies "[b]y early August 2024, many of the Databricks pipeline projects Sheridan was working on were at or near contract execution."  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project A" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the remaining allegations in Paragraph 44.

**D.     Sheridan's Resignation From 11:59**

---

[2] 11:59's clients, projects, partners, and the like have been anonymized to protect 11:59's confidential information against further misuse.

45.     On August 22, 2024, Sheridan provided two weeks' notice of his resignation effective September 6, 2024.   Sheridan thanked 11:59 for the professional and personal development opportunities 11:59 provided to him over the course of his employment.   He commended 11:59 for its culture and talented team members.   During his two week notice period, 11:59 believed Sheridan was transitioning his work to his team members, ensuring 11:59's customers and prospects would continue to be seamlessly serviced by 11:59. A true and correct copy of Sheridan's August 22, 2024 resignation is attached hereto as **Exhibit E**.

**ANSWER:** Sheridan admits "[o]n August 22, 2024, Sheridan provided two weeks' notice of his resignation effective September 6, 2024.   Sheridan thanked 11:59 for the professional and personal development opportunities 11:59 provided to him over the course of his employment.   He commended 11:59 for its culture and talented team members."   Sheridan lacks sufficient information and belief to admit or deny 11:59's beliefs and therefore denies the remaining allegations in Paragraph 45. The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

46.     Unbeknownst to 11:59, Sheridan had not been working to ensure 11:59's clients would continue to be served by 11:59.   Instead, he was brazenly and deliberately targeting 11:59's partners, vendors, customers, and prospective customers, taking improper and illegal actions to move 11:59's business to his new employer, Infinitive.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Sheridan denies this Paragraph.

47.     11:59 only learned after Sheridan's separation that he had accepted a job offer to return to Infinitive the same day he gave notice to 11:59.

**ANSWER:** Sheridan lacks sufficient information and belief to admit or deny whether "11:59 only learned after Sheridan's separation that he had accepted a job offer to return to Infinitive the same day he gave notice to 11:59" because Sheridan cannot ascertain what and when 11:59 learned the purported information, and therefore denies the allegations in this paragraph.

48.     Shortly after Sheridan's last day of employment at 11:59, 11:59 learned that several of the projects that were being managed by Sheridan and his team were suddenly and inexplicably in jeopardy.  Databrick's engagement with Project A was scheduled to start on or about August 19, 2024.  After Sheridan's departure, Project A put the project on "hold" stating it had lost faith in 11:59.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain with certainty the client "Project A" to which 11:59 refers or the "several projects" which "were suddenly an inexplicably in jeopardy" and therefore denies all allegations in Paragraph 48.

**E.     11:59's Investigation into Sheridan's Pre-Separation Misconduct**

49.     11:59 immediately began an internal investigation and quickly learned that the client's lost faith was due to Sheridan's derogatory and false statements about 11:59 while he was still an employee of 11:59.  Upon review of Sheridan's 11:59 email account, 11:59 discovered that on August 29, 2024, Sheridan emailed a Databricks Account Executive, informing them that he was returning to Infinitive, which he called, "a more advanced Databricks partner and part of the invite-only DPP program." Sheridan told this partner that "a lot of negative stuff" was happening at 11:59 and he needed "to get out."  Sheridan cautioned the partner, "Where there's smoke, there's fire," telling 11:59's partner in no uncertain terms not to do business with 11:59. A true and correct copy of the August 29, 2024 email correspondence is attached hereto as **Exhibit F**.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny 11:59's purported actions following his separation from employment with 11:59 and therefore denies the allegations in this paragraph. The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

50.    11:59's internal investigation revealed more.   Sheridan received an email regarding "Project B"[3] on his 11:59 email on August 1, 2024, that was copied to what appeared to be Sheridan's *Infinitive* email address, brad.sheridan@infinitive.com.  A true and correct copy of the August 1, 2024 email correspondence is attached hereto as **Exhibit G**.[4]

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan further lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project B" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 50.

51.    Sheridan had been emailing with a contact at Project B in July 2024 regarding programming issues.  On July 25, 2024, the Project B contact asked Sheridan to look at an issue they had been discussing.  Sheridan did not provide the requested response until over a month later, on August 28, 2024.  Apologizing for the long delay in responding, Sheridan told Project B that he had resigned the previous week and was busy "turning over everything."  He told Project B the "[g]ood news is that I'm going back to Infinitive."  A true and correct copy of the July 25, 2024 email correspondence is attached hereto as **Exhibit H**.

---

[3] See Footnote 2.  Project B is another Databricks partner project that Sheridan worked on while employed by 11:59.
[4] Some Exhibits attached hereto have been redacted to remove 11:59 client names and other confidential and trade secret information.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan further lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project B" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 51.

52.     During his two-week notice period in August 2024, 11:59's initial investigation further revealed that Sheridan also contacted numerous 11:59 employees on the company's Team platform to inform them he had resigned and was moving to Infinitive.  In contravention of his Non-Solicitation obligations to 11:59, Sheridan disparaged the company to these employees, telling them that 11:59 was insolvent and directing them to contact him offline to discuss further. As a Vice President and a senior member of the company, Sheridan was perceived as a reliable source of information.  Those employees Sheridan targeted would have no way of knowing that his statements were false.  Sheridan's obligation not to interfere with 11:59's relationships with its employees, directly or indirectly remains in effect until, at the earliest, September 6, 2025.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.  Sheridan further lacks sufficient information and belief to admit or deny the allegations in this Paragraph concerning "11:59's initial investigation" or how others may or not "perceive" Sheridan or their respective knowledge and therefore denies the allegations in this Paragraph.  To the extent a response is required, Sheridan denies this Paragraph.

53.     Although the investigation into Sheridan and Infinitive's conduct was ongoing and Sheridan had not yet returned his company issued laptop *despite requests for same*, 11:59 had already uncovered evidence of Sheridan's breach of his duty of loyalty and tortious interference and Infinitive's constructive or actual knowledge of same, such that it served upon Sheridan and

Infinitive cease and desist letters (the "Cease and Desist Letters") on September 12, 2024.  The Cease and Desist Letters placed Sheridan and Infinitive on notice of Sheridan's breach of his applicable agreements and company policies, requested the preservation and return of 11:59's data and property, among other demands appropriate to the evidence and facts.  True and correct copies of the September 12, 2024 "Cease and Desist Letters" to Defendants are attached hereto as **Exhibit I**.

     **ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief with regard to the allegations concerning why 11:59 engaged in any conduct and therefore denies them.

**F.**     **11:59's Forensic Review of Sheridan's Company MacBook**

     54.     In tandem with the Cease and Desist Letters, 11:59 followed up with Sheridan regarding his failure to return of his company-issued laptop, an Apple MacBook Pro.  On the afternoon of September 13, 2024, after 11:59's repeated follow up, Sheridan initiated the return shipment of his 11:59-issued laptop.

     **ANSWER:**  Sheridan admits 11:59 corresponded with him regarding arrangements to return his company-issued laptop, an Apple MacBook Pro.  Sheridan further admits he initiated the return of his 11:59-issued laptop on September 13, 2024.  Sheridan denies the remaining allegations in Paragraph 54.

     55.     Shortly thereafter, 11:59 engaged a third-party vendor to undertake forensic imaging and review of Sheridan's 11:59-issued laptop.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain 11:59's conduct following his separation from employment and therefore denies the allegations in Paragraph 55.

