# EXHIBIT A

`

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **M CORP DBA 11:59,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. 1:24-cv-1823** |
| ) | |
| **INFINITIVE, INC.,** *et al.* ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**DEFENDANT INFINITIVE, INC.'S AMENDED ANSWER AND AFFIRMATIVE**
**DEFENSES TO THE FIRST AMENDED COMPLAINT AND COUNTERCLAIMS**

Defendant Infinitive, Inc. ("Infinitive" or "Defendant"), by and through the undersigned counsel, hereby provides its Amended Answer to Plaintiff M Corp dba 11:59's ("Plaintiff" or "11:59") First Amended Complaint (Dkt. 43), and asserts Counterclaims.

Infinitive's responses to the First Amended Complaint are made to the best of its knowledge at this time. Except as otherwise admitted, qualified, or denied, Infinitive denies each and every allegation in Plaintiff's First Amended Complaint.

## THE PARTIES

1.      Plaintiff 11:59 is a California based consulting firm dedicated to helping businesses transform their operations by leveraging the power of the cloud, artificial intelligence ("AI"), and other innovative technologies. 11:59 develops custom solutions in less time and at a lower cost than traditional consulting engagements.

**ANSWER:** Infinitive admits that Plaintiff 11:59 is a California based consulting firm. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 1 and on that basis denies the allegations.

1

`

2.      11:59 is engaged in interstate commerce, with employees and clients in multiple U.S. states, delivering products across state lines on a regular basis.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 2 and on that basis denies the allegations.

3.      Defendant Infinitive is a Delaware corporation with headquarters located in Ashburn, Virginia. Infinitive is a data and AI consulting firm.

**ANSWER:** Infinitive admits the allegations in Paragraph 3.

4.      Defendant Sheridan is an individual who resides in Ashburn, Virginia. Sheridan commenced his employment with 11:59 in March 2023. Until his separation on September 6, 2024, Sheridan's title was Vice President, Data Analytics. 11:59 learned shortly after Sheridan's separation that he accepted employment at Infinitive, a direct competitor of 11:59.

**ANSWER:** Infinitive admits the first and second sentence of Paragraph 4. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 4 and on that basis denies the allegations.

5.      Defendant Databricks is a data and AI company headquartered in San Francisco, California, which provides a platform for data analysis, engineering and generative AI.

**ANSWER:** Infinitive admits the allegations in Paragraph 5.

6.      Defendant McKinney is an individual who resides, on information and belief, in Raleigh, North Carolina. McKinney was at all relevant times an Account Executive at Databricks, responsible for public sector projects in the eastern half of the United States.

**ANSWER:** Infinitive admits Defendant McKinney is an individual who resides in Raleigh, North Carolina and was an Account Executive at Databricks. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 6 and on that basis denies the allegations.

`

7.    Defendant Miles is an individual who resides, on information and belief, in Fair Oaks, California. Miles was at all relevant times an Account Executive at Databricks, responsible for public sector projects in the western half of the United States.

**ANSWER:** Infinitive admits that Defendant Miles is an Account Executive at Databricks. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 7 and on that basis denies the allegations.

## JURISDICTION AND VENUE

8.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's claims arising under the laws of the United States that they form part of the same case or controversy. The Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter is between citizens of different states and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:** Paragraph 8 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims but does not contest jurisdiction for purposes of this action only.

9.    Venue is proper in the Eastern District of Virginia, pursuant to 28 U.S.C. § 1391(b) because Defendants Sheridan and Infinitive are residents of Virginia within the jurisdiction of the Alexandria Division and a substantial part of the events or omissions giving rise to the claims occurred in this jurisdiction.

`

**ANSWER:** Paragraph 9 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims but does not contest venue for purposes of this action only.

10.    The Court has personal jurisdiction over Infinitive and Databricks because they do business in Virginia and have sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because Infinitive and Databricks committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia.

**ANSWER:** Paragraph 10 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims but does not contest jurisdiction over it for purposes of this action only.  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 10 concerning Databricks.

11.    This Court has personal jurisdiction over Sheridan because he is a resident of the Commonwealth of Virginia and further has specific personal jurisdiction over Sheridan because he committed acts complained of in this Verified Complaint, in whole or in part, in the Commonwealth of Virginia, and purposely caused injury to 11:59.

**ANSWER:** Paragraph 11 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims but does not contest jurisdiction for purposes of this action only.

12.    This Court has personal jurisdiction over Miles because she has sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because Miles committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia, purposefully availing herself of the laws of Virginia.

`

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 12 and on that basis denies the allegations.

13.     This Court has personal jurisdiction over McKinney because he has sufficient minimum contacts with Virginia to have established specific personal jurisdiction, and because McKinney committed acts complained of in this Verified Complaint, purposely causing injury to 11:59 in Virginia, purposefully availing himself of the laws of Virginia.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 13 and on that basis denies the allegations.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     11:59 and Infinitive are direct competitors in the data/AI consulting industry, an industry which is comprised of a relatively limited number of providers.

**ANSWER:** Infinitive admits that it competes with 11:59 in some areas in the data/AI consulting industry.  Infinitive denies the remaining allegations in Paragraph 14.

15.     11:59 is a premier data/AI consulting provider, working with clients to get the most out of their data, optimize processes and outcomes, using an approach that tailors solutions to each customer's unique needs. 11:59 offers custom solutions in projects involving data management, cyber security, Lakehouse implementation and management, reporting, data catalogue management, AI genies, and DBRX Instruct solutions (such as creating a web front-end for a RAG chatbot.

**ANSWER:** Infinitive admits that 11:59 is a data/AI consulting provider.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 15 and on that basis denies the allegations.

`

16.    11:59 works with strategic partners, such as Databricks and Amazon Web Services ("AWS"), to deliver its custom data solutions to clients.

**ANSWER:** Infinitive admits that 11:59 has worked with Databricks and Amazon Web Services in the past.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 16 and on that basis denies the allegations.

17.    The sales cycle for 11:59's customers is typically 3-6 months, depending on the complexity of the project, but can be as long as 12-18 months. Due to the technical nature of the work it does, 11:59 has made a significant investment, both in terms of personnel and financial investment, into bringing projects to contract. This investment often comes in the form of providing demos and showing potential customers proofs of concept and sponsoring and attending events.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 17 and on that basis denies the allegations.

18.    Given the competitive nature of the data/AI consulting industry, 11:59 has invested a significant amount of time, money, and resources developing and nurturing its client base, developing demonstrations and proofs of concept to respond to the identified needs and preferences of its clients and potential clients. The information amassed through 11:59's efforts has been compiled over years at significant expense. Through its investment and efforts, 11:59 has amassed substantial trade secrets and proprietary information, including but not limited to custom coding, its customers' needs and preferences, and pricing and contract terms. Such information is not known to the industry or outside of 11:59 and provides 11:59 with a competitive advantage.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 18 and on that basis denies the allegations.

`

19.    In or about 2020, Sheridan worked for Infinitive in roles as Director of Data Engineering, Deputy Technology Practice Lead, and Market Technology Lead. In these roles, he was responsible for the healthcare and education/non-profit market segments.

**ANSWER:** Infinitive admits the allegations Paragraph 19.

20.    In March of 2023, Sheridan left Infinitive and joined 11:59. On or about March 9, 2023, 11:59 offered Sheridan a position as Vice President of Data Analytics. Sheridan accepted the role by executing the Offer of Employment ("Offer Letter") on March 10, 2023. Sheridan's start date was scheduled for March 27, 2023. He earned a significant base salary and was eligible for a discretionary bonus if he achieved certain goals and milestones. A true and correct copy of the "Offer Letter" is attached hereto as Exhibit A.

**ANSWER:** Infinitive admits the first three sentences of Paragraph 20.  Infinitive further admits that Mr. Sheridan earned a base salary and qualified for a discretionary bonus if he achieved certain goals and milestones and that Mr. Sheridan executed the Offer Letter, which terms speaks for itself.  Infinitive denies the remaining allegations in Paragraph 20.

21.    As VP of Data Analytics, Sheridan was responsible for driving the growth and success of 11:59's data consulting practice. His position involved managing and maintaining client relationships, leading and overseeing complex data projects, overseeing a team who develops 11:59's custom data solutions, and included business development responsibilities. Sheridan reported to 11:59's Chief Technology Officer.

**ANSWER:** Infinitive admits the allegations in Paragraph 21.

22.    Sheridan's Offer Letter contained a prohibition on Sheridan engaging in conflicting employment and a Non-Solicitation of Employees.

`

**ANSWER:** Infinitive denies the allegations in Paragraph 22 to the extent it seeks to characterize the Offer Letter, which speaks for itself.

23.    Specifically, the "Conflicting Employment" provision of the Offer Letter provides:

> Executive is not automatically prohibited from having a second job or outside business interests. However, while Executive is employed by M Corp, he is expected to devote his professional energies to M Corp and shall not engage without disclosure to and written approval from M Corp. Executive is prohibited from engaging in any other employment, occupation, consulting or other business activity that creates a conflict of interest with M Corp. M Corp assumes no responsibility for secondary employment or an outside business interest and shall not provide workers' compensation coverage or any other benefit for injuries occurring from it.

**ANSWER:** Infinitive admits the allegations in Paragraph 23.

24.    The Offer Letter's "Non-Solicitation of Employees" provision states:

> While Executive is employed by M Corp, and for a period of twelve (12) months immediately following the termination of his employment with M Corp for any reason, whether with or without cause, he shall not solicit, induce, recruit or encourage any of M Corp's employees to terminate their relationship with M Corp.

**ANSWER:**  Infinitive admits the allegations in Paragraph 24.

25.    In addition to the Offer Letter, Sheridan was under other obligations to 11:59 under his Confidentiality and Non-Disclosure Agreement ("NDA") regarding his use and treatment of 11:59's confidential and trade secret information. Sheridan executed the NDA on March 17, 2023. A true and correct copy of the Confidentiality and Non-Disclosure Agreement ("NDA") is attached hereto as Exhibit B.

**ANSWER:** Infinitive admits that Sheridan executed the NDA on March 17, 2023, but denies the characterization of that document which speaks for itself.

26.     "Confidential Information" in the NDA is defined to include:

`

information or material that is commercially valuable to M Corp and not generally known or readily ascertainable in the industry. This includes, but is not limited to:

(a)    technical information concerning M Corp's products and services, including product knowhow, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)    information concerning M Corp's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, strategic plans for the capture of new business, technical and business approaches for improving target and existing client systems, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)    information concerning M Corp's employees and consultants, including salaries, strengths, weaknesses and skills;

(d)    information submitted by M Corp's customers, suppliers, employees, consultants or coventure partners with M Corp for study, evaluation or use; and

(e)     any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect M Corp's business.

**ANSWER:** Infinitive admits the allegations in Paragraph 26.

27.    The NDA requires Sheridan to keep 11:59's Confidential Information "in the strictest confidence." It prohibits the disclosure of 11:59's Confidential Information to anyone outside of 11:59 without the company's prior written consent. The NDA also prohibits the use of 11:59's Confidential Information for Sheridan's own purposes or for the benefit of anyone other than 11:59.

**ANSWER:** Infinitive admits that Sheridan executed the NDA, but denies the characterization of that document which speaks for itself.

`

28.    Under the "Return of Materials" provision, Sheridan's NDA requires that he promptly deliver to 11:59 "all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information." The NDA further obligates Sheridan to return all of 11:59's equipment, files, software, programs and other personal property" belonging to the company.

**ANSWER:** Infinitive admits that Sheridan executed the NDA, but denies the characterization of that document which speaks for itself.

29.    Sheridan's NDA obligations survived after his employment with 11:59 ended and remain as long as the Confidential Information remains confidential (i.e., unknown to the public.)

**ANSWER:** Infinitive admits that Sheridan executed the NDA, but denies the characterization of that document which speaks for itself.

30.    Under the NDA, if Sheridan misappropriated any of 11:59's Confidential Information, he acknowledged this would cause the company irreparable harm such that he agreed 11:59 may apply to a court of competent jurisdiction for an injunction against any further misappropriation and for any other relief the company and court deems necessary. This is in addition to any other remedies available.

**ANSWER:** Infinitive admits that Sheridan executed the NDA, but denies the characterization of that document which speaks for itself.

31.    For any disputes arising out of the NDA, the prevailing party has the right to collect its attorneys' fees, costs, and other necessary expenditures from the other party.

**ANSWER:** Infinitive admits that Sheridan executed the NDA, but denies the characterization of that document which speaks for itself.

