# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| M CORP DBA 11:59, | : | |
| | : | Civil Action: 1:24-cv-1823 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **PLAINTIFF'S AMENDED OBJECTIONS** |
| INFINITIVE, INC., JOSEPH | : | **AND RESPONSES TO DEFENDANT** |
| BRADLEY SHERIDAN, | : | **INFINITIVE INC.'S FIRST SET OF** |
| DATABRICKS INC., WILLIAM | : | **INTERROGATORIES** |
| McKINNEY, CHERYL MILES, AND | : | |
| DOES 1-25, INCLUSIVE. | : | |
| | : | |
| Defendants. | : | |

## PRELIMINARY STATEMENT

Plaintiff M Corp DBA 11:59 ("Plaintiff" or "11:59") pursuant to Federal Rule of Civil Procedure 33 and the local rules, hereby provides its Amended Objections and Responses to Defendant Infinitive Inc.'s ("Infinitive") First Set of Interrogatories ("Interrogatories").

Plaintiff's objections are made without waiving any objection to the competence, relevance, materiality, privilege, or admissibility of these Interrogatories and the information sought therein. Plaintiff's objections also are made without prejudice to its right to assert additional or supplemental objections if Plaintiff discovers additional grounds for such objections in responding to the Interrogatories. Plaintiff has asserted objections to certain Interrogatories to preserve those objections but, in responding, may include information that would be subject to a preserved objection that Plaintiff determines is no longer valid or necessary.

## **SPECIFIC OBJECTIONS**

1.      Plaintiff objects to each Interrogatory to the extent that it exceeds, contradicts, or imposes any obligation greater than that imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable Court Orders, procedural rules, case law, or statutes governing the proper scope of discovery.

2.      Plaintiff objects to the definitions and instructions included in the Interrogatories and does not consider itself bound by them.  Without waiving this general objection, Plaintiff will respond to the Interrogatories to the extent of their obligations under the Federal Rules of Civil Procedure.

Respectfully submitted,

**POTTER & MURDOCK**
*Attorneys for Plaintiff M Corp dba 11:59*

By:  _/s/ John M. Murdock_____
        John M. Murdock, Esq.
        Brian S. Szmak, Esq.
        252 N. Washington Street
        Falls Church, VA  22046
        jmurdock@pottermurdock.com
        bszmak@pottermurdock.com
        Telephone:  (703) 992-6950

**NUKK-FREEMAN & CERRA, P.C.**
*Attorneys for Plaintiff M Corp dba 11:59*

By: _____
        Kegan S. Andeskie, Esq.
        Stacy Landau, Esq.
        26 Main Street, Suite 202
        Chatham, NJ, 07928
        kandeskie@nfclegal.com
        slandau@nfclegal.com
        Tel.: (973) 665-9100
        Fax: (973) 665-9101

Dated: June 13, 2025

2

## PLAINTIFF'S AMENDED OBJECTIONS AND RESPONSES TO DEFENDANT INFINITIVE INC.'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify every person who has knowledge concerning the allegations contained in the Operative Pleadings and, for each person so identified, set forth their full name, address, job title, employer or affiliated entity, and a detailed summary of the relevant facts that you believe are known to that person.

**OBJECTION:** Plaintiff objects to the Interrogatory on the grounds that it seeks information already in Defendant Infinitive's possession. More specifically, without more discovery, Plaintiff lacks the knowledge and information regarding the true extent of Defendant Infinitive's malfeasance, and therefore, is unable to identify *all* persons with knowledge concerning the allegations in this litigation.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiff specifically identifies the below individuals as people with knowledge and provides a detailed summary of the relevant facts believed to be known to that person.

**The following individuals may have knowledge of relevant facts relating to this litigation:**

1. **Defendant, Joseph Bradley Sheridan**

   **Defendant Sheridan has knowledge and information related to the allegations set forth in the Amended Complaint, including but not limited to: his employment with 11:59; his resignation of employment; his employment with Infinitive; his interactions with 11:59 employees, clients and prospective clients, and partners; his disparagement of 11:59; his misappropriation of 11:59's trade secrets, confidential and proprietary information; his and others including but not limited to Defendants Infinitive and Databricks' use, disclosure and benefits received from the use of 11:59's trade secrets, confidential and proprietary information.**

2. **Denis McFarlane, Infinitive's Founder and Chief Executive Officer**

   **Mr. McFarlane has knowledge and information related to the allegations set forth in the Amended Complaint involving him and/or Infinitive, including but not limited to: Mr. Sheridan's employment with Infinitive; Infinitive's communications and business relations with 11:59 client and prospective clients; Mr. Sheridan's breach of his fiduciary duty to 11:59; Infinitive's involvement in the misappropriation of 11:59's trade secrets, confidential, and proprietary information; Infinitive's retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; Databricks' retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information.**

3

3. **Jeff Theobald, Infinitive's Managing Director**

Mr. Theobald has knowledge and information related to the allegations set forth in the Amended Complaint involving him and/or Infinitive, including but not limited to: Mr. Sheridan's employment with Infinitive; Infinitive's communications and business relations with 11:59 client and prospective clients; Mr. Sheridan's breach of his fiduciary duty to 11:59; Infinitive's involvement in the misappropriation of 11:59's trade secrets, confidential, and proprietary information; Infinitive's retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; Databricks' retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information.

4. **Phil Kyle, Infinitive Chief Executive Officer**

Mr. Kyle has knowledge and information related to the allegations set forth in the Amended Complaint involving Infinitive, including but not limited to: Mr. Sheridan's employment with Infinitive; Infinitive's involvement in the misappropriation of 11:59's trade secrets, confidential, and proprietary information; Infinitive's retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; Databricks' retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; Infinitive's communications and business relations with 11:59 client and prospective clients.

5. **David Gonet, Infinitive Human Resources**

Mr. Gonet has knowledge and information related to the allegations set forth in the Amended Complaint involving Infinitive, including but not limited to: Mr. Sheridan's employment with Infinitive; Infinitive's recruiting, onboarding, training, agreements and employment policies and procedures.