56.     The forensic review revealed substantial evidence that in the weeks leading to Sheridan's separation from 11:59, instead of working to ensure that 11:59's customers experienced a seamless transition with 11:59 following his departure, he engaged in actions designed to ensure that 11:59's customers would not continue working with 11:59 and would instead move their projects to Infinitive.  The forensic review confirmed that Infinitive was aware of Sheridan's misconduct and to have sanctioned it.[5]

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain the outcome of a purported "forensic review" and therefore denies the allegations in Paragraph 56.

57.     On Sheridan's company-issued MacBook, the forensic examination recovered 1,478 text messages.  Based on those text messages and a review of his Google searches, web history, cloud service access, and related forensic artifacts on the MacBook, 11:59 learned that Sheridan spent weeks (at minimum) working with Miles and McKinney to carry out their plan to steal 11:59's confidential data and information and client projects, as follows:

    a.     On Sunday, August 18, 2024, (four days before Sheridan would give notice to 11:59) Sheridan's cellular phone number texted a contact identified as one of Sheridan's former 11:59 colleagues, confirming Sheridan would ensure 11:59 lost its Databricks related work, telling him, "I'm working hard to get out . . . I'm taking my Databricks AEs and several prospects with me."

---

[5] See Declaration of Steve Hillary, Lead Digital Forensic Examiner at Maragell, LLC and the appendices attached thereto (DKT. #1-11 to 1-23), which are incorporated by reference as if fully set forth herein.

b.      On August 20, 2024, Sheridan contacted a client contact at "Project C," [6] requesting access to the 11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address.

c.      On August 21, 2024, Sheridan's cellular phone number texted a phone number identified as Miles at Databricks telling her (before he told 11:59) that he planned to resign the next day.  Sheridan told Miles, "Going back to Infinitive, company I left for 11:59.  Thomas out CEO let go last week. Ran company into ground.  I'm worried about them Being insolvent, so it's time for me to leave."  Miles responded, "Should we pivot away from 11:59 for [Project A]??" Sheridan advised the contact that one of his clients "already pulled the plug and is coming over." The two conspired to ensure the Project A contract with 11:59 was not signed.

d.      On August 21, 2024, Mr. Sheridan texted McKinney at Databricks, "I'm resigning tomorrow.  Start new gig 9/16.  I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]."  Although McKinney told Sheridan he had never heard of Infinitive before, the two went on to discuss whether Sheridan could change his 11:59 email associated with the project access site to a personal email and concern over whether Sheridan would be able to access 11:59's work product (*i.e.*, demo coding) after he moved to Infinitive.  On August 22, 2024, Sheridan advised McKinney that he had submitted

---

[6] See Footnote 2.  Project C is another 11:59 Databricks partner project that Sheridan worked on while employed by 11:59.

his resignation to 11:59, telling him, "resignation done.  Last day is 9/6.  We need to come up with a plan for [Project C]."

e.      On August 22, 2024, Mr. Sheridan confirmed to a personal contact that his efforts to divert 11:59 customers to Infinitive were successful, writing, "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive."

f.      On August 23, 2024, Sheridan bragged to a former 11:59 colleague that he had been successful in diverting Projects A, B and C.

g.      On August 23, 2024, Sheridan communicated with an Infinitive employee, providing him with critical information impacting Infinitive's Q4 business planning.

h.      As stated above, throughout August 2024, Sheridan conferred with Infinitive's CEO and General Manager regarding transitioning 11:59 projects over to Infinitive.  On August 27, 2024, Sheridan texted yet another 11:59 prospective client, telling him:

> Afternoon ["Company D"[7] Vice President].  It's Brad Sheridan with 11:59. I wanted to let you know that I've resigned from 11:59 and my last day is Friday 9/6. I'm joining Infinitive, the company I left to come to 11:59. They have a stronger Databricks practice and a very healthy pipeline. I of course will reach out to you during my first week so that you have my new email address bc I'd still like the oppty to partner with you/[Company D]. If you'd like more information on my decision to leave, please feel free to call me.

---

[7] See Footnote 2.  Company D is a partner with whom Sheridan worked on project opportunities while employed by 11:59.

Moments before Sheridan sent this text message, he emailed the same client with a facially innocuous announcement of his resignation, clearly indicating he was attempting to cover up his solicitation.

i.    Sheridan's tortious conduct continued on August 28, 2024, when Sheridan messaged with two contacts making clear that he believed 90% of 11:59's $7 million pipeline belonged to him, stating, "On a oppty call yesterday going through Salesforce.  Pipeline is only 7MM and 90% of its mine that are leaving to follow me."

j.    On August 29, 2024, Sheridan brazenly disparaged 11:59 to a Databricks contact on his 11:59 email, telling him he was leaving 11:59 for Infinitive, "a more advanced Databricks partner and part of the invite-only DPP program."  Sheridan told the contact, "a lot of negative stuff going on at 11:59 and I need to get out. Where there's smoke, there's fire."

k.    On September 5, 2024, nearly Sheridan's last day at 11:59, McKinney texted Sheridan requesting that Sheridan locate and provide him with the recording of the demo 11:59 did for Project C only a few weeks earlier.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny allegations concerning the forensic examination and therefore denies the allegations in this Paragraph. The allegations contained in this Paragraph also contain legal conclusions to which no response is required. The allegations contained in this Paragraph further purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan also lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain the outcome of a purported "forensic review" and

therefore denies the allegations in Paragraph 57.  Sheridan additionally lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Projects A, B, and C" and "Company D" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the remaining allegations in Paragraph 57.

58.     Sheridan and McKinney knew the importance of ensuring they had access to 11:59's demo coding and demo recording to move the business to Infinitive.  After attempting to access the Project C demo workspace through his personal Gmail account, Sheridan told McKinney that he could schedule a demo for Project C at the end of the week of September 16th, after he started at Infinitive.  However, Sheridan was concerned about any delay in delivering the demo to the Project C client.  So, on September 5, 2024, Sheridan reached out to an Infinitive employee to request that he be given access to his Infinitive email address sooner as he had "several account execs in Databricks that are pulling opportunities from 1159 tomorrow after my last day and I thought it'd be nice to not have to use my gmail."

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the remaining allegations in Paragraph 58.   The allegations contained in this Paragraph further purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied.  Sheridan further lacks sufficient information and belief to admit or deny allegations concerning McKinney's knowledge and therefore denies the allegations in this Paragraph.

59.     On September 5, 2024, Sheridan went on to discuss with McKinney how to convince Project C to move to Infinitive.  Here, Sheridan and McKinney their goal crystal clear – McKinney telling Sheridan, "I want you to steal it from 11:59 haha," to which Sheridan replied,

"I too want to **steal** it."  And steal it they did, as on information and belief, Sheridan conducted the demo for Project C on September 20, 2024, as demonstrated by a September 9, 2024 Gmail calendar invite, and did so using 11:59's coding.  Sheridan could not have developed a demo in such a short amount of time as he did not have the skills necessary to do so.

**ANSWER:** The allegations contained in this Paragraph purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 59.

60.    On September 20, 2024, a misdirected email seemingly intended for Sheridan at Infinitive was sent to Sheridan's 11:59 email by McKinney providing apparent confirmation that Sheridan was providing a demo for Project C on behalf of Infinitive.