`

32.    Under 11:59's Employee Handbook, which Sheridan reviewed and acknowledged, Sheridan was subject to additional obligations to the company, including:

a) **Ethics Code:** 11:59's managers and team members are expected to adhere to high standards of business and personal integrity as a representation of 11:59's business practices, at all times consistent with their duty of loyalty to the Corporation.

b) **Outside Employment:** Outside employment that creates a conflict of interest or that affects the quality or value of your work performance or availability at 11:59 is prohibited.

c) **Computer Security and Copying of Software:** Software programs purchased and provided by 11:59 are to be used only for creating, researching, and processing materials for Corporation use. By using Corporation hardware, software, and networking systems you assume personal responsibility applicable Corporation policies, as well as city, state, and federal laws and regulations.

d) **Use of Company Technology**: Corporation IT resources and communications systems are to be used for business purposes only unless otherwise permitted under applicable law. All content maintained in Corporation IT resources and communications systems are the property of the Corporation. Therefore, team members should have no expectation of privacy in any message, file, data, document, facsimile, telephone conversation, social media post, conversation, or any other kind or form of information or communication transmitted to, received, or printed from, or stored or recorded on Corporation electronic information and communications systems. The Corporation reserves the right to monitor, intercept, and/or review all data transmitted, received, or downloaded over Corporation IT resources and communications systems in accordance with applicable law. Any individual who is given access to the system is hereby given notice that the Corporation will exercise this right periodically, without prior notice and without prior consent. The interests of the Corporation in monitoring and intercepting data include, but are not limited to: protection of Corporation trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.); managing the use of the computer system; and/or assisting team members in the management of electronic data during periods of absence.

`

e) **Confidentiality and Nondisclosure of Trade Secrets:** As a condition of employment, 11:59 team members are required to protect the confidentiality of Corporation trade secrets, proprietary information, and confidential commercially sensitive information (i.e., financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Corporation. Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released without prior authorization from management. If you have information that leads you to suspect that team members are sharing such information in violation of this policy and/or competitors are obtaining such information, you are required to inform your Manager and/or People Operations or Human Resources.

f) **Return of Property**: Return all Corporation1 property at the time of separation, including computer equipment. True and correct copies of excerpts of 11:59's Employee Handbooks and Defendant Sheridan's acknowledgement of and training related to same are attached hereto as **Exhibit C**.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 32 and on that basis denies the allegations.

33.     11:59's Employee Handbook further prohibits employees from being under the influence of illegal drugs or substances during work hours or while on company business.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 33 and on that basis denies the allegations.

34.     Sheridan held a senior role at 11:59, overseeing a team of professionals responsible for writing the code and developing the framework for its custom data solutions. Sheridan was client-facing, responsible for managing a pipeline of over $7 million in business.

**ANSWER:** Infinitive admits the first sentence in Paragraph 34. Infinitive denies the remaining allegations in Paragraph 34.

35.     In connection with his role, Sheridan was provided with access to 11:59's confidential and proprietary information, including 11:59's pipeline, forecasts, status of

12

`

negotiations, clients, prospective clients, contract and pricing terms, and other critical aspects of 11:59's business. This information is extremely valuable and allows 11:59 to serve its clients, providing 11:59 with a competitive advantage. This valuable information can be used by competitors to entice clients away from 11:59.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 35 and on that basis denies the allegations.

36.    Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with one of its strategic partners, Databricks. 11:59 and Databricks worked together to provide data, analytics and AI solutions and services to their clients. In furtherance of their partnership, 11:59 entered into a Partner Program Agreement ("Partner Agreement") with Databricks on or about August 15, 2022. A true and correct copy of the Databricks Partner Agreement is attached hereto as **Exhibit D**.

**ANSWER:** Infinitive admits the first two sentences of Paragraph 36.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 36 and on that basis denies the allegations.

37.    Pursuant to the Terms and Conditions of the Partner Agreement, Databricks was required to maintain the confidentiality of 11:59's Confidential Information to any third party except under limited enumerated circumstances.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 37 and on that basis denies the allegations.

38.    The Terms and Conditions of the Partner Agreement define Confidential Information to include:

> a party's non-public information, know-how, or trade secrets that (a)
> the disclosing party designates as being confidential (either at the

`

> time of disclosure or in writing within 30 days of disclosure), or (b) given the nature of the disclosure or circumstances surrounding the disclosure, the receiving party should treat as confidential, and (c) which is disclosed by a party to the receiving party, or to any of the other's Affiliates, employees, contractors, agents and advisors.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 38 and on that basis denies the allegations.

39.     The Terms and Conditions of the Partner Agreement further provide that Databricks is permitted to distribute 11:59's Partner Materials "solely in connection with promoting [] [11:59's] solutions, and furthering the parties' collaboration . . ." Partner Materials are defined to mean "published content, logos and other branding materials, sales tools, and other resources concerning your Company or solutions that you may provide Databricks, but excluding your Confidential Information.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 39 and on that basis denies the allegations.

40.     11:59 worked with various Databricks personnel to promote their services to prospective customers. Relative to public entity work, 11:59 primarily worked with two Databricks Account Executives – Defendant William McKinney, who oversaw projects in the eastern half of the United States, and Defendant Cheryl Miles, who oversaw projects in the western half of the country.

**ANSWER:** Infinitive admits the first sentence of Paragraph 40. Infinitive denies the remaining allegations except to admit that relative to public entity work, 11:59 primarily worked with Databricks Account Executives Defendant William McKinney and Defendant Cheryl Miles.

41.     Over the course of Sheridan's employment, 11:59's pipeline of work on Databricks partner projects grew to over $7 million. Many of the opportunities in 11:59's pipeline were single source opportunities, meaning because of their size, there is no public request for proposal and

`

11:59 was the only vendor being considered. Many of the projects in 11:59's pipeline were also at or near contract execution after 11:59 had worked on them for months or more than a year in some cases.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 41 and on that basis denies the allegations.

42.    During the course of the sales cycle, 11:59 invested upwards of $500,000, creating and providing demonstrations, proving the concepts developed would succeed in providing the clients with the desired results and sponsoring and attending industry events.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 42 and on that basis denies the allegations.

43.    Unique to these projects, Databricks also makes a financial investment into the projects, giving Databricks influence over whether prospective clients ultimately select 11:59.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 43 and on that basis denies the allegations.

44.    By early August 2024, many of the Databricks pipeline projects Sheridan was working on were at or near contract execution. For example, as to one project Plaintiff will refer to as "Project A," 11:59 had already received a verbal commitment from the client and a Statement of Work was in near final form with an estimated engagement start date of August 19, 2024.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 44 and on that basis denies the allegations.

45.    On August 22, 2024, Sheridan provided two weeks' notice of his resignation effective September 6, 2024. Sheridan thanked 11:59 for the professional and personal development opportunities 11:59 provided to him over the course of his employment. He

`

commended 11:59 for its culture and talented team members. During his two week notice period, 11:59 believed Sheridan was transitioning his work to his team members, ensuring 11:59's customers and prospects would continue to be seamlessly serviced by 11:59. A true and correct copy of Sheridan's August 22, 2024 resignation is attached hereto as **Exhibit E**.

**ANSWER:** Infinitive admits the first three sentences of Paragraph 45. Mr. Sheridan's resignation speaks for itself. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 45 and on that basis denies the allegations.

46.    Unbeknownst to 11:59, Sheridan had not been working to ensure 11:59's clients would continue to be served by 11:59. Instead, he was brazenly and deliberately targeting 11:59's partners, vendors, customers, and prospective customers, taking improper and illegal actions to move 11:59's business to his new employer, Infinitive.

**ANSWER:** Infinitive denies the allegations in Paragraph 46.

47.    11:59 only learned after Sheridan's separation that he had accepted a job offer to return to Infinitive the same day he gave notice to 11:59.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 47 and on that basis denies the allegations.

48.    Shortly after Sheridan's last day of employment at 11:59, 11:59 learned that several of the projects that were being managed by Sheridan and his team were suddenly and inexplicably in jeopardy. Databrick's engagement with Project A was scheduled to start on or about August 19, 2024. After Sheridan's departure, Project A put the project on "hold" stating it had lost faith in 11:59.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 48 and on that basis denies the allegations.

`

49.    11:59 immediately began an internal investigation and quickly learned that the client's lost faith was due to Sheridan's derogatory and false statements about 11:59 while he was still an employee of 11:59. Upon review of Sheridan's 11:59 email account, 11:59 discovered that on August 29, 2024, Sheridan emailed a Databricks Account Executive, informing them that he was returning to Infinitive, which he called, "a more advanced Databricks partner and part of the invite-only DPP program." Sheridan told this partner that "a lot of negative stuff" was happening at 11:59 and he needed "to get out." Sheridan cautioned the partner, "Where there's smoke, there's fire," telling 11:59's partner in no uncertain terms not to do business with 11:59. A true and correct copy of the August 29, 2024 email correspondence is attached hereto as **Exhibit F**.

**ANSWER:**  Infinitive denies the characterization of the attached document which speaks for itself. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 49 and on that basis denies the allegations.

50.    11:59's internal investigation revealed more. Sheridan received an email regarding "Project B" on his 11:59 email on August 1, 2024, that was copied to what appeared to be Sheridan's Infinitive email address, brad.sheridan@infinitive.com. A true and correct copy of the August 1, 2024 email correspondence is attached hereto as **Exhibit G**.

**ANSWER:** Infinitive denies the characterization of the attached document which speaks for itself. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 50 and on that basis denies the allegations.

51.    Sheridan had been emailing with a contact at Project B in July 2024 regarding programming issues. On July 25, 2024, the Project B contact asked Sheridan to look at an issue they had been discussing. Sheridan did not provide the requested response until over a month later, on August 28, 2024. Apologizing for the long delay in responding, Sheridan told Project B that he

`

had resigned the previous week and was busy "turning over everything." He told Project B the "[g]ood news is that I'm going back to Infinitive." A true and correct copy of the July 25, 2024 email correspondence is attached hereto as **Exhibit H**.

**ANSWER:** Infinitive denies the characterization of the attached document which speaks for itself. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 51 and on that basis denies the allegations.

52.    During his two-week notice period in August 2024, 11:59's initial investigation further revealed that Sheridan also contacted numerous 11:59 employees on the company's Team platform to inform them he had resigned and was moving to Infinitive. In contravention of his Non-Solicitation obligations to 11:59, Sheridan disparaged the company to these employees, telling them that 11:59 was insolvent and directing them to contact him offline to discuss further. As a Vice President and a senior member of the company, Sheridan was perceived as a reliable source of information. Those employees Sheridan targeted would have no way of knowing that his statements were false. Sheridan's obligation not to interfere with 11:59's relationships with its employees, directly or indirectly remains in effect until, at the earliest, September 6, 2025.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 52 and on that basis denies the allegations.

53.    Although the investigation into Sheridan and Infinitive's conduct was ongoing and Sheridan had not yet returned his company issued laptop *despite requests for same*, 11:59 had already uncovered evidence of Sheridan's breach of his duty of loyalty and tortious interference and Infinitive's constructive or actual knowledge of same, such that it served upon Sheridan and Infinitive cease and desist letters (the "Cease and Desist Letters") on September 12, 2024. The Cease and Desist Letters placed Sheridan and Infinitive on notice of Sheridan's breach of his

`

applicable agreements and company policies, requested the preservation and return of 11:59's data and property, among other demands appropriate to the evidence and facts. True and correct copies of the September 12, 2024 "Cease and Desist Letters" to Defendants are attached hereto as **Exhibit I**.

**ANSWER:** Infinitive admits that it received a cease and desist letter on September 12, 2024, which speaks for itself. Infinitive denies the remaining allegations in Paragraph 53.

54.    In tandem with the Cease and Desist Letters, 11:59 followed up with Sheridan regarding his failure to return of his company-issued laptop, an Apple MacBook Pro. On the afternoon of September 13, 2024, after 11:59's repeated follow up, Sheridan initiated the return shipment of his 11:59-issued laptop.

**ANSWER:** Infinitive admits that 11:59 and Mr. Sheridan corresponded regarding returning the company-issued laptop, an Apply MacBook Pro, and that Mr. Sheridan initiated the return on September 13, 2024.  Infinitive denies the remaining allegations in Paragraph 54.

55.    Shortly thereafter, 11:59 engaged a third-party vendor to undertake forensic imaging and review of Sheridan's 11:59-issued laptop.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 55 and on that basis denies the allegations.

56.    The forensic review revealed substantial evidence that in the weeks leading to Sheridan's separation from 11:59, instead of working to ensure that 11:59's customers experienced a seamless transition with 11:59 following his departure, he engaged in actions designed to ensure that 11:59's customers would not continue working with 11:59 and would instead move their projects to Infinitive. The forensic review confirmed that Infinitive was aware of Sheridan's misconduct and to have sanctioned it.