6. **Cheryl Miles, Databricks Account Executive**

Ms. Miles has knowledge and information related to the allegations set forth in the Amended Complaint involving her and Databricks, including but not limited to: Mr. Sheridan's employment with 11:59 and Infinitive; Databricks' misappropriation of 11:59's trade secrets, confidential, and proprietary information; Databricks' retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; and Databricks' relations with 11:59 prospective and existing clients.

7. **William McKinney, Databricks Account Executive**

Mr. McKinney has knowledge and information related to the allegations set forth in the Amended Complaint involving him and Databricks, including but not limited to: Mr. Sheridan's employment with 11:59 and Infinitive; Databricks' involvement in the misappropriation of 11:59's trade secrets, confidential, and proprietary

information; Databricks' retention, use and/or benefit from 11:59's trade secrets, confidential, and proprietary information; and Databricks' relations with 11:59 prospective and existing clients.

8. **Tim Collinson, 11:59 Chief Technology Officer**

Mr. Collinson has knowledge and information related to the allegations set forth in the Amended Complaint, including but not limited to: 11:59's consulting services, vendor and partner relationships, pipeline, Sheridan's 11:59 job responsibilities and performance, Sheridan's interference with 11:59's current and prospective client relationships, and Sheridan's disparagement of 11:59.

9. **Kenneth Geh, 11:59 Manager, Data Analytics**

Mr. Geh has knowledge and information related to the allegations set forth in the Amended Complaint, including but not limited to: 11:59's consulting services, vendor and partner relationships, pipeline, and his creation of proprietary coding and demos for 11:59 current and potential clients.

10. **Alison Moye, 11:59 Chief Operating Officer**

Ms. Moye has knowledge and information related to allegations involving her contained in Infinitive's Counterclaims.

**Jim McGinn, 11:59's Former Chief Technology Officer**

Mr. McGinn has knowledge and information related to allegations involving him contained in Infinitive's Counterclaims.

11. **Crystal Hair, 11:59's Former Vice President – Cloud**

Ms. Hair has knowledge and information related to allegations involving him contained in Infinitive's Counterclaims.

12. **All other individuals identified in: (a) Defendants' Initial Disclosures; (b) documents to be produced by the parties; and (c) interrogatory answers and other discovery produced by the parties.**

Plaintiff reserves the right to supplement this list as discovery progresses. By identifying the above-named individuals, Plaintiff does not intend to waive any rights under R.P.C. 1.13(a).

**<u>INTERROGATORY NO. 2</u>:**

Describe in detail each of the trade secrets you claim were misappropriated by Infinitive in Counts II, III, and IV against Infinitive, including the identifications of the trade secret, an

identification of any document containing the trade secret, all efforts undertaken by 11:59 to prevent disclosure of the trade secret, the value of the trade secret, and all facts that support your contention that the trade secret was misappropriated by Infinitive.

**OBJECTION**:  **Plaintiff objects to the Interrogatory on the grounds that it seeks a legal conclusion regarding the terms "trade secrets" and "misappropriation," and is premature regarding Plaintiff's ability to assess the value of any trade secrets.  Plaintiff further objects on the grounds that this is a contention interrogatory requesting the identity of each trade secret, all related to documents, all efforts undertaken by Plaintiff to prevent the disclosure of any trade secrets, and all facts supporting Plaintiff's position that trade secrets were misappropriated.  Accordingly, the Interrogatory is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion.  See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at \*2 (E.D. Va. Apr. 11, 2018).**

**RESPONSE**:  **Subject to and without waiving the foregoing objections, in preparation for his departure from 11:59 and new employment with Infinitive, Defendant Sheridan copied the contents of his 11:59 laptop hard drive to his personal Google Drive.  On information and belief, Sheridan downloaded the contents of 11:59's hard drive to his personal Google Drive on his last day of employment with 11:59, which was also the first time he accessed his Google Drive in 17 months. The Google Drive files consist of approximately 1,709 files and 4 Gigabytes of data, including a folder entitled "WhenLeave" which contains approximately 3.5 GB of data.  The WhenLeave folder contains some of 11:59's most valuable information, including: coding, Statements of Work, pricing estimates, marketing presentations, 11:59 employee and client contact lists, proposals, and detailed notes relating to client preferences and project requirements.**

**While it is impracticable to list every single file of the 1,700 files that is a trade secret, Plaintiff provides the following list of files and folders in Defendant Sheridan's personal Google Drive without limitation, that contain Plaintiff's trade secret information:**

- **The One Note folder contained within the WhenLeave folder contains 18 subfolders related to pipeline projects and partners to the work.  These subfolders contain internal notes regarding the scope of Plaintiff's work with these clients, client preferences, and other detailed information from Plaintiff's meetings with those clients and partners, that are not available to the public.**

- **In the When Leave folder, subfolder MacHardDrive, subfolder Projects, the following items contain Plaintiff's trade secrets:**

  - **Company O: phase scripts, [Company O] Databricks Pending Backlog SOW**
  - **Company D: Last email from [Company D executive], About 1159**
  - **Project N: About 1159_[Project N]**
  - **DAIS: Databricks Happy Hour**
  - **Project A: Use Case Ideation, code, [Project A]_1159 Scope & Timeline_20240808, [Project A]-Enterprise Data Platform-Proposal**