**ANSWER:** The allegations contained in this Paragraph purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 60.

61.    Sheridan also communicated with another 11:59 partner on Thursday, September 5, 2024, suggesting that the partner reply to 11:59, "["Company E"[8]] still isn't quite ready" . . . [t]hen next week we have Bill tell Drew that he's taking this oppty to follow me." Later that day, Sheridan told the same contact, "I'm going to reply to your email now and you can ignore it.  I will then reply with my true response from my Gmail account." This is just one of many examples

---

[8] See Footnote 2.  Company E is a company with whom Sheridan worked on project opportunities while he was employed by 11:59.

where Sheridan attempted to move his conversations to his personal accounts in order to hide his malfeasance from 11:59.

**ANSWER:** The allegations contained in this Paragraph purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Company E" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 61.

62. The forensic analysis further revealed that on September 9, 2024, before Sheridan had shipped back his 11:59-issued MacBook, there was a Google search conducted, "how to reset macbook [sic]" suggesting Sheridan planned to erase the evidence of his, Infinitive, and Databricks' wrongdoing.

**ANSWER:** Sheridan lacks sufficient information and belief to admit or deny allegations concerning the forensic analysis and therefore denies the allegations in this Paragraph. The allegations contained in this Paragraph further purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief regarding what 11:59 was suggested and therefore denies the allegations in this Paragraph.

**G.    Infinitive's Involvement in Sheridan's Illegal Actions**

63. The forensic evaluation did more than reveal Sheridan's wrongdoing. It also uncovered Infinitive's participation in aiding and abetting Sheridan's breach of his duty of loyalty to 11:59, tortious interference with 11:59's business relationships and coordination between the two regarding the same.  On August 26, 2024, Mr. Sheridan messaged Infinitive's CEO, Denis McFarland, telling him:

> Morning Denis. I have some prospects that want to move
> forward and are going to wait for me to join Infinitive. I'd like
> to chat with someone, perhaps Jeff, but wanted to know if
> you'd rather me wait until the 16th or can I reach out now to
> setup another coffee with him?

**ANSWER:** Sheridan lacks sufficient information and belief to admit or deny allegations concerning the forensic evaluation and therefore denies the allegations in this Paragraph. The allegations contained in this Paragraph contain legal conclusions to which no response is required. The allegations contained in this Paragraph further purport to characterize documents, and to the extent the allegations are inconsistent with the document, the allegations are denied.

64.     McFarlane responded directing Sheridan to set up the meeting.  The "Jeff" referred to in the above text message is Jeff Theobald, Infinitive's Managing Director.  Regarding their meeting, Sheridan told Theobald, "[b]ring something to take notes with bc I'm trying to minimize emails right now." On August 27, 2024, Sheridan provided Theobald with one of his Databricks' contact emails stating, "AE for Databricks in [Project C] He will be reaching out to you."  Sheridan had begun to lay the groundwork to move Project C to Infinitive back on August 20, 2024, when he requested a Project C contact provide him with access to Project C's systems via Sheridan's personal Gmail.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 64.

65.     On September 24, 2024, as 11:59 continued its investigation, Infinitive's counsel responded to the Cease and Desist Letters (the "Cease and Desist Letters Response").  Although

Infinitive's counsel did not represent Sheridan, they represented that Sheridan had reviewed the contents of their letter and that he agreed it was accurate.

**ANSWER:** Upon information and belief, Sheridan admits the allegations in Paragraph 65.

66. The Cease and Desist Letters Response confirmed *Sheridan's* timeline of events:

   a.  On August 13, 2024, Sheridan met with McFarlane to discuss possible employment.

   b.  On August 19, 2024, Infinitive offered Sheridan a position.

   c.  On August 22, 2024, Sheridan accepted Infinitive's employment offer.

   d.  Infinitive claimed Sheridan was provided with an Infinitive email address, brad.sheridan@infinitive.com on ***September 9, 2024***, his first day of employment with Infinitive notwithstanding the fact that this email address was copied on an email received on 11:59's systems on ***August 1, 2024***.

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

67. Sheridan denied having solicited or disparaged 11:59 to its clients or partners or having diverted business from 11:59 to Infinitive. With respect to Project A, Sheridan admitted only that he alerted his Databricks contacts that he would no longer be employed by 11:59 after September 6, 2024. Sheridan claimed it was "an entirely appropriate thing to do" so that Databricks or Project A would not enter into a deal thinking Sheridan would be delivering it. He claimed that not doing so "would have been unethical."

**ANSWER:** Sheridan denies the allegations in Paragraph 67.

68.     Sheridan further admitted to improperly retaining "a number of files that contain his work product from his time at 11:59 on his Google Drive."  Sheridan claimed (through counsel that does not represent him and not under penalty of perjury as had been requested) that he did not use or disclose the files with anyone at Infinitive.

**ANSWER:**  Sheridan denies the allegations in Paragraph 68.

69.     Sheridan and Infinitive lied to Infinitive's counsel and Plaintiff about their actions.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to Infinitive actions and therefore denies the allegations in Paragraph 69 as they relate to Infinitive.  Sheridan denies the allegations in Paragraph 69 as they relate to Sheridan.

70.     Contrary to Defendants' representations, on Sheridan's 11:59 laptop, there are artifacts showing Google Drive activity for the first time in 17 months on Sheridan's last day at 11:59, Friday, September 6, 2024.  Then, the following week after Sheridan started at Infinitive, there is evidence of Google Drive activity related to multiple 11:59 projects Sheridan had worked on while he was an 11:59 employee:

> a.     On Monday, September 9th, Sheridan's first day at Infinitive, there is access to Google Drive folders related to 11:59 project work, including Project A, Project C and Company D.
>
> b.     On Wednesday, September 11th, there is access to Google Drive folders related to 11:59 project work including Project C at 3:17 p.m. and to a general folder named "Projects."  At 3:18 p.m. the same day, there is access to a Google Drive folder named "Infinitive."

**ANSWER:** The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project A," "Project C," and "Company D" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 70. Sheridan further lacks sufficient information and belief to admit or deny the allegations concerning artifacts on "Sheridan's 11:59 laptop," as is it is no longer in his possession and therefore denies the allegations in this Paragraph.

71. There is also evidence supporting that Sheridan had a Dropbox account. An email was sent to the email address sheridan06@gmail.com, which was accessed on September 10, 2024 and shows an attempt to change a Dropbox password.

**ANSWER:** Sheridan admits he has a Dropbox account. The additional allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

**H.**     <u>Plaintiff's Further Attempts to Address Infinitive and Sheridan's Misconduct</u>

72. On September 24, 2024, through Infinitive's counsel, Defendants responded to 11:59's September 12, 2024 Cease and Desist Letters ("Cease and Desist Response"). Therein, it was confirmed that Sheridan "retained copies of a number of files that contain his work product from his time at 11:59 on his Google Drive" and "it is likely that at least some of the files contain information that 11:59 would consider confidential." Sheridan requested permission to "delete and destroy" these files, which would have eliminated any evidence of access to and use of same.

A true and correct copy of the September 24, 2024 "Cease and Desist Response" is attached hereto as **Exhibit J**.

    **ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

    73.    Although it asserted that "no one from Infinitive has catalogued or analyzed these files," Infinitive vaguely advised it "searched its network" and Sheridan's email and confirmed that none of the files on Sheridan's Google Drive had "been shared through its network or placed on its servers."  It is unclear how Infinitive could have searched its network for files it had not catalogued or analyzed.

    **ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain Infinitive's purported actions and therefore denies the allegations in Paragraph 73.