`

**ANSWER:** Infinitive denies that it engaged in any acts of omission that would give rise to any legal claims. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 56 and on that basis denies the allegations.

57.    On Sheridan's company-issued MacBook, the forensic examination recovered 1,478 text messages. Based on those text messages and a review of his Google searches, web history, cloud service access, and related forensic artifacts on the MacBook, 11:59 learned that Sheridan spent weeks (at minimum) working with Miles and McKinney to carry out their plan to steal 11:59's confidential data and information and client projects, as follows:

> a) On Sunday, August 18, 2024, (four days before Sheridan would give notice to 11:59) Sheridan's cellular phone number texted a contact identified as one of Sheridan's former 11:59 colleagues, confirming Sheridan would ensure 11:59 lost its Databricks related work, telling him, "I'm working hard to get out . . . I'm taking my Databricks AEs and several prospects with me."

> b)   On August 20, 2024, Sheridan contacted a client contact at "Project C," requesting access to the 11:59 demo environment (which contained the demo coding 11:59 developed) using his personal Gmail address.

> c)   On August 21, 2024, Sheridan's cellular phone number texted a phone number identified as Miles at Databricks telling her (before he told 11:59) that he planned to resign the next day. Sheridan told Miles, "Going back to Infinitive, company I left for 11:59. Thomas out CEO let go last week. Ran company into ground. I'm worried about them Being insolvent, so it's time for me to leave." Miles responded, "Should we pivot away from 11:59 for [Project A]??" Sheridan advised the contact that one of his clients "already pulled the plug and is coming over." The two conspired to ensure the Project A contract with 11:59 was not signed.

> d)   On August 21, 2024, Mr. Sheridan texted McKinney at Databricks, "I'm resigning tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." Although McKinney told Sheridan he had never heard of Infinitive before, the two went on to discuss whether Sheridan could change his 11:59 email associated with the project access site to a personal email and concern over whether Sheridan would be able to access 11:59's

`

work product (*i.e.*, demo coding) after he moved to Infinitive. On August 22, 2024, Sheridan advised McKinney that he had submitted his resignation to 11:59, telling him, "resignation done. Last day is 9/6. We need to come up with a plan for [Project C]."

e) On August 22, 2024, Mr. Sheridan confirmed to a personal contact that his efforts to divert 11:59 customers to Infinitive were successful, writing, "3 of my accts emailed today that they aren't going to sign the contract with 1159 and are now waiting for me to start at infinitive."

f) On August 23, 2024, Sheridan bragged to a former 11:59 colleague that he had been successful in diverting Projects A, B and C.

g) On August 23, 2024, Sheridan communicated with an Infinitive employee, providing him with critical information impacting Infinitive's Q4 business planning.

h) As stated above, throughout August 2024, Sheridan conferred with Infinitive's CEO and General Manager regarding transitioning 11:59 projects over to Infinitive. On August 27, 2024, Sheridan texted yet another 11:59 prospective client, telling him: Afternoon ["Company D" Vice President]. It's Brad Sheridan with 11:59. I wanted to let you know that I've resigned from 11:59 and my last day is Friday 9/6. I'm joining Infinitive, the company I left to come to 11:59. They have a stronger Databricks practice and a very healthy pipeline. I of course will reach out to you during my first week so that you have my new email address bc I'd still like the oppty to partner with you/[Company D]. If you'd like more information on my decision to leave, please feel free to call me. Moments before Sheridan sent this text message, he emailed the same client with a facially innocuous announcement of his resignation, clearly indicating he was attempting to cover up his solicitation.

i) Sheridan's tortious conduct continued on August 28, 2024, when Sheridan messaged with two contacts making clear that he believed 90% of 11:59's $7 million pipeline belonged to him, stating, "On a oppty call yesterday going through Salesforce. Pipeline is only 7MM and 90% of its mine that are leaving to follow me."

j) On August 29, 2024, Sheridan brazenly disparaged 11:59 to a Databricks contact on his 11:59 email, telling him he was leaving 11:59 for Infinitive, "a more advanced Databricks partner and part of the invite-only DPP program." Sheridan told the contact, "a lot of

`

negative stuff going on at 11:59 and I need to get out. Where there's smoke, there's fire."

k) On September 5, 2024, nearly Sheridan's last day at 11:59, McKinney texted Sheridan requesting that Sheridan locate and provide him with the recording of the demo 11:59 did for Project C only a few weeks earlier.

**ANSWER:**   To the extent Paragraph 57 relies on documents, the documents speak for themselves.  Infinitive lacks sufficient in formation to admit or deny the remaining allegations in Paragraph 57 and on that basis denies the allegations.

58.    Sheridan and McKinney knew the importance of ensuring they had access to 11:59's demo coding and demo recording to move the business to Infinitive. After attempting to access the Project C demo workspace through his personal Gmail account, Sheridan told McKinney that he could schedule a demo for Project C at the end of the week of September 16th, after he started at Infinitive. However, Sheridan was concerned about any delay in delivering the demo to the Project C client. So, on September 5, 2024, Sheridan reached out to an Infinitive employee to request that he be given access to his Infinitive email address sooner as he had "several account execs in Databricks that are pulling opportunities from 1159 tomorrow after my last day and I thought it'd be nice to not have to use my gmail."

**ANSWER:**   To the extent Paragraph 58 relies on documents, the documents speak for themselves.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 58 and on that basis denies the allegations.

59.    On September 5, 2024, Sheridan went on to discuss with McKinney how to convince Project C to move to Infinitive. Here, Sheridan and McKinney their goal crystal clear – McKinney telling Sheridan, "I want you to steal it from 11:59 haha," to which Sheridan replied, " I too wasn't to *steal* it." And steal it they did, as on information and belief, Sheridan conducted the demo for Project C on September 20, 2024, as demonstrated by a September 9, 2024 Gmail

`

calendar invite, and did so using 11:59's coding. Sheridan could not have developed a demo in such a short amount of time as he did not have the skills necessary to do so.

**ANSWER:** To the extent Paragraph 59 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 59 and on that basis denies the allegations.

60.    On September 20, 2024, a misdirected email seemingly intended for Sheridan at Infinitive was sent to Sheridan's 11:59 email by McKinney providing apparent confirmation that Sheridan was providing a demo for Project C on behalf of Infinitive.

**ANSWER:** To the extent Paragraph 60 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 60 and on that basis denies the allegations.

61.    Sheridan also communicated with another 11:59 partner on Thursday, September 5, 2024, suggesting that the partner reply to 11:59, "["Company E"] still isn't quite ready" . . . [t]hen next week we have Bill tell Drew that he's taking this oppty to follow me." Later that day, Sheridan told the same contact, "I'm going to reply to your email now and you can ignore it. I will then reply with my true response from my Gmail account." This is just one of many examples where Sheridan attempted to move his conversations to his personal accounts in order to hide his malfeasance from 11:59.

**ANSWER:** To the extent Paragraph 61 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 61 and on that basis denies the allegations.

62.    The forensic analysis further revealed that on September 9, 2024, before Sheridan had shipped back his 11:59-issued MacBook, there was a Google search conducted, "how to reset

`

macbook [sic]" suggesting Sheridan planned to erase the evidence of his, Infinitive, and Databricks' wrongdoing.

    **ANSWER:** To the extent Paragraph 62 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 62 and on that basis denies the allegations.

    63.    The forensic evaluation did more than reveal Sheridan's wrongdoing. It also uncovered Infinitive's participation in aiding and abetting Sheridan's breach of his duty of loyalty to 11:59, tortious interference with 11:59's business relationships and coordination between the two regarding the same. On August 26, 2024, Mr. Sheridan messaged Infinitive's CEO, Denis McFarland, telling him:

> Morning Denis. I have some prospects that want to move forward and are going to wait for me to join Infinitive. I'd like to chat with someone, perhaps Jeff, but wanted to know if you'd rather me wait until the 16th or can I reach out now to setup another coffee with him?

    **ANSWER:** Infinitive denies that it engaged in any acts of omission that would give rise to any legal claims. To the extent Paragraph 63 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 63 and on that basis denies the allegations.

    64.    McFarlane responded directing Sheridan to set up the meeting. The "Jeff" referred to in the above text message is Jeff Theobald, Infinitive's Managing Director. Regarding their meeting, Sheridan told Theobald, "[b]ring something to take notes with bc I'm trying to minimize emails right now." On August 27, 2024, Sheridan provided Theobald with one of his Databricks' contact emails stating, "AE for Databricks in [Project C] He will be reaching out to you." Sheridan had begun to lay the groundwork to move Project C to Infinitive back on August 20, 2024, when

`

he requested a Project C contact provide him with access to Project C's systems via Sheridan's personal Gmail.

**ANSWER:** Infinitive denies that it engaged in any acts of omission that would give rise to any legal claims. To the extent Paragraph 64 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 64 and on that basis denies the allegations.

65.    On September 24, 2024, as 11:59 continued its investigation, Infinitive's counsel responded to the Cease and Desist Letters (the "Cease and Desist Letters Response"). Although Infinitive's counsel did not represent Sheridan, they represented that Sheridan had reviewed the contents of their letter and that he agreed it was accurate.

**ANSWER:** Infinitive admits that its counsel responded to the cease and desist letter on September 24, 2025. The response speaks for itself.

66.    The Cease and Desist Letters Response confirmed Sheridan's timeline of events:

a) On August 13, 2024, Sheridan met with McFarlane to discuss possible employment.

b) On August 19, 2024, Infinitive offered Sheridan a position.

c) On August 22, 2024, Sheridan accepted Infinitive's employment offer.

d) Infinitive claimed Sheridan was provided with an Infinitive email address, brad.sheridan@infinitive.com on ***September 9, 2024***, his first day of employment with Infinitive notwithstanding the fact that this email address was copied on an email received on 11:59's systems on ***August 1, 2024***.

**ANSWER:** To the extent Paragraph 66 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 66 and on that basis denies the allegations.

`

67.    Sheridan denied having solicited or disparaged 11:59 to its clients or partners or having diverted business from 11:59 to Infinitive. With respect to Project A, Sheridan admitted only that he alerted his Databricks contacts that he would no longer be employed by 11:59 after September 6, 2024. Sheridan claimed it was "an entirely appropriate thing to do" so that Databricks or Project A would not enter into a deal thinking Sheridan would be delivering it. He claimed that not doing so "would have been unethical."

**ANSWER:**  To the extent Paragraph 67 relies on documents, the documents speak for themselves.  Infinitive denies the remaining allegations in Paragraph 67.

68.    Sheridan further admitted to improperly retaining "a number of files that contain his work product from his time at 11:59 on his Google Drive." Sheridan claimed (through counsel that does not represent him and not under penalty of perjury as had been requested) that he did not use or disclose the files with anyone at Infinitive.

**ANSWER:**   To the extent Paragraph 68 relies on documents, the documents speak for themselves.  Infinitive denies the remaining allegations in Paragraph 68.

69.    Sheridan and Infinitive lied to Infinitive's counsel and Plaintiff about their actions.

**ANSWER:** Infinitive denies the allegations in Paragraph 69.

70.    Contrary to Defendants' representations, on Sheridan's 11:59 laptop, there are artifacts showing Google Drive activity for the first time in 17 months on Sheridan's last day at 11:59, Friday, September 6, 2024. Then, the following week after Sheridan started at Infinitive, there is evidence of Google Drive activity related to multiple 11:59 projects Sheridan had worked on while he was an 11:59 employee:

`

a) On Monday, September 9th, Sheridan's first day at Infinitive, there is access to Google Drive folders related to 11:59 project work, including Project A, Project C and Company D.

b) On Wednesday, September 11th, there is access to Google Drive folders related to 11:59 project work including Project C at 3:17 p.m. and to a general folder named "Projects." At 3:18 p.m. the same day, there is access to a Google Drive folder named "Infinitive."

**ANSWER:** To the extent Paragraph 70 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 70 and on that basis denies the allegations.

71. There is also evidence supporting that Sheridan had a Dropbox account. An email was sent to the email address sheridan06@gmail.com, which was accessed on September 10, 2024 and shows an attempt to change a Dropbox password.

**ANSWER:** Infinitive admits that Mr. Sheridan has a Dropbox account. The email speaks for itself. Infinitive denies the remaining allegations in Paragraph 71.