- o **IIS POC: various coding**
- o **InternalLakehouse: Employee Listing, Cost Center Charge by Day – All**
- o **Project P: About 1159_[Project P], 1159 Capabilities Statement, About 1159_[Project P]WLRD**
- o **Project Q: About 1159_[Project Q]**
- o **Project G: various coding, DynamoDB_design_draft, RE_ [Project G] POC - ER Patient Matching, Meeting Recording – Matching Solution Demo**
- o **Project B: various coding, [Project B] - Combined Integration Layer SOW (Final Draft) 3.17, [Project B] - Integration Layer SOW (Draft) v1.2 (1) Brad, NM Lakehouse Pricing Option Schedule [Company E] and 1159 and EDS**
- o **Project C: About 1159, [Project C] Demo, RAG Chatbot, [Project C] Proposal DRAFT, [Project C]_Proposal, meeting notes 06.24.24**
- o **Project S: Databricks Features for [Project S], Databricks Experience for [Project S]**
- o **Project T: Lakehouse Value Proposition, coding**
- o **Project H: Data migration draft for [Project H] BW RFP[39], Data Management response**
- o **Passed_lost: Response to [Project T] RFI 50040755_elevenfiftynine, Response to [Project T] RFI 50040755_elevenfiftynine_BS, Bidders Conference Call, brad rewrite**
- o **EDDNext: VOL 2 M Corp Response to EDD RFP3187_FINAL**
- o **ESMA E2-226 AC[Project L]: [Project L]_Databricks_May_8_2023_V1, J----- R------- letter, pre-proposal call notes**
- o **Project K: [Project K] Databrics POC SOW (3), POC_Timeline**
- o **RFx: 1159 Scope & Pricing_[Project L]_08.22.24**
- o **Projects: 1159 Databricks Intro, 1159 Playbooks_analytics_DRAFT, my deals generated**
- o **Notebooks**
- o **[Project B]_Teams_Files: [Project B] – Combined Integration Layer SOW (Draft) V1.1,   [Project B] - Combined Integration Layer SOW (Final Draft) 3.17, [Project B] - Integration Layer SOW (Draft) v1.2 (1), Copy of [Project B] Lakehouse Pricing Option ScheduleLB, [Project B] SOW - 1159_08272024, [Project B] Lakehouse Tasks – Infinitive**
- o **WS FuzzyMatching_ER_MDM: DynamoDB_design_draft, Meeting Recording - Matching Solution Demo, RE_ [Project G] POC - ER Patient Matching, various coding**
- o **Code Samples**
- o **AWS FuzzySearchDDB**
- o **Past prospect & client contact info**
- o **RAG & LLM email to I-----**

**By letter dated September 24, 2024 from Infinitive's counsel, Defendants admitted that Sheridan "retained copies of a number of files that contain his work product from his time at 11:59 on his Google Drive" and "it is likely that at least some of the files contain information that 11:59 would consider confidential."**

There is forensic evidence that Google Drive folders related to 11:59 project work, including Project C and a general folder named "Projects," occurred after Mr. Sheridan's employment with Infinitive began on September 9, 2024.

Infinitive knew and coordinated with Sheridan while Sheridan was still an 11:59 employee to steal work from 11:59 and bring it to Infinitive, on information and belief, for the purposes of using the thousands of 11:59 proprietary files and information Sheridan had taken.  On August 26, 2024, almost two weeks before Sheridan would separate from 11:59, Infinitive's Chief Executive Officer, Denis McFarlane, explicitly directed Sheridan to meet with Jeff Theobald, Infinitive's Managing Director, to discuss how to steal this work from 11:59. Sheridan then reached out to Theobald to set up the meeting, telling him to "[b]ring something to take notes with bc I'm trying to minimize emails right now."  Following their meeting, Sheridan put Theobald in touch with Infinitive account executive William McKinney to further their plans to steal the Project C business for Infinitive.  McKinney had texted Sheridan on September 5, 2024 requesting Sheridan locate and provide him with a recording of the demo 11:59 had done for Project C a few weeks earlier.  Sheridan then scheduled a demo for Project C at Infinitive on September 20, 2024, on information and belief, using 11:59's coding.

The Google Drive contains further evidence of Infinitive's use of 11:59's trade secrets.  For example, a file entitled "Copy of NM Lakehouse Pricing Option ScheduleLB" was saved alongside a nearly identical document except that "11:59" within the document is replaced with "Infinitive" (document entitled "[Project B] Lakehouse Tasks – Infinitive").  Forensic evidence was found showing that the document entitled "[Project B]AA Lakehouse Tasks - Infinitive.xlsx" was modified on September 11, 2024, after, on information and belief, Sheridan left 11:59 and started at Infinitive.

In addition, on September 9, 2024, Sheridan's first day of Infinitive employment, he reached out to several 11:59 clients utilizing 11:59's trade secret information to steal the business for Infinitive.  First, Sheridan emailed the main client contact from Project A, telling her in relevant part:

> I also wanted to highlight two solutions I shared with her technical team last week. One involves my creative approach to the LPR data, which I believe aligns well with Brandon's needs, and the other is a Genie Room featuring monthly economic indicators I pulled from the Hawaii open data portal.

Second, Sheridan emailed contacts at Project C, telling them in relevant part:

> I'll be returning to Infinitive on Monday, 9/16, and I'd like to schedule some time with you and the rest of my leadership team either later that week or the following week. During this meeting, we can review who Infinitive is, the services we offer, and the exclusive program Databricks recommended us for, which Infinitive is now part of. I'd also like to use some time to ask a few questions I've gathered after reviewing the slides, architecture diagrams, and recorded meetings.

Third, Sheridan emailed another contact at Project C, telling her, "I'm confident I can deliver the final demo just as well, if not better, than the previous two, and seamlessly transition . . ." The prior two demos had been conducted by 11:59, using its resources and proprietary code and approach.

Sheridan also reached out to contacts at Projects K, L, P and Company O using contact and project information he obtained only from his work at 11:59 to attempt to move these projects to Infinitive.

Every action by Sheridan detailed in this response and as set forth in the pleadings was taken in furtherance of Sheridan's employment with Infinitive, and in his capacity as an employee of Infinitive. The above evidence demonstrates that Infinitive knew or should have known that Sheridan was taking these actions on behalf of Infinitive.

In further response, Plaintiff takes appropriate steps to protect all sensitive information in the course of carrying out its business, including but not limited to, measures such as entering into confidentiality and non-disclosure agreements, stamping confidentiality markings on documents, and preparing and enforcing policies regarding the protection of confidential information. Plaintiff's trade secrets are of great value to Plaintiff as they provide a competitive advantage in the industry. Plaintiff refers Infinitive to the text messages between Sheridan and Infinitive contained within Plaintiff's document production at Bates-stamped PLAINTIFF_516. Plaintiff further refers to the facts contained in its Complaint and Amended Complaint and the accompanying declarations. Plaintiff reserves the right to supplement this response during the course of discovery.

**INTERROGATORY NO. 3:**

Describe in detail all facts that support your contention that Infinitive acted with willful and/or malicious intent.