    74.    As the Cease and Desist Response did not contain the assurances Plaintiff requested from Defendants as to their access and use of 11:59's information and improper solicitation and servicing of 11:59's clients using that information, on September 30, 2024, 11:59 sent a follow up letter to Infinitive and Sheridan ("Cease and Desist Follow Up").  The purpose of the Cease and Desist Follow up was to apprise Infinitive and Sheridan of the results of the forensic examination of Sheridan's 11:59 computer and Sheridan's lack of candor and to further explain the assurances 11:59 needed.  A true and correct copy of the September 30, 2024 "Cease and Desist Follow Up" correspondence is attached hereto as **Exhibit K**.

    **ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are

denied. Sheridan lacks sufficient information and belief concerning the allegations in this Paragraph and therefore denies them.

75.     Counsel for the parties attempted to confer in the days following the Cease and Desist Follow Up but were unable to agree upon a course of action that would provide 11:59 with appropriate assurances that Sheridan and Infinitive would not use or benefit from the use of 11:59's confidential, proprietary and trade secret information.

**ANSWER:** Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain what 11:59 would deem to be "appropriate assurances" and therefore denies the allegations in Paragraph 75.

76.     In mid-October 2024, through his attorneys, Sheridan provided 11:59 with a link to a Zip file containing the contents of his personal Google Drive, which Sheridan represented contains 11:59's confidential information that Sheridan stored and/or or accessed following his separation from 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.  The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

77.     This Zip file contains 4 Gigabytes of 11:59's proprietary and confidential data, including more than 1,700 files.  One folder in Sheridan's Google Drive is entitled "WhenLeave," seemingly containing the files Sheridan took with him when he "left" 11:59.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

36

78.     The WhenLeave folder of Sheridan's Google Drive contains some of 11:59's most valuable proprietary, confidential and trade secret information, including 11:59's Statements of Work, proposals, pricing estimates, coding, marketing presentations and more related to then current projects and projects in its pipeline (including Projects A, B, and C).  It also contains 11:59 employee and client contact lists.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan denies the characterization of "11:59's most valuable property."  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Projects A, B, And C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 78.

79.     The WhenLeave folder of Sheridan's Google Drive contains evidence that Sheridan accessed and used 11:59's confidential data for Infinitive's benefit – a copy of 11:59's Statement of Work for Project B saved alongside a nearly identical documents except that "11:59" within the document is replaced with "Infinitive."[9]

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project B" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 79. The allegations in this Paragraph concerning "evidence" is a legal conclusion to which no response is required.

80.      Sheridan has conceded that he copied the contents of the Documents and Downloads folders on his 11:59 issued computer to his personal Google Drive "in mass" before he separated from 11:59.

**ANSWER:**  The allegation in this Paragraph is a legal conclusion to which no response is required.

G.      **Plaintiff's Further Attempts to Address Databricks, McKinney and Miles' Misconduct**

81.      Beginning on or about October 1, 2024, 11:59's counsel attempted to reach Databricks multiple times to discuss McKinney and Miles' misconduct.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain 11:59's counsels' conduct and therefore denies the allegations in Paragraph 81.

82.      Counsel finally connected on October 14 and 22, 2024. 11:59 provided Databricks with information regarding Miles and McKinney's misconduct and requested that Databricks take action to ensure such misconduct immediately ceased.   Databricks' counsel indicated an investigation would be conducted.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain 11:59's counsels' or Databrick's counsel's conduct and therefore denies the allegations in Paragraph 82.

83.      Databricks did not respond to 11:59's multiple additional follow ups to provide any update on the status of its investigation or assurances that Miles and McKinney's misconduct would be addressed in any manner.  Thus, on or about November 20, 2024, 11:59 dispatched to Databricks a formal cease and desist letter, which, among other things, demanded that Databricks and its employees cease and desist from "all conduct which may constitute tortious interference,

misappropriation of confidential and proprietary information, or conspiracy to commit same against 11:59." A true and accurate copy of 11:59's November 20, 2024 Cease and Desist Letter to Databricks is attached hereto as **Exhibit L**.

**ANSWER:** Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain 11:59's counsels' or Databrick's counsel's conduct and therefore denies the allegations in Paragraph 83. The allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

84.     The cease and desist letter highlighted some of McKinney and Miles' most egregious misconduct, including:

      a.   With respect to Project A, on which Databricks and 11:59 had been working together for months and which Databricks knew 11:59 had received a verbal commitment, Miles conspired with Sheridan to interfere with 11:59's relationship with Project A. For example, Miles texted Sheridan on August 22, 2024, telling him, "Stay in touch w Cam. I told him not to sign the [Project A] contract." On August 23, 2024, Sheridan texted a former colleague confirming Miles' interference with Project A stating, "Cheryl [Miles] isn't going to sign the [Project A] sow. She waiting for me to start at INF."

      b.   With respect to Project C, which Databricks and 11:59 had also been working together on, Sheridan texted McKinney on August 21, 2024, stating, "I'm resigning tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." The same day Sheridan confirmed to McKinney that he had resigned and told him his

last day was September 6th and they needed to "come up with a plan for [Project C]."  The next day Sheridan confirmed to a former colleague that McKinney told him he would ensure Project C did not proceed with 11:59 and instead would be moved to Infinitive.

c.   McKinney and Sheridan then conspired to attempt to gain access to 11:59's confidential and proprietary data on 11:59's demo environment for Project C, which contained the demo coding 11:59 had developed and demonstrated for Project C.  On August 26, 2024, McKinney texted Sheridan, "Can you change the email associated with your NC ID from the backend on your side.  If so then go in and change it to your personal email so its not tied to your old 11:59 email."

d.   On September 5, 2024, while Sheridan was still employed by 11:59, McKinney asked Sheridan for a video recording of the demo 11:59 had done for Project C, then proceeded to text Sheridan, "Oh I want you to steal it from 11:59 haha." Sheridan responded, "Good you feel that was [sic] cuz I too want to steal it."

e.   Sheridan then confirmed to an Infinitive employee that Databricks was "pulling opportunities from 11:59" and moving them to Infinitive.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to the letter which he has not seen and also relating to "Project A" or "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 84.

85.     Clearly, Miles and McKinney not only cooperated with Sheridan, but they also actively participated and conspired with him to misappropriate and "steal" 11:59's confidential and proprietary information and leverage that data against 11:59 and in favor of Infinitive.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to the letter which he has not seen and therefore denies the allegations in this Paragraph.

86.     11:59's cease and desist letter requested, among other things, that Databricks return to it any of 11:59's confidential or proprietary information in its possession and cease from interfering in 11:59's business relationships.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to the letter which he has not seen and therefore denies the allegations in this Paragraph.

87.     On or about November 25, 2024, Databricks advised Plaintiff's counsel that Databricks had no influence over whether 11:59 was selected by a prospective client.  Databricks provided no explanation for the evidence to the contrary, that its account executives, Miles and McKinney, had clearly interfered with 11:59's client projects.  For example, Miles had told Project A not to sign the contract with 11:59.  McKinney held back Project C and attempted to gain access to 11:59's coding to enable Sheridan to provide a demo for Project C on behalf of Infinitive.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain communications between

Databricks and 11:59's counsel and therefore denies the allegations in Paragraph 87.  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project A" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 87.

88.     On or about December 2, 2024, Databricks further responded to 11:59's cease and desist letter, baldly asserting without support that Miles and McKinney do not have access to 11:59's confidential information, including its coding for Project C.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain communications between Databricks and 11:59's counsel and therefore denies the allegations in Paragraph 88. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 88.