72. On September 24, 2024, through Infinitive's counsel, Defendants responded to 11:59's September 12, 2024 Cease and Desist Letters ("Cease and Desist Response"). Therein, it was confirmed that Sheridan "retained copies of a number of files that contain his work product from his time at 11:59 on his Google Drive" and "it is likely that at least some of the files contain information that 11:59 would consider confidential." Sheridan requested permission to "delete and destroy" these files, which would have eliminated any evidence of access to and use of same. A true and correct copy of the September 24, 2024 "Cease and Desist Response" is attached hereto as **Exhibit J**.

`

**ANSWER:** To the extent Paragraph 72 relies on documents, the documents speak for themselves. Infinitive denies the remaining allegations in Paragraph 72.

73.    Although it asserted that "no one from Infinitive has catalogued or analyzed these files," Infinitive vaguely advised it "searched its network" and Sheridan's email and confirmed that none of the files on Sheridan's Google Drive had "been shared through its network or placed on its servers." It is unclear how Infinitive could have searched its network for files it had not catalogued or analyzed.

**ANSWER:** To the extent Paragraph 73 relies on documents, the documents speak for themselves. Infinitive admits that it searched its network and confirmed nothing from Mr. Sheridan's Google Drive had been shared through its network or placed on its servers. Infinitive denies the remaining allegations in Paragraph 73.

74.    As the Cease and Desist Response did not contain the assurances Plaintiff requested from Defendants as to their access and use of 11:59's information and improper solicitation and servicing of 11:59's clients using that information, on September 30, 2024, 11:59 sent a follow up letter to Infinitive and Sheridan ("Cease and Desist Follow Up"). The purpose of the Cease and Desist Follow up was to apprise Infinitive and Sheridan of the results of the forensic examination of Sheridan's 11:59 computer and Sheridan's lack of candor and to further explain the assurances 11:59 needed. A true and correct copy of the September 30, 2024 "Cease and Desist Follow Up" correspondence is attached hereto as **Exhibit K**.

**ANSWER:** To the extent Paragraph 74 relies on documents, the documents speak for themselves. Infinitive denies the remaining allegations in Paragraph 74.

75.    Counsel for the parties attempted to confer in the days following the Cease and Desist Follow Up but were unable to agree upon a course of action that would provide 11:59 with

`

appropriate assurances that Sheridan and Infinitive would not use or benefit from the use of 11:59's confidential, proprietary and trade secret information.

**ANSWER:** Infinitive admits that counsel for the parties conferred in the days following the Cease and Desist Follow Up, but denies that counsel for 11:59 conferred in good faith as counsel for 11:59 steadfastly refused to discuss any type of resolution of the matter. Infinitive denies the remaining allegations in Paragraph 75.

76.     In mid-October 2024, through his attorneys, Sheridan provided 11:59 with a link to a Zip file containing the contents of his personal Google Drive, which Sheridan represented contains 11:59's confidential information that Sheridan stored and/or or accessed following his separation from 11:59.

**ANSWER:** Infinitive admits that Mr. Sheridan provided 11:59 with a link to a Zip file containing the contents of his personal Google Drive. To the extent Paragraph 76 relies on documents, the documents speak for themselves.

77.     This Zip file contains 4 Gigabytes of 11:59's proprietary and confidential data, including more than 1,700 files. One folder in Sheridan's Google Drive is entitled "WhenLeave," seemingly containing the files Sheridan took with him when he "left" 11:59.

**ANSWER:**  To the extent Paragraph 77 relies on documents, the documents speak for themselves. Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 77 and on that basis denies the allegations.

78.     The WhenLeave folder of Sheridan's Google Drive contains some of 11:59's most valuable proprietary, confidential and trade secret information, including 11:59's Statements of Work, proposals, pricing estimates, coding, marketing presentations and more related to then

`

current projects and projects in its pipeline (including Projects A, B, and C). It also contains 11:59 employee and client contact lists.

**ANSWER:**  To the extent Paragraph 78 relies on documents, the documents speak for themselves.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 78 and on that basis denies the allegations.

79.      The WhenLeave folder of Sheridan's Google Drive contains evidence that Sheridan accessed and used 11:59's confidential data for Infinitive's benefit – a copy of 11:59's Statement of Work for Project B saved alongside a nearly identical documents except that "11:59" within the document is replaced with "Infinitive."

**ANSWER:**  To the extent Paragraph 79 relies on documents, the documents speak for themselves.  Infinitive lacks sufficient information to admit or deny the remaining allegations in Paragraph 79 and on that basis denies the allegations.

80.      Sheridan has conceded that he copied the contents of the Documents and Downloads folders on his 11:59 issued computer to his personal Google Drive "in mass" before he separated from 11:59.

**ANSWER:**  To the extent Paragraph 80 relies on documents, the documents speak for themselves.  Infinitive denies the remaining allegations in Paragraph 80.

81.      Beginning on or about October 1, 2024, 11:59's counsel attempted to reach Databricks multiple times to discuss McKinney and Miles' misconduct.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 81 and on that basis denies the allegations.

82.      Counsel finally connected on October 14 and 22, 2024. 11:59 provided Databricks with information regarding Miles and McKinney's misconduct and requested that Databricks take

`

action to ensure such misconduct immediately ceased. Databricks' counsel indicated an investigation would be conducted.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 82 and on that basis denies the allegations.

83.    Databricks did not respond to 11:59's multiple additional follow ups to provide any update on the status of its investigation or assurances that Miles and McKinney's misconduct would be addressed in any manner. Thus, on or about November 20, 2024, 11:59 dispatched to Databricks a formal cease and desist letter, which, among other things, demanded that Databricks and its employees cease and desist from "all conduct which may constitute tortious interference, misappropriation of confidential and proprietary information, or conspiracy to commit same against 11:59." A true and accurate copy of 11:59's November 20, 2024 Cease and Desist Letter to Databricks is attached hereto as **Exhibit L**.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 83 and on that basis denies the allegations.

84.    The cease and desist letter highlighted some of McKinney and Miles' most egregious misconduct, including:

a) With respect to Project A, on which Databricks and 11:59 had been working together for months and which Databricks knew 11:59 had received a verbal commitment, Miles conspired with Sheridan to interfere with 11:59's relationship with Project A. For example, Miles texted Sheridan on August 22, 2024, telling him, "Stay in touch w Cam. I told him not to sign the [Project A] contract." On August 23, 2024, Sheridan texted a former colleague confirming Miles' interference with Project A stating, "Cheryl [Miles] isn't going to sign the [Project A] sow. She waiting for me to start at INF."

`

b) With respect to Project C, which Databricks and 11:59 had also been working together on, Sheridan texted McKinney on August 21, 2024, stating, "I'm resigning tomorrow. Start new gig 9/16. I hope 11:59 doesn't say to just go now bc that would impact my availability to do the final demo for [Project C]." The same day Sheridan confirmed to McKinney that he had resigned and told him his last day was September 6th and they needed to "come up with a plan for [Project C]." The next day Sheridan confirmed to a former colleague that McKinney told him he would ensure Project C did not proceed with 11:59 and instead would be moved to Infinitive.

c) McKinney and Sheridan then conspired to attempt to gain access to 11:59's confidential and proprietary data on 11:59's demo environment for Project C, which contained the demo coding 11:59 had developed and demonstrated for Project C. On August 26, 2024, McKinney texted Sheridan, "Can you change the email associated with your NC ID from the backend on your side. If so then go in and change it to your personal email so its not tied to your old 11:59 email."

d) On September 5, 2024, while Sheridan was still employed by 11:59, McKinney asked Sheridan for a video recording of the demo 11:59 had done for Project C, then proceeded to text Sheridan, "Oh I want you to steal it from 11:59 haha." Sheridan responded, "Good you feel that was [sic] cuz I too want to steal it."

e) Sheridan then confirmed to an Infinitive employee that Databricks was "pulling opportunities from 11:59" and moving them to Infinitive.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 84 and on that basis denies the allegations.

`

85.    Clearly, Miles and McKinney not only cooperated with Sheridan, but they also actively participated and conspired with him to misappropriate and "steal" 11:59's confidential and proprietary information and leverage that data against 11:59 and in favor of Infinitive

**ANSWER:** Infinitive denies the allegations in Paragraph 85.

86.    11:59's cease and desist letter requested, among other things, that Databricks return to it any of 11:59's confidential or proprietary information in its possession and cease from interfering in 11:59's business relationships.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 86.

87.    On or about November 25, 2024, Databricks advised Plaintiff's counsel that Databricks had no influence over whether 11:59 was selected by a prospective client. Databricks provided no explanation for the evidence to the contrary, that its account executives, Miles and McKinney, had clearly interfered with 11:59's client projects. For example, Miles had told Project A not to sign the contract with 11:59. McKinney held back Project C and attempted to gain access to 11:59's coding to enable Sheridan to provide a demo for Project C on behalf of Infinitive.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 87 and on that basis denies the allegations.

88.    On or about December 2, 2024, Databricks further responded to 11:59's cease and desist letter, baldly asserting without support that Miles and McKinney do not have access to 11:59's confidential information, including its coding for Project C.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 88 and on that basis denies the allegations.

`

89.     On December 12, 2024, 11:59 made another attempt to obtain assurances from Databricks via a second Cease and Desist Letter (see **Exhibit M**) regarding its investigation into Miles and McKinney's misconduct, given that Databricks' prior representations that it has not interfered with 11:59's business relationships was refuted by undisputed evidence to the contrary, as well as confirmation under penalty of perjury that a reasonable search of Databricks' systems and accounts was conducted to determine whether Databricks remained in possession of 11:59's proprietary or confidential information.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 89 and on that basis denies the allegations.

90.     In the aforementioned letter, 11:59 officially terminated its Partner Agreement with Databricks, as Databricks had clearly breached the same.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 90 and on that basis denies the allegations.

91.     Databricks failed to provide 11:59 with appropriate assurances that it would not use or benefit from the use of 11:59's confidential, proprietary and trade secret information, necessitating the filing of the instant action.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 91 and on that basis denies the allegations.

92.     11:59 invests time, resources, and money in creating, developing, and protecting its confidential information and trade secrets.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 92 and on that basis denies the allegations.

`

93.     Access to 11:59's systems, including e-mail and shared drives, is password protected and requires two factor authentication. Employees have differing levels of access based on their position and job responsibilities.

**ANSWER:** Infinitive admits the allegations in Paragraph 93.

94.     11:59 employee access to 11:59's systems is withdrawn immediately upon termination.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 94 and on that basis denies the allegations.

95.     11:59's employees are subject to policies not to disclose the company's confidential information or trade secrets and are generally required to sign agreements containing confidentiality restrictions and other restrictive covenants.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 95 and on that basis denies the allegations.

96.     11:59's employees are required to return all company devices, documents, and information upon request and/or termination.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 96 and on that basis denies the allegations.

97.     11:59 employee policies and agreements impose confidentiality and safeguarding obligations, in addition to those imposed by contract and by the law. Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 97 and on that basis denies the allegations.

98.     11:59, upon discovering evidence of misconduct serves a cease and desist letter placing the employee on notice of a breach of applicable agreements and company policies,

`

requesting the preservation and return of Plaintiff's data and property, among other demands appropriate to the facts and circumstances.

**ANSWER:**   Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 98 and on that basis denies the allegations.

99.    11:59 enters into non-disclosure agreements ("NDA") with its potential customers, such as in relation to Project B, which govern the treatment of proprietary information while the parties discuss, evaluate and consult to determine whether a possible future transaction will occur. This NDA requires the party receiving proprietary information not to disclose such proprietary information, including but not limited to information about the disclosing party's software and technology, analyses, compilations, and the disclosing party's trade secret information without the disclosing party's written permission.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 99 and on that basis denies the allegations.

100.    11:59 derives a significant benefit from its confidential information and trade secrets and will suffer a significant detriment from their misappropriation.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 100 and on that basis denies the allegations.

101.    11:59 owns and/or lawfully possesses confidential information and trade secrets.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 101 and on that basis denies the allegations.

102.    Defendants do not own, lawfully possess, or have any right or authorization to use any of 11:59's confidential information or trade secrets.

**ANSWER:** Infinitive denies the allegations in Paragraph 102.

`

103.    As a direct result of the misconduct of the Defendants, absent injunctive relief, 11:59 may lose millions of dollars in projects.

**ANSWER:**  Infinitive denies the allegations in Paragraph 103.

104.    Much of Defendants' tortious conduct uncovered and described herein involves their use of or attempted use of 11:59's code for demonstrations, materials and strategy, and disparagement of 11:59 in order to interfere with 11:59's relationships with their customers and partners as described herein.

**ANSWER:** Infinitive denies the allegations in Paragraph 104.

105.    In Sheridan and Infinitive's case, their tortious conduct interfered with 11:59's relationships with Databricks and 11:59's business relationships for Databricks related projects including but not limited to Projects A-C.