**OBJECTION**: Plaintiff objects to the Interrogatory on the grounds that it is overbroad and unduly burdensome as it is not reasonably limited in time and scope. Plaintiff further objects on the grounds that "willful and/or malicious intent" requires a legal conclusion. Plaintiff further objects on the grounds that this is a contention interrogatory, which is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion. See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at *2 (E.D. Va. Apr. 11, 2018).

**RESPONSE**: Subject to and without waiving the foregoing objections, Infinitive knew and coordinated with Sheridan while Sheridan was still an 11:59 employee to steal work from 11:59 and bring it to Infinitive, on information and belief, for the purposes of using the thousands of 11:59 proprietary files and information Sheridan had taken. On August 26, 2024, almost two weeks before Sheridan would separate from 11:59, Sheridan explicitly informed Infinitive's Chief Executive Officer, Denis McFarlane, that he wanted to move some prospects to Infinitive. Sheridan asked McFarlane if he should wait until after he started at Infinitive to move the business over. McFarlane told Sheridan to proceed.

McFarlane then directed Sheridan to meet with Jeff Theobald, Infinitive's Managing Director, to discuss how to steal this work from 11:59.

On that same date, McFarlane asked Sheridan for his "employment agreement" with 11:59, which was sent by Sheridan to Infinitive, meaning that Infinitive was well aware of the Confidentiality and Non-Disclosure Agreement signed by Sheridan on March 17, 2023. Despite clear language in the Confidentiality and Non-Disclosure Agreement imposing a contractual obligation upon Sheridan and a duty to protect and not disclose 11:59's trade secrets and confidential information, Infinitive willfully and maliciously aided Sheridan in his breach of same.

As instructed by McFarlane, Sheridan reached out to Theobald to set up the meeting, telling him to "[b]ring something to take notes with bc I'm trying to minimize emails right now." Following their meeting, Sheridan put Theobald in touch with Databricks account executive William McKinney to further their plans to steal the Project C business for Infinitive.

The Google Drive contains further evidence of Infinitive's use of 11:59's trade secrets. For example, a file entitled "Copy of NM Lakehouse Pricing Option ScheduleLB" was saved alongside a nearly identical document except that "11:59" within the document is replaced with "Infinitive" (document entitled "[Project B] Lakehouse Tasks – Infinitive"). Forensic evidence was found showing that the document entitled "[Project B]AA Lakehouse Tasks - Infinitive.xlsx" was modified on September 11, 2024, after, on information and belief, Sheridan left 11:59 and started at Infinitive.

In addition, McFarlane actively encouraged and gave Sheridan the green light to reach out to several 11:59 clients utilizing 11:59's confidential and proprietary information and trade secrets to steal the business for Infinitive, which Sheridan did immediately upon starting at Infinitive.

Every action by Sheridan detailed in this response and as set forth in the pleadings was taken in furtherance of Sheridan's employment with Infinitive, in his capacity as an employee of Infinitive, and with Infinitive's knowledge and support.

Upon information and belief, Infinitive's willful and malicious conduct was in retaliation against former Infinitive employees who left Infinitive (some of whom were laid off) and joined 11:59, the retaliatory nature of which is supported by the fact that this very same nexus of facts forms the basis of Infinitive's counterclaims against 11:59 (and were only filed after 11:59 sought to enforce its rights and protect its own intellectual property).

**INTERROGATORY NO. 4:**

Describe in detail all facts to support the contention that Infinitive conspired with the other Defendants.

**OBJECTION:** Plaintiff objects to the Interrogatory on the grounds that it is overbroad and unduly burdensome as it is not reasonably limited in time and scope. Plaintiff further objects

on the grounds that this is a contention interrogatory requesting all facts regarding Infinitive's "conspiracy" with other Defendants. Accordingly, the Interrogatory is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion. See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at *2 (E.D. Va. Apr. 11, 2018).

**RESPONSE:** Subject to and without waiving the foregoing objections, Infinitive knew and coordinated with Sheridan while Sheridan was still an 11:59 employee to steal work from 11:59 and bring it to Infinitive, on information and belief, for the purposes of using the thousands of 11:59 proprietary files and information Sheridan had taken. On August 26, 2024, almost two weeks before Sheridan would separate from 11:59, Sheridan explicitly informed Infinitive's Chief Executive Officer, Denis McFarlane, that he wanted to move some prospects to Infinitive. Sheridan asked McFarlane if he should wait until after he started at Infinitive to move the business over. McFarlane told Sheridan to proceed. McFarlane then directed Sheridan to meet with Jeff Theobald, Infinitive's Managing Director, to discuss how to steal this work from 11:59.

On that same date, McFarlane asked Sheridan for his "employment agreement" with 11:59, which was sent by Sheridan to Infinitive, meaning that Infinitive was well aware of the Confidentiality and Non-Disclosure Agreement signed by Sheridan on March 17, 2023. Despite clear language in the Confidentiality and Non-Disclosure Agreement imposing a contractual obligation upon Sheridan and a duty to protect and not disclose 11:59's trade secrets and confidential information, Infinitive willfully and maliciously aided Sheridan in his breach of same.

As instructed by McFarlane, Sheridan reached out to Theobald to set up the meeting, telling him to "[b]ring something to take notes with bc I'm trying to minimize emails right now." Theobald's instruction clearly indicated that he intended to engage in conspiratorial and tortious activity and sought to minimize the documentation of same. Following their meeting, Sheridan put Theobald in touch with Databricks account executive William McKinney to further their plans to steal the Project C business for Infinitive. Currently, Databricks is Infinitive's primary partner and are even listed on Infinitive's website all as a result of Sheridan's introduction and the mutual effort to steal 11:59 confidential and proprietary information and business. McKinney had texted Sheridan on September 5, 2024 requesting Sheridan locate and provide him with a recording of the demo 11:59 had done for Project C a few weeks earlier. Sheridan then scheduled a demo for Project C at Infinitive on September 20, 2024, on information and belief, using 11:59's coding.