89.     On December 12, 2024, 11:59 made another attempt to obtain assurances from Databricks via a second Cease and Desist Letter (see **Exhibit M**) regarding its investigation into Miles and McKinney's misconduct, given that Databricks' prior representations that it has not interfered with 11:59's business relationships was refuted by undisputed evidence to the contrary, as well as confirmation under penalty of perjury that a reasonable search of Databricks' systems and accounts was conducted to determine whether Databricks remained in possession of 11:59's proprietary or confidential information.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain communications between Databricks and 11:59's counsel and therefore denies the allegations in Paragraph 89.   The

allegations contained in this Paragraph further purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

90.     In the aforementioned letter, 11:59 officially terminated its Partner Agreement with Databricks, as Databricks had clearly breached the same.

**ANSWER:**   The allegations contained in this Paragraph purport to characterize a document, and to the extent the allegations are inconsistent with the document, the allegations are denied. Sheridan also lacks sufficient information and belief to admit or deny the allegations in this Paragraph and therefore denies the allegations in this Paragraph.

91.     Databricks failed to provide 11:59 with appropriate assurances that it would not use or benefit from the use of 11:59's confidential, proprietary and trade secret information, necessitating the filing of the instant action.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain what 11:59 would deem "appropriate assurances" and therefore denies the allegations in Paragraph 91.

## H. Plaintiff's Confidential and Trade Secret Information

92.     11:59 invests time, resources, and money in creating, developing, and protecting its confidential information and trade secrets.

**ANSWER:**  Defendant admits the allegations in Paragraph 92.

93.      Access to 11:59's systems, including e-mail and shared drives, is password protected and requires two factor authentication.  Employees have differing levels of access based on their position and job responsibilities.

**ANSWER:**  Defendant admits the allegations in Paragraph 93.

94.     11:59 employee access to 11:59's systems is withdrawn immediately upon termination.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain how 11:59 handles its systems access for all its employees, and therefore denies the allegations in Paragraph 94.   Upon information and belief, Sheridan admits his access to 11:59's systems was withdrawn immediately upon his separation from employment with 11:59.

95.     11:59's employees are subject to policies not to disclose the company's confidential information or trade secrets and are generally required to sign agreements containing confidentiality restrictions and other restrictive covenants.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain how 11:59 operates generally as it relates to its other employees, and therefore denies the allegations in Paragraph 95.

96.     11:59's employees are required to return all company devices, documents, and information upon request and/or termination.

**ANSWER:**   Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain how 11:59 operates generally as it relates to its other employees, and therefore denies the allegations in Paragraph 96.

97.     11:59 employee policies and agreements impose confidentiality and safeguarding obligations, in addition to those imposed by contract and by the law.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.  The allegations contained in this Paragraph further purport to characterize

a document, and to the extent the allegations are inconsistent with the document, the allegations are denied.

98.      11:59, upon discovering evidence of misconduct serves a cease and desist letter placing the employee on notice of a breach of applicable agreements and company policies, requesting the preservation and return of Plaintiff's data and property, among other demands appropriate to the facts and circumstances.

**ANSWER:**  Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph because Sheridan cannot ascertain how 11:59 operates generally as it relates to its other employees, and therefore denies the allegations in Paragraph 98.

99.      11:59 enters into non-disclosure agreements ("NDA") with its potential customers, such as in relation to Project B, which govern the treatment of proprietary information while the parties discuss, evaluate and consult to determine whether a possible future transaction will occur. This NDA requires the party receiving proprietary information not to disclose such proprietary information, including but not limited to information about the disclosing party's software and technology, analyses, compilations, and the disclosing party's trade secret information without the disclosing party's written permission.

**ANSWER:**  The allegations contained in this Paragraph purport to characterize a document(s), and to the extent the allegations are inconsistent with the document(s), the allegations are denied. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Project B" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 99.

100.      11:59 derives a significant benefit from its confidential information and trade secrets and will suffer a significant detriment from their misappropriation.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions and Plaintiff's theory of the case to which no response is required.

101.    11:59 owns and/or lawfully possesses confidential information and trade secrets.

**ANSWER:** Sheridan admits the allegations in Paragraph 101.

102.    Defendants do not own, lawfully possess, or have any right or authorization to use any of 11:59's confidential information or trade secrets.

**ANSWER:**  Sheridan denies the allegations in Paragraph 102 because he did, for a period, lawfully possess and had authorization to use 11:59's confidential information or trade secrets.

## I.    Harm Caused by Defendants

103.    As a direct result of the misconduct of the Defendants, absent injunctive relief, 11:59 may lose millions of dollars in projects.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

104.    Much of Defendants' tortious conduct uncovered and described herein involves their use of or attempted use of 11:59's code for demonstrations, materials and strategy, and disparagement of 11:59 in order to interfere with 11:59's relationships with their customers and partners as described herein.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

105.    In Sheridan and Infinitive's case, their tortious conduct interfered with 11:59's relationships with Databricks and 11:59's business relationships for Databricks related projects including but not limited to Projects A-C.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Projects A-C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 105.

106.    The financial impact of Defendants' misconduct on 11:59 is incalculable, but potentially exceeds millions of dollars.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

107.    As a direct result of Defendants' actions, 11:59 has already received confirmation that Projects A and C will not proceed with 11:59 and that instead, on information and belief, the clients have moved these projects to Sheridan and Infinitive.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan lacks sufficient information and belief to admit or deny the allegations in this Paragraph relating to "Projects A and C" because Sheridan cannot ascertain with certainty the client to which 11:59 refers and therefore denies the allegations in Paragraph 59.

108.    As a direct result of the misconduct of the Defendants described above and herein, Plaintiff has suffered irreparable harm, including but not limited to:

a.        Loss of future business opportunities;

b.        Loss of customers and other goodwill;

c.        Loss of market share; and

d.        Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

109.    Absent injunctive relief and an immediate cessation of misconduct by Defendants, and as a direct result of likely and inevitable future misconduct by the Defendants, Plaintiff will suffer irreparable harm, including but not limited to:

a        Loss of future business opportunities;

b.        Loss of customers, customers' trust and other goodwill;

c.        Loss of market share;

d.        Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties; and

e.        Present economic loss, which is difficult to ascertain at this time, and future economic loss, which is presently incalculable.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## CAUSES OF ACTION

### COUNT I
### BREACH OF DUTY OF LOYALTY
### (AGAINST DEFENDANT SHERIDAN)

110.        Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs, as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

111.     As a result of his employment, Sheridan owed a common law duty of loyalty to 11:59 to act in the company's best interest and to not compete against 11:59 during his employment.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

112.     Sheridan breached his duty by, among other things, purposefully and deliberately disparaging 11:59 to its customers, employees, and vendors, deliberating abandoning his efforts to secure 11:59's contracts for in progress projects in the 11:59 pipeline, soliciting and obtaining access to 11:59's demo code via his personal Gmail, and his failure to maintain the secrecy of 11:59's confidential, proprietary and trade secret information in order to benefit himself and/or his new employer, Defendant Infinitive.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

113.     As a result of Sheridan's breach of his common law duty of loyalty, 11:59 has suffered damages.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

<u>**COUNT II**</u>

**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)**

114.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

49

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

115. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

116. The DTSA defines "Trade Secret" as "information that derives economic value from not being generally known to or readily ascertainable through proper means by another person, and that is subject to reasonable efforts to maintain its secrecy." *Id. §* 1839(3).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

117. 11:59 possesses highly confidential trade secrets, protected under the DTSA including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

118. 11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets out of its business.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

119.     11:59 uses these trade secrets in both interstate and foreign commerce; 11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

120.     11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

121.     The DTSA defines "Misappropriation" to include the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or disclosure or use of a trade secret of another without express or implied consent in specified circumstances.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

122.     Sheridan had access to and regularly used 11:59's highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:** Sheridan admits Paragraph 122.