**ANSWER:**  Infinitive denies the allegations in Paragraph 105.

106.    The financial impact of Defendants' misconduct on 11:59 is incalculable, but potentially exceeds millions of dollars.

**ANSWER:** Infinitive denies the allegations in Paragraph 106.

107.    As a direct result of Defendants' actions, 11:59 has already received confirmation that Projects A and C will not proceed with 11:59 and that instead, on information and belief, the clients have moved these projects to Sheridan and Infinitive.

**ANSWER:** Infinitive denies the allegations in Paragraph 107.

108.    As a direct result of the misconduct of the Defendants described above and herein, Plaintiff has suffered irreparable harm, including but not limited to:

a. Loss of future business opportunities;

b. Loss of customers and other goodwill;

`

c. Loss of market share; and

d.  Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties.

**ANSWER:** Infinitive denies the allegations in Paragraph 108.

109.    Absent injunctive relief and an immediate cessation of misconduct by Defendants, and as a direct result of likely and inevitable future misconduct by the Defendants, Plaintiff will suffer irreparable harm, including but not limited to:

a Loss of future business opportunities;

b. Loss of customers, customers' trust and other goodwill;

c. Loss of market share;

d. Competitor use of its confidential information and trade secrets, including the attendant loss of the exclusivity, confidentiality, secrecy, and other valuable properties; and

e. Present economic loss, which is difficult to ascertain at this time, and  future economic loss, which is presently incalculable.

**ANSWER:** Infinitive denies the allegations in Paragraph 108.

## CAUSES OF ACTION

### COUNT I
**BREACH OF DUTY OF LOYALTY**
**(AGAINST DEFENDANT SHERIDAN)**

110.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs, as if fully set forth herein.

**ANSWER:**  Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

`

111.    As a result of his employment, Sheridan owed a common law duty of loyalty to 11:59 to act in the company's best interest and to not compete against 11:59 during his employment.

**ANSWER:**  Infinitive admits that Mr. Sheridan owed a duty of loyalty to 11:59 during his employment and denies the remaining allegations in Paragraph 111..

112.    Sheridan breached his duty by, among other things, purposefully and deliberately disparaging 11:59 to its customers, employees, and vendors, deliberating abandoning his efforts to secure 11:59's contracts for in progress projects in the 11:59 pipeline, soliciting and obtaining access to 11:59's demo code via his personal Gmail, and his failure to maintain the secrecy of 11:59's confidential, proprietary and trade secret information in order to benefit himself and/or his new employer, Defendant Infinitive.

**ANSWER:** Paragraph 112 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims.

113.    As a result of Sheridan's breach of his common law duty of loyalty, 11:59 has suffered damages.

**ANSWER:** Infinitive denies the allegations in Paragraph 113.

<u>**COUNT II**</u>
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**
**(AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)**

114.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs, as if fully set forth herein.

**ANSWER:**  Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

`

115.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

**ANSWER:** Infinitive admits the quotation of the statute, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

116.    The DTSA defines "Trade Secret" as "information that derives economic value from not being generally known to or readily ascertainable through proper means by another person, and that is subject to reasonable efforts to maintain its secrecy." Id. § 1839(3).

**ANSWER:** Infinitive admits the quotation of the statute, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

117.    11:59 possesses highly confidential trade secrets, protected under the DTSA including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 117 and on that basis denies the allegations.

118.    11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets out of its business.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 118 and on that basis denies the allegations.

119.    11:59 uses these trade secrets in both interstate and foreign commerce; 11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and

`

these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 119 and on that basis denies the allegations.

120.    11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 120 and on that basis denies the allegations.

121.    The DTSA defines "Misappropriation" to include the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or disclosure or use of a trade secret of another without express or implied consent in specified circumstances.

**ANSWER:** Infinitive denies the characterization of the statute, which speaks for itself and denies that it engaged in any acts or omissions that would give rise to any legal claims.

122.    Sheridan had access to and regularly used 11:59's highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 122 and on that basis denies the allegations.

123.    Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on

`

information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and  exploitation.

**ANSWER: I**nfinitive denies the allegations in Paragraph 123.

124.    11:59, upon discovering evidence of misappropriation Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and company policies, requesting the preservation and return of Plaintiff's data and property, among other demands.

**ANSWER:**  Infinitive admits that 11:59 sent the Cease and Desist Letter, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

125.    By unlawfully taking, accessing, and/or using Plaintiff's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the DTSA.

**ANSWER:** Infinitive denies the allegations in Paragraph 125.

126.    Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the DTSA.

**ANSWER:** Infinitive denies the allegations in Paragraph 126.

127.    11:59's investigation into Defendants' conduct, which is ongoing, has identified substantial evidence of misappropriation by Defendants. This conduct includes, but is not limited to, Sheridan's use of improper means, without authorization and/or by exceeding authorization, to breach his duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

`

**ANSWER:** Infinitive denies the allegations in Paragraph 127.

128.    As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets. By engaging in the conduct described herein, Sheridan violated those policies.

**ANSWER:**  Infinitive denies the allegations in Paragraph 128, except to admit that Mr. Sheridan executed the documents referenced in this Paragraph.

129.    The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

**ANSWER:** Infinitive denies the allegations in Paragraph 129.

130.    Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** Infinitive denies the allegations in Paragraph 130.

131.    Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** Infinitive denies the allegations in Paragraph 131.

132.    Defendants' conduct was wanton, willful, and malicious.

**ANSWER:** Infinitive denies the allegations in Paragraph 132.

133.    11:59 has had to incur cost and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:** Infinitive denies the allegations in Paragraph 133.

134.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages.

**ANSWER:** Infinitive denies the allegations in Paragraph 134.

`

## COUNT III
### VIRGINIA UNIFORM TRADE SECRETS ACT, § 59.1-336 to § 59.1-343
### (AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)

135.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs, as if fully set forth herein.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

136.    The Virginia Unified Trade Secrets Act ("VUTSA") is analogous to the DTSA and similarly prohibits the misappropriation of trade secrets.

**ANSWER:** Infinitive admits the allegations in Paragraph 136, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

137.    The VUTSA defuses a trade secret as:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**ANSWER:** Infinitive admits the quotation of the statute, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

138.    "Misappropriation" under the VUTSA means:

1. Acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

> a. Used improper means to acquire knowledge of the trade secret; or

> b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

44

`

(1) Derived from or through a person who had utilized improper means to acquire it;

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

**ANSWER:** Infinitive admits the quotation of the statute, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

139.    11:59 possesses highly confidential trade secrets, protected under the VUTSA including, but not limited to, demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 139 and on that basis denies the allegations.

140.    11:59 derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of its business.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 140 and on that basis denies the allegations.

141.    11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets; and these trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 141 and on that basis denies the allegations.

45

`

142.    11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 142 and on that basis denies the allegations.

143.    Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 143 and on that basis denies the allegations..

144.    Based on information available to date, Sheridan accessed 11:59's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which, on information and belief, he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

**ANSWER:** Infinitive denies the allegations in Paragraph 144.

145.    11:59, upon discovering indicia of misappropriation by Sheridan, served upon Defendants a Cease and Desist Letter placing them on notice of Sheridan's breach of applicable agreements and company policies, requesting the preservation and return of 11:59's data and property, and requesting the cessation of tortious interference and contact with the customers Sheridan improperly solicited during his 11:59 employment, among other demands.

**ANSWER:** Infinitive admits that 11:59 sent the Cease and Desist Letter, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

`

146.    By unlawfully taking, accessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained Plaintiff's trade secrets, thus misappropriating such information in violation of the VUTSA.

**ANSWER:** Infinitive denies the allegations in Paragraph 146.

147.    Defendants' conduct, described herein, constitutes misappropriation of 11:59's trade secrets in violation of the VUTSA.

**ANSWER:** Infinitive denies the allegations in Paragraph 147.

148.    11:59's investigation into Defendants' conduct, which is ongoing, has identified multiple instances of this misappropriation by Defendants. This conduct includes, but is not limited to, Defendants' use of improper means, without authorization and/or by exceeding authorization, to breach their duty to maintain the secrecy of these trade secrets by printing and taking such documents and information and/or by transferring them from 11:59's systems to Sheridan's personal Google drive account and other storage locations to be used for his own personal benefit or for the benefits of others (including his new employer, Infinitive).

**ANSWER:** Infinitive denies the allegations in Paragraph 148.

149.    As stated above, Sheridan was required to adhere to various 11:59 policies regarding the access, use, and disclosure of 11:59's trade secrets. By engaging in the conduct described herein, Sheridan violated those policies.

**ANSWER:** Infinitive denies the allegations in Paragraph 149, except to admit that Mr. Sheridan executed the documents referenced in this Paragraph.

150.    The acts and threatened acts of misappropriation or misuse by Defendants have directly and proximately caused and will continue to cause substantial damage to Plaintiff.

**ANSWER:** Infinitive denies the allegations in Paragraph 150.

`

151.    Defendants, on information and belief, have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** Infinitive denies the allegations in Paragraph 151.

152.    Disclosure or use of 11:59's trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** Infinitive denies the allegations in Paragraph 152.

153.    Defendants' conduct was wanton, willful, and malicious.

**ANSWER:** Infinitive denies the allegations in Paragraph 153.

154.    11:59 has had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:** Infinitive denies the allegations in Paragraph 154.

155.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

**ANSWER:** Infinitive denies the allegations in Paragraph 155.

<u>COUNT IV</u>
**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS**
**(AGAINST DEFENDANTS SHERIDAN AND INFINITIVE)**

156.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

157.    11:59 possesses highly confidential, proprietary information and trade secrets, including, but not limited to, Plaintiff's demo code, customer contacts, customer preferences, pricing, contract terms, marketing materials, business plans, pipeline, status of negotiations, and internal operational infrastructure.

48

`

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 157 and on that basis denies the allegations.

158.    11:59 has taken and continues to take reasonable steps to maintain the secrecy of these trade secrets. These trade secrets are not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 158 and on that basis denies the allegations.

159.    11:59 is the owner of these trade secrets because they had the rightful title to the trade secrets, having developed and protected them as described above.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 159 and on that basis denies the allegations.

160.    Sheridan had access to and regularly used 11:59's most highly confidential data and materials during his employment with 11:59 and by virtue of his role as Vice President of Data Analytics.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 160 and on that basis denies the allegations.

161.    Based on information available to date, Defendants accessed Plaintiff's trade secrets without 11:59's authorization. Further, based on information available to date, Sheridan has retained an unknown volume of 11:59's confidential data and other materials, which he has disclosed to Defendant Infinitive for Defendant Infinitive's benefit and exploitation.

**ANSWER:** Infinitive denies the allegations in Paragraph 161.

162.    11:59, upon discovering indicia of misappropriation by Sheridan, served upon him a Cease and Desist Letter placing him on notice of his breach of applicable agreements and

`

company policies, and requesting the preservation and return of 11:59's data and property, among other demands.

**ANSWER:** Infinitive admits that 11:59 sent the Cease and Desist Letter, but denies that it engaged in any acts or omissions that would give rise to any legal claims.

163.    By unlawfully taking, assessing, and/or using 11:59's confidential and proprietary information, Defendants have improperly obtained 11:59's trade secrets, thus misappropriating such information in violation of Virginia common law.

**ANSWER:** Infinitive denies the allegations in Paragraph 163.

164.    These actions, taken together, at a minimum, demonstrate that Defendants used the proprietary, confidential and trade secrets as a result of discovery by improper means.

**ANSWER:** Infinitive denies the allegations in Paragraph 164.

165.    The acts and threatened acts of misappropriation or misuse have directly and proximately caused and continue to cause substantial damage to 11:59.

**ANSWER:** Infinitive denies the allegations in Paragraph 165.

166.    Defendants have been unjustly enriched by the information wrongfully obtained from 11:59.

**ANSWER:** Infinitive denies the allegations in Paragraph 166.

167.    Disclosure or use of 11:59's proprietary, confidential and trade secrets will result and has resulted in immediate and irreparable harm to Plaintiff for which there is no adequate remedy at law.

**ANSWER:** Infinitive denies the allegations in Paragraph 167.

168.    Defendants' conduct was wanton, willful, and malicious.

**ANSWER:** Infinitive denies the allegations in Paragraph 168

`

169.    11:59 had to incur costs and attorney's fees as additional and consequential damages of the violations, breaches, and other misconduct of Defendants.

**ANSWER:**  Infinitive denies the allegations in Paragraph 169.

170.    As a result of the conduct of Defendants, 11:59 has suffered and continues to suffer damages in an amount to be determined at trial.