The Google Drive contains further evidence of Infinitive's use of 11:59's trade secrets. For example, a file entitled "Copy of NM Lakehouse Pricing Option ScheduleLB" was saved alongside a nearly identical document except that "11:59" within the document is replaced with "Infinitive" (document entitled "[Project B] Lakehouse Tasks – Infinitive"). Forensic evidence was found showing that the document entitled "[Project B]AA Lakehouse Tasks - Infinitive.xlsx" was modified on September 11, 2024, after, on information and belief, Sheridan left 11:59 and started at Infinitive.

In addition, McFarlane actively encouraged and gave Sheridan the green light to reach out to several 11:59 clients utilizing 11:59's confidential and proprietary information and trade secrets to steal the business for Infinitive, which Sheridan did immediately upon starting at Infinitive.

First, Sheridan emailed the main client contact from Project A, telling her in relevant part:

> I also wanted to highlight two solutions I shared with her technical team last week. One involves my creative approach to the LPR data, which I believe aligns well with Brandon's needs, and the other is a Genie Room featuring monthly economic indicators I pulled from the Hawaii open data portal.

Second, Sheridan emailed contacts at Project C, telling them in relevant part:

> I'll be returning to Infinitive on Monday, 9/16, and I'd like to schedule some time with you and the rest of my leadership team either later that week or the following week. During this meeting, we can review who Infinitive is, the services we offer, and the exclusive program Databricks recommended us for, which Infinitive is now part of. I'd also like to use some time to ask a few questions I've gathered after reviewing the slides, architecture diagrams, and recorded meetings.

Third, Sheridan emailed another contact at Project C, telling her, "I'm confident I can deliver the final demo just as well, if not better, than the previous two, and seamlessly transition . . ." The prior two demos had been conducted by 11:59, using its resources and proprietary code and approach. William McKinney of Databricks scheduled, arranged, and participated in each of these demos, and was aware of 11:59's work product and efforts in this regard. As previously stated, Sheridan introduced Theobald of Infinitive to McKinney while Sheridan was still an 11:59 employee in furtherance of moving Project C to Infinitive and carrying out the third demo there.

Sheridan also reached out to contacts at Projects K, L, P and Company O using contact and project information he obtained only from his work at 11:59 to attempt to move these projects to Infinitive.

Within days of Sheridan joining Infinitive, Sheridan and Theobald worked with Databricks representatives, McKinney and "Scott," in a conspiratorial effort to divert 11:59 business to Infinitive, with McFarlane's blessing.

Every action by Sheridan detailed in this response and as set forth in the pleadings was taken in furtherance of Sheridan's employment with Infinitive, in his capacity as an employee of Infinitive, with Infinitive's actual or constructive knowledge and support, and in conspiracy with Infinitive and Databricks.

**INTERROGATORY NO. 5:**

Describe in detail all facts that support your contention that Infinitive "intentionally sought to destroy 11:59's relationships with its customers without any legitimate purpose for doing so."

**OBJECTION:  Plaintiff objects to the Interrogatory on the grounds that it is a contention interrogatory requesting all facts supporting Plaintiff's contention about Infinitive's role in destroying Plaintiff's relationships with its customers. Accordingly, the Interrogatory is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion.  See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at \*2 (E.D. Va. Apr. 11, 2018).  Plaintiff also objects on the grounds that this Interrogatory is premature, given that Plaintiff is not yet privy to Defendants', including Defendant Infinitive, discovery responses and Infinitive only knows the extent of what it has done to destroy Plaintiff's customer relationships.**

**RESPONSE:  Subject to and without waiving the foregoing objections, Infinitive knew and coordinated with Sheridan while Sheridan was still an 11:59 employee to steal work from 11:59 and bring it to Infinitive, on information and belief, for the purposes of using the thousands of 11:59 proprietary files and information Sheridan had taken.  On August 26, 2024, almost two weeks before Sheridan would separate from 11:59, Sheridan explicitly informed Infinitive's Chief Executive Officer, Denis McFarlane, that he wanted to move some prospects to Infinitive.  Sheridan asked McFarlane if he should wait until he started at Infinitive. McFarlane told him to move forward immediately.  McFarlane then directed Sheridan to meet with Jeff Theobald, Infinitive's Managing Director, to discuss how to steal this work from 11:59.**

**On that same date, McFarlane asked Sheridan for his "employment agreement" with 11:59, which was sent by Sheridan to Infinitive, meaning that Infinitive was well aware of the Confidentiality and Non-Disclosure Agreement signed by Sheridan on March 17, 2023. Despite clear language in the Confidentiality and Non-Disclosure Agreement imposing a contractual obligation upon Sheridan and a duty to protect and not disclose 11:59's trade secrets and confidential information, Infinitive willfully and maliciously aided Sheridan in his breach of same.**

**As instructed by McFarlane, Sheridan reached out to Theobald to set up the meeting, telling him to "[b]ring something to take notes with bc I'm trying to minimize emails right now." Following their meeting, Sheridan put Theobald in touch with Databricks account executive William McKinney to further their plans to steal the Project C business for Infinitive.  11:59 had conducted two demos for Project C, and was already making arrangements to schedule a third, but on behalf of Infinitive.  On information and belief, Infinitive could not have developed a demo for Project C without using 11:59's proprietary information so quickly.**

**The Google Drive contains further evidence of Infinitive's use of 11:59's trade secrets.  For example, a file entitled "Copy of NM Lakehouse Pricing Option ScheduleLB" was saved alongside a nearly identical document except that "11:59" within the document is replaced with "Infinitive" (document entitled "[Project B] Lakehouse Tasks – Infinitive").  Forensic**

evidence was found showing that the document entitled "[Project B]AA Lakehouse Tasks - Infinitive.xlsx" was modified on September 11, 2024, after, on information and belief, Sheridan left 11:59 and started at Infinitive.

Immediately upon the start of his employment with Infinitive (with Infinitive's  actual or constructive knowledge), Sheridan engaged in discussions with 11:59 clients to interfere with their relationships and shift work to Infinitive in furtherance of a campaign to destroy 11:59's relationships.

Every action by Sheridan detailed in this response and as set forth in the pleadings was taken in furtherance of Sheridan's employment with Infinitive, in his capacity as an employee of Infinitive, and with Infinitive's knowledge and support.