123.     Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization.  Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on

51

information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan further denies "Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation."

124.     11:59, upon discovering evidence of misappropriation Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and company policies, requesting the preservation and return of Plaintiff's data and property, among other demands.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

125.     By unlawfully taking, accessing, and/or using Plaintiff's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the DTSA.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

126.     Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the DTSA.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

127.     11:59's investigation into Defendants' conduct, which is ongoing, has identified substantial evidence of misappropriation by Defendants.  This conduct includes, but is not limited to, Sheridan's use of improper means, without authorization and/or by exceeding authorization, to breach his duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan lacks sufficient information and belief to admit or deny the allegations concerning 11:59's investigation and therefore denies this Paragraph.

128.     As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets.  By engaging in the conduct described herein, Sheridan violated those policies.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

129.     The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

130.     Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

131. Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

132. Defendants' conduct was wanton, willful, and malicious.

ANSWER: The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

133. 11:59 has had to incur cost and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

134. As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

### <u>COUNT III</u>
### VIRGINIA UNIFORM TRADE SECRETS ACT, § 59.1-336 to § 59.1-343
### (AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)

135. Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

136.    The Virginia Unified Trade Secrets Act ("VUTSA") is analogous to the DTSA and similarly prohibits the misappropriation of trade secrets.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

137.    The VUTSA defuses a trade secret as:

[I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

138.    "Misappropriation" under the VUTSA means:

1. Acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

    a. Used improper means to acquire knowledge of the trade secret; or

    b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

        (1) Derived from or through a person who had utilized improper means to acquire it;

        (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

        (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required.

139.     11:59 possesses highly confidential trade secrets, protected under the VUTSA including, but not limited to, demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

140.     11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of its business.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

141.     11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

142.     11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

143.     Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:** Sheridan admits the allegations in Paragraph 143.

144.     Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization.  Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan further denies "Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation."

145.     11:59, upon discovering indicia of misappropriation by Sheridan, served upon Defendants a Cease and Desist Letter placing them on notice of Sheridan's breach of applicable agreements and company policies, requesting the preservation and return of 11:59's data and property, and requesting the cessation of tortious interference and contact with the customers Sheridan improperly solicited during his 11:59 employment, among other demands.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan lacks sufficient information and belief to admit or deny allegations concerning 11:59's discovery and motivations and therefore denies this Paragraph.

146.    By unlawfully taking, accessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the VUTSA.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

147.    Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the VUTSA.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

148.    11:59's investigation into Defendants' conduct, which is ongoing, has identified multiple instances of this misappropriation by Defendants.  This conduct includes, but is not limited to, Defendants' use of improper means, without authorization and/or by exceeding authorization, to breach their duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

149.    As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets. By engaging in the conduct described herein, Sheridan violated those policies.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

150.    The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

151.    Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

152.    Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

153.    Defendants' conduct was wanton, willful, and malicious.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

154.    11:59 has had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

155.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## COUNT IV
## COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)

156.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:**  Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

157.   11:59 possesses highly confidential, proprietary information and trade secrets, including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

158.   11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets.  These trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

159.   11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

160.    Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:**  Sheridan admits the allegations in Paragraph 160.

161.    Based on information available to date, Defendants accessed Plaintiff's trade secrets without 11:59's authorization.  Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan further denies "Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation."

162.    11:59, upon discovering indicia of misappropriation by Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and company policies, and requesting the preservation and return of 11:59's data and property, among other demands.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph. Sheridan lacks sufficient information and belief to admit or deny allegations concerning 11:59's discovery and motivations and therefore denies this Paragraph.

163.    By unlawfully taking, assessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained 11:59's trade secrets, thus misappropriating such information in violation of Virginia common law.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

164.    These actions, taken together, at a minimum, demonstrate that Defendants used the proprietary, confidential and trade secrets as a result of discovery by improper means.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

165.    The acts and threatened acts of misappropriation or misuse have directly and proximately caused and continue to cause substantial damage to 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

166.    Defendants have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

167.    Disclosure or use of 11:59's proprietary, confidential and trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

168.    Defendants' conduct was wanton, willful, and malicious.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

169.   11:59 had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

170.   As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

**COUNT V**

**CONSPIRACY IN VIOLATION OF VA CODE ANN. § 18.2-499**
**(AGAINST ALL DEFENDANTS)**

171.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

**ANSWER:**  Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

172.   Defendants have mutually undertaken and acted in concert to purportedly, willfully, and maliciously injure 11:59 as set forth herein, without legal justification for their actions.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

173.   As a result of Defendants' actions Plaintiff has incurred substantial damages including without limitation to its reputation.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

<u>COUNT VI</u>

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES AND/OR CONTRACT RELATIONS (AGAINST ALL DEFENDANTS)**

174.    Plaintiff alleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

175.    11:59 had a reasonable expectation of business and contract relationships with its customers.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

176.    Sheridan by virtue of his 11:59 employment and by the actions described herein and, on information and belief, Infinitive are both aware of 11:59's expected business relationships and contracts with its customers.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

177.    Defendants have intentionally sought to destroy 11:59's relationships with its customers without any legitimate purpose for doing so.

**ANSWER:** Sheridan denies the allegations in Paragraph 177.

178.    Defendants used improper means, including but not limited to taking, retaining, and leveraging 11:59's confidential, proprietary, and trade secret information for the purpose of interfering with 11:59's business relationships.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

179.    These actions are no mere competition; they are unlawful acts meant solely to harm 11:59 and to benefit Defendants.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

180.    As a result of Defendants' actions, 11:59 has incurred substantial damages that are irreparable and cannot be fully or adequately measured or compensated by monetary relief.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## COUNT VII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST DEFENDANTS INFINITIVE, DATABRICKS,  MILES AND MCKINNEY)

181.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

182.    Defendants Infinitive, Databricks, Miles and McKinney were aware that Sheridan owed and owes 11:59 a fiduciary duty, including but not limited to duties of care, loyalty, candor, and disclosure.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan lacks sufficient information and belief to admit or deny allegations concerning the knowledge of other defendants and therefore denies this Paragraph.

65

183.    Upon information and belief, Defendants Infinitive, Databricks, Miles and McKinney requested, directed, incited, encouraged, compelled, and otherwise solicited Sheridan to breach his fiduciary duty to 11:59 by engaging in the acts and omissions described above.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan lacks sufficient information and belief to admit or deny allegations concerning the knowledge and actions of other defendants and therefore denies this Paragraph.

184.    Defendants Infinitive, Databricks, Miles and McKinney's conduct was intentional, willful, malicious, wanton, and intended to damage 11:59's business.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. Sheridan lacks sufficient information and belief to admit or deny allegations concerning the knowledge and motivations of other defendants and therefore denies this Paragraph.