**ANSWER:** Infinitive denies the allegations in Paragraph 170.

## COUNT V
## CONSPIRACY IN VIOLATION OF VA CODE ANN. § 18.2-499
## (AGAINST ALL DEFENDANTS)

171.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

172.    Defendants have mutually undertaken and acted in concert to purportedly, willfully, and maliciously injure 11:59 as set forth herein, without legal justification for their actions.

**ANSWER:**   Infinitive denies the allegations in Paragraph 172.

173.    As a result of Defendants' actions Plaintiff has incurred substantial damages including without limitation to its reputation.

**ANSWER:** Infinitive denies the allegations in Paragraph 125..

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES AND/OR
## CONTRACT RELATIONS
## (AGAINST ALL DEFENDANTS)

174.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

`

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

175.    11:59 had a reasonable expectation of business and contract relationships with its customers.

**ANSWER:** Paragraph 175 contains allegations that are vague and nonspecific, and on that basis are denied.

176.    Sheridan by virtue of his 11:59 employment and by the actions described herein and, on information and belief, Infinitive are both aware of 11:59's expected business relationships and contracts with its customers.

**ANSWER:** Paragraph 176 contains allegations that are vague and nonspecific, and on that basis are denied.

177.    Defendants have intentionally sought to destroy 11:59's relationships with its customers without any legitimate purpose for doing so.

**ANSWER:** Infinitive denies the allegations in Paragraph 177.

178.    Defendants used improper means, including but not limited to taking, retaining, and leveraging 11:59's confidential, proprietary, and trade secret information for the purpose of interfering with 11:59's business relationships.

**ANSWER:** Infinitive denies the allegations in Paragraph 178.

179.    These actions are no mere competition; they are unlawful acts meant solely to harm 11:59 and to benefit Defendants.

**ANSWER:**  Infinitive denies the allegations in Paragraph 179.

180.    As a result of Defendants' actions, 11:59 has incurred substantial damages that are irreparable and cannot be fully or adequately measured or compensated by monetary relief.

`

**ANSWER:** Infinitive denies the allegations in Paragraph 180.

**COUNT VII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(AGAINST DEFENDANTS INFINITIVE, DATABRICKS, MILES AND MCKINNEY)**

181.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

182.    Defendants Infinitive, Databricks, Miles and McKinney were aware that Sheridan owed and owes 11:59 a fiduciary duty, including but not limited to duties of care, loyalty, candor, and disclosure.

**ANSWER:** Infinitive denies the allegations in Paragraph 182, except to admit that Sheridan owed a duty of loyalty to 11:59 during his employment.

183.    Upon information and belief, Defendants Infinitive, Databricks, Miles and McKinney requested, directed, incited, encouraged, compelled, and otherwise solicited Sheridan to breach his fiduciary duty to 11:59 by engaging in the acts and omissions described above.

**ANSWER:** Infinitive denies the allegations in Paragraph 183.

184.    Defendants Infinitive, Databricks, Miles and McKinney's conduct was intentional, willful, malicious, wanton, and intended to damage 11:59's business.

**ANSWER:** Infinitive denies the allegations in Paragraph 184.

**COUNT VIII**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANT SHERIDAN)**

185.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

`

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

186.    The NDA is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:** Paragraph 186 contains legal conclusions. To the extent an answer is required, Infinitive denies that it engaged in any acts or omissions that would give rise to any legal claims.

187.    Sheridan's Offer Letter is a valid and binding agreement between Sheridan and 11:59 formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:** Infinitive denies the allegations in Paragraph 187.

188.    The NDA and Offer Letter (the "Agreements") contain valid and enforceable confidentiality, non-solicitation, return of company property and other provisions which prohibit Sheridan from interfering with 11:59's relationships with its employees, directly or indirectly, from disclosing or using 11:59's confidential information for improper purposes and require the prompt return of 11:59's equipment and information upon Sheridan's separation from the company.

**ANSWER:**  Infinitive denies the allegations in Paragraph 188.

189.    Sheridan failed to protect, retained, disclosed and utilized 11:59's confidential and trade secret information for his own and Infinitive's benefit, interfered with 11:59's relationships with its employees, and failed to promptly return 11:59's equipment and confidential, proprietary and trade secret information.

**ANSWER:** Infinitive denies the allegations in Paragraph 189.

`

190.    Infinitive knowingly, purposefully and/or negligently aided and abetted the breach of the Agreements by, among other things, leveraging and/or allowing Sheridan and Infinitive's benefit.

**ANSWER:** Infinitive denies the allegations in Paragraph 190.

191.    Sheridan has retained, obtained, used, and disclosed (and has not returned) 11:59's trade secrets and confidential information in violation of these provisions.

**ANSWER:** Infinitive denies the allegations in Paragraph 191.

192.    11:59 has a legitimate business interests justifying the non-solicitation and confidentiality provisions contained in the Agreements, which include, but are not limited to, the protection of 11:59's business goodwill, reputation, competitive advantage, and trade secrets and other valuable confidential business information.

**ANSWER:** Infinitive denies the allegations in Paragraph 192

193.    The provisions are reasonably necessary to protect 11:59's legitimate business interests since 11:59's confidential and trade secret information is not available to the public or generally known in the industry.

**ANSWER:** Infinitive denies the allegations in Paragraph 193.

194.    The provisions are not harmful to the general public and are not unreasonably burdensome to the Defendants.

**ANSWER:** Infinitive denies the allegations in Paragraph 194.

195.    Unless enjoined by this Court, Sheridan will continue breaching the Agreements.

**ANSWER:** Infinitive denies the allegations in Paragraph 195.

196.    As a direct and proximate result of Sheridan's breaches, as described herein, 11:59 has suffered and will continue to suffer irreparable harm and loss, and has sustained damages,

`

including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

**ANSWER:** Infinitive denies the allegations in Paragraph 196.

**COUNT IX**
**VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C.S. § 1030, ET SEQ.**
**(AGAINST DEFENDANT SHERIDAN)**

197.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

198.    Defendant Sheridan's actions as described above constitutes violations of one or more provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.

**ANSWER:**  Infinitive denies the allegations in Paragraph 198.

199.    The CFAA makes it unlawful for a person to intentionally obtain information from a "protected computer system," "without authorization" or by "exceeding authorized access." 18 U.S.C. § 1030 (a)(2)(C).

**ANSWER:** Infinitive denies the characterization of the statute, which speaks for itself.

200.    The CFAA provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). 18 U.S.C. § 1030(g).

`

**ANSWER:** Infinitive admits the allegations in Paragraph 200.

201.    Conduct violates the CFAA if it, among other things causes "damage or loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value[,]" or damage "affecting 10 or more protected computers during any 1-year period." 18 U.S.C. § 1030(c)(4)(A)(i)(I) & (VI).

**ANSWER:** Infinitive denies the characterization of the statute, which speaks for itself.

202.    "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030 (e)(8).

**ANSWER:** Infinitive admits the allegations in Paragraph 202.

203.    11:59's computers are "protected computers" that are used in or affect interstate and foreign commerce and/or communication within the meaning of 18 U.S.C. § 1030(e)(2)(B).

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 203 and on that basis denies the allegations.

204.    Defendant Sheridan had no authority to access 11:59's computer server system, computer networks, computer programs or software to make unauthorized copies of, or use, 11:59's Confidential, proprietary and trade secret information for purposes of using it in a competitive business, such as Infinitive, which as described in detail herein, he did.

**ANSWER:** Infinitive denies the allegations in Paragraph 204.

205.    Defendant Sheridan willfully and maliciously used 11:59's computer serve system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive.

`

**ANSWER:** Infinitive denies the allegations in Paragraph 205.

206.    Such actions violated 11:59's policies regarding the access, use, and disclosure of company Confidential, proprietary and trade secret information and were without authorization and/or exceeded Plaintiff's authorization to access 11:59's protected computers and Information Systems within the meaning of 18 U.S.C. §1030(a)(2)(C).

**ANSWER:** Infinitive denies the allegations in Paragraph 206.

207.    Defendant Sheridan's actions and 11:59's resulting damage and loss all occurred within a one (1) year period.

**ANSWER:** Paragraph 207 contains allegations that are vague and nonspecific, and on that basis are denied..

208.    As a result of Defendant Sheridan's conduct, 11:59 has sustained damage and/or loss of not less than $5,000.00, within the meaning of the CFAA, and will continue to suffer substantial losses in excess of $5,000, including but not limited to loses sustained in responding to and investigating Defendant Sheridan's misconduct.

**ANSWER:** Infinitive denies the allegations in Paragraph 208.

209.    Defendant Sheridan's theft of 11:59's trade secrets and other proprietary and Confidential information and documents has caused 11:59 to devote substantial resources and efforts to investigate Defendant Sheridan's misconduct in order to access the full extent of Defendant Sheridan's misappropriation, to respond to Defendant Sheridan's misconduct, and to ensure that 11:59 is protected from further harm to its business. These amounts continue to accumulate.

**ANSWER:** Infinitive denies the allegations in Paragraph 209.

`

## COUNT X
## VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT, VA CODE ANN. § 18.2-152.1, ET SEQ.
## (AGAINST DEFENDANT SHERIDAN)

210.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

211.    The Virginia Computer Crimes Act prohibits, among other things, any person "without authority" to use a computer or computer network to "make… an unauthorized copy… of computer data." Virginia Code § 18.2-152.4.

**ANSWER:** Infinitive denies the characterization of the statute, which speaks for itself.

212.    Virginia Code § 18.2-152-2 provides that a person is "without authority" when he or she knows or reasonably should know that he or she has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission that was actually granted to him or her.

**ANSWER:** Infinitive denies the characterization of the statute, which speaks for itself.

213.    Defendant Sheridan had no authority to access 11:59's computer server system, computer networks, computer programs or software to make unauthorized copies of, or use, 11:59's Confidential, proprietary and trade secret information for purposes of using it in a competitive business, such as Infinitive, which he did.

**ANSWER:**  Infinitive denies the allegations in Paragraph 213.

214.    Defendant Sheridan willfully and maliciously used 11:59's computer server system, computer networks, computer programs and software to make unauthorized copies of 11:59's Confidential, proprietary and trade secret information, and used that information to

`

compete against 11:59 by soliciting and selling the same or similar AI data solutions to 11:59 clients on behalf of Infinitive, in violation of Va. Code §§ 18.2-152.3 and 18.2-152.4.

**ANSWER:** Infinitive denies the allegations in Paragraph 214.

215.    11:59 was damaged by, among other damages, loss of revenue and goodwill as a result of these actions by the Defendant Sheridan. As a direct and proximate cause of Sheridan's unauthorized actions, 11:59 has sustained damages, which, in part, are undeterminable, and, in part, in an amount to be determined by evidence at trial, but not less than $7 million.

**ANSWER:**   Infinitive denies the allegations in Paragraph 215.

216.    Under Va. Code § 18.2-152.12(A), 11:59 is entitled to recover damages and costs, which includes the costs of retaining computer forensics experts to discover exactly what Confidential information was accessed, what Confidential information was printed, and to determine whether such information was subsequently stored in the Defendants' storage locations.

**ANSWER:**  Infinitive denies the allegations in Paragraph 216.

## COUNT XI
## BREACH OF CONTRACT
## (AGAINST DEFENDANT DATABRICKS)

217.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding Paragraphs, as if fully set forth here.

**ANSWER:** Infinitive reasserts and hereby incorporates by reference its responses to each paragraph of Plaintiff's complaint as though fully set forth herein.

218.    The Partner Agreement is a valid and binding agreement between 11:59 and Databricks formed by an offer, acceptance of that offer and the presence of adequate consideration.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 218 and on that basis denies the allegations.

`

219.    The Partner Agreement contains valid and enforceable confidentiality and other provisions which prohibit Databricks from disclosing or using 11:59's confidential information for improper purposes.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 219 and on that basis denies the allegations.

220.    Databricks breached its duties under the Partner Agreement by disclosing or using 11:59's confidential information for improper purposes as detailed herein.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 220 and on that basis denies the allegations.

221.    McKinney and Miles knowingly, purposefully and/or negligently aided and abetted the breach of the Agreements by, among other things, leveraging and/or allowing Databricks to leverage 11:59's confidential and trade secret information for Databricks, Sheridan and/or Infinitive's benefit.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 221 and on that basis denies the allegations.

222.    11:59 has legitimate business interests justifying the confidentiality provisions contained in the Partner Agreement, which include, but are not limited to, the protection of 11:59's business goodwill, reputation, competitive advantage, and trade secrets and other valuable confidential business information.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 222 and on that basis denies the allegations..