In addition, upon information and belief, Infinitive's willful and malicious conduct was in retaliation against former Infinitive employees who left Infinitive (some of whom were laid off) and joined 11:59, the retaliatory nature of which is supported by the fact that this very same nexus of facts forms the basis of Infinitive's counterclaims against 11:59 (and were only filed after 11:59 sought to enforce its rights and protect its own intellectual property).

**INTERROGATORY NO. 6:**

Describe in detail all facts to support the contention that Infinitive "requested, directed, incited, encouraged, compelled, and otherwise solicited Sheridan to breach his fiduciary duty to 11:59."

**OBJECTION**:  Plaintiff objects to the Interrogatory on the grounds that it is a contention interrogatory requesting all facts supporting Plaintiff's contention regarding Infinitive's role in Defendant Sheridan's breach of his fiduciary duty.  Accordingly, the Interrogatory is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion.  See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at *2 (E.D. Va. Apr. 11, 2018).  Plaintiff also objects on the grounds that this Interrogatory is premature, given that Plaintiff is not yet privy to Defendants', including Defendant Infinitive, discovery responses and Infinitive only knows the extent of what it has done to destroy Plaintiff's customer relationships.

**RESPONSE**:  Subject to and without waiving the foregoing objections, Infinitive knew and coordinated with Sheridan while Sheridan was still an 11:59 employee to steal work from 11:59 and bring it to Infinitive, on information and belief, for the purposes of using the thousands of 11:59 proprietary files and information Sheridan had taken.  On August 26, 2024, almost two weeks before Sheridan would separate from 11:59, Sheridan explicitly informed Infinitive's Chief Executive Officer, Denis McFarlane, that he wanted to move some prospects to Infinitive.   Sheridan asked McFarlane if he should wait until he started at Infinitive. McFarlane told him to move forward immediately.  McFarlane then directed Sheridan to meet with Jeff Theobald, Infinitive's Managing Director, to discuss how to steal this work from 11:59.

On that same date, McFarlane asked Sheridan for his "employment agreement" with 11:59, which was sent by Sheridan to Infinitive, meaning that Infinitive was well aware of the Confidentiality and Non-Disclosure Agreement signed by Sheridan on March 17, 2023. Despite clear language in the Confidentiality and Non-Disclosure Agreement imposing a contractual obligation upon Sheridan and a duty to protect and not disclose 11:59's trade secrets and confidential information, Infinitive willfully and maliciously, ignored the terms of the Agreement and aided Sheridan in his breach of same.

As instructed by McFarlane, Sheridan reached out to Theobald to set up the meeting, telling him to "[b]ring something to take notes with bc I'm trying to minimize emails right now." Following their meeting, Sheridan put Theobald in touch with Databricks account executive William McKinney to further their plans to steal the Project C business for Infinitive.

The Google Drive contains further evidence of Infinitive's use of 11:59's trade secrets. For example, a file entitled "Copy of NM Lakehouse Pricing Option ScheduleLB" was saved alongside a nearly identical document except that "11:59" within the document is replaced with "Infinitive" (document entitled "[Project B] Lakehouse Tasks – Infinitive"). Forensic evidence was found showing that the document entitled "[Project B]AA Lakehouse Tasks - Infinitive.xlsx" was modified on September 11, 2024, after, on information and belief, Sheridan left 11:59 and started at Infinitive.

With McFarlane's green light, Sheridan reached out to several 11:59 clients utilizing 11:59's trade secret information to attempt to steal the business for Infinitive as soon as he started working for Infinitive.

Every action by Sheridan detailed in this response and as set forth in the pleadings was taken in furtherance of Sheridan's employment with Infinitive, in his capacity as an employee of Infinitive, and with Infinitive's actual or constructive knowledge and support.

Upon information and belief, Infinitive's willful and malicious conduct was in retaliation against former Infinitive employees who left Infinitive (some of whom were laid off) and joined 11:59, the retaliatory nature of which is supported by the fact that this very same nexus of facts forms the basis of Infinitive's counterclaims against 11:59 (and were only filed after 11:59 sought to enforce its rights and protect its own intellectual property).

**INTERROGATORY NO. 7:**

To the extent you are seeking a permanent injunction against Infinitive, state specifically and precisely what conduct you contend Infinitive should be enjoined from performing and the duration you contend the injunction should last.

**OBJECTION:** Plaintiff objects to the Interrogatory on the grounds that it requests information already in Defendant Infinitive's possession in the form of a Preliminary Injunction Order issued by The Honorable Rossie D. Alston, Jr., on December 10, 2024 (PAGEID# 809), which enumerates, with specificity, the conduct Defendant Infinitive is enjoined from performing, which is to be abided to by Defendant Infinitive in perpetuity.

15

Plaintiff further objects on the grounds that this Interrogatory is premature in terms of additional requests for injunctive relief as discovery is ongoing.

**RESPONSE**: Subject to and without waiving the foregoing objections, at this time and subject to revision, Plaintiff intends to seek permanent injunctive relief against Infinitive including enjoining and restraining Infinitive from soliciting any of the Restricted Clients who are not Infinitive's existing clients and enjoining Infinitive from using and accessing or disclosing any confidential, proprietary or trade secret information of 11:59. Plaintiff reserves the right to supplement this response during the course of discovery.

**INTERROGATORY NO. 8:**

Describe in detail any loss of revenue for which you contend Infinitive is liable, including but not limited to the identity of the customer, the identify of the project; the estimated loss of revenue, the facts that support the calculation of the estimated loss of revenue; and the facts that support your contention that Infinitive's conduct caused the loss.

**OBJECTION**: Plaintiff objects to the Interrogatory on the grounds that it seeks information that is already in Defendant Infinitive's possession. Plaintiff further objects on the grounds that the Interrogatory seeks proprietary information related to Plaintiff's customers and confidential accounting data. Plaintiff also objects on the basis that this Interrogatory requires legal analysis as to causation. Plaintiff further objects on the grounds that the Interrogatory is premature given that Plaintiff is not yet privy to Defendants', including Defendant Infinitive, discovery responses in order to determine the extent of the loss of revenue and other investments at this early stage in the litigation. Plaintiff further objects on the grounds that this is a contention interrogatory requesting the facts supporting that Infinitive's acts caused Plaintiff's losses. Accordingly, the Interrogatory is improper as it requires that Plaintiff provide the equivalent of a narrative account of its case, as well as a legal conclusion. See, e.g., Rainey for Estate of Rainey v. Anderson, No. 2:17cv444, 2018 WL 3636596, at *2 (E.D. Va. Apr. 11, 2018).