**COUNT VIII**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANT SHERIDAN)**

185.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

**ANSWER:**  Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

186.    The NDA is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

187.    Sheridan's Offer Letter is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

188.    The NDA and Offer Letter (the "Agreements") contain valid and enforceable confidentiality, non-solicitation, return of company property and other provisions which prohibit Sheridan from interfering with 11:59's relationships with its employees, directly or indirectly, from disclosing or using 11:59's confidential information for improper purposes and require the prompt return of 11:59's equipment and information upon Sheridan's separation from the company.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

189.    Sheridan failed to protect, retained, disclosed and utilized 11:59's confidential and trade secret information for his own and Infinitive's benefit, interfered with 11:59's relationships with its employees, and failed to promptly return 11:59's equipment and confidential, proprietary and trade secret information.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

190.    Infinitive knowingly, purposefully and/or negligently aided and abetted the breach of the Agreements by, among other things, leveraging and/or allowing Sheridan and Infinitive's benefit.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

191. Sheridan has retained, obtained, used, and disclosed (and has not returned) 11:59's trade secrets and confidential information in violation of these provisions.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

192. 11:59 has a legitimate business interests justifying the non-solicitation and confidentiality provisions contained in the Agreements, which include, but are not limited to, the protection of 11:59's business goodwill, reputation, competitive advantage, and trade secrets and other valuable confidential business information.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

193. The provisions are reasonably necessary to protect 11:59's legitimate business interests since 11:59's confidential and trade secret information is not available to the public or generally known in the industry.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

194. The provisions are not harmful to the general public and are not unreasonably burdensome to the Defendants.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

195. Unless enjoined by this Court, Sheridan will continue breaching the Agreements.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

196.    As a direct and proximate result of Sheridan's breaches, as described herein, 11:59 has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial.  Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

**COUNT IX**

**VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT ("CFAA")
18 U.S.C.S. § 1030, ET SEQ.
(AGAINST DEFENDANT SHERIDAN)**

197.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

198.    Defendant Sheridan's actions as described above constitutes violations of one or more provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

199.    The CFAA makes it unlawful for a person to intentionally obtain information from a "protected computer system," "without authorization" or by "exceeding authorized access." 18 U.S.C. § 1030 (a)(2)(C).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

200.    The CFAA provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). 18 U.S.C. § 1030(g).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

201.    Conduct violates the CFAA if it, among other things causes "damage or loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value[,]" or damage "affecting 10 or more protected computers during any 1-year period." 18 U.S.C. § 1030(c)(4)(A)(i)(I) & (VI).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

202.    "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030 (e)(8).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

203.    11:59's computers are "protected computers" that are used in or affect interstate and foreign commerce and/or communication within the meaning of 18 U.S.C. § 1030(e)(2)(B).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

204.     Defendant Sheridan willfully and maliciously used 11:59's computer server system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information for purposes of using it in a competitive business, such as Infinitive, which as described in detail herein, he did.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

205.     Defendant Sheridan willfully and maliciously used 11:59's computer serve system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

206.     Such actions violated 11:59's policies regarding the access, use, and disclosure of company Confidential, proprietary and trade secret information and were without authorization and/or exceeded Plaintiff's authorization to access 11:59's protected computers and Information Systems within the meaning of 18 U.S.C. §1030(a)(2)(C).

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

207.     Defendant Sheridan's actions and 11:59's resulting damage and loss all occurred within a one (1) year period.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

208.     As a result of Defendant Sheridan's conduct, 11:59 has sustained damage and/or loss of not less than $5,000.00, within the meaning of the CFAA, and will continue to suffer substantial losses in excess of $5,000, including but not limited to loses sustained in responding to and investigating Defendant Sheridan's misconduct.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

209.     Defendant Sheridan's theft of 11:59's trade secrets and other proprietary and Confidential information and documents has caused 11:59 to devote substantial resources and efforts to investigate Defendant Sheridan's misconduct in order to access the full extent of Defendant Sheridan's misappropriation, to respond to Defendant Sheridan's misconduct, and to ensure that 11:59 is protected from further harm to its business. These amounts continue to accumulate.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## COUNT X

### VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT, VA CODE ANN. § 18.2-152.1, ET SEQ.
### (AGAINST DEFENDANT SHERIDAN)

210.     Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

**ANSWER:** Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

211.    The Virginia Computer Crimes Act prohibits, among other things, any person "without authority" to use a computer or computer network to "make… an unauthorized copy… of computer data." Virginia Code § 18.2-152.4.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required.

212.    Virginia Code § 18.2-152-2 provides that a person is "without authority" when he or she knows or reasonably should know that he or she has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission that was actually granted to him or her.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

213.    Defendant Sheridan had no authority to access 11:59's computer server system, computer networks, computer programs or software to make unauthorized copies of, or use, 11:59's Confidential, proprietary and trade secret information for purposes of using it in a competitive business, such as Infinitive, which he did.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

214.    Defendant Sheridan willfully and maliciously used 11:59's computer server system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive, in violation of Va. Code §§ 18.2-152.3 and 18.2-152.4.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

215.    11:59 was damaged by, among other damages, loss of revenue and goodwill as a result of these actions by the Defendant Sheridan.  As a direct and proximate cause of Sheridan's unauthorized actions, 11:59 has sustained damages, which, in part, are undeterminable, and, in part, in an amount to be determined by evidence at trial, but not less than $7 million.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

216.    Under Va. Code § 18.2-152.12(A), 11:59 is entitled to recover damages and costs, which includes the costs of retaining computer forensics experts to discover exactly what Confidential information was accessed, what Confidential information was printed, and to determine whether such information was subsequently stored in the Defendants' storage locations.

**ANSWER:**  The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## COUNT XI
## BREACH OF CONTRACT
## (AGAINST DEFENDANT DATABRICKS)

217.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

**ANSWER:**  Sheridan repeats, reiterates, and incorporates by reference each and every response to all preceding paragraphs as if fully set forth herein.

218.    The Partner Agreement is a valid and binding agreement between 11:59 and Databricks formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

219.   The Partner Agreement contains valid and enforceable confidentiality and other provisions which prohibit Databricks from disclosing or using 11:59's confidential information for improper purposes.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

220.   Databricks breached its duties under the Partner Agreement by disclosing or using 11:59's confidential information for improper purposes as detailed herein.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

221.   McKinney and Miles knowingly, purposefully and/or negligently aided and abetted the breach of the Agreements by, among other things, leveraging and/or allowing Databricks to leverage 11:59's confidential and trade secret information for Databricks, Sheridan and/or Infinitive's benefit.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

222.   11:59 has legitimate business interests justifying the confidentiality provisions contained in the Partner Agreement, which include, but are not limited to, the protection of 11:59's business goodwill, reputation, competitive advantage, and trade secrets and other valuable confidential business information.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

223.    The provisions are reasonably necessary to protect 11:59's legitimate business interests since 11:59's confidential and trade secret information is not available to the public or generally known in the industry.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

224.    The provisions are not harmful to the general public and are not unreasonably burdensome to the Defendants.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

225.    Unless enjoined by this Court, Databricks will continue breaching the Partner Agreement.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

226.    As a direct and proximate result of Databricks' breaches, as described herein, 11:59 has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial.  Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order enjoining and restraining Defendants, and any other person acting in concert with Defendants, from:

(a)     Directly or indirectly servicing, soliciting, enticing, or inducing any 11:59 clients serviced by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59 or assisting any other person or entity to do so;

(b)     Using any confidential, proprietary, or trade secret information of 11:59;

(c)     Continuing to use 11:59's confidential information, and Defendants shall specifically identify, preserve, and appropriately sequester and refrain from further accessing any information belonging to 11:59 in Defendants' possession, including but not limited to, hard copies and computer-saved versions of these documents, whether the information is on external hard drives, disks, CD-ROMs, networked data services, internet accessed outside storage, or any other portable media device;