61

`

223.    The provisions are reasonably necessary to protect 11:59's legitimate business interests since 11:59's confidential and trade secret information is not available to the public or generally known in the industry.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 223 and on that basis denies the allegations.

224.    The provisions are not harmful to the general public and are not unreasonably burdensome to the Defendants.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 224 and on that basis denies the allegations.

225.    Unless enjoined by this Court, Databricks will continue breaching the Partner Agreement.

**ANSWER:**  Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 225 and on that basis denies the allegations.

226.    As a direct and proximate result of Databricks' breaches, as described herein, 11:59 has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

**ANSWER:** Infinitive lacks sufficient information to admit or deny the allegations in Paragraph 226 and on that basis denies the allegations.

`

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order enjoining and restraining Defendants, and any other person acting in concert with Defendants, from:

(a) Directly or indirectly servicing, soliciting, enticing, or inducing any 11:59 clients serviced by Sheridan during his employment with 11:59 to terminate or modify its contractual or business relationship with 11:59 or assisting any other person or entity to do so;

(b) Using any confidential, proprietary, or trade secret information of 11:59;

(c) Continuing to use 11:59's confidential information, and Defendants shall specifically identify, preserve, and appropriately sequester and refrain from further accessing any information belonging to 11:59 in Defendants' possession, including but not limited to, hard copies and computer-saved versions of these documents, whether the information is on external hard drives, disks, CD-ROMs, networked data services, internet accessed outside storage, or any other portable media device;

(d) With respect to Defendant Sheridan, directly or indirectly soliciting, recruiting, inducing, or hiring any employee of 11:59 to work for a third party other than 11:59 or engage in any activity that would cause any employee to violate any agreement with 11:59;

(e) With respect to Defendant Sheridan, disclosing any 11:59 confidential, proprietary, and trade secret information or documents to any third party, including but not limited to Infinitive;

(f) Granting such other relief as the court deems equitable and just. And further requiring that:

`

(g) Defendants shall immediately produce copies of any and all of 11:59's documents within their possession to 11:59;

(h) Sheridan shall identify any and all storage locations where he retained, copied, accessed or modified 11:59's confidential, proprietary or trade secret information following his separation from 11:59;

(i) Sheridan shall identify any and all third parties, including but not limited to Infinitive, to whom he provided information or documents belonging to 11:59;

(j) Sheridan shall provide a certification that verifies, under the pains and penalties of perjury, that he has identified, and sequestered all of 11:59 documents and information in his possession;

(k) An appropriate and duly authorized representative of Infinitive shall provide a certification that verifies, under the pains and penalties of perjury, that Infinitive has returned all 11:59 documents and information in its possession and it has not retained copies, electronic or otherwise.

(l) McKinney and Miles each provide a certification that verifies, under the pains and penalties of perjury, that they have identified, preserved, and sequestered all of 11:59's confidential and proprietary information for any reason;

(m) An appropriate and duly authorized representative of Databricks shall provide a certification that verifies, under the pains and penalties of perjury, that Databricks has returned all 11:59 documents and information in its possession and it has not retained copies, electronic or otherwise;

`

(n) Ordering disgorgement and requiring Defendants to repay to 11:59 the value of Sheridan's salary, benefits and other compensation paid during the period of faithless service and/or disloyalty to 11:59;

(o) Ordering disgorgement and requiring Infinitive to repay to 11:59 the value of the ill-gotten gains it received as a result of its violations of the law;

(p) Ordering disgorgement and requiring the Defendants to pay to 11:59 the value of all benefits obtained as a result of their tortious conduct;

(q) Awarding 11:59 compensatory, special, consequential, exemplary, treble, and punitive damages in an amount to be determined but not less than the amount of 11:59's actual loss and the amount of Defendants unjust enrichment;

(r) Awarding 11:59 its attorneys' fees, costs, and other expenses incurred in this Action and in otherwise enforcing its rights and addressing misconduct by the Defendants;

(s) Awarding 11:59 reimbursement of the expenses it incurred in forensically examining Sheridan's 11:59 issued device and other data storage devices or accounts related to the Defendants' breaches of their duties, contracts, and other violations of the law; and

(t) Granting such other relief as the court deems equitable and just.

**ANSWER:** Infinitive denies that Plaintiff is entitled to the relief sought against Infinitive in Paragraphs a-t of the prayer for relief or any relief at all relating to the allegations against Infinitive made in the First Amended Complaint.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issue so triable as set forth herein.

**ANSWER:**  Plaintiff's demand for a trial by jury does not require a response from Infinitive. To the extent a response is required, Infinitive denies that it engaged in any acts or omissions that

`

would give rise to any legal claims.  Infinitive further denies that Plaintiff is entitled to a jury on its equitable claims.

## DEFENSES AND AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Plaintiff fails to state a claim in Counts IV and VII, because neither claim is a viable cause of action under Virginia law.

### SECOND DEFENSE

Some or all of Plaintiff's claims are barred to the extent the agreements alleged by Plaintiff are void or otherwise unenforceable.

### THIRD DEFENSE

Plaintiffs claims fail because Infinitive did not assist or encourage Mr. Sheridan to breach any common law or contractual duty owed to Plaintiff.

### FOURTH DEFENSE

The Defend Trade Secrets Act bars Plaintiff from recovering punitive damages or attorneys fees because the alleged agreement does not contain the statutorily required notices. *See* 18 U.S.C. § 1833.

### FIFTH DEFENSE

Plaintiff's claims fail because the documents and information allegedly misappropriated and/or disclosed by Defendants are neither trade secrets nor subject to non-disclosure because among other reasons the information: (i) is public; (ii) is generally known in the relevant industry or readily ascertainable; (iii) does not have actual or potential economic value because of secrecy; (iv) has not been the subject of reasonable measures to maintain secrecy; (v) was in Mr. Sheridan's

`

possession or known to Mr. Sheridan before such information was disclosed to Mr. Sheridan by 11:59; and/or (vi) was lawfully available to Mr. Sheridan from a source other than 11:59.

### SIXTH DEFENSE

Defendant has not misappropriated or used any of Plaintiff's alleged trade secrets or confidential information.

### SEVENTH DEFENSE

Plaintiff has not been damaged as alleged and damages are barred in whole or in part because any losses or damages sustained by Plaintiff are *de minimis*, remote, speculative, and/or transient and hence not cognizable at law.

### EIGHTH DEFENSE

If Plaintiff sustained any damages as alleged, such damages were not caused, directly or proximately, by any acts and/or omissions of Infinitive.

### NINTH DEFENSE

Plaintiff is not entitled to some or all of the relief requested in the First Amended Complaint because Infinitive's actions were not wanton or willful or malicious, nor did Infinitive or any other Defendant have an intent to injure Plaintiff's reputation, trade, business or profession.

### TENTH DEFENSE

Plaintiff's claims for damages fail, in whole or in part, because it failed to mitigate its alleged damages.

### ELEVENTH DEFENSE

Plaintiff's request for relief is barred in whole or in part under the doctrine of unclean hands.

`

### **TWELFTH DEFENSE**

Plaintiff's claims are barred because it does not have a certificate of authority to transact business in Virginia.

### **THIRTEENTH DEFENSE**

Infinitive reserves the right to raise such other defenses as might become known by it during discovery in this litigation.

`

## COUNTERCLAIMS

Counter-Plaintiff, Infinitive Inc. ("Infinitive"), by and through its undersigned counsel, hereby files counterclaims against Counter-Defendant M Corp dba 11:59 ("11:59") and Counter-Defendant Alison Moye ("Ms. Moye"), alleging as follows:

### INTRODUCTION

1.       In 2023, 11:59, Ms. Moye, Mr. Sheridan and other conspirators entered into a wide-ranging conspiracy to willfully and maliciously harm Infinitive's business by, among other things: (i) soliciting and stealing Infinitive's customers and potential customers in violation of the conspirator's contractual obligations to Infinitive, (ii) encouraging, aiding, and abetting the breach of the duty of loyalty of Infinitive's current employees; (iii) soliciting and hiring Infinitive employees in violation of the conspirator's contractual obligations to Infinitive, and (iv) using Infinitive's work product for the benefit of 11:59.

### PARTIES

2.       Counter-Plaintiff Infinitive is a Delaware corporation with headquarters in Ashburn, Virginia. Infinitive is a data and AI consulting firm.

3.       Counter-Defendant 11:59 is a California Corporation with its headquarters in Sacramento, California. 11:59 is also a data and AI consulting firm and competes with Infinitive for business.

4.       Counter-Defendant Alison Moye is an individual who resides in Pennington, New Jersey. Ms. Moye was formally employed by Infinitive as an executive, but left Infinitive in 2023 to join 11:59.  Ms. Moye is currently employed by 11:59 as its Chief Operating Officer.

`

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction over 11:59 because the company initiated the underlying lawsuit in this Court.

6.      The Court has personal jurisdiction over Ms. Moye because she signed an agreement with Infinitive where she "irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Virginia, as applicable, for any matter arising out of or relating to this Agreement." The claims at issue here arise out of and relate to that contract.

7.      Furthermore, the Court has personal jurisdiction over both Counter-Defendants because the majority of conduct undertaken in furtherance of the conspiracy occurred in Virginia, and was aimed at harming a company headquartered in Virginia.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

9.      Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the district.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.     Infinitive and 11:59 compete in the data/AI consulting industry for both business and talent.

11.     To protect its business and talent, Infinitive requires its high level employees to sign employment agreements that contain restrictive covenants prohibiting: (i) the solicitation or interference with Infinitive's clients, and (ii) the solicitation or hiring of Infinitive's employees. Additionally, Infinitive's employment agreements require employees to return confidential or

`

proprietary information immediately upon the end of their employment relationship with Infinitive.

12.   The employees relevant to the instant matter,[1] each had the following nonsolicitation covenants in their employment agreements:

> 12.1 <u>Non-solicitation of Clients or Prospects</u>.   During the term of this Agreement and for a period of twelve (12) months after my employment ends for any reason, or from the date of entry by a court of competent jurisdiction of a final judgment enforcing this Agreement (whichever is later), I will not, either directly or indirectly, separately or in association with others, interfere with, impair, disrupt or damage the Company's relationship with any of its existing clients or prospects by soliciting, or encouraging others to solicit, any of them for the purpose of diverting or taking away business from the Company. For purposes of this Agreement, "client" means any entity for which I had personal involvement in the development, creation, design, marketing or sales of a competitive Client Service or Product (or assisted or supervised such conduct) within the twelve-month period immediately preceding my resignation or termination date. "Prospect" means any entity that is not a Client but with respect to whom, within the twelve-month period immediately preceding my resignation or termination date, I conducted, prepared, submitted (or assisted or supervised such conduct) any proposal, client development work product or marketing efforts on behalf of the Company with respect to a competitive Client Service or Product.

> 12.2 <u>Non-solicitation of Company's Employees</u>. During the term of this Agreement and for a period of twelve (12) months after my employment ends for any reason, or from the date of entry by a court of competent jurisdiction of a final judgment enforcing this Agreement (whichever is later), I will not, either directly or indirectly, separately or in association with others, interfere with, impair, disrupt or damage the Company's business by hiring, soliciting, inducing, encouraging or attempting to hire any of the Company's employees or causing others to hire, solicit, induce or encourage any of the Company's employees to discontinue their employment with Company or to seek or accept any employment with any other business entity that performs competitive Client Services or Products.

---

[1] This language comes from the version of the Employee Innovations and Proprietary Rights Agreement signed by Ms. Moye, Mr. McGinn, and Ms. Hair. The version Mr. Sheridan signed is slightly different.

`

13.     Employees also agreed to the following:

        11.     <u>Return of Company Property</u>. I acknowledge that all materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, and all other tangible media of expression) furnished to me by Company shall remain the property of Company. On termination of my employment with Company for whatever reason, or at the request of Company before termination, I agree to promptly deliver to Company all records, files, computer disks, memoranda, documents, lists, materials and other information regarding or containing any confidential or Proprietary Information, including all copies, reproductions, summaries or excerpts thereof, then in my possession or control, whether prepared by me or others. I also agree to promptly return, upon termination or at any time upon Company's request, any and all Company property issued to me, including but not limited to computers, facsimile transmission equipment, cellular phones, keys and credits cards. I further agree that should I discover any Company property or Proprietary Information in my possession after my termination and departure from Company, I agree to return it promptly to Company without retaining copies or excerpts of any kind.

14.     In or around February 2023, 11:59 hired Jim McGinn as its Chief Technology Officer.  Prior to his hiring at 11:59, Mr. McGinn worked at Infinitive as an executive from 2018 to 2021.