**RESPONSE**: Subject to and without waiving the foregoing objections, Infinitive's conduct caused Plaintiff the loss of a pipeline of significant business, as well as the costs of this litigation. More specifically, Plaintiff is entitled to all statutory, common law, and contractual damages as a result of Infinitive's malfeasance, including without limitation: treble damages sustained by Plaintiff, including lost profits and attorneys' fees and costs, in connection with Infinitive's violation of VA Code Ann § 18.2-500; compensatory damages, including lost profits, and punitive damages in connection with Infinitive's tortious interference with Plaintiff's contractual relations and business expectancies; treble damages, attorneys' fees and costs in connection with Infinitive's aiding and abetting Defendant Sheridan's breach of his fiduciary duty to Plaintiff; actual loss caused by the misappropriation, unjust enrichment, exemplary damages in an amount up to two (2) times the amount of the damages

16

awarded, forensic fees/costs, and exemplary damages and attorneys' fees for Infinitive's violation of the Defend Trade Secrets Act; and actual loss caused by the misappropriation, unjust enrichment, punitive damages up to two (2) times the amount of the damages awarded, or $350,000, whichever is less, attorneys' fees and costs, forensic fees/costs for Infinitive's violation of the Virginia Uniform Trade Secrets Act. In further response, Plaintiff is entitled to the following categories of damages: (1) lost profits; (2) investment into the pipeline of business with which Infinitive interfered; (3) attorneys' fees and costs, including consultation with economic damages expert; (4) fees related to the forensic examination of relevant devices and information.

Plaintiff estimates its total damages to range from $18.3 million to $37.1 million, based on information known to date, which total is comprised of the following approximate amounts (subject to the anticipated analysis to be provided by Plaintiff's economic expert, which will be disclosed pursuant to applicable court rules and any applicable court order):

- Lost profits in the amount of $16.3 to $35.1 million (before tripling as provided under applicable remedies) relating to Projects A, B, C, K, L, N, T, and Companies F and O as well as the remaining projects in 11:59's $7 million initial stage Databricks pipeline;

- Investment into its business pipeline in the amount of $1.5 million;

- Forensic analysis fees in the amount of $65,537; and

- Attorneys' fees and costs, including consultation with economic damages expert, of $443,683.

Plaintiff is also entitled to additional categories of damages that cannot be quantified at this stage in the litigation, which include without limitation: injuries to Plaintiff's reputation, trade, business or profession, punitive damages which may be awarded by a jury, unjust enrichment, reasonable royalties for unauthorized use or disclosure of 11:59's trade secrets and all other equitable remedies.

In further response, Plaintiff refers to the documents contained within Plaintiff's document production Bates-stamped PLAINTIFF_000830-PLAINTIFF_000837; 000467 -_000472, 000547, 001440-001441, 001444-001445 and EPIQ-Plaintiff_000879. Plaintiff reserves the right to supplement its Response to this Interrogatory as discovery progresses and will provide responsive documents to this Interrogatory on a rolling basis.

**INTERROGATORY NO. 9:**

Describe in detail your claim for attorneys' fees against Infinitive, including, but not limited to, the number of hours billed to the claims asserted against Infinitive for each attorney, paralegal, law clerk or other timekeeper, the number of additional hours you anticipate each timekeeper billing to those claims prior to final judgment; the rate or rates charged for each time

keeper in connection with the claim; and all facts that support your contention that the rates or time spent are reasonable.

**OBJECTION:  Plaintiff objects to this Interrogatory on the grounds that counsel's hours billed and rates are privileged and constitute attorney work product.  Plaintiff further objects on the grounds that this Interrogatory seeks proprietary information, as well as a legal theory and documents that may not be within Plaintiff's custody or control regarding the reasonableness of the time spent in this litigation.  Plaintiff further objects on the basis that there are multiple Defendants in this litigation and identifying the specific number of hours "billed to the claims asserted against Infinitive" only is impracticable at this stage in time.**

**RESPONSE:  Subject to and without waiving the foregoing objections, Plaintiff responds as follows:  Plaintiff's counsel's full hourly fees range from $550-$750 for partners; $375-$745 for counsel; $360-$730 for of-counsel; $290-$330 for associates; and $175.00 for paralegals. Plaintiff's local counsel's hourly fees range from $650 for partners, of-counsel, and contract attorneys; $450.00 for associates and contract attorneys with comparable experience; and $175.00 for paralegals and contract personnel. In further response, Plaintiff refers Infinitive to its Response to Interrogatory No. 8.  Plaintiff also refers to the documents contained within Plaintiff's document production Bates-stamped PLAINTIFF_000830.**

**INTERROGATORY NO. 10:**

Describe in detail your relationship with each of the clients on the 11:59 Client List, including:  the point of contact for the client, the date you first established a relationship with the client, the amount of revenue you earned from the client prior to Mr. Sheridan's hire at 11:59, the amount of revenue you earned during Mr. Sheridan's employment, the amount of revenue you have earned since his resignation, and a detailed description of the services Mr. Sheridan performed for the client on behalf of 11:59.

**OBJECTION:  Plaintiff objects to the Interrogatory on the grounds that it is overbroad and unduly burdensome as it is not reasonably limited in time and scope.  Plaintiff further objects on the grounds that the Interrogatory seeks information that is proprietary and highly confidential regarding Plaintiff's clients, accounting data, and services which is not relevant to the claims or defenses in this action.**

**RESPONSE:  Subject to and without waiving the foregoing objections, Plaintiff stands on its objections as the 11:59 Client List is comprised of entities for which Sheridan provided substantive work (serviced) while he was an 11:59 employee.**

**INTERROGATORY NO. 11:**

Describe in detail your "pipeline" with regard to Databricks work as of (i) March 27, 2023; (ii) September 6, 2024, and (iii) today, including a description of every project in the pipeline, identification of the client, the amount of projected revenue associated with that project, and the basis for that projection.