(d)     With respect to Defendant Sheridan, directly or indirectly soliciting, recruiting, inducing, or hiring any employee of 11:59 to work for a third party other than 11:59 or engage in any activity that would cause any employee to violate any agreement with 11:59;

(e)     With respect to Defendant Sheridan, disclosing any 11:59 confidential, proprietary, and trade secret information or documents to any third party, including but not limited to Infinitive;

(f)     Granting such other relief as the court deems equitable and just. And further requiring that:

(g)     Defendants shall immediately produce copies of any and all of 11:59's documents within their possession to 11:59;

(h)       Sheridan shall identify any and all storage locations where he retained, copied, accessed or modified 11:59's confidential, proprietary or trade secret information following his separation from 11:59;

(i)       Sheridan shall identify any and all third parties, including but not limited to Infinitive, to whom he provided information or documents belonging to 11:59;

(j)       Sheridan shall provide a certification that verifies, under the pains and penalties of perjury, that he has identified, and sequestered all of 11:59 documents and information in his possession;

(k)       An appropriate and duly authorized representative of Infinitive shall provide a certification that verifies, under the pains and penalties of perjury, that Infinitive has returned all 11:59 documents and information in its possession and it has not retained copies, electronic or otherwise.

(l)       McKinney and Miles each provide a certification that verifies, under the pains and penalties of perjury, that they have identified, preserved, and sequestered all of 11:59's confidential and proprietary information for any reason;

(m)       An appropriate and duly authorized representative of Databricks shall provide a certification that verifies, under the pains and penalties of perjury, that Databricks has returned all 11:59 documents and information in its possession and it has not retained copies, electronic or otherwise;

(n)       Ordering disgorgement and requiring Defendants to repay to 11:59 the value of Sheridan's salary, benefits and other compensation paid during the period of faithless service and/or disloyalty to 11:59;

(o)      Ordering disgorgement and requiring Infinitive to repay to 11:59 the value of the ill-gotten gains it received as a result of its violations of the law;

(p)      Ordering disgorgement and requiring the Defendants to pay to 11:59 the value of all benefits obtained as a result of their tortious conduct;

(q)      Awarding 11:59 compensatory, special, consequential, exemplary, treble, and punitive damages in an amount to be determined but not less than the amount of 11:59's actual loss and the amount of Defendants unjust enrichment;

(r)      Awarding 11:59 its attorneys' fees, costs, and other expenses incurred in this Action and in otherwise enforcing its rights and addressing misconduct by the Defendants;

(s)      Awarding 11:59 reimbursement of the expenses it incurred in forensically examining Sheridan's 11:59 issued device and other data storage devices or accounts related to the Defendants' breaches of their duties, contracts, and other violations of the law; and

(t)      Granting such other relief as the court deems equitable and just.

**ANSWER:** The allegations contained in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, Sheridan denies this Paragraph.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issue so triable as set forth herein.

**ANSWER:** Sheridan admits Plaintiff demands a jury trial.

## GENERAL DENIAL

Defendant denies all allegations not expressly admitted herein.

## SHERIDAN'S GENERAL AND AFFIRMATIVE DEFENSES

Sheridan asserts the following affirmative and other defenses, without prejudice to its right to argue that Plaintiff bears the burden of proof regarding some or all of these defenses.

1.      Plaintiff's claims are barred, in whole or in part, by the doctrines of res judicata, collateral estoppel, promissory estoppel, equitable estoppel, unjust enrichment, justification, ratification, release, waiver, and/or unclean hands.

2.      Plaintiff's claims are barred to the extent the agreements alleged by Plaintiff are void or otherwise unenforceable.

3.      Plaintiff's claims are barred to the extent the agreements alleged lack adequate consideration.

4.      Plaintiff's claims are barred to the extent the agreements alleged are unnecessary to protect legitimate business interests.

5.      Plaintiff's claims are barred to the extent the agreements alleged are overbroad, are not narrowly drawn to protect Plaintiff's legitimate business interest, are unduly burdensome on Defendant's ability to earn a living, are against public policy, or are otherwise unenforceable.

6.      Plaintiff's claims are barred to the extent the agreements alleged are not in the public interest.

7.      Plaintiff's claims fail, in whole or in party, because it failed to mitigate its alleged damages.

8.      Sheridan avers that Plaintiff's claims, including its claim of trade secret misappropriation, are brought in bad faith.

9.      Plaintiff's claims are barred to the extent the agreement alleged does not meet the requirements of the Defend Trade Secrets Act.

10.     The Defend Trade Secrets Act bars Plaintiff from recovering punitive damages because the alleged agreement does not contain the statutorily required notices.  *See* 18 U.S.C. § 1833.

11.     Plaintiff does not possess a protectable interest in the matters alleged.

12.     Sheridan has not used any of Plaintiff's alleged trade secrets in an unauthorized manner.

13.     Plaintiff failed to protect or keep the alleged information secret.

14.     The items alleged by Plaintiff are public domain or public information.

15.     Plaintiff has not been damaged as alleged and are barred in whole or in part because any losses or damages sustained by Plaintiff are *de minimis*, remote, speculative, and/or transient and hence not cognizable at law.

16.     If Plaintiff sustained any damages as alleged, such damages were not caused, directly or proximately, by any acts and/or omissions of Sheridan.

17.     Sheridan reserves the right to rely on each and every additional defense that may become known to him through the course of this litigation, including discovery, trial, or otherwise. Sheridan expressly reserves the right to amend this Answer, to assert different or additional defenses, or to otherwise amend any of its denials or averments.


WHEREFORE, Defendant Sheridan respectfully requests that the Court dismiss Plaintiff's Complaint against Defendant with prejudice; award Defendant its costs and attorneys' fees incurred in connection with the defense of this matter; and all other relief the Court in its exercise of discretion deems just and proper.

January 3, 2025                          Respectfully submitted,

                                         **JACKSON LEWIS P.C.**

                                         */s/ John M. Remy*
                                         John M. Remy (VA Bar No. 65863)
                                         Eric P. Burns (VA Bar No. 76554)
                                         Alyssa B. Testo (VA Bar No. 97254)
                                         10701 Parkridge Blvd., Suite 300
                                         Reston, VA 20191
                                         (703) 483-8300 – Telephone
                                         (703) 483-8301 – Fax
                                         John.Remy@Jacksonlewis.com
                                         Eric.Burns@Jacksonlewis.com
                                         Alyssa.Testo@Jacksonlewis.com

                                         *Counsel for Defendant Joseph Bradley Sheridan*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 3rd day of January, 2025, a copy of the foregoing was filed with the court's ECF system and served on the following counsel of record for Plaintiff and Defendants:

Micah E. Ticatch, Esq.
Isler Dare PC
1945 Old Gallows Road, Suite 650
Vienna, VA 22182
mticatch@islerdare.com

*Attorneys for Defendant Infinitive*

John Murdock, Esq.
Brian S. Szmak, Esq.
POTTER & MURDOCK
252 N. Washington Street
Falls Church, VA 22046
jmurdock@pottermurdock.com
bszmak@pottermurdock.com

*Attorneys for Plaintiff M Corp dba 11:59*

Stacy Landau, Esq.
*(Admitted Pro Hac Vice)*
Kegan S. Andeskie, Esq.
*(Admitted Pro Hac Vice)*
NUKK-FREEMAN & CERRA, P.C.
26 Main Street, Suite 202
Chatham, NJ 07928
slandau@nfclegal.com
kandeskie@nfclegal.com

*Attorneys for Plaintiff M Corp dba 11:59*

/s/  John M. Remy