15.     In or around March 2023, 11:59 hired Crystal Hair as Vice President – Cloud.  From 2019 to 2022, Ms. Hair worked at Infinitive as a Principal and Market Technology Lead.

16.     In or around March 2023, 11:59 hired Counter-Defendant Alison Moye as Chief Transformation Officer.  Immediately prior to her employment at 11:59, Ms. Moye was an executive at Infinitive for more than four years.   Ms. Moye was required to abide by her nonsolicitation covenants until March 30, 2024:

17.     In or around March 2023, 11:59 hired Joseph Bradley Sheridan as Vice President-Data Analytics.  Immediately prior to his employment at 11:59, Mr. Sheridan was a Director at Infinitive.   Mr. Sheridan was required to abide by the nonsolicitation covenants until March 23, 2024.

`

a.    11:59 Steals and Attempts to Steal Infinitive's Customers and Prospective Customers

18.    In March 2023, 11:59, Mr. McGinn, Ms. Hair, and Mr. Sheridan were aware that Mr. Sheridan had nonsolicitation covenants that prevented them from directly or indirectly interfering with Infinitive's customer relationships.

19.    Despite that knowledge, 11:59, Mr. McGinn, Ms. Hair, Mr. Sheridan, and others conspired to steal and tortiously interfere with Infinitive's customer relationships.

20.    During his time at Infinitive, Mr. Sheridan was actively involved in several projects for Infinitive's client Navy Mutual Aid Association. The revenue from the projects Mr. Sheridan had worked on prior to his departure was approximately $250,000.  Additionally, there was a pipeline of potential work valued at approximately $900,000 that Infinitive had pitched or otherwise invested in.  One of those projects was for a Data Warehouse that was valued at $350,000 on its own.

21.    Despite his covenant, upon joining 11:59, Mr. Sheridan began taking steps to steal the Navy Mutual Aid Association relationship and transfer it to 11:59.  11:59, Mr. McGinn, and Ms. Hair, and 11:59 were aware of these efforts and actively encouraged it.

22.    On or about June 7, 2023, Mr. Sheridan solicited Navy Mutual's point of contact and for the purposes of setting up a meeting between Navy Mutual and Mr. McGinn, 11:59's Chief Technology Officer, and Thomas Beyer, 11:59's Chief Operating Officer.



23.    Following the meeting, Mr. Sheridan followed up with Mr. McGinn to ensure that Mr. McGinn had specifically discussed the Data Warehouse project with Navy Mutual.

`

24.     As a result of the conduct of Mr. Sheridan, Mr. McGinn, Mr. Beyer, and others, Infinitive lost in excess of $1million in projects for Navy Mutual.

25.     Mr. Sheridan, with the blessing of 11:59, also interfered with another Infinitive client, Common App.

26.     On May 31, 2023, Mr. Sheridan attempted to give 11:59 credit for a demonstration he had performed for Infinitive client Common App, even though he had performed that demonstration on behalf of Infinitive.  Mr. Sheridan also joked about how Common App had decided not to use Infinitive.



27.     On another occasion, the conspirators, while in the process of improperly soliciting an Infinitive employee, Michael Sellery, improperly received information from Mr. Sellery regarding Infinitive's clients and used it to interfere with Infinitive's relationship with that client.

28.     On July 7, 2023, Mr. Sellery, while still employed at Infinitive, learned through an internal Infinitive email that an Infinitive client was looking to move to using the Databricks platform.  This was valuable information regarding the client's plans.

29.     Mr. Sellery took a photo of the internal email and sent a copy of it to Mr. Sheridan's personal email.  Mr. Sheridan then shared the information with Mr. McGinn and Ms. Hair.

30.     After reviewing the Infinitive email, Mr. Sheridan and Mr. McGinn agreed that it was time to "swoop in" and take the client from Infinitive.

`

31.     Mr. Sellery was aware that sharing that email with 11:59 was improper, which is clear from the fact that he did not simply forward the email from his Infinitive email account, but instead took a picture and sent it via his Gmail account.

32.     11:59, Mr. Sheridan, Mr. McGinn, and Ms. Hair were all aware that Mr. Sellery was in breach of his duty of loyalty to Infinitive by sending the email.



33.     In total, Infinitive estimates that it lost out on more than $2 million of revenue due to the customer interference by 11:59, Mr. Sheridan, Mr. McGinn, and Ms. Hair.

          b. 11:59 Uses Infinitive Work Product in Violation of Employment Agreements

34.     In violation of his contractual obligations, Mr. McGinn retained Infinitive work product after he terminated by Infinitive.

`

35.     11:59, Ms. Hair, and Mr. Sheridan were aware both that Mr. McGinn: (i) had agreed not to retain these documents; and (ii) that he and others within 11:59 were using Infinitive's documents to benefit 11:59.

36.     On July 2023, 11:59 employees Mr. McGinn, Ms. Hair, and Mr. Sheridan were working on a presentation for the state of Michigan.   Mr. McGinn instructed Ms. Hair and Mr. Sheridan to copy some PowerPoint slides that Mr. McGinn had retained from his time at Infinitive.

37.     First, Mr. McGinn asked Ms. Hair to copy a slide.



`



38.    The slide Ms. Hair replicated is clearly marked as copyrighted by Infinitive.

39.    Later that day Mr. McGinn asked Mr. Sheridan to "rebuild" another slide.



`



40.    Upon information and belief, these copied slides were used in the Michigan presentation and others.

41.    Copying Infinitive's work product for 11:59 to use to compete in the same industry caused further damage to Infinitive.

     c.    <u>11:59 Raids Infinitive for Employees in Violation of Employment Agreements</u>

42.    Both Ms. Moye and Mr. Sheridan were prohibited from directly or indirectly soliciting or encouraging others to solicit employees away from Infinitive until March 2024.

43.    Nevertheless, 11:59, Ms. Moye, Mr. McGinn, Ms. Hair, Mr. Sheridan, and others conspired to solicit Infinitive employees to 11:59 in violation of these active nonsolicitation provisions.

`

44.    Ms. Moye breached her employment contract by (i) encouraging others to solicit and (ii) actively soliciting her sister and others away from Infinitive.  This caused significant damage to Infinitive.

45.    For example, on April 13, 2023, about one month after Mr. Sheridan and Ms. Moye left Infinitive, Mr. McGinn, Ms. Hair, and Mr. Sheridan conspired to recruit Infinitive employee Derek Kennedy. In doing so, these individuals joked about Mr. Sheridan's non-solicitation:



`

46.     Specifically, Mr. Sheridan encouraged Mr. McGinn and Ms. Hair to "grab some rockstars!!" from Infinitive in violation of his contract. In response, Ms. Hair flippantly stated that she was going "[b]ack to stealth mode" to avoid Mr. Sheridan's non-solicitation.

47.     Less than two months later, Derek Kennedy left Infinitive to join 11:59 as a result of this encouragement and solicitation.

48.     Similarly, on April 19, 2023, again about one month after Ms. Moye and Mr. Sheridan left Infinitive, Mr. McGinn, Ms. Hair, and Mr. Sheridan discussed 11:59 stealing additional Infinitive employees: Michael Sellery and Laura Moye.  Laura Moye is Counter-Defendant Alison Moye's sister.

49.     In their conversation, Mr. McGinn and Ms. Hair stated it was important to maintain "plausible deniability" for Mr. Sheridan and Ms. Moye when engaging in their solicitation and recruitment.  The text messages acknowledged that Mr. McGinn and Ms. Hair were hiring Infinitive employees on behalf of Ms. Moye, who they referred to as "A."  Further, it is clear that Mr. McGinn was in regular discussions with Ms. Moye about the recruitment and solicitation of her sister.



50.    Less than one month after this conversation, Laura Moye left Infinitive and joined her sister, Mr. McGinn, Ms. Hair, and Mr. Sheridan at 11:59.

51.    Laura Moye left Infinitive because of Alison Moye's solicitation of her in breach of Ms. Moye's contractual obligations.

`

52.     In another instance, Mr. Sheridan was about to call an Infinitive employee, Noah Lacey, to recruit him to 11:59 when he remembered he could not.  Mr. Sheridan then had Jim McGinn call in his stead:





53.     Less than one month later, Noah Lacey left Infinitive to join 11:59.

54.     What is more, Mr. McGinn, Ms. Hair, and Mr. Sheridan mocked Infinitive for sending a letter reminding them of their obligations. These individuals  specifically discussed how frustrated Infinitive's CEO looked at an event due to 11:59's poaching and how Infinitive would likely send another letter soon:

82

`



55.    The gif that Mr. Sheridan shared in response Ms. Hair's thought of a letter coming stated "Bring. It. On."



56.    This response clearly shows that the conspirators were aware of the nonsolicitation covenants and were acting with willful malice and for the purposes of harming Infinitive.

57.    This solicitation pattern continued and eventually 11:59 hired *eleven* of Infinitive's employees away from the company. At least six of those employees had previously worked closely with Ms. Moye and her sister Laura Moye.

`

58.     Based on the evidence Infinitive has reviewed to date, it is clear that 11:59 through its employees acted with malice towards Infinitive. In various conversations between Mr. McGinn, Ms. Hair, and Mr. Sheridan, they described Infinitive as "appalling," "disgusting," and "[t]heir noses are too high to see past them."

59.     Ms. Moye's breach of her contract and the conspiracy to solicit employees by Laura Moye, Mr. McGinn, Ms. Hair, and Mr. Sheridan caused Infinitive damage in excess of $2 million.

## COUNTERCLAIM I
## BREACH OF CONTRACT
### (Against Alison Moye)

60.     Infinitive realleges and incorporates by reference the allegations in its Counterclaims as if fully set forth herein.

61.     As an employee of Infinitive, Ms. Moye signed an Employee Innovations and Proprietary Rights Agreement.  That agreement is a valid and binding contract.

62.     The agreement contained valid and enforceable non-solicitation covenants and a return of property provision.

63.     Ms. Moye breached that agreement by directly soliciting her sister as well as indirectly soliciting other employees from Infinitive to join her at 11:59.

64.     Infinitive suffered damages in excess of $2 million as a direct and proximate cause of Ms. Moye's breach.

## COUNTERCLAIM II
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES
### (Against 11:59)

65.     Infinitive realleges and incorporates by reference the allegations in its Counterclaims as if fully set forth herein.

`

66.     Infinitive had a reasonable expectation of business relationships with its customers.

67.     11:59 was aware of Infinitive's customer relationships and its expectation of further business from those customers.

68.     11:59 intentionally sought to destroy Infinitive's relationships with its customers without any legitimate purpose for doing so.

69.     11:59 used improper means, including: (i) having Mr. Sheridan solicit Infinitive customers in violation of his contractual obligations; and (ii) copying and replicating Infinitive's work product.

70.     These actions are not simply competition, but rather are unlawful acts meant to harm Infinitive and benefit 11:59.

71.     As a result of 11:59's actions Infinitive's business was significantly damaged in an amount in excess of $3 million.

## COUNTERCLAIM III
### CONSPIRACY IN VIOLATIONS OF VA CODE § 18.2-499
### (Against All Counter-Defendants)

72.     Infinitive realleges and incorporates by reference the allegations in its Counterclaims as if fully set forth herein.

73.     11:59 and Ms. Moye along with other co-conspirators, including but not limited to Mr. McGinn, Ms. Hair, Mr. Sheridan, and Mr. Sellery have mutually undertaken and acted in concert for the purpose of willfully and maliciously injuring Infinitive's business interests.

74.     As a result of Couter-Defendants' actions Infinitive's business was significantly damaged in an amount in excess of $3 million.

`

**WHEREFORE**, Counter-Plaintiff respectfully requests that this Court enter an order:

(a)     Awarding Infinitive compensatory, special, consequential, exemplary, and punitive damages in an amount to be determined but no less than $3 million;

(b)     Awarding Infinitive attorneys' fees, costs, and other expenses incurred in this action;

(c)     Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Counter-Plaintiff Infinitive hereby demands a trial by jury on all issues so triable.

Dated: May 14, 2025                             Respectfully submitted,

                                    _____/s/ Micah E. Ticatch_____
                                    Micah E. Ticatch, Va. Bar No. 83351
                                    John W. H. Harding, Va. Bar No. 87602
                                    ISLER DARE, P.C.
                                    1945 Old Gallows Road. Suite 650
                                    Vienna, Virginia 22182
                                    Phone: (703) 748-2690
                                    Facsimile: (703) 748-2695
                                    mticatch@islerdare.com
                                    jharding@islerdare.com

                                    *Counsel for Infinitive, Inc.*

86