**OBJECTION:  Plaintiff objects to the Interrogatory on the grounds that it seeks information that is proprietary and highly confidential regarding Plaintiff's clients, partners, and accounting data.**

**RESPONSE:  Subject to and without waiving the foregoing objections, Databricks and 11:59 became partners on or about August 15, 2022 and had since grown the pipeline of projects they were working on together to upwards of $7 million.  11:59 hired Defendant Sheridan to lead and oversee complex data projects carried out by 11:59's development team, largely relating to projects involving Databricks.  Mr. Sheridan's role was focused significantly on growing 11:59's data consulting practice projects with Databricks.**

**Plaintiff further provides information regarding the following projects from the 11:59 Databricks pipeline:**

- **Project A:  The initial project for this client involved building upon a license plate reader data pipeline to identify patterns, trends and anomalies by developing a functional minimally viable product.  The initial phase was estimated to generate $408,275 of revenue.  The second planned phase of this project would have generated approximately $1.25 million.  Subsequent maintenance and operations ("M & O") for this project was expected to generate approximately $750,000/year for five or more years.**
- **Project B:  This project involved an industrial datalake implementation, expected to generate $200k in phase one, $850k in phase 2, and $350k per year in ongoing service.**
- **Project C:**
  - **DHHS: The initial phase of this project, which involved a datalake implementation for health services data processing, was expected to generated $225,000 in revenue.  $774,999 was expected in the second phase.  $2.19 million was expected in the third phase.  M & O was anticipated to generate $1 million/year for a minimum 3-year guarantee.  This was a sole source opportunity for phases 1 and 2 with a strong preference for existing partnerships on the third phase.**
  - **DAC: The initial phase of this project (a Databricks funded prototype), which involved a datalake implementation to modernize and streamline department data, , was expected to generate $250,000.  During the implementation phase, $2 million was anticipated.  M & O would have generated $450,000/year.**

- **Project L**: This project involved an implementation of a large datalake to modernize the entity's data storage and utilization.  The project was expected to generate approximately $1.75 million with an additional $1 million/year in M&O with an initial 2 year contract and potential extension.
- **Company O**:  This project involved creating a datalake implementation for patient data matching and storage.  It was expected to generate $1.1 million in initial phase revenue, $1.6 million/year for three years in phase 2 revenue and $500k/year in M & O during years 4 through 7 of the project.
- **Project T**:  This project involved a datalake implementation for patient and payor healthcare data.  The project was expected to generate $400k in initial phase revenue, $1.6 million in implementation phase revenue, and $350k/year in M & O work.

**Plaintiff will supplement its Response to this Interrogatory as discovery progresses and will provide responsive documents to this Interrogatory on a rolling basis.**

**INTERROGATORY NO. 12:**

Describe in detail every project you have completed or proposed for (i) Common App; (ii) National Student Clearinghouse, and (iii) Navy Mutual Aid Association, including the identification of the project, the dates the project was proposed the dates the project was completed, the revenue earned, the identification of the 11:59 employees who worked on the project and a description of their respective roles on the project.

**OBJECTION:  Plaintiff objects to the Interrogatory on the grounds that it seeks information that is proprietary and highly confidential regarding Plaintiff, its clients, and accounting data. Plaintiff further objects to the Interrogatory on the grounds that it is overbroad, unduly burdensome as it is not reasonably limited in time and scope.**

**RESPONSE:  Subject to and without waiving the foregoing objections, Plaintiff refers to the documents contained within Plaintiff's document production Bates-stamped PLAINTIFF_001444-PLAINTIFF_001445.  Plaintiff reserves the right to supplement its Response to this Interrogatory as discovery progresses and will provide responsive documents to this Interrogatory on a rolling basis.**

**INTERROGATORY NO. 13:**

Describe all communications between you and any Former Infinitive Employees, which occurred before that Former Infinitive Employee began working for 11:59.

**OBJECTION:  Plaintiff objects to the Interrogatory on the grounds that it is overbroad, unduly burdensome as it is not reasonably limited in time and scope.  Plaintiff further objects**

on the grounds that the request is not relevant to any party's claim or defense and it is not proportional to the needs of the case.  See Fed. R. Civ. P. 26(b)(1).

**RESPONSE:**  Subject to and without waiving the foregoing objections, Plaintiff will conduct a custodial search for relevant communications between 11:59 and Former Infinitive Employees from September 30, 2023 to March 30, 2024 and will produce responsive communications subject to relevance to the allegations in the Complaint.  Plaintiff will identify whether certain communications involve personal matters, in which case, such communications will not be produced.

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, on the 13th day of June, 2025, I caused Plaintiff's Amended Objections and Responses to Defendant Infinitive Inc.'s First Set of Interrogatories to be served upon Defendants by electronic mail as follows:

Micah E. Ticatch, Esq.
John W.H. Harding, Esq.
ISLERDARE, P.C.
1945 Old Gallows Road. Suite 650
Vienna, Virginia 22182
mticatch@islerdare.com
jharding@islerdare.com
*Attorneys for Defendant Infinitive, Inc.*

John M. Remy, Esq.
Eric P. Burns, Esq.
Alyssa B. Testo, Esq.
JACKSON LEWIS, P.C.
10701 Parkridge Blvd., Suite 300
Reston, VA  20191
John.Remy@jacksonlewis.com
Eric.Burns@jacksonlewis.com
Alyssa.Testo@jacksonlewis.com
*Attorneys for Defendant Joseph Bradley Sheridan*

Daniel McCoy, Esq.
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
dmccoy@fenwick.com
*Attorneys for Defendant Databricks Inc.*

Reanne Swafford-Harris, Esq.
FENWICK & WEST LLP
730 Arizona Avenue, 1st Floor
Santa Monica, CA  90401
rswaffordharris@fenwick.com
*Attorneys for Defendant Databricks Inc.*

Robert R. Vieth, Esq.
HIRSCHLER FLEISCHER, PC
1676 International Dr., Suite 1350
Tysons Corner, Virginia 22102
rvieth@hirschlerlaw.com
*Attorneys for Defendant Databricks Inc.*

*Brenda Widman*
Brenda Widman, Paralegal

Dated:  June 13, 